**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

AMIDE BEVERAGE COMPANY, LLC,

*Plaintiff*,

v.

AMAZON.COM, INC., WOOT.COM LLC, WALMART, INC., SAM'S WEST, INC., ALBERTSONS, LLC, THE KROGER COMPANY, TARGET CORPORATION, PEPSICO, INC., WALGREEN COMPANY, CVS PHARMACY, INC., 7-ELEVEN, INC., CIRCLE K STORES INC., COSTCO WHOLESALE CORPORATION, AND H-E-B, LP,

*Defendants*.

Case No. 4:24-cv-1022-SDJ

**Jury Trial Demanded**

# DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF

## TABLE OF CONTENTS


**Page**

I. INTRODUCTION ..................... 1

II. LEGAL STANDARD ..................... 2

III. LEVEL OF SKILL IN THE ART ..................... 3

IV. ’077 PATENT OVERVIEW ..................... 3

V. ARGUMENT ..................... 4

A. “Amides of Creatine having a general formula: $NH{=}C(NH_2)\text{-}N(CH_3)\text{-}CH_2\text{-}CO\text{-}NH\text{-}R*X$” (Claims 1, 3) ..................... 4

1. The Asterisk in the Claimed General Formula Denotes a Center Dot ..................... 5

2. The Claimed General Formula’s Use of the Center Dot Indicates the Presence of an “Addition Compound.” ..................... 6

B. “having a general formula” (Claims 1, 3) ..................... 10

1. The Intrinsic Record Supports a Closed Construction of “having a general formula.” ..................... 11

2. Defendants’ Proposed Construction Does Not Exclude the Dependent Claims, as Amide Suggests. ..................... 13

C. “X is low-molecular-weight organic or mineral acid or water” (Claims 1, 3) ..................... 14

1. The Intrinsic Record Supports Defendants’ Proposed Construction. ...... 15

2. Defendants’ Proposed Construction Comports with Customary Understanding in the Art. ..................... 18

3. Another Federal Court Construed the ’077 Patent and Reached the Same Construction For the Term “X.” ..................... 19

D. “compound possessing neuroprotective activity” / “as a remedy possessing a neuroprotective activity” (Claim 3) ..................... 21

E. “consisting of” (Claim 3) ..................... 25

F. “anhydrous” (Claim 4) ..................... 28

VI. CONCLUSION ..................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aylus Networks, Inc. v. Apple Inc.*,
856 F.3d 1353 (Fed. Cir. 2017)....................................................................................... 17

*Azurity Pharms., Inc. v. Alkem Lab'ys Ltd.*,
133 F.4th 1359 (Fed. Cir. 2025) ...................................................................................... 25

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*,
713 F.3d 1090 (Fed. Cir. 2013)......................................................................................... 2

*Board of Regents of University of Texas System v. A123 Systems, Inc.,*
2011 WL 1135115 (N.D. Tex. Mar. 29, 2011) ................................................................ 20

*Bridgelux Inc. v. Cree, Inc.*,
Case No. 9:06-cv-240, 2008 WL 2325623 (E.D. Tex. June 3, 2008)................................ 12

*CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co. KG*,
224 F.3d 1308 (Fed. Cir. 2000)....................................................................................... 22

*Chef Am., Inc., v. Lamb-Weston, Inc.*,
358 F.3d 1371 (Fed. Cir. 2004)..................................................................................... 2, 7

*CIAS, Inc. v. All. Gaming Corp.,*
504 F.3d 1356 (Fed. Cir. 2007)....................................................................................... 26

*Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l Inc.*,
246 F.3d 1336 (Fed. Cir. 2001)................................................................................. 11, 13

*Cypress Lake Software, Inc. v. Samsung Elecs. Am. Inc.*,
382 F. Supp. 3d 586 (E.D. Tex. May 10, 2019)................................................................ 21

*Dynapass IP Holdings LLC v. Bank of Am. Corp.*,
No. 2025-1222, 2026 WL 1689580 (Fed. Cir. June 11, 2026) ........................................... 27

*Edwards Lifesciences LLC v. Cook Inc.*,
582 F.3d 1322 (Fed. Cir. 2009)....................................................................................... 15

*Enzo Biochem Inc. v. Applera Corp.*,
780 F.3d 1149 (Fed. Cir. 2015)................................................................................. 10, 13

*Eon Corp. IP Holdings v. Silver Spring Networks*,
815 F.3d 1314 (Fed. Cir. 2016)......................................................................................... 2

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
527 F.3d 1379 (Fed. Cir. 2008)....................................................................................... 22

*Intell. Ventures I LLC v. T-Mobile USA, Inc.*,
902 F.3d 1372 (Fed. Cir. 2018)....................................................................................... 21

*Interval Licensing LLC v. AOL, Inc.*,
766 F.3d 1364 (Fed. Cir. 2014)....................................................................................... 21

*Lampi Corp. v. Am. Power Prods., Inc.*,
228 F.3d 1365 (Fed. Cir. 2000)................................................................................. 11, 13

*Light Transformation Techs. LLC v. Lighting Sci. Grp. Corp.*,
No. 2:12-cv-826MHS-RSP, 2014 WL 3402125 (E.D. Tex. July 11, 2014) ............................ 3

**TABLE OF AUTHORITIES
(continued)**

**Page(s)**


*Luminara Worldwide, LLC v. Liown Elecs. Co.*,
814 F.3d 1343 (Fed. Cir. 2016)....7

*Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*,
831 F.3d 1350 (Fed. Cir. 2016)....25, 26

*Nautilus Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014)....3

*Northpeak Wireless, LLC v. 3COM Corp.*,
674 F. App'x 982 (Fed. Cir. 2016)....28

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008)....1, 2

*Pacing Techs., LLC v. Garmin Int'l, Inc.*,
778 F.3d 1021 (Fed. Cir. 2015)....12

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)....2, 3, 28

*Pieczenik v. Dyax Corp.*,
76 F. App'x 293 (Fed. Cir. 2003)....13

*Poly-Am., L.P. v. API Indus., Inc.*,
839 F.3d 1131 (Fed. Cir. 2016)....18

*Purdue Pharma L.P. v. Faulding Inc.*,
230 F.3d 1320 (Fed. Cir. 2000)....10

*Quantum Corp. v. Rodime, PLC*,
65 F.3d 1577 (Fed. Cir. 1995)....10

*SkinMedica, Inc. v. Histogen Inc.*,
727 F.3d 1187 (Fed. Cir. 2013)....8

*St. Clair Intell. Prop. Consultants, Inc. v. Canon Inc.*,
412 F. App'x 270 (Fed. Cir. 2011)....28

*Starhome GmbH v. AT&T Mobility LLC*,
743 F.3d 849 (Fed. Cir. 2014)....19

*TecSec, Inc. v. Int'l Bus. Machines Corp.*,
731 F.3d 1336 (Fed. Cir. 2013)....15

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
789 F.3d 1335 (Fed. Cir. 2015)....21

*ThermoLife Int'l, LLC et al. v. Vital Pharms., Inc.*,
No. 14-cv-61864-WJZ (S.D. Fla. Sep. 21, 2015)....5, 6

*TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*,
529 F.3d 1364 (Fed. Cir. 2008)....27

*Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*,
212 F.3d 1377 (Fed. Cir. 2000)....27

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Versata Software, Inc. v. Sun Microsystems, Inc.*,
No. CIV.A. 2:06-CV-358, 2008 WL 3914098 (E.D. Tex. Aug. 19, 2008) ............................ 26

*Virnetx, Inc. v. Cisco Sys., Inc.*,
767 F.3d 1308 (Fed. Cir. 2014)........................................................................................... 18

*Werteks Closed Joint Stock Company et al. v. Vitamin Shoppe, Inc. et al.*,
No. 16-cv-60693-UU (S.D. Fla. Jan. 12, 2017)................................................................ 4, 20

**Statutes**

35 U.S.C. § 305.................................................................................................................. 10

Pre-AIA 35 U.S.C. § 112 ...................................................................................................... 30

**Other Authorities**

*Brady, Russell, Holum, Chemistry Matter and Its Changes 3E*, Wiley (2000) ...................... 19, 30

Connelly, et al., *Nomenclature of Inorganic Chemistry IUPAC Recommendations 2005*,
International Union of Pure and Applied Chemistry (2005) ............................................. 6, 19

Glenn D. Considine, Van Nostrand's Encyclopedia of Chemistry 5th ed. (2005) ....................... 30

Whitten et al., Chemistry 8th Edition, Brooks Cole, 77 (2007)................................................... 30

**TABLE OF EXHIBITS**

| Ex. Number | Document |
|---|---|
| Plaintiff's Exhibits Filed With Plaintiff's Opening Brief (Dkt. 277) | |
| 1 | U.S. Patent No. 8,350,077 |
| 2 | Declaration of Dr. Jonathan L. Sessler |
| 3 | *Magnesium for Acute Stroke (Intravenous Magnesium Efficacy in Stroke Trial): Randomised Controlled Trial*, The Lancet 363, 439-445 (Feb. 7, 2004) |
| Defendants' Additional Exhibits Filed With This Brief | |
| A | Declaration of Dr. Marvin J. Rudolph in Support of Defendants' Preliminary Claim Constructions for U.S. Patent No. 8,350,077, dated July 14, 2025 |
| B | PCT/RU2008/000793 (PEPSI_0005932) |
| C | Connelly, et al., *Nomenclature of Inorganic Chemistry IUPAC Recommendations 2005*, International Union of Pure and Applied Chemistry at 28 (PEPSI_0005918) |
| D | Amide Beverage Company LLC's Preliminary Infringement Contentions Chart for Defendant PepsiCo, Inc. (Apr. 21, 2025) |
| E | Prosecution History of U.S. Patent No. 8,350,077 (PEPSI_0001182) |
| F | *Ex Parte* Reexamination of U.S. Patent No. 8,350,077, Reexamination No. 90/013,902 (PEPSI_0000298) |
| G | Brady, Russell, Holum, Chemistry Matter and Its Changes 3E, Wiley, 51 (2000) (PEPSI_0005991) |
| H | Whitten et al., Chemistry 8th Edition, Brooks Cole, 77 (2007) (PEPSI_0005979) |
| I | Florence and Atwood, Physicochemical Principles of Pharmacy Fourth Edition, Pharmaceutical Press, 19 (2006) (PEPSI_0005909) |
| J | Oxford Dictionary of Chemistry, Oxford University Press, 37 (2016) (AMIDE_COMMON002833) |
| K | Glenn D. Considine, Van Nostrand's Encyclopedia of Chemistry 5th ed., 101 (2005) (AMIDE_COMMON003281) |

# I. INTRODUCTION

In this case, Plaintiff Amide Beverage Company, LLC ("Amide") asserts U.S. Patent No. 8,350,077 (the "'077 Patent"). The '077 Patent is chemically complex—claiming inventions by reference to chemical formulas, among other things. This is a classic case that requires express constructions to assist the jury in its application of technical, specialized terms to the case—not plain meanings of chemically complex terms that are otherwise incomprehensible.

There are six disputed claim terms. Defendants'[1] proposed constructions reflect the meaning a person of ordinary skill in the art ("POSITA") would have ascribed to the disputed terms. Defendants' constructions prioritize the intrinsic evidence and, where appropriate, confirmatory extrinsic evidence. These constructions are further corroborated by the testimony of Dr. Marvin Rudolph, a POSITA. Ex. A (Rudolph Decl.) at ¶¶ 36-38. By contrast, Amide proposes a "plain meaning" construction for every term, attempting to preserve its infringement theories but failing to assist the jury in applying the disputed claim language. Further, Amide's positions about the "plain meaning" of each disputed term contradict intrinsic and extrinsic evidence and do not reflect how a POSITA would have interpreted the terms in the context of the '077 Patent. Moreover, Amide's proposed constructions deviate from—while Defendants' proposed constructions align with—a previous federal court's construction of one of the same terms.

Where, as here, there are "fundamental dispute[s] regarding the scope of [the] claim term[s], it is the court's duty to resolve [them]." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360-63 (Fed. Cir. 2008); *see id.* ("[T]he 'ordinary' meaning of a term does not resolve the parties' dispute, and claim construction requires the court to determine what claim

[1] "Defendants" refers to Amazon.com, Inc., Woot.Com LLC, Walmart, Inc., Sam's West, Inc., Albertsons, LLC, The Kroger Co., Target Corporation, PepsiCo, Inc., Walgreen Company, CVS Pharmacy, Inc., 7-Eleven, Inc., Circle K Stores Inc., Costco Wholesale Corporation, and H-E-B, LP.

scope is appropriate in the context of the patents-in-suit."). Because Amide's proposed "plain meaning" constructions leave the parties' claim-scope disputes unanswered, Defendants' express constructions, which define the disputed terms, should be adopted. *See Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1319 (Fed. Cir. 2016) ("By determining only that the terms should be given their plain and ordinary meaning, the court left this question of claim scope unanswered, leaving it for the jury to decide. This was legal error.").

## II. LEGAL STANDARD

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citation omitted). A POSITA "is deemed to read the claim term not only in the context of the particular claim . . . but in the context of the entire patent, including the specification." *Id.* at 1313. "When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it." *O2 Micro*, 521 F.3d at 1362. Courts, however, "may not redraft claims, whether to make them operable or sustain their validity" and should "construe the claim[s] as written, not as the patentees wish they had written it." *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004).

A "term's ordinary meaning must be considered in the context of all the intrinsic evidence, including the claims, specification, and prosecution history." *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1094 (Fed. Cir. 2013). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (citation omitted). Extrinsic evidence can also be useful, and courts have "especially noted the help that technical dictionaries may provide . . . to better understand the underlying technology and the way in which one of skill in the art might use the claim terms." *Id.* at 1317-18 (citation omitted). Expert testimony may also aid a court in

understanding the underlying technology. *See id.*

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). It is insufficient that "a court can ascribe some meaning to a patent's claim." *Id.* at 911 (emphasis original). Where there are multiple potential constructions and the intrinsic record does not provide a reasonable basis to decide between the constructions, the claim is indefinite. *See Light Transformation Techs. LLC v. Lighting Sci. Grp. Corp.*, No. 2:12-cv-826MHS-RSP, 2014 WL 3402125, at *8 (E.D. Tex. July 11, 2014).

## III. LEVEL OF SKILL IN THE ART

The art of the '077 Patent is amino acid and peptide chemistry, and a POSITA at the time of the filing of the patent application (December 24, 2008) would have a degree in chemistry and at least two additional years of laboratory experience. Ex. A at ¶¶ 36-38.

## IV. '077 PATENT OVERVIEW

The '077 Patent was filed December 24, 2008 and issued January 8, 2013. It is titled "Amides of Creatine, Method of Their Preparation, and Remedy Possessing a Neuroprotective Activity," and concerns chemically synthesized creatine derivatives. It describes and claims creatine amides having the general formula $NH{=}C(NH_2)–N(CH_3)–CH_2–CO–NH–R{*}X$, in which "R" is a specified L-amino-acid residue or derivative and "X" is a low-molecular-weight organic or mineral acid, or water. The specification states that these compounds may be used as neuroprotective agents, including for the prevention of ischemic brain injury. The specification includes eight working examples of syntheses of creatine amides, all of which result in crystalline creatine compounds. The patent originally issued with two independent claims (Claims 1 and 3) directed to creatine compounds and one dependent claim (Claim 2) directed to a method of

preparing creatine amides by reacting amides of sarcosine with amino acids or their derivatives. Over four years after the original 2013 issuance, on March 3, 2017, patentee requested *ex parte* reexamination ("EPR") and, during that process, added new claims 4-7, all dependent on Claim 1.

The claims of the '077 Patent have been construed previously by a federal court. Defendants' proposed construction aligns with that previous construction. Amide's differs. The original owner of the '077 Patent asserted it in *Werteks Closed Joint Stock Company v. Vitamin Shoppe, Inc.*, No. 16-cv-60693-UU (S.D. Fla. 2016) ("*Werteks* Lawsuit").[2] Judge Ursula Ungaro issued a *Markman* order in that case on January 12, 2017, construing the term "X is low-molecular-weight organic or mineral acid or water" in the same way Defendants seek here. *Werteks* Lawsuit, Dkt. No. 74, at 23-24 ("Prior '077 Claim Construction Order").

## V. <u>ARGUMENT</u>

### A. "Amides of Creatine having a general formula: NH=C(NH$_2$)-N(CH$_3$)-CH$_2$-CO-NH-R*X" (Claims 1, 3)

| Plaintiff's Proposal | Defendants' Proposal |
|---|---|
| Plain meaning | "Amides of Creatine having a general formula: NH=C(NH$_2$)-N(CH$_3$)-CH$_2$-CO-NH-R*X, wherein * represents a center dot that separates components of an addition compound, in this case NH=C(NH$_2$)-N(CH$_3$)-CH$_2$-CO-NH-R and X" |

The parties' primary dispute is over the plain meaning of the asterisk in the claimed formula. The issue is whether "Amides of Creatine having a general formula: NH=C(NH$_2$)-N(CH$_3$)-CH$_2$-CO-NH-R*X" denotes a compound joining the stated groups of atoms in the formula as an addition compound, as Defendants' construction clarifies, or not, as Amide suggests.

[2] At that time, the '077 Patent was licensed to ThermoLife International, LLC ("ThermoLife"). The '077 Patent was sold in June 2020 to ThermoLife, who subsequently assigned it to Amide on November 6, 2024, just weeks before Amide filed the present suit.

### 1. The Asterisk in the Claimed General Formula Denotes a Center Dot.

A POSITA would have understood the asterisk in Claim 1 to be equivalent to a center dot, a notation commonly used in both organic and inorganic chemical formulas. Ex. A at ¶ 44. Although a dot "●" is the more common center dot symbol, other symbols, such as an asterisk "*", are also used to denote a center dot. The choice between using "●" or "*" is largely one of convenience in a typewritten document like the '077 Patent ("*" being more easily typed as Shift-8 on a standard word processing keyboard), and a POSITA would have understood the two to be interchangeable without altering the chemical formula's meaning. Ex. A at ¶ 44. Dr. Richard Chamberlin, an expert for the '077 Patent's owner in the previous *Werteks* Lawsuit, agreed that "an asterisk such as in claim 1 is the equivalent of a center dot in a chemical equation." *Werteks* Lawsuit, Dkt. No. 46-2 at 2; *see* Ex. A at ¶ 46. Summary judgment briefing from another prior lawsuit asserting the '077 Patent reflects that even the then-owner of the patent "fully agree[d] . . . [t]he asterisk in front of the X is the equivalent of a center dot in the equation." *ThermoLife Int'l, LLC et al. v. Vital Pharms., Inc.*, No. 14-cv-61864-WJZ, Dkt. No. 72-1 (S.D. Fla. Sep. 21, 2015).

The intrinsic evidence uses "●" or "*" interchangeably as well. The '077 claims priority to and incorporates PCT Patent Application PCT/RU2008/000793, which itself uses "●" or "*" interchangeably for the same general formula. Dkt. No. 277-1 ('077 Patent) at 1:8-11; Ex. B (PEPSI_0005932) (PCT/RU2008/000793). The original Russian text of the PCT recites the general formula using an asterisk: $NH{=}C(NH_2){-}N(CH_3){-}CH_2{-}CO{-}NH{-}R{*}X$. Ex. B at -5932 (Abstract). Meanwhile, the English translation of the published PCT uses a "●" symbol instead of the asterisk to describe the same formula. *Id.*; *see* Ex. A at ¶ 45. And as discussed in Section V.A.2., *infra*, the '077 Patent specification repeatedly uses "*" in chemical formulae in the same way "●" would be used to describe compounds synthesized as solids.

Amide does not argue that the '077 Patent specification provides a special definition for

"*". *See* Amide Br. at 7-9. In fact, Amide's non-construction does not specify what type of bonds or interactions "*" signifies, leaving it open to any type of interaction between atoms or molecules that will later suit Amide's infringement arguments.[3] The "*"—a technical term not understood by a lay reader—should not be left unconstrued when the parties dispute its scope.

### 2. The Claimed General Formula's Use of the Center Dot Indicates the Presence of an "Addition Compound."

The claims' use of a "*" in the chemical formula is significant to POSITAs because it indicates an "addition compound" joining "$NH{=}C(NH_2)$-$N(CH_3)$-$CH_2$-CO-NH-R" and "X". *See* Ex. A at ¶¶ 48, 49, 60; Ex. C (PEPSI_0005918) (Nomenclature of Inorganic Chemistry IUPAC Recommendations 2005) at -5925. An addition compound indicated by a center dot is formed when two or more stable molecules are bonded together to create a single, larger molecule. Ex. A at ¶ 49. Dr. Chamberlin, an expert retained by the '077 Patent's prior owner, agreed, testifying that "[w]hen a chemical structure is followed by a center dot, this usually indicates an additional element or molecule that is bonded to the structure." *Werteks* Lawsuit, Dkt. No. 46-2 at 2; *see also ThermoLife*, No. 14-cv-61864-WJZ, Dkt. 72-1 at 7-8 (noting patent owner's same position in another case); Ex. A at ¶ 59.

Amide incorrectly argues that Defendants' construction "improperly imports an 'addition compound' limitation from inorganic chemistry." Amide Br. at 7. But the patentee chose that notation to claim an organic compound and provided no different meaning for it. Having selected this notation with an established meaning, Amide cannot now disclaim that meaning because it proves inconvenient in litigation. Had the patentee wished to denote a different interaction

---

[3] Amide's motivation is apparent from its infringement contentions, which attempt to read the claimed formula $NH{=}C(NH_2)$-$N(CH_3)$-$CH_2$-CO-NH-R*X on an aqueous solution that contains a **+**$\mathbf{N}\mathbf{H}_{\underline{\mathbf{2}}}$$=C(NH_2)$-$N(CH_3)$-$CH_2$-CO-NH-R positive ion and a citrate negative ion. Ex. D, (Infringement Contentions Chart) (reading Claim 1 on CLL "in its protonated form" and X "in its anionic (aka deprotonated [negative ion]) form").

between the amide of creatine and "X", it could have used a different notation. Indeed, the remainder of the very same general formula uses solid lines to denote bonds between atoms instead of using "*" or "●". Thus, the patent deliberately chose to indicate the interaction between "X" and the remainder of the formula with a specific and different notation. *See Chef Am.,* 358 F.3d at 1374 (Fed. Cir. 2004) (courts "must construe the claims based on the patentee's version of the claim as he himself drafted it"). Even in the context of an organic compound, a POSITA would have understood "*" or "●" as indicating an addition compound. Indeed, as noted above, the expert of the '077 Patent's prior owner applied that notation to the '077 Patent's organic compounds, contrary to the distinction that Amide now argues. *See Werteks* Lawsuit, Dkt. No. 46-2 at 2. Although center dots are used less frequently in organic compounds, when they are used, a POSITA would have expected the nomenclature rules for center dots for inorganic compounds to apply to organic compounds. Ex. A at ¶¶ 57-58 (names for adducts are not assigned in IUPAC documents governing organic chemistry, but are assigned in documents on inorganic compounds).

A POSITA reviewing the '077 Patent specification as a whole would have understood the "*" or "●" to require an addition compound because the patent repeatedly and consistently sets forth solid addition compounds. The "Object and Brief Description of the Invention" section of the '077 Patent states, "[a] primary object of the present invention is the obtaining of novel Creatine derivatives ***produced through chemical synthesis***…" Dkt. No. 277-1 ('077 Patent) at 3:45-51 (emphasis added). The "present invention" language in this section does not merely refer to an embodiment but rather limits the scope of the invention. *See Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343, 1353 (Fed. Cir. 2016). Every example of synthesizing the claimed compounds in the specification describes forming a solid final product without the loss of any atoms between the creatine amide and X—the hallmark of an addition compound. *See* Ex. A at ¶¶ 49, 50, 52. Example 1 discloses the synthesis of Creatinyl-γ-Aminobutyric Acid Ethyl Ester

Acetate, with the formula $C_{10}H_{20}N_4O_3*CH_3COOH$. Dkt. 277-1 at 5:30-47. The resulting product is an adduct in which all atoms from both Creatinyl-γ-Aminobutyric Acid Ethyl Ester (the amide of creatine) and acetate (a low-molecular-weight organic acid, "$CH_3COOH$") remain present. *Id.*; *see* Ex. A at ¶ 52. Examples 2 through 8 follow the same pattern: the chemical name or formula for the final product is stated, and that product is characterized as a solid recovered after evaporation of solvent, with a mass and a percent yield calculated for that solid. Dkt. 277-1 at 5:49-6:6, 6:8-11, 6:17-18, 6:20-23, 6:41-44, 6:46-48, 7:35-43, 7:45-47, 8:19-26, 8:28-31, 10:7-16, 10:18-20, 11:10-16; *see* Ex. A at ¶¶ 53-54. Therefore, the '077 Patent specification's repeated and consistent usage informs a POSITA that the claimed compounds having the claimed formula are solid addition compounds, not merely any substance in which the components of that formula appear. *See SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1196, 1203 (Fed. Cir. 2013).

Defendants' construction does not "improperly exclude the non-covalent bonds" between "R" and "X," as Amide suggests. *See* Amide Br. at 8. Defendants' expert opined that addition compounds can be formed via covalent or non-covalent bonding. Ex. A at ¶ 50 (addition compounds "can be formed through various types of bonding, including covalent, coordinate, and van der Waals forces"). Defendants' construction only clarifies that the center dot requires an addition compound, i.e., that the "$NH{=}C(NH_2)\text{-}N(CH_3)\text{-}CH_2\text{-}CO\text{-}NH\text{-}R$" and "X" cannot exist as two separate components. *Id.* at ¶¶ 50, 54.

Amide leans heavily on dependent Claim 5—"wherein the compound [of Claim 1] is in an aqueous solution"—to argue that the formula of Claim 1 must read on an ionic bond between the R and X when the claimed compound is dissolved in water, and that Defendants' construction requiring an addition compound therefore excludes a claimed embodiment. Amide Br. at 8-9.[4]

[4] This argument is also tailor-made to support Amide's infringement arguments. *See* note 3, *supra*.

Amide's reliance on Claim 5 is flawed. Despite asserting that "the specification's description is consistent with claim 5," Amide cites nothing from the specification to support it. *Id.* (citing Dr. Sessler's declaration).[5] Indeed, dependent Claim 5 did not appear in the original claims of the U.S. application, its priority applications, or even the originally-issued version of the '077 Patent. Dkt. 277-1 at 16:35-62; Ex. E (PEPSI_0001182) ('077 Patent Certified File History) at -1477-86 (Notice of Allowance). Claim 5 was added in an EPR concluded five years later during the *Werteks* Lawsuit. Ex. F (PEPSI_0000298) (Reexamination No. 90/013,902) at -1180-81 (Ex Parte Reexamination Certificate). Solely based on this litigation-driven dependent claim added in reexamination, Amide attempts to impermissibly broaden Claim 1 to reach ionic components of a creatine amide dissolved in an aqueous solution. That argument fails both factually and legally.

Factually, the plain language of Claim 5 only states that the claimed compound is "in" an aqueous solution. '077 Patent at cl. 5. It does not state that the claimed compound is dissolved in or formed within an aqueous solution. Placing a solid compound (as claimed) in an aqueous solution does not necessarily mean that solid compound will dissolve; if the claimed solid amides of creatine are added to an aqueous solution in sufficient concentrations, some portion would remain in crystalline form. Ex. A at ¶¶ 54-55. Claim 5 is therefore fully satisfied by the solid addition compound of Claim 1 placed into an aqueous medium and, contrary to Amide's suggestion, Defendants' construction excludes no claimed or disclosed embodiment. The specification confirms the distinction: all of the examples describe formation of a crystalline, i.e.,

---

[5] Even in the portions of the specification Dr. Sessler cites, the claimed product is expressly obtained only after the solvent is evaporated or separated. *See* Dkt. 277-1 at 5:46, 6:9-18, 10:55. Nor does Column 4, lines 19 through 23 of the '077 Patent support Amide's position, as that passage describes a beneficial *property* of amides of creatine—i.e., water solubility—that facilitates use in an organism. Amide Br. at 23 (citing '077 Patent at 4:19-23). Stating that the claimed amides of creatine have a certain chemical property is not the same as equating the claimed formula to an aqueous solution of dissolved amides of creatine.

solid "amide of creatine," which is then added into an aqueous solution in Examples 9 and 10 for further experimentation. '077 Patent at 11:19-41, 12:41-59. No example discloses forming the claimed compound in, or dissolving it in, an aqueous solution. *See* Ex. A at ¶ 54.

Legally, Amide's argument misapplies Federal Circuit precedent regarding dependent claims. Regardless of any embodiments to which Claim 5 is directed, "dependent claims cannot broaden an independent claim from which they depend." *Enzo Biochem Inc. v. Applera Corp.*, 780 F.3d 1149, 1156 (Fed. Cir. 2015). Amide's argument violates this rule: it uses Claim 5 not to confirm independent Claim 1's scope but instead to expand it beyond its plain meaning. That is particularly inappropriate here, where Claim 5 was added much later, during reexamination. *See* 35 U.S.C. § 305 ("No proposed amended or new claim enlarging the scope of a claim of the patent will be permitted in a reexamination proceeding..."); *Quantum Corp. v. Rodime, PLC*, 65 F.3d 1577, 1581-82 (Fed. Cir. 1995) ("Since the amended limitation includes subject matter not covered by the original claims . . . we conclude that [the patentee] expanded the scope of their claims during reexamination in violation of 35 U.S.C. § 305."); *see also Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1326-27 (Fed. Cir. 2000) (holding "the amended claims could not be used to provide" written-description support because they "did not appear in the application as filed").

Accordingly, the "Amides of Creatine having a general formula: $NH{=}C(NH_2)–N(CH_3)–CH_2–CO–NH–R*X$" term denotes an addition compound joining the stated groups.

### B. "having a general formula" (Claims 1, 3)

| Plaintiff's Proposal | Defendants' Proposal |
|---|---|
| Plain meaning | "containing only what is expressly set forth in the recited general formula" |

The parties' dispute is narrow: whether "having a general formula" is (1) as Defendants propose, a closed transitional phrase limiting the claimed creatine amide to "containing only what

is expressly set forth in the recited general formula," or (2) as Amide proposes, an open transition permitting additions to that formula. Amide prefers an open interpretation to expand the universe of substances on which the formula might read.[6] Amide is wrong.

At the outset, Amide argues that Defendants have improperly enlarged the term by including "general formula" in their proposed construction. Amide Br. at 9-10. But "having" does not float free in Claims 1 and 3; it appears only in the phrase "having a general formula." And a transitional phrase can be construed only in relation to the object to which it transitions.

"[H]aving" as used in Claims 1 and 3 is a transitional phrase. Whether "having" should be interpreted as conveying an open or closed meaning depends on the '077 Patent's specification. Even the cases that Amide relies on to frame "having" as presumptively open—absent "clear and unmistakable intent"—actually hold the opposite: the use of "'having,' … does not create a presumption that the body of the claim is open." *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l Inc.*, 246 F.3d 1336, 1348 (Fed. Cir. 2001); *Lampi Corp. v. Am. Power Prods., Inc.*, 228 F.3d 1365, 1376 (Fed. Cir. 2000) ("Transitional phrases … must be interpreted in light of the specification to determine whether open or closed language is intended.") (quoting MPEP § 2111.03 (7th ed. Rev. 2000)). The specification supports Defendants' construction.

**1. The Intrinsic Record Supports a Closed Construction of "having a general formula."**

In contrast to "having" used in Claims 1 and 3, Claim 2 uses the transitional phrase "comprising" to denote an open-ended claim. "Comprising" conveys an open-ended meaning. *Crystal Semiconductor Corp.*, 246 F.3d at 1348. Thus, the '077 patentee knew how to draft an open-ended claim, and its decision not to do so in Claims 1 and 3 shows an intent to limit the

[6] *See* notes 3 and 4, *supra*. To be clear, Defendants do not argue that "having a general formula" limits the compounds *that can be used or combined with* the claimed creatine amides; they argue only that the *claimed creatine amides* are limited to those represented by Claim 1's formula.

claimed amides to those of the recited general formula. *See Bridgelux Inc. v. Cree, Inc.*, Case No. 9:06-cv-240, 2008 WL 2325623, at *12 (E.D. Tex. June 3, 2008) ("[T]hat the inventors used the open term 'comprising' within the same claims means that they intended 'having' to be a closed transitional term."). Furthermore, Claim 3 nests "having a general formula" within a narrower "consisting of" transitional phrase. As discussed below, "consisting of" limits the claim to "containing only what is expressly set forth in the claim." *Infra* Section V.E. Amide's proposed open-ended construction of "having a general formula" improperly seeks to expand Claim 3 beyond what its closed "consisting of" transition allows. Claim 1's reference to the formula as "general" does not suggest that the formula may be modified; it only refers to the formula's recitation of generic "R" and "X" groups that may be chosen from enumerated lists.

The specification likewise supports Defendants' construction because it does not disclose amides of creatine containing components not listed in the general formula of Claims 1 and 3. *See* Ex. A at ¶ 67. The Abstract and description both describe a general formula ($NH=C(NH_2)–N(CH_3)–CH_2–CO–NH–R*X$) where the identities of the amino acid residues ("R") and organic or mineral acid or water ("X") are limited to two closed, enumerated lists. Dkt. No. 277-1 at Abstract, 4:5-18. Examples 1 through 8 likewise describe the synthesis of a discrete, solid compound matching the general formula, where R and X are selected from closed lists of specific amino acid residues and low-molecular-weight organic or mineral acids or water, respectively.[7] Neither the '077 Patent nor Amide's brief clarifies what types of additions or modifications to Claim 1's general formula would or would not fall within the scope of Claim 1 under Amide's interpretation.

[7] Amide points to Example 7, arguing that the described compound "has ***two*** X molecules," and thus includes an additional compound not listed in the general formula. Amide Br. at 13. Defendants disagree. *See infra* Section V.C.1; Ex. A at ¶¶ 74-75. Regardless, courts are not required to construe claim terms to cover every embodiment, especially when "the plain language of a limitation of the claim does not appear to cover that embodiment." *Pacing Techs., LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1026 (Fed. Cir. 2015).

Amide's open interpretation, allowing ***any*** additions or modifications of Claim 1's general formula, encompasses a virtually infinite number of compounds and fails to inform POSITAs about the scope of the alleged invention with reasonable certainty.

Amide misplaces reliance on *Lampi* and *Crystal Semiconductor*. In both cases, "having" referred to inventions "having" physical elements. *See Lampi Corp.*, 228 F.3d at 1369 (reciting a "housing having two separable half-shells" in a fluorescent lamp) (emphasis omitted); *Crystal Semiconductor Corp.*, 246 F.3d at 1347-49 (reciting a "capacitor having" several conductive layers).[8] "[H]aving" in the '077 Patent claims, however, refers to being represented by the recited formula. In those circumstances, "having" indicates a closed meaning. *See Pieczenik v. Dyax Corp.*, 76 F. App'x 293, 296 (Fed. Cir. 2003) (non-precedential) (limiting "a coding region ***having*** a length from about 4 to about 12 nucleotide triplets" to recited length range) (emphasis added).

### 2. Defendants' Proposed Construction Does Not Exclude the Dependent Claims, as Amide Suggests.

Amide's main complaint about Defendants' construction is that it would exclude dependent Claims 5-7. Amide Br. at 11. But again, "dependent claims cannot broaden an independent claim from which they depend." *See Enzo Biochem Inc.*, 780 F.3d at 1156. Amide wrongly argues that the claimed compound cannot be limited to Claim 1's exact formula because that compound may interact with other components, such as an aqueous solution in Claim 5. Amide Br. at 11, 14. But how ***other components*** interact with the claimed compound is irrelevant when determining the claimed compound's chemical formula. Ex. A at ¶¶ 65-66. Instead, when determining whether a compound meets a chemical formula, a POSITA must look at each component of the compound

[8] Furthermore, the specification in *Lampi* described the "housing" element as "***preferably*** *consist[ing] of* two separable half-shells," indicating that it was "merely a preferred embodiment … that the housing be made of ***only*** two half-shells." 228 F.3d at 1376 (emphasis added). The '077 Patent contains no such "preferred embodiment" or "preferably has" language.

because a change in the identity or amount of a single atom would result in a chemical formula that refers to an entirely different compound. *Id.* Amide offers no argument and cites no intrinsic or extrinsic evidence, other than the claimed compound's interactions with other components, to support its open interpretation. *See* Dkt. No. 277-2 at ¶¶ 26-29.

Nor do Claims 6 and 7 recite changing the chemical formula of Claim 1. Rather, those claims simply recite "a composition with an auxiliary component." The specification confirms that the claimed creatine amides "can be administered independently and ***within*** compositions … with auxiliary components," where the auxiliary components are "solvents, excipients, adhesive agents … etc." Dkt. No. 277-1 at 5:1-27. Thus, the auxiliary component does not become a part of the claimed compound; instead, the claimed compound is placed ***within*** a composition that also includes an auxiliary component.

Therefore, "having a general formula" means "containing only what is expressly set forth in the recited general formula."

**C. "X is low-molecular-weight organic or mineral acid or water" (Claims 1, 3)**

| Plaintiff's Proposal | Defendants' Proposal |
|---|---|
| Plain meaning | The term "X is low-molecular-weight organic or mineral acid or water" requires that X must be one molecule of "low molecular weight organic or mineral acid or water." "X" therefore cannot be equal to zero molecules of low-molecular-weight organic or mineral acid or water. |

The parties' dispute hinges on whether the term "X" in the general formula $NH=C(NH_2)-N(CH_3)-CH_2-CO-NH-R*X$ (1) as Defendants propose, represents *one* molecule, or (2) as Amide argues, could represent *any number of molecules*.[9] Amide proffers an alleged plain meaning that is inconsistent with the intrinsic and extrinsic evidence. Amide provides no compelling rationale for its position that the plain meaning of "X is low-molecular-weight organic or mineral acid or

[9] Amide's argument is made to support its infringement read, which attempts to allow for and cover many components of Bang that are not bonded to each other. *See* notes 3, 4 and 6, *supra*.

water" allows one *or more* molecules of "X". Worse yet, Amide misstates the Prior '077 Claim Construction Order on this term. *Compare* Amide Br. at 17 ("The Florida court never considered whether X could be more than one molecule, because the issue was never presented") (emphasis omitted) *with* Prior '077 Claim Construction Order at 3 (showing "Plaintiffs' Proposed Claim Construction" to be "'Water' refers to degrees of hydration, and hydrate systems can be classified from anhydrous, **where the coefficient that is implicit in 'X'** would be zero, ***to higher degrees of hydrates*, where the coefficient would be greater than zero.**") (emphasis added).

Conversely, several independent sources support Defendants' construction: the patentee's and the patent examiners' statements during prosecution, the specification, well-known chemical nomenclature, and prior claim construction orders. During reexamination, the patentee distinguished its alleged invention from prior art that described anhydrous compounds and hydrated compounds, but not *mono*hydrates (i.e., compounds bonded to one molecule of water). Every embodiment described in the specification contains one molecule of "X." Well-established chemical nomenclature confirms the point: where a chemical formula is written without a preceding coefficient, that coefficient is understood to be one. And other federal courts—including one interpreting the '077 Patent—have reached the same conclusion, construing the coefficient of a chemical formula to be one where not expressly written.

### 1. The Intrinsic Record Supports Defendants' Proposed Construction.

Defendants' construction follows from patentee's remarks distinguishing prior art during reexamination, which defined the scope of the "X" term. *TecSec, Inc. v. Int'l Bus. Machines Corp.*, 731 F.3d 1336, 1345 (Fed. Cir. 2013) (holding, "[t]hrough these statements [made in prosecution], the inventor defined the term" at issue); *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1329 (Fed. Cir. 2009). During reexamination, patentee and the examiner both interpreted Claims 1 and 3 to require a single molecule of "X." In the field of chemistry, a "hydrate" refers to a

compound with one or more water molecules bonded, whereas a "monohydrate" refers to a compound with one and only one molecule of water bonded. Ex. A at ¶ 79. The patent examiner and patentee both expressed their understanding that if "X is water," a compound matching the claimed formula would be "***a monohydrate as here claimed***." Ex. F at -842 (July 26, 2017 Non-Final Rejection) (emphasis added); *see also id.* at -908-909 (Sep. 26, 2017 Response to Office Action) (arguing, "Purpura in view of Weiss does not establish a *prima facie* case that ***the monohydrate form of the amide of creatine of claims 1 and 3*** … are obvious") (emphasis added).

To overcome a § 103 rejection, patentee distinguished prior art that disclosed compounds with zero molecules of "X" and multiple molecules of "X," but failed to disclose compounds bonded to *one* molecule of "X." In a rejection, the patent examiner stated that Claims 1 and 3 of the '077 Patent were invalid in view of WO 03/071884 A1 ("Purpura"), which disclosed removing water from a product compound "such that the water content of the compound is 0.1 to 20% by weight," a range that included the water content of the monohydrate form, "6.5% of the mass." Ex. F at -842. In response, patentee, relying on the declaration of its expert Dr. Chamberlin, argued the claims are not invalid over Purpura and other references because they do "not disclose the monohydrate of an amide of creatine." *Id.* at -908. Dr. Chamberlin stated, "water content alone is far from conclusive" to "evidence that a compound is a monohydrate." *Id.* at -922 (Chamberlin Decl.). Disclosing a water percentage "consistent with the monohydrate" form is a "necessary but not sufficient criterion to claim a monohydrate" as "[t]he term monohydrate is generally understood to mean ***exactly one molar equivalent of water*** that is an integral part of the crystal lattice of the material in question … I don't see how Weiss or any other reference can support the mistaken contention that Purpura discloses the monohydrate form of anything, and most certainly not of N-creatinyl-L-glutamine amide or any other amide." *Id.* at -922-23.

Patentee repeatedly expressed its view that prior art describing hydration in an unspecified

amount failed to teach a monohydrate—i.e., a compound with one molecule of "X"—and therefore did not invalidate the '077 Patent claims. *See also id*. at -922-24. The USPTO relied on this argument when issuing its Reexamination Certificate withdrawing rejections of Claims 1 and 3. Ex. F at -1157. Thus, Amide should be held to patentee's disavowal of "hydrates" beyond monohydrates and other compounds that contain more than one molecule of "X." This result is essential to "ensure[ ] that claims are not construed one way in order to obtain their allowance and in a different way against accused infringers." *Aylus Networks, Inc. v. Apple Inc*., 856 F.3d 1353, 1362 (Fed. Cir. 2017) (internal quotations omitted).

Moreover, the '077 specification provides eight examples of the claimed compounds—and each example contains one molecule of "X"—a low-molecular-weight organic acid or water. Defendants' claim construction expert, Dr. Rudolph, explained the specification's examples are:

| **Exemplary Compound (*See* Ex. A at ¶¶ 74-78)** | **Associated "X"** |
|---|---|
| Creatinyl- γ-Aminobutyric Acid Ethyl Ester Acetate (Ex. 1)<br><br>Creatinyl-L-Phenylalanine Amide Acetate (Ex. 3)<br><br>Creatinyl-Glycine Ethylamide Acetate (Ex. 6)<br><br>Creatinyl-Phenylalanyl-Arginyl-Glycine Ethyl Ester Acetate (Ex. 7) | One molecule of acetic acid, a low molecular weight organic acid, serving as X. *See* Ex. A at ¶ 75; *see also* Dkt. No. 277-1 at 5:46 ("Yield: $C_{10}H_{20}N_4O_3$***$CH_3COOH$**") (emphasis added), 6:17 ("Yield: $C_{13}H_{19}N_5O_2$***$CH_3COOH$**") (emphasis added). |
| Creatinyl-L-Phenylalanine Amide Hydrate (Ex. 2) | One molecule of water, serving as X. *See* Ex. A at ¶ 76; *see also* '077 Patent at 6:5 ("Yield: $C_{13}H_{19}N_5O_2$***$H_2O$**") (emphasis added). |
| Creatinyl-Glycine Benzyl Ester hydrochloride (Ex. 4)<br><br>Creatinyl-Phenylalanine Hydrochloride (Ex. 8) | One molecule of hydrochloric acid, a low molecular weight mineral acid, serving as X. *See* Ex. A at ¶ 77. |
| Creatinyl-Tyrosine Amide Succinate (Ex. 5) | One molecule of succinic acid, a low molecular weight organic acid, serving as X. Ex. A at ¶ 78. |

Defendants' proposed construction is supported by the specification's consistent usage of "X" to mean exactly one molecule of X.[10] *See Poly-Am., L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1137 (Fed. Cir. 2016) (construing claim based on disclosed embodiments, where "[e]very embodiment ... and every section of the specification" describes the invention one way). By including "X" as one molecule in every embodiment across the Abstract, Summary, Detailed Description, Examples, and Figures, the '077 Patent makes clear the claimed subject matter requires a single molecule of low-molecular-weight organic or mineral acid or water bonded to it. This defining feature is not merely exemplary, but central to what the patent teaches. The Federal Circuit has recognized that where the specification "repeatedly and consistently" characterizes the alleged invention to include a particular feature, that characterization "strongly suggests" the feature must be read as part of the claim. *See Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1318 (Fed. Cir. 2014). That is the case here.

**2. Defendants' Proposed Construction Comports with Customary Understanding in the Art.**

Defendants' proposed construction also aligns with well-known chemical nomenclature. A POSITA reading the claimed formula would understand "X" must be one molecule, not zero or multiple molecules, because no coefficient precedes the component and no subscript follows it. Ex. A at ¶¶ 71-73. Patentee followed other well-known naming conventions, e.g., reciting subscripts for atomic groupings only where more than one of a particular atom is present (e.g.,

[10] Amide's expert, Dr. Sessler, agrees that a "POSITA would understand that there would be only one X molecule" "bonded to the claimed compound" with respect to Examples 1-6 and 8 of the '077 Patent. Dkt. No. 277-2 (Sessler Decl.) at ¶ 33. As referenced in note 7, *supra,* the parties' experts disagree about whether Example 7 contains one or two molecules of X. To the extent that Example 7 discloses two molecules of "X", despite being called "Synthesis of Creatinyl-Phenylalanyl-Arginyl-Glycine Ethyl Ester ***Acetate***" instead of "Synthesis of Creatinyl-Phenylalanyl-Arginyl-Glycine Ethyl Ester ***Diacetate***," such a compound would be excluded from the scope of Claims 1 and 3 in light of the patentee's statements during reexamination.

$NH_2$, $CH_3$). An atom written without a subscript or coefficient represents only one of that atom. The ’077 Patent does not depart from this standard convention for “X.” If X could represent more than one molecule, a POSITA would expect to see a placeholder with a range of possible values.[11]

Textbooks from before the priority date of the ’077 Patent affirm that “[w]hen no number is written, the coefficient is assumed to be 1 (so the coefficient of $O_2$ equals 1).” Ex. G (PEPSI_0005991) at 997-98; *see also, e.g.,* Ex. C at -926 (“(c) To indicate the composition of (formal) addition compounds or non-stoichiometric compounds. The numeral is written on the line before the formula of each constituent except that unity is omitted.”); Ex. A at ¶ 72. The fact that there are consistent definitions for the same term confirms that the term has “a well-understood meaning in the art.” *Starhome GmbH v. AT&T Mobility LLC*, 743 F.3d 849, 856 (Fed. Cir. 2014). Indeed, in another section of its brief, Amide admits there is “only ***one*** X in the claim’s listed formula.” Amide Br. at 13. This well-understood meaning requires that the coefficient be one.

**3. Another Federal Court Construed the ’077 Patent and Reached the Same Construction For the Term “X.”**

In the Prior ’077 Claim Construction Order, Judge Ungaro of the Southern District of Florida considered the meaning of the “X” term in Claims 1 and 3 of the same ’077 Patent asserted here. *See generally* Prior ’077 Claim Construction Order. There, the court adopted the same construction that Defendants now propose: that “[t]he term ‘X is low-molecular-weight organic or mineral acid or water’ requires that X **must be** one molecule of ‘low molecular weight organic or mineral acid or water.’ ‘X’ therefore cannot be equal to zero molecules of low-molecular-weight organic or mineral acid or water.” *Id.* at 23-24 (emphasis original). Other federal courts have reached the same conclusion when asked to construe the implied coefficient of a chemical formula.

[11] Indeed, the general formula in Claims 1 and 3 recites “X” and “R” as placeholders and separately enumerates possible “X” and “R” groups.

In *Board of Regents of University of Texas System v. A123 Systems, Inc*., the court adopted a construction clarifying that "a compound having the formula $LiMPO_4$" should be understood to mean "only one lithium (Li), one and only one metal M (Fe, Mn, Ni, or Ti), and only one phosphate ($PO_4$)," despite the plaintiff's argument that the claim did not require a "stoichiometric ratio," i.e., a balanced proportion of elements in a ratio of 1:1:1. No. 3:06-CV-1655-B, 2011 WL 1135115, at *9, 12, 19 (N.D. Tex. Mar. 29, 2011).

Amide's brief and expert misstate the Prior '077 Claim Construction Order. Both Amide's brief and expert declaration admit that Defendants' construction matches Judge Ungaro's. Amide Br. at 17; Dkt. No. 277-2, at ¶ 32. But Amide incorrectly argues that "the Florida Court was asked to decide only whether X could be ***zero***—not whether X could be *one or more than one* molecule (as Defendant's [sic] seek to use the Court's construction here)." Amide Br. at 17 (emphasis original). Likewise, Dr. Sessler inaccurately states, "I do not see that Judge Ungaro considered whether X could be more than one molecule." Dkt. No. 277-2 at ¶ 32. The record in *Werteks* disproves those assertions. In its claim construction brief, the prior owner Werteks stated that "the Parties' dispute centers on whether the coefficient that is implicit in 'X' is limited to 1 (as proposed by Defendant) or can also be zero ***or an integer greater than one*** (as proposed by Plaintiffs)." *Werteks* Lawsuit, Dkt. No. 46 at 4 (S.D. Fla. Nov. 14, 2016) (emphasis added); *see also* Prior '077 Claim Construction Order at 3 (showing that "Plaintiffs' Proposed Claim Construction" was "'Water' refers to degrees of hydration, and hydrate systems can be classified from anhydrous, **where the coefficient that is implicit in 'X'** would be zero, ***to higher degrees of hydrates*****, where the coefficient would be greater than zero.**") (emphasis added). Judge Ungaro adopted the Defendants' proposal, rejecting Amide's argument that "X" could represent more than one molecule.

### D. "compound possessing neuroprotective activity" / "as a remedy possessing a neuroprotective activity" (Claim 3)

| Plaintiff's Proposal | Defendants' Proposal |
|---|---|
| Plain meaning | Indefinite |

The "neuroprotective activity" terms are not terms of art to a POSITA and thus do not have a plain meaning. The '077 specification and claims also fail to provide sufficient background for a POSITA to understand with reasonable certainty how compounds "possess neuroprotective activity" or how "X is … a remedy possessing a neuroprotective activity." As Defendants' expert explained, "it would be unclear to a POSITA whether 'neuroprotective activity' refers to any combination of: (1) healing of neurons, (2) slowing neuron damage, (3) causing increased neuron activity, or (4) any other activity." Ex. A at ¶ 86. "And even if a POSITA could determine the type of activity to which the term 'neuroprotective activity' refers, a POSITA would not be aware of the appropriate way to measure 'neuroprotective activity.'" *Id.* The intrinsic evidence does not resolve this ambiguity; in fact, Amide's apparent interpretation of "neuroprotective activity" magnifies the issue. It is further unclear whether Claim 3 requires the claimed compound to have neuroprotective activity, X to have neuroprotective activity, or both.

It is well-established that "facially subjective claim language without an objective boundary" is indefinite. *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1373 (Fed. Cir. 2014). The objective boundary analysis is straightforward: to be definite, the claim must inform those of skill in the art what is protected and what is not. *See id.,* at 1371 ("The claims, when read in light of the specification and the prosecution history, must provide objective boundaries for those of skill in the art."); *Cypress Lake Software, Inc. v. Samsung Elecs. Am. Inc.*, 382 F. Supp. 3d 586, 610 (E.D. Tex. May 10, 2019). A claim is indefinite when the question of infringement hinges upon a subjective determination or the "unpredictable vagaries of any one person's

opinion." *Intell. Ventures I LLC v. T-Mobile USA, Inc.*, 902 F.3d 1372, 1381 (Fed. Cir. 2018); *see also Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1344–45 (Fed. Cir. 2015). Here, neither the claims nor the specification provides any guidance to a POSITA regarding what constitutes a "neuroprotective activity" and what does not.

The '077 Patent's claim language itself renders the term "neuroprotective activity" ambiguous with its different uses of the term. *See, e.g.*, Dkt. No. 277-1 at cl. 3 (emphasis added):

> 3. ***A compound possessing neuroprotective activity***, said compound consisting of: amides of Creatine having a general formula: $NH{=}C(NH_2){-}N(CH_3){-}CH_2{-}CO{-}NH{-}R{*}X$;
> wherein R is amino acid residue of aliphatic L-amino acid, or aromatic amino L-acid or heteroaromatic L-amino acid, or derivatives of aliphatic L-amino acid, or aromatic L-amino acid, or heteroaromatic L-amino acid representing at least one of the following: salts of amino acid, amino acid esters, amino acid amides, or amino acid peptides; and
> ***X is*** low-molecular-weight organic or mineral acid or water as ***a remedy possessing a neuroprotective activity***.

Federal Circuit precedent instructs that "different claim terms are presumed to have different meanings." *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1381-2 (Fed. Cir. 2008); *see also CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000). Under this presumption, the terms "a compound possessing neuroprotective activity" and "a remedy possessing a neuroprotective activity" should have distinct meanings. Yet the patent does not clarify whether or how the two terms differ. Further, the claim language indicates that "X," the low-molecular-weight organic or mineral acid or water, must independently serve as "a remedy possessing a neuroprotective activity." The prior *Werteks* court confirmed that reading. *See* Prior '077 Claim Construction Order at 15 (because plaintiff's proposed construction, allowing "X" to be zero molecules "would, in effect, eliminate the language in Claim 3 concerning a 'remedy possessing a neuroprotective activity,' it must be rejected."). While the claim language suggests that "X" alone possesses "neuroprotective activity," the patent fails

to describe any "neuroprotective activity" the organic or mineral acid or water possesses.[12]

Compounding the confusion, the specification does not clarify the kind or degree of "neuroprotective activity" to which the claims are directed. Amide argues that "'neuroprotective activity' refers to protecting neurons to any degree." Amide Br. at 18-19. The '077 specification, meanwhile, contains examples of purported "neuroprotective activity," but fails to define the scope of the term. Example 10 in the '077 Patent, titled "Nootropic Activity of Creatine Amides," discusses a "[s]tudy of Creatine amides['] influence upon their ability to demonstrate a neuroprotective action on the brain tissues." *See* Dkt. No. 277-1 at 12:40-16:32. In that study, rats "were administered intravenous" doses of the claimed compound. *See id*. at 12:57-67. "A conclusion regarding … the samples[ ] efficiency was drawn" on two bases: (a) "their effect on animals' behavior reactions" in a Morris watermaze ("MWM") or in an open field, or (b) "morphological changes in brain tissue … by administration of Creatine amides" after the initiation of "global and focal cerebral ischemia" ("FCI"). *Id*. at 13:9-14.

For the behavioral analysis, researchers measured how long it took rats to complete the MWM or move in an open field. *Id*. at 13:15-20. For the morphological analysis, researchers induced FCI, or stroke, in the rats, and "on the 7th day after ischemia, the rats were killed by decapitation, the brain was removed, … and the morphological examination was carried out." *Id*. at 13:1-7. But the specification does not indicate: (1) the threshold level of performance in the MWM required to constitute "neuroprotective activity;" (2) the threshold reduction of neuron damage after FCI required to constitute "neuroprotective activity;" (3) whether these are the only types of "neuroprotective activity" covered by the patent; or (4) if these are not the only kinds of neuroprotection covered by the patent, what else might be. Instead of providing clarity on the

[12] In light of this failure, Claim 3 lacks written description under 35 U.S.C. § 112.

meaning of "neuroprotective activity," the specification's multiple examples highlight the subjectivity of the term. The specification does not provide any objective standard to guide a POSITA in determining when a compound or remedy "possess[es] a neuroprotective activity."

Amide's brief further muddies the water. Amide's definition of neuroprotective activity excludes the specification's MWM test. Amide argues that neuroprotective means "serving to protect neurons from injury or degeneration" or "protecting neurons and neuronal tissue from damage." Amide Br. at 17-19; Dkt. No. 277-2 at ¶ 40. Dr. Sessler further claimed that the "patent's specification consistently discusses neuroprotectivity in this context." Dkt. No. 277-2 at ¶ 40. Not so. The MWM test does not involve injury, degeneration, or damage. *See* Dkt. No. 277-1 at 13:15-20. Researchers did induce FCI in *some* rats, but not the MWM rats. *Id*. at 14:31-44 (discussing the "data of rats training in MWM groups" and noting that "FCI per se blocked the training completely.") Because the MWM rats did not undergo FCI—that is, they did not experience an event causing neuronal damage—their improved maze performance cannot constitute evidence of "protecting neurons and neuronal tissue from damage." Amide's proposed definition therefore fails to embrace a potential kind of neuroprotective activity described in the specification, underscoring the term's indefiniteness.

Amide's additional arguments fare no better. First, Amide obscures the meaning of "neuroprotective activity" by arguing that there may be other, undisclosed methods of testing neuroprotection beyond the examples provided in the patent. *See* Amide Br. at 19 ("A POSITA would have no difficulty conducting or understanding this test, nor any other test discussed in the specification (***or elsewhere***), and interpreting the results of those tests to determine whether a compound has neuroprotective activity.") (emphasis added). But, similar to the ambiguity arising from the '077 Patent's MWM test discussed above, a POSITA would have no way to determine whether a given test could evidence the kinds of neuroprotective activity claimed by the patent.

Rather than addressing that ambiguity, Amide further compounds it, arguing that testing is not "even required at all to determine whether a treatment is neuroprotective." Amide Br. at 19. Instead, under Amide's view, a POSITA could "choose to measure neuroprotectivity based on the properties of a given compound in comparison to other compounds known in the art or otherwise proven to be neuroprotective." *Id*. at 19-20. Amide does not explain what this comparison would entail or what kinds of other compounds could be analogous. Amide's reading of "neuroprotective activity" leaves unbounded: (1) whether a compound needs to be tested for neuroprotectivity in the first place; (2) if testing is not required, then which other compounds "known in the art" could serve as a proxy for its neuroprotectivity; (3) the kinds of testing used to measure neuroprotectivity; and (4) the kinds of effects that qualify as neuroprotective activity.

Because the intrinsic record, extrinsic record, and Amide itself all fail to provide any clear indication of what constitutes "neuroprotective activity," the term is indefinite.

**E. "consisting of" (Claim 3)**

| Plaintiff's Proposal | Defendants' Proposal |
| --- | --- |
| Plain meaning | "containing only what is expressly set forth in the claim" |

The term "consisting of" is the recited transition in Claim 3 of the '077 Patent. '077 Patent, at cl. 3. The analysis for this term is straightforward: the Federal Circuit has repeatedly held that the phrase "consists of" or "consisting of" is "a term of patent convention meaning that the claimed invention *contains only what is expressly set forth in the claim*." *Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp*., 831 F.3d 1350, 1358-59 (Fed. Cir. 2016) (emphasis added) (citation omitted); *see also Azurity Pharms., Inc. v. Alkem Lab'ys Ltd.*, 133 F.4th 1359, 1367 (Fed. Cir. 2025) ("The 'consisting of' transition is closed. With little exception, it limits the claim's scope to the recited components."); *Multilayer*, 831 F.3d at 1358-59 ("The presumption that a claim term set off by the transitional phrase 'consisting of' is closed to unrecited elements is at

least a century old and has been reaffirmed many times by our court and other courts."). The meaning of this phrase fundamentally differs from the meaning of "comprising," which presumes that the recited elements are only part of what has been claimed such that the claim does not preclude additional, unrecited elements. *See CIAS, Inc. v. All. Gaming Corp.,* 504 F.3d 1356, 1361 (Fed. Cir. 2007) ("It is . . . well understood in patent usage that 'consisting of' is closed-ended and conveys limitation and exclusion .... For patent claims the distinction between 'comprising' and 'consisting' is established[.]").

"[T]o overcome the exceptionally strong presumption that a claim term set off with 'consisting of' is closed to unrecited elements, the specification and prosecution history must unmistakably manifest an alternative meaning." *Multilayer*, 831 F.3d at 1359. Here, neither does. Amide's argument that "consisting of" should be given its plain and ordinary meaning leaves open the possibility that a jury will confuse "consisting of" with "comprising." Thus, Defendants' construction should be adopted. *See, e.g.*, *Versata Software, Inc. v. Sun Microsystems, Inc.*, No. CIV.A. 2:06-CV-358, 2008 WL 3914098, at *11-12 (E.D. Tex. Aug. 19, 2008) (construing "consisting of" as "consisting only of" because "meaning of…'consisting of' is well-established").

Amide argues that the "aqueous solution" recited in Claim 5 compels an interpretation of "consisting of" in Claim 3 that allows for "weak molecular interactions that are not 'expressly set forth' in the claimed 'general formula' but are nonetheless present when the claimed compound is in a solution." Amide Br. at 21-22. But Claim 5 does not depend from Claim 3 and so it does not indicate—much less require—a broad meaning of "consisting of" that overcomes the presumption to the contrary. Next Amide circularly argues that "the phrase 'consisting of' limits a formula, but that formula *itself* includes compounds having weak molecular interactions that occur when the compound is in solution." Amide Br. at 22. Amide assumes Claim 3's compound is in solution where there may be "weak molecular interactions," and then argues the phrase "consisting of"

must allow for those interactions. This argument ignores that Claim 3's compound exists in crystalline form in *every* example in the '077 specification free of those weak molecular interactions. *See* Section V.A.2, *supra.* Therefore, Claim 3's "consisting of" phrase properly mandates that the claimed compound is free of weak molecular interactions to unrecited chemicals.

Finally, Amide argues that "the language of Claim 3 must be construed in light of the specification's disclosure that the claimed compounds can exist in solutions." Amide Br. at 23.[13] But the possibility that a creatine amide *can* exist in solutions does not mean that every claim must encompass a solution. *See TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1373 (Fed. Cir. 2008) ("Indeed, read in the context of the specification, the claims of the patent need not encompass all disclosed embodiments."); *Dynapass IP Holdings LLC v. Bank of Am. Corp.*, No. 2025-1222, 2026 WL 1689580, at *1-2 (Fed. Cir. June 11, 2026) (affirming district court's claim construction that excluded alternative embodiment). The '077 specification explains that creatine amides have "enhanced solubility and stability in aqueous solutions"—***not*** that they must actually be in aqueous solution. Dkt. No. 277-1 at 3:49-53 ("a primary object of the present invention is the obtaining of novel Creatine derivatives produced through chemical synthesis, which derivatives should possess a higher stability and a wider spectrum of biological actions, in particular, the neuro-protective activity."); 4:5-23 ("[A]mides of Creatine have an enhanced solubility and stability in aqueous solutions in comparison with well-known analogues that allows deploying them more widely as a source of Creatine in the organism."). Therefore, the benefit of having "enhanced solubility and stability in aqueous solutions" is a *characteristic* of the claimed creatine amides, not a requirement that creatine amides always be present in an aqueous solution.

If patentee intended to include elements beyond the recited claim, it could have used the

[13] Again, Amide's position is motivated by its infringement arguments. *See* notes 3, 4, 6, and 9 *supra*.

transitional language "comprising," which has been established to suggest open-endedness, as opposed to "consisting of." *See Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*, 212 F.3d 1377, 1382 (Fed. Cir. 2000) ("In simple terms, a drafter uses the phrase 'consisting of' to mean 'I claim what follows and nothing else.' A drafter uses the term 'comprising' to mean 'I claim at least what follows and potentially more.'"). Patentee instead drafted Claim 3 as presented.

### F. "anhydrous" (Claim 4)

| Plaintiff's Proposal | Defendants' Proposal |
|---|---|
| Plain meaning | "without water" |

Claim 4 of the '077 Patent recites "[t]he compound of claim 1, wherein the compound is anhydrous." '077 Patent, at cl. 4. The term "anhydrous" does not appear anywhere in the specification or in the original issued patent—the term was added for the first time during the '077 EPR.[14] A jury need not grapple with the "plain meaning" of this technical term since the patentee's use of the term during EPR is instructive, if not dispositive. *See Phillips*, 415 F.3d at 1317-18 ("prosecution history … [is] part of the 'intrinsic evidence'"); *Northpeak Wireless, LLC v. 3COM Corp.*, 674 F. App'x 982, 985-86 n.1 (Fed. Cir. 2016) ("Statements made during reexamination … are part of the prosecution history."); *St. Clair Intell. Prop. Consultants, Inc. v. Canon Inc.*, 412 F. App'x 270, 275-76 (Fed. Cir. 2011) ("Reexamination statements 'are relevant prosecution history when interpreting claims.'") (citation omitted).

As discussed in Section V.C.1, *supra*, the patentee distinguished prior art from Claim 1 by arguing that the prior art failed to disclose a "monohydrate" (i.e., the one-water-molecule adduct) of the claimed amide of creatine—and instead, described "anhydrous" compounds. *See, e.g.*, Ex. F at 907-12 (explaining that prior art compounds were not monohydrates), 1157 (finding that prior art compounds did not disclose "X being water"). In Dr. Chamberlin's Declaration, he contrasts

[14] In light of this failure, the term lacks written description under 35 U.S.C. § 112.

the terms "monohydrate" and "anhydrous" to differentiate compounds with and without water. Dr. Chamberlin defined monohydrate: "The term monohydrate is generally understood to mean exactly ***one molar equivalent of water that is an integral part of the crystal lattice of the material in question***." *Id.* at -922 (emphasis added).

Dr. Chamberlin then explained that a compound is either "hydrated" or "anhydrous," treating the terms as opposites. Dr. Chamberlin stated: "Without confirmation by an X-ray crystal structure, one normally infers a monohydrate by demonstrating that the combustion analysis (% C, H, and N) of an otherwise a [sic] pure sample, after drying to a constant weight, is consistent with ***the calculated molecular formula for the hydrate***, but ***not the anhydrous material***." *Id*. at 922-23 (emphasis added). Thus, a compound's measured properties are either "consistent with the calculated molecular formula for the hydrate" or for "the anhydrous material." *Id*. Dr. Chamberlin continued: "In other words, ***the crystal lattice of creatine and one equivalent of water*** forms faster and/or is more stable tha[n] ***the anhydrous form*** under these conditions. Special measures must the [sic] employed to obtain ***anhydrous*** material; such as, heating the monohydrate crystals under vacuum or crystallization from a non-aqueous medium." *Id.* at -924 (emphasis added).

Finally, Dr. Chamberlin explained that a compound could be made "anhydrous," "by attempted drying under more vigorous conditions sufficient to drive off the water of hydration, followed by another combustion analysis to verify that ***the resultant crystalline material has a formula consistent with the anhydrous form***." *Id.* at 922-23 (emphasis added). Put simply, "anhydrous" material is what remains when water is "driven off" (i.e., completely removed) from the monohydrate—it is a compound whose molecular formula does not include water.

There is no third category between hydrated and anhydrous. A compound is either hydrated (i.e., it contains water) or anhydrous (i.e., it does not contain water). Dr. Sessler's attempt to imagine a third category where the compound contains ionized water lacks any support in the

’077 specification and flies in the face of the EPR prosecution history.[15] Dkt. No. 277-2 at ¶ 47.

Claim 4 depends on Claim 1, adding the limitation “wherein the compound is anhydrous.” ’077 Patent, at cl. 4. Because Claim 1 defines X as “low-molecular-weight organic or mineral acid or water,” the “anhydrous” term narrows to chemical structures that are without water. If “anhydrous” meant anything other than “without water,” then Claim 4 would not further limit Claim 1. *See* Pre-AIA 35 U.S.C. § 112, ¶ 4 (“[A] claim in dependent form shall contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed.”).

Defendants’ position is confirmed by extrinsic evidence that defines “anhydrous” to mean “without water.” *See, e.g.*, Ex. H (PEPSI_0005979) at -982 (defining “Anhydrous” as “Without water” and “Hydrates” as “A crystalline sample that contains water, $H_2O$, and another compound in a fixed mole ratio. Examples include $CuSO_4 \cdot 5H_2O$ and $(COOH)_2 \cdot 2H_2O$.”); Ex. G at -996 (“When all the water is removed, the solid is said to be **anhydrous**, meaning *without water*.”); Ex. I (PEPSI_0005909) at -914; Ex. A at ¶¶ 98-102.

Amide’s own extrinsic evidence agrees. *See, e.g.*, Ex. J (AMIDE_COMMON002833) at -835 (defining “Anhydrous” as “Denoting a chemical compound lacking water: applied particularly to salts lacking their water of crystallization”); Ex. K (AMIDE_COMMON003281) at -289 (defining “Anhydrous” as “Descriptive of an inorganic compound that does not contain water either absorbed on its surface or combined as water of crystallization”).

## VI. CONCLUSION

For the above reasons, Defendants respectfully request that the Court adopt their proposed claim constructions.

---

[15] Dr. Sessler’s theory also requires assuming that Defendants’ proposed construction of the center dot in Claims 1 and 3 is wrong and that the chemical formula recited therein reads on ionic solutions that contain pieces of the claimed compound as dissociated ions.

Dated: September 15, 2026

O'MELVENY & MYERS LLP
By: */s/ Timothy S. Durst*
Timothy S. Durst (TX #00786924)
tdurst@omm.com
John Kappos (TX #24130097)
jkappos@omm.com
Patrick V. Plassio (TX #24102362)
pplassio@omm.com
2801 North Harwood Street
Suite 1600
Dallas, TX 75201-2692
Telephone: (972) 360-1900
Facsimile: (972) 360-1901

*Attorneys for Defendants Albertsons, LLC, Amazon.com, Inc., Costco Wholesale Corporation, CVS Pharmacy, Inc., PepsiCo, Inc., Sam's West, Inc., Target Corporation, Walgreen Company, Walmart, Inc., and Woot.com LLC*

JACKSON WALKER LLP
By: */s/ Blake T. Dietrich*
Nathaniel St. Clair, II
Texas State Bar No. 24071564
nstclair@jw.com
Blake T. Dietrich
State Bar No. 24087420
bdietrich@jw.com
2323 Ross Avenue, Suite 600
Dallas, Texas 75201
(214) 953-6000
(214) 953-5822 – Fax

*Attorneys for Defendant/Counter-Plaintiff 7-Eleven, Inc.*

BAKER BOTTS L.L.P.
By: */s/ Elizabeth D. Flannery*
Elizabeth D. Flannery (Texas State Bar No. 24045815)
liz.flannery@bakerbotts.com
Lindsay Volpenhein Cutié (Texas State Bar No. 24093305)
lindsay.cutie@bakerbotts.com

Roger Joseph Fulghum (Texas State Bar No. 00790724)
roger.fulghum@bakerbotts.com
One Shell Plaza
910 Louisiana Street
Houston, Texas 77002
Tel: 713-229-1234
Fax: 713-229-7704

*Attorneys for Defendant/Counter-Plaintiff H-E-B, LP*

CUSHMAN PARTNERS LLC
By: */s/ William P. Atkins*
William P. Atkins (Virginia Bar No. 47562)
wpa@cushmanlaw.com
1100 H Street NW
Suite 740
Washington, DC 20005
Phone: 202-991-0006

Benjamin L. Kiersz (Virginia Bar No. 47032)
benjamin.kiersz@pillsburylaw.com
Pillsbury Winthrop Shaw Pittman
1650 Tyson Blvd
McLean, Virginia 22102
Phone: 703-770-7900
Fax: 703-770-7901

Gregory P. Love (Texas Bar No. 24013060)
Steckler Wayne & Love, PLLC
107 E. Main Street
Henderson, Texas 75652
Phone: 903-212-4444
Fax: 903-392-2267
Email: greg@swclaw.com

*Attorneys for The Kroger Co.*

GREENBERG TRAURIG, LLP
By: */s/ Matthew J. Levinstein*
Matthew J. Levinstein (IL State Bar No. 6300343)
levinsteinm@gtlaw.com
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
Telephone: (312) 456-1039

Facsimile: (312) 456-8435

Tyler Andrews (CA State Bar No. 250686)
tyler.andrews@gtlaw.com
18565 Jamboree Road, Suite 500
Irvine, CA 92612
Telephone: (949) 732-6500
Facsimile: (949) 732-6501

Joseph Griffith (TX State Bar No. 24045982)
joseph.griffith@gtlaw.com
2200 Ross Avenue, Suite 5200
Dallas, TX 75201
Telephone: (214) 665-3666
Facsimile: (214) 665-5966

*Attorneys for Defendant Circle K Stores Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record who have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on September 15, 2026.

*/s/ Timothy S. Durst*
Timothy S. Durst