# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

AMIDE BEVERAGE COMPANY, LLC,

*Plaintiff*,

v.

AMAZON.COM, INC., WOOT.COM LLC, WALMART, INC., SAM'S WEST, INC., THE KROGER COMPANY, TARGET CORPORATION, GNC HOLDINGS, LLC, PEPSICO, INC., WALGREEN CO., CVS PHARMACY, INC., 7-ELEVEN, INC., CIRCLE K STORES INC., COSTCO WHOLESALE CORPORATION, AND H-E-B, LP,

*Defendants*.

Case No. 4:24-cv-1022-SDJ

**Jury Trial Demanded**

**DECLARATION OF DR. MARVIN J. RUDOLPH IN SUPPORT OF DEFENDANTS' PRELIMINARY CLAIM CONSTRUCTIONS FOR U.S. PATENT NO. 8,350,077**

# TABLE OF CONTENTS


**I. INTRODUCTION** ........ 1

**II. BASIS FOR OPINION** ........ 1

**A. Qualifications** ........ 1

**B. Materials Considered** ........ 7

**III. LEGAL STANDARDS FOR CLAIM CONSTRUCTION** ........ 8

**A. Claim Construction** ........ 8

**B. Indefiniteness** ........ 9

**IV. SUMMARY OF THE ’077 PATENT** ........ 10

**V. LEVEL OF ORDINARY SKILL IN THE ART** ........ 11

**VI. AGREED UPON CLAIM CONSTRUCTIONS** ........ 13

**VII. OPINIONS ON THE DISPUTED CLAIM TERMS** ........ 13

**A. “Amides of Creatine Having a General Formula: NH=C($NH_2$)—N($CH_3$)—$CH_2$—CO—NH—R*X”** ........ 14

**1. An Asterisk Used in a Chemical Formula is Equivalent to a Center Dot** 14

**2. An Asterisk (Center Dot) Used in a Chemical Formula Represents an Addition Compound** ........ 16

**B. “Having”** ........ 22

**C. “X is Low-Molecular-Weight Organic or Mineral Acid or Water”** ........ 25

**D. “Compound Possessing Neuroprotective Activity” / “As a Remedy Possessing a Neuroprotective Activity”** ........ 30

**E. “Anhydrous”** ........ 38

**VIII. OTHER COMMENTS** ........ 39

I, Marvin J. Rudolph, Ph.D., CFS, declare as follows:

# I. INTRODUCTION

1. I have been retained by Defendants Amazon.com, Inc., Woot.com LLC, Walmart, Inc., Sam's West, Inc., Albertson's, LLC, The Kroger Co., Target Corporation, PepsiCo, Inc., Walgreen Co., CVS Pharmacy, Inc., 7-Eleven, Inc., Circle K Stores Inc., Costco Wholesale Corporation, and H-E-B, LP (collectively, "Defendants") as an independent expert consultant in connection with the above-captioned lawsuit to provide my analyses and opinions in certain technical aspects of this dispute.

2. The purpose of this Declaration is to analyze and explain how a person of ordinary skill in the art at the time of the alleged invention would understand certain terms in the asserted claims of U.S. Patent No. 8,350,077 (the "'077 Patent" or the "Asserted Patent"), which I understand are asserted by Plaintiff Amide Beverage Company, LLC ("Amide"). My opinions and the bases for my opinions are set forth below.

3. I am being compensated at my ordinary and customary consulting rate of $600 per hour for my work. My compensation is in no way contingent on the nature of my findings, the presentation of my findings in testimony, or the outcome of this or any other proceeding. I have no interest in the outcome of this proceeding.

4. I am competent to testify to the matters stated in this Declaration, have personal knowledge of the facts and statements herein, and each of the statements is true and correct.

# II. BASIS FOR OPINION

## A. Qualifications

5. I have summarized in this section my educational background, career history, publications, and other relevant qualifications. A more detailed account of my work experience,

qualifications, and publications is included in my curriculum vitae, attached as Exhibit 1 to this declaration.

6. I received a Bachelor of Science degree in Chemistry in 1967 from Drexel University, Philadelphia, Pennsylvania, and a Doctorate in Physical Chemistry, also from Drexel University, in 1971. My Ph.D. thesis was entitled "The conductances of barium, barium perchlorate, and potassium perchlorate in liquid ammonia at -62.37 degree C." Marvin J. Rudolph, Philip H. Mogul, and Frederick R. Longo, *The conductances of barium, barium perchlorate, and potassium perchlorate in liquid ammonia at -62.37.degree.C*, The Journal of Physical Chemistry, Vol. 82, Issue 11, June 1, 1978, at 1324-1326. My thesis reported observations that a deep blue, oil-like phase separation, unlike the more familiar blue-bronze phase separation, occurred at 0.02951 equivalents Ba/liter ammonia. An analysis for the conductance data of dilute solutions of sulfuric acid solutions seemed applicable to the Ba-$NH_3$ system, and I determined the limiting equivalent conductance and dissociation constants for the barium-ammonia system by this analysis. My thesis further determined that the Shedlovsky method is an appropriate method for measuring the limiting equivalent conductances and disassociation constants for KClO4—NH3 and Ba(ClO4)2 systems.

7. As an undergraduate, my senior research project was entitled "The kinetics of the incorporation of cobalt ion (Co++) into the tetraphenyl porphine molecule in dimethylformamide." Teraphenyl porphine is a type of porphyrin. Porphyrins are a group of organic molecules that play crucial roles in various biological processes. They are particularly known for their ability to bind with metal ions, forming complexes like <u>heme</u> (with iron) and chlorophyll (with magnesium). These metalloporphyrins are essential for fundamental functions such as oxygen transport (hemoglobin), photosynthesis (chlorophyll), and cellular energy production (cytochromes).

8. From 1971 to 1974, I was a Research Food Scientist at Lehi the Farmer's Dairy in Allentown, Pennsylvania. At Lehi I was the recipient of an Environmental Protection Agency grant, "A Continuous Enzymatic Conversion of Whey (Cottage and Cheddar)." I collaborated with a chemical engineer from Lehigh University, where we developed a pilot system to continuously separate out whey protein, and then enzymatically convert the remaining lactose, which is not very useful, into the sweeter, more soluble sugars glucose and galactose. This system is in use today in many cheese-making operations. I further researched the utilization of the whey protein into protein-based beverages and frozen desserts.

9. From 1974 to 1980, I was a Group Leader at General Foods Corporation in Tarrytown, New York. There, I was in charge of product and process development efforts for products such as Pop Rocks® carbonated candy and Increda-Bubble carbonated bubble gum. I was the recipient of six US Patents (see below) that dealt with the incorporation of carbon dioxide gas at 600 psi (43 times atmospheric pressure) into an amorphous carbohydrate glass matrix.

10. From 1980 to 1985, I was Manager of Product Development with Ragú Foods, Inc., in Shelton, Connecticut, where I developed and managed timetables for multiple projects related to tomato sauces and *Adolph's Meat Tenderizer,* which is a commercial mixture of salt and papain enzyme. This natural enzyme extracted from green papaya fruit tenderizes (softens) the muscle tissue found in meat, poultry, and seafood at elevated (cooking) temperatures, which I measured and documented for advertising claim substantiation.

11. From 1985 to 2004 I was a Director of Food Product Development with Arthur D. Little, Inc./TIAX, LLC in Cambridge, Massachusetts. There, I led all food and beverage product and process development consulting and provided direction and leadership to ensure realization of product development objectives for external clients and internal key business plans. I successfully

developed products such as Slim Fast® dry-mix and ready-to-drink meal replacements; ice cream, mayonnaise, and butter-like spread products containing Olestra® fat substitutes; and frozen yogurt products that can be scooped with a plastic spoon directly from the consumer's freezer. Olestra, which has the chemical structure of a sucrose molecule, substitutes edible fats and oils for the sucrose -OH groups. The molecule is not absorbed or digested and thus, can serve as a zero-calorie replacement for dietary fat. I was awarded two US Patents based on the use of Olestra in frozen desserts and yogurt with the characteristic smooth mouthfeel of high fat, high caloric frozen products.

12. From 2004 to 2007, I was a Business Development Director of DuPont Food Industry Solutions for E.I. DuPont de Nemours and Company in Wilmington, Delaware. In my role, I uncovered technical issues that were prevalent in various food manufacturing companies, and brought the talent and knowledge of the scientists and engineers at the DuPont Experimental Station in Wilmington DE to assist in solving these issues. Two notable examples were the precise spraying of vitamins onto a moving bed of breakfast cereal, and the efficient production of beverage concentrates for carbonated beverage flavoring.

13. From 2007 to 2011, I was Director of Food Science at Moobella, Inc., in Taunton, Massachusetts, a company that provides vending machines for fresh ice cream. At Moobella, I formulated, sensory tested, scaled up, and supervised the manufacturing of ice cream mixes and flavors that supply MooBella ice cream vending machines with 96 different ice cream combinations. The patented Moobella vending machine relied on the precise control of the freezing point depression in all incoming mix ingredients, since the vending machine freezing point control was set at a constant temperature. Freezing point depression, a colligative property of all solutions, is dependent on sweetener type and concentration used. If the freezing point of

the incoming mix is too low, the resultant ice cream will have a "soupy" consistency. If the freezing point of the incoming mix is too high, the resultant ice cream will stick to the internal parts of the vending machine and not dispense.

14. After leaving Moobella, in October 2011 I began work as an independent consultant. I perform my consulting work through Dr. M.J. Rudolph Consulting, LLC, a sole proprietorship of which I am the managing principal. I specialize in providing advice on new food products and process development to companies desiring to enter the marketplace with unique food and beverage products, including providing advice on use of molecules approved by the FDA or generally recognized as safe. I also provide technology assessments for private and public companies.

15. Since 1971, I have had more than 50 years of product development experience within the food and beverage industry, which experience included developing products from the bench top to pilot-plant scale-up and commercialization, product development, product formulation, product manufacturing, and product engineering. My product-related experience includes dairy products, cereals, baked goods, confections, beverages, soups, dressings, nutraceuticals, and weight-control foods. My experience with beverages includes dry mixes, ready-to-drink beverages, herbal-based products, reduced-calorie beverages, and a line of flavored liquid concentrates.

16. I am a frequent speaker on managing innovation and strategic partnerships within the food industry and have authored a chapter entitled "Innovations in Food Technology" for the book, *Developing New Food Products for a Changing Marketplace* (Technomic Publishing, 1999).

17. I am an active member of the American Chemical Society and the Institute of Food Technologists. The Institute of Food Technologists has recognized me as a Certified Food Scientist (CFS).

18. I am a named inventor on ten United States Patents arising from my research and development experience and expertise in the areas of confectionery, snack food, dairy, and sweetener technology. My most recent patent deals with the solubilization of Rebaudiocide A, a natural sweetener with a very low solubility in water. The invention allows for the use of a concentrated zero calorie solution of the sweetener in hot and cold beverages, on cereal, in frozen and non-frozen desserts, etc.

19. The ten United States patents are as follows:

a. United States Patent No. 6,010,734, entitled "Low Calorie Fat-Containing Frozen Dessert Products Having Smooth, Creamy, Nongritty Mouthfeel," issued January 4, 2000.

b. United States Patent No. 5,571,546, entitled "Food Product and Method of Making Same," issued November 5, 1996.

c. United States Patent No. 5,084,295, entitled "Process for Making Low Calorie Fat-Containing Frozen Dessert Products Having Smooth, Creamy, Nongritty Mouthfeel," issued January 28, 1992.

d. United States Patent No. 4,356,198, entitled "Method of Preparing a Binder for Tableted Gasified Candy," issued October 26, 1982.

e. United States Patent No. 4,273,793, entitled "Apparatus and Process for the Preparation of Gasified Confectionaries by Pressurized Injection Molding," issued June 16, 1981.

f. United States Patent No. 4,271,206, entitled "Gasified Candy Having a Predetermined Shape," issued June 2, 1981.

g. United States Patent No. 4,263,328, entitled "Tableted Gasified Candy," issued April 21, 1981.

h. United States Patent No. 4,254,149, entitled "Carbonated Chewing Gum," issued March 3, 1981.

i. United States Patent No. 4,150,161, entitled "Carbonated Chewing Gum," issued April 17, 1979.

j. United States Patent No. 11,825, 868 entitled "Sweetener Composition," issued November 28, 2023.

20. I have previously offered testimony as an expert witness, including as an expert witness in cases involving issues related to the formulation of and ingredients included in food and beverage products. A list of my prior engagements for the last five years is included in my CV in Exhibit 1. My CV also lists my publications.

**B. Materials Considered**

21. As part of my preparation for writing this Declaration, I reviewed, among other things, the '077 Patent and its prosecution history, including the original prosecution and the reexamination history, the parties' proposed constructions, and other materials discussed in the body of my declaration.

## III. LEGAL STANDARDS FOR CLAIM CONSTRUCTION

### A. Claim Construction

22. I am not a legal expert or an attorney and offer no opinions on the law. I understand that claim construction is a matter of law. I have been informed by counsel of the legal standards that apply to claim construction, and I have applied them in arriving at my conclusions.

23. I understand that the words of a claim are generally given the ordinary and customary meaning that the term would have to a person of ordinary skill in the art at the time of the invention.

24. I understand that to determine how a person of ordinary skill would understand a claim term, courts may consider both "intrinsic" and "extrinsic" evidence. I understand that courts look first to the intrinsic evidence of record, which includes the patent itself (including the claims and specification) and the prosecution history. I also understand that courts may consider extrinsic evidence, such as expert and inventor testimony, dictionaries, and learned treatises.

25. I understand that a person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which it appears, but also in the context of the entire patent, including the specification and prosecution history. Thus, any explicit definitions of terms or intentional disclaimers or disavowals of claim scope in the specification or prosecution history must be considered in determining the meaning of a claim term.

26. I understand that particular embodiments appearing in the written description do not limit claim language that has broader effect, and that the scope of the claims is not necessarily limited to inventions that look like the ones shown in the figures and described in the specification. However, I also understand that the patentee is required to define precisely what he claims his invention to be, and the claims must be construed in a manner consistent with the specification.

27. I am informed that a term must be interpreted with a full understanding of what the inventors actually invented and intended to include within the scope of the claim as set forth in the patent itself. Thus, claim terms should not be broadly construed to encompass subject matter that is technically within the broadest reading of the term, but is not supported when the claims are viewed in light of the invention described in the specification and the file history.

28. I understand that the prosecution file history of the patent provides additional evidence of how both the Patent Office and the inventors understood the terms of the patent, particularly in light of what was known in the prior art. I understand that arguments and amendments made during prosecution may further require a narrow interpretation of a claim term, even if that term is used more broadly in the specification, or may clarify the interpretation of a claim term that is ambiguous.

29. I understand that differences among claims can also be a useful guide in understanding the meaning of particular claim terms. For example, I am familiar with the doctrine of "claim differentiation" where the presence of dependent claims that add a particular limitation to an independent claim gives rise to a presumption that the limitation in question is not present in the independent claim.

**B. Indefiniteness**

30. I understand that the standard for indefiniteness is whether a person having ordinary skill in the art would understand what is claimed when the claim is read in light of the specification and prosecution history. A claim is indefinite if, viewed in light of the specification and prosecution history, it fails to inform one skilled in the art about the scope of the invention with "reasonable certainty." The definiteness requirement must take into account the inherent

limitations of language; reasonable certainty in light of the subject matter, and not absolute precision, is required.

31. I understand that a patent must be precise enough to afford clear notice of what is claimed and apprise the public of what subject matter is still open to them in a manner that avoids a zone of uncertainty. I am informed that a claim does not provide clear notice of its scope if a claim term may be reasonably interpreted to refer to multiple different structures or methods, which provide different results, and the intrinsic evidence offers no guidance regarding which method or structure should be used. I am also informed that a claim does not provide clear notice of its scope if the claim, when read in light of the specification and the prosecution history, does not provide objective boundaries for those of skill in the art. Therefore, I understand that patent claims with descriptive words or terms of degree must provide objective boundaries for those of skill in the art in the context of the invention to be definite.

32. I understand that indefiniteness is an invalidity defense, and that the defendant or accused infringer bears the burden to demonstrate a term is indefinite by clear and convincing evidence.

## IV. SUMMARY OF THE ’077 PATENT

33. The ’077 Patent is directed to supposedly “new biologically active substances (BAS) and their properties,” specifically “Creatine derivatives having a general formula: $NH{=}C(NH_2)—N(CH_3)—CH_2—CO—NH—R{*}X$. ’077 Patent at Abstract. The ’077 Patent discloses that R is “amino acid residue of aliphatic, aromatic or heteroaromatic L-amino acid or its derivative representing a salts of amino acid, amino acid esters, amino acid amides or peptides.” *Id.*; *see also id.* at 4:5-14. The ’077 Patent also discloses that X is “lower-molecular-weight organic acid, or mineral acid, or water.” *Id.* at 4:9-10. Lower-molecular-weight organic or mineral

acid can be represented by "pharmaceutically acceptable lower organic or mineral acids," which have "molecular weight usually less than 300." *Id.* at 4:14-17. A few examples of lower-molecular-weight organic or mineral acids include acetic, hydrochloric, and citric acids. *Id.* at 4:17-18.

34. All of the '077 Patent claims are directed to amides of creatine having a specific chemical formula. For example, Claim 1 recites:

> 1. Amides of Creatine having a general formula: $NH{=}C(NH_2){-}N(CH_3){-}CH_2{-}CO{-}NH{-}R{*}X$,
>
> wherein R is amino acid residue of aliphatic L-amino acid, or aromatic amino L-acid or heteroaromatic L-amino acid or derivatives of aliphatic L-amino acid, or aromatic L-amino acid or heteroaromatic L-amino acid representing at least one of the following: salts of amino acid, amino acid esters, amino acid amides, or amino acid peptides; and
>
> X is low-molecular-weight organic or mineral acid or water.

35. Independent Claim 3 of the '077 Patent further requires amides of creatine possessing a neuroprotective activity:

> 3. A compound possessing neuroprotective activity, said compound consisting of amides of Creatine having a general formula: $NH{=}C(NH_2){-}N(CH_3){-}CH_2{-}CO{-}NH{-}R{*}X$;
>
> wherein R is amino acid residue of aliphatic L-amino acid, or aromatic amino L-acid or heteroaromatic L-amino acid, or derivatives of aliphatic L-amino acid, or aromatic L-amino acid, or heteroaromatic L-amino acid representing at least one of the following: salts of amino acid, amino acid esters, amino acid amides, or amino acid peptides; and
>
> X is low-molecular-weight organic or mineral acid or water as a remedy possessing a neuroprotective activity.

## V. LEVEL OF ORDINARY SKILL IN THE ART

36. I have been informed that the factors that may be considered in determining the ordinary level of skill in the art include: (1) the types of problems encountered in the art, (2) the

prior art solutions to those problems, (3) the rapidity with which innovations are made, (4) the sophistication of the technology, and (5) the educational level of active workers in the field.

37. I am aware that in *ThermoLife Int'l LLC v. Vital Pharmaceuticals, Inc.*, No. 0:16-cv-60691-WPD, Dkt. 107-4, 7 (S.D. Fla. June 24, 2019), which is attached as Exhibit 2, Dr. Gregg B. Fields opined that the level of skill of a POSITA with respect to the '077 Patent is the following: "The art of the '077 Patent is amino acid and peptide chemistry, and a person of ordinary skill in that art at the time of the filing of the patent application (December 24, 2008) would have a degree in chemistry and at least two additional years of laboratory experience." I have adopted this definition for my opinions here.

38. Under this definition, I would have qualified as a POSITA as of the alleged priority date of the '077 Patent, December 24, 2008, for the reasons discussed above in my section on qualifications. For example, by 1967, I had received a B.S. in Chemistry and by 1971, I had received a Doctorate in Physical Chemistry. My doctoral research required laboratory work, and as a result, by 1971, I had already received four years of laboratory experience. And by 2008, I had over 30 years of laboratory experience. In my roles as Research Food Scientist at Lehi the Farmer's Dairy, Group Leader at General Foods Corporation, Manager of Product Development with Ragú Foods, Inc., Director of Food Product Development with Arthur D. Little, Inc./TIAX, LLC, Business Development Director of DuPont Food Industry Solutions for E.I. DuPont de Nemours and Company, and Director of Food Science at Moobella, Inc., my work partially required laboratory work or management of laboratory work. Therefore, I consider myself to have been at least a person of ordinary skill in the time frame of the Asserted Patent.

## VI. AGREED UPON CLAIM CONSTRUCTIONS

39. I understand that the parties agree to the following constructions:

| Claim Term(s) | Agreed Construction |
|---|---|
| "amino acid residue"<br><br>(Claims 1, 3) | Plain Meaning |
| "aromatic amino L- acid"<br><br>(Claims 1, 3) | "aromatic L-amino acid" |
| "wherein R is amino acid residue of aliphatic L-amino acid, or aromatic amino L-acid or heteroaromatic L-amino acid, or derivatives of aliphatic L-amino acid, or aromatic L amino acid, or heteroaromatic L-amino acid representing at least one of the following: salts of amino acid, amino acid esters, amino acid amides, or amino acid peptides"<br><br>(Claims 1, 3) | "wherein R is amino acid residue of<br><br>[aliphatic L-amino acid, or aromatic L-amino acid or heteroaromatic L-amino acid]<br><br>or<br><br>[derivatives of aliphatic L-amino acid, or aromatic L-amino acid or heteroaromatic L-amino acid representing at least one of the following: salts of L-amino acid, L-amino acid esters, L-amino acid amides, or L-amino acid peptides]" |
| "The compound of claim 1, wherein the compound is a composition with an auxiliary component"<br><br>(Claim 6, 7) | "The compound of claim 1, wherein the compound is in a composition with an auxiliary component" |
| "auxiliary component is water"<br><br>(Claim 6, 7) | "auxiliary component is water other than X" |

## VII. OPINIONS ON THE DISPUTED CLAIM TERMS

40. I understand that the parties dispute the meaning of several claim terms. My opinions with respect to these terms are set forth below.

### A. "Amides of Creatine Having a General Formula: $NH{=}C(NH_2)$—$N(CH_3)$—$CH_2$—CO—NH—R*X"

41. I am informed that the parties propose the following constructions:

| Claim Term(s) | Defendants' Construction | Plaintiff's Construction |
|---|---|---|
| "Amides of Creatine having a general formula: $NH{=}C(NH_2)$—$N(CH_3)$—$CH_2$—CO—NH—R*X"<br><br>(Claim 1, 3) | "Amides of Creatine having a general formula: $NH{=}C(NH_2)$—$N(CH_3)$—$CH_2$—CO—NH—R*X, wherein * represents a center dot that separates components of an addition compound, in this case $NH{=}C(NH_2)$—$N(CH_3)$—$CH_2$—CO—NH—R and X" | Plain meaning |

42. The proper construction to a POSITA is Defendants' proposed construction because it is consistent with the use of these terms in the claims and specification of the '077 Patent, including in all examples. I further agree with Defendants' proposed construction because it comports with well-known and fundamental chemistry principles, and because it is how a POSITA would have understood this term at the time of the alleged invention. Defendants' proposed construction provides necessary clarity and articulation of the scope of this claim term and avoids ambiguity as to how a POSITA would have understood these limitations.

43. A POSITA would understand the asterisk ("*") used in Claims 1 and 3 to mean a center dot (•) that separates components of an addition compound, in this case $NH{=}C(NH_2)$—$N(CH_3)$—$CH_2$—CO—NH—R and X.

#### 1. An Asterisk Used in a Chemical Formula is Equivalent to a Center Dot

44. Center dots are commonly used in chemical formulas for organic and inorganic compounds. Center dots often appear in type as a dot "•." Other times, center dots may appear as other symbols, such as an asterisk "*." The choice to use one symbol or another is largely a matter

of convenience. An asterisk appears on a keyboard and is a commonly recognized character by word processing system whereas a dot is a special symbol that must be inserted and may not always be available in word processing software. Regardless of which symbol is used, a POSITA would understand that an asterisk or a dot appearing in the center of a chemical formula, such as that in Claims 1 and 3, could be used interchangeably without changing the meaning of the chemical formula.

45. This understanding of a POSITA is confirmed through intrinsic evidence. First, the publication of the international patent application to which the ’077 Patent claims priority, PCT/RU2008/000793, uses the dot "•" and asterisk "*" symbols interchangeably. The publication’s English Abstract states: "[t]he invention relates to pharmaceutical chemistry . . . namely to creatine derivatives of general formula: NH=C($NH_2$)-N($CH_3$)-$CH_2$-CO-NH-***R•X***." *See* Exhibit 3, International Patent Publication No. WO2010/074591, at Abstract (PEPSI-0005932–64 at 932) (HEB0003798–830 at 798) (emphasis added).[1] The same publication later states in Russian: "Реферат: Изобретение относится к обЛасти фармацевтической химии, а именно к новьIм биологически активньIм веществам (БАВ) и их свойствам, а именно к производньIм креатина обшей формульI: NH=C(NH2)-N(CH3)-CH2-CO-NH-***R*X***." *See id*. at Claim 1 (PEPSI-0005960) (HEB0003826). Thus, even in different instances of reciting the same chemical formula, the publication uses a dot "•" and an asterisk "*" interchangeably.

46. Second, three other experts that have analyzed the ’077 Patent in prior litigations have opined that an asterisk "*" is the same as a center dot "•" in a chemical formula. Exhibit 4, *Werteks Closed Joint Stock Co. et al. v. Vitamin Shoppe, Inc. et al*., 0:16-cv-60693-UU, Dkt. 46-

[1] Unless otherwise noted, all emphases have been added.

2, ¶ 6 (S.D. Fla. Nov. 14, 2016) (PEPSI_0006009–12 at 011) (HEB0003704–07 at 706) ("It is generally known that an asterisk such as in claim 1 is the equivalent of a center dot in a chemical equation." (Dr. Chamberlin)); Exhibit 5, *Werteks Closed Joint Stock Co. et al. v. Vitamin Shoppe, Inc. et al*., 0:16-cv-60693-UU, Dkt. 47-2, ¶ 18 (S.D. Fla. Nov. 14, 2016) (PEPSI_0006013–17 at 016) (HEB0003708–12 at 711) ("The asterisk ("*") in the chemical formula in claims 1 and 3 is equivalent of a center dot ("•"). An asterisk is sometimes used in lieu of a center dot in chemical formulas in patents." (Dr. Fields)); Exhibit 6, *ThermoLife Int'l LLC v. Vital Pharmaceuticals, Inc.*, No. 0:14-cv-61864-WJZ, Dkt. 72-1, 7-8 (PEPSI_0006042–51 at 047-048) (HEB0003668–77 at 673-74) (S.D. Fla. Sept. 21, 2015) ("[T]he asterisk in front of the X is equivalent of a center dot in the equation." (Dr. Bugay and Dr. Fields)); *see also* Exhibit 7, *ThermoLife Int'l LLC v. Vital Pharmaceuticals, Inc.*, No. 0:14-cv-61864-WJZ, Dkt. 75, ¶¶ 22-23 (S.D. Fla. Sep. 21, 2015) (PEPSI_0006052–55 at 054) (HEB0003678–81 at 680) (Dr. Fields); Exhibit 8, *ThermoLife Int'l LLC v. Vital Pharmaceuticals, Inc.*, No. 0:14-cv-61864-WJZ, Dkt. 76, ¶¶ 40, 44 (S.D. Fla. Sep. 21, 2015) (PEPSI_0006056–62 at 059-61) (HEB0003682–88 at 685-87) (Dr. Bugay).

47. Accordingly, a POSITA would understand the asterisk used in the chemical formula claimed in Claims 1 and 3 of the '077 Patent to represent a center dot. Therefore, the portion of Defendants' proposed construction that "*" represents a center dot is consistent with the knowledge of a POSITA.

**2. An Asterisk (Center Dot) Used in a Chemical Formula Represents an Addition Compound**

48. A POSITA further would understand that the asterisk in the '077 Patent's chemical formula separates components of an addition compound, which components in the case of Claims 1 and 3 are $NH{=}C(NH_2)$—$N(CH_3)$—$CH_2$—CO—NH—R and X.

49. An addition compound is formed when two or more stable compounds combine to create a single, larger molecule. There are several types of addition compounds, including hydrates, adducts, clathrates, double salts, and double oxides. *See* Exhibit 9, Connelly, *et al.*, *Nomenclature of Inorganic Chemistry IUPAC Recommendations 2005*, International Union of Pure and Applied Chemistry, 28 (2005) (PEPSI_0005918–31 at 925) (HEB0003776–89 at 783). As discussed below, the two types of addition compounds most relevant to the ’077 Patent based on the examples are adducts and hydrates.

50. An adduct is a compound formed by the direct combination of two or more simpler molecules, without any loss of atoms from those molecules. Adducts can be formed through various types of bonding, including covalent, coordinate, and van der Waals forces.

51. A hydrate is a compound that includes one or more water molecules within its chemical structure, often in a crystalline form.[2] It is my understanding that a previous owner of the ’077 Patent presented a similar definition to the Patent Office during reexamination of the ’077 Patent. *See* Reexamination No. 90/013,902 Declaration of Richard Chamberlain Under 37 C.F.R. § 1.132 dated 09/22/2017 at ¶15 (“The term monohydrate is generally understood to mean exactly one molar equivalent of water *that is an integral part of the crystal lattice of the material in question*.” (emphasis original)).

52. The specification of the ’077 Patent does not expressly state the meaning of the asterisk in the claimed chemical formula. However, it provides three examples from which a

[2] As discussed below, the number of water molecules is represented as a coefficient in the chemical formula.

POSITA would have understood that the asterisk separates components of an addition compound. Each example discloses an addition compound:

- Example 1 relates to the synthesis of Creatinyl-γ-Aminobutyric Acid Ethyl Ester Acetate having the chemical formula: $C_{10}H_{20}N_4O_3*CH_3COOH$. In this example, the asterisk (*) separates Creatinyl-γ-Aminobutyric Acid Ethyl Ester (an amide of creatine) from Acetate (a low-molecular weight acid). The resulting product from the synthesis of this example is an adduct in which all atoms from both Creatinyl-γ-Aminobutyric Acid Ethyl Ester and Acetate are present.

- Example 2 relates to the synthesis of Creatinyl-L-Phenylalanine Amide Hydrate having the chemical formula: $C_{13}H_{19}N_5O_2*H_2O$. In this example, the asterisk (*) separates Creatinyl-L-Phenylalanine Amide (an amide of creatine) from water. The resulting product from the synthesis of this example is a hydrate in which one water molecule is included within the crystalline structure of Creatinyl-L-Phenylalanine Amide. Again, all atoms from both components are present in this addition compound.

- Example 3 relates to synthesis of Creatinyl-L-Phenylalanine Amide Acetate having the chemical formula: $C_{13}H_{19}N_5O_2*CH_3COOH$. In this example, the asterisk (*) separates Creatinyl-L-Phenylalanine Amide (an amide of creatine) from Acetate (a low-molecular weight acid). The resulting product from the synthesis of this example is an adduct in which all atoms from both Creatinyl-L-Phenylalanine Amide and Acetate are present.

53. Although the chemical formula is not provided for the compounds prepared through the synthesis described in Examples 4-8 in the ’077 Patent, a POSITA would have likewise understood each resulting product to be an addition compound because each resulting product is a solid compound that is in crystalline form, which resulted from solvent evaporation or other separation from solution.

54. The ’077 Patent does not provide any other examples or otherwise explain any other form in which the compound having the claimed general formula could exist. I understand that Amide asserts in its infringement contentions in this lawsuit that the compound having the claimed general formula may be formed within an aqueous solution (i.e., a solution in water as the solvent) where the asterisk (*) represents a non-covalent bond. That is not disclosed in the specification of

the ’077 Patent. The ’077 Patent does not provide any such examples in which this occurs or any mechanism by which this could occur. I acknowledge that Example 3 of the ’077 Patent discloses that “[c]reatinyl-L-phenylalanine amide prepared according to the example 2 [i.e., an amide of creatine having the general formula of Claims 1 and 3] was dissolved in water and applied on the column 25×100 mm with a silica gel Lichroprep RP-18 (43-60 µm, Merck) then eluted by 0.2% acetic acid and separated from the solution” to form a different amide of creatine having the general formula of Claims 1 and 3 — $C_{13}H_{19}N_5O_2*CH_3COOH$. In this example, at least a portion of the creatinyl-L-phenylalanine amide prepared according to Example 2 ceases to have the general formula of Claims 1 and 3 when it is dissolved in water due to dissolution of the water molecule, and the new amide of creatine having the general formula of Claims 1 and 3 ($C_{13}H_{19}N_5O_2*CH_3COOH$) is formed by separation from solution using the silica gel column, not in an aqueous solution (i.e., not in water). This mechanism for forming an amide of creatine having the general formula of Claims 1 and 3 is different than the mechanism asserted in Amide’s infringement contentions and results in an addition compound (more specifically, an adduct), not a non-covalently bonded compound in aqueous solution.

55. I further understand that dependent Claim 5 requires that the compound having the general formula recited in Claim 1 is in an aqueous solution, and that dependent Claim 7 requires that the compound is in a composition with an auxiliary component that is water. I note that the ’077 Patent discloses that “[c]reatine amides can be administered into the organism independently and within compositions, containing a mixture of an active ingredient with auxiliary components” and that “the auxiliary substances may include: solvents, such as water.” ’077 Patent at 5:1-12. I further note that the ’077 Patent provides examples in which the solid “amide of creatine” formed through Examples 1 to 8 were added to an aqueous solution in connection with further experiments

in Examples 9 and 10. However, Examples 9 and 10 do not provide any instances in which an amide of creatine is formed within an aqueous solution as Amide asserts in its infringement contentions. Furthermore, although these examples do not specify, depending on the amount of the amide of creatine having the general formula recited in Claim 1 that is added to the aqueous solution, it is possible for at least some of that amide of creatine to remain in the form of an addition compound (crystals) in water, not as a solution. I note that the claims of the '077 Patent do not specify any amount or concentration of the compound in an aqueous solution.

56. Accordingly, it is clear from the '077 Patent specification that the asterisk in a chemical formula separates the components of an addition compound, for example, an adduct or a hydrate, as required by Defendants' proposed construction.

57. Extrinsic evidence also supports Defendants' proposed construction. For example, prior to the 2008 filing date of the '077 Patent, a POSITA would have relied on *Nomenclature of Inorganic Chemistry IUPAC Recommendations 2005* (PEPSI_0005918–31) (HEB0003776–89) (hereinafter, "The Red Book"), attached as Exhibit 9, to inform their understanding of chemical formulas. I note that Russia, the country in which the inventors of the '077 Patent are from, was among IUPAC's National Adhering Organizations in 2008. *See* IUPAC National Adhering Organizations, available at https://publications.iupac.org/organ/nao.html, last modified Feb. 15, 2008. The Red Book indicates that, "[i]n the formulae of addition compounds and compounds which can formally be regarded as such, including clathrates and multiple salts, a special format is used. The proportions of constituents are indicated by arabic numerals preceding the formulae of the constituents, ***and the formulae of the constituents are separated by a centre dot***." Exhibit 9 at 56 (PEPSI_0005928) (HEB0003786). The Red Book further instructs that, "[c]entre dots in formulae of (formal) addition compounds, including hydrates, adducts, clathrates, double salts and

double oxides, separate the individual constituents." *Id*. at 28 (PEPSI_0005925) (HEB0003783). Thus, it would have been common knowledge to a POSITA that the asterisk (center dot) separates the components of an addition compound.

58. I recognize that the Red Book relates to nomenclature for inorganic chemistry, whereas the compounds recited in Claims 1 and 3 of the '077 Patent are organic compounds. The Red Book nevertheless would have been instructive to a POSITA in the context of organic compounds as well. I reviewed the *Nomenclature of Organic Chemistry IUPAC Recommendations and Preferred Names 2013* (also called "The Blue Book"), and it notes that preferred IUPAC names for adducts are not assigned in the Blue Book and instead are assigned in documents on inorganic compounds. Center dots are less common in organic compounds. However, when they are used, a POSITA would have expected the nomenclature rules that apply to inorganic compounds to also apply to organic compounds. This understanding is consistent with the use of the asterisk (center dot) in the '077 Patent specification, as described above. Accordingly, a POSITA would have understood the asterisk (center dot) used in Claims 1 and 3 of the '077 Patent to separate the components of an addition compound.

59. Furthermore, an expert retained by the prior owner of the '077 Patent, ThermoLife International LLC, agrees with me that "the International Union of Pure and Applied Chemistry (IUPAC) sets the standard for hydrate nomenclature, and under that IUPAC nomenclature, a chemical structure followed by a center dot – as in the '077 Patent – has the potential to indicate the presence of an addition compound such as 'water,'" and the other expert in that case "seems to agree with this contention." Exhibit 8, *ThermoLife International LLC v. Vital Pharmaceuticals, Inc.*, No. 0:14-cv-61864-WJZ, Dkt. 76, ¶ 40 (S.D. Fla. Oct. 8, 2015) (PEPSI_0006056–62 at 059) (HEB0003682–88 at 685) (Dr. Bugay). Additionally, after reviewing the '077 Patent,

ThermoLife's expert further opined, like me, that "an addition compound is clearly referred to by the inclusion of an asterisk (equivalent to a center dot) in the molecular formula: NH=C($NH_2$)—N($CH_3$)—$CH_2$—CO—NH—R*X." *Id.* at ¶ 44 (emphasis added).

60. Accordingly, a POSITA would have understood that the asterisk, which represents a center dot, separates the components of an addition compound, which components in this case are NH=C($NH_2$)—N($CH_3$)—$CH_2$—CO—NH—R and X.

61. Defendants' proposed construction is consistent with the claims and specification of the '077 Patent and the understanding of a POSITA, and Defendants' proposed construction clarifies and forestalls ambiguity for this claim term.

**B. "Having"**

62. I am informed that the parties propose the following constructions:

| Claim Term(s) | Defendants' Construction | Plaintiff's Construction |
|---|---|---|
| "having"<br><br>(Claim 1, 3) | "containing only what is expressly set forth in the recited general formula" | Plain meaning |

63. I agree with Defendants' proposed construction because it is consistent with the use of these terms in the claims, specification, and figures of the '077 Patent, because it comports with well-known and fundamental chemistry principles, and because it is how a POSITA would have understood this term at the time of the alleged invention. Defendants' proposed construction provides necessary clarity for what is specifically claimed for this term and obviates ambiguity as to how a POSITA would have understood these limitations.

64. A person of skill in the art, reading the claims of the '077 Patent, would have interpreted "having" to require that compounds practicing the '077 Patent, must have each of the components recited in the '077 Patent claims and nothing more to meet that compound limitation.

"Having" is used to describe the compound recited in Claims 1 and 3 of the '077 Patent. Both Claims 1 and 3 recite "Amides of Creatine having a general formula: NH=C($NH_2$)—N($CH_3$)—$CH_2$—CO—NH—R*X." "Having," as used in these claims, would indicate to a POSITA that a compound that meets the claims must have the exact general formula recited in the claims—"NH=C($NH_2$)—N($CH_3$)—$CH_2$—CO—NH—R*X."

65. A chemical formula tells a POSITA the types and amounts of components (e.g., atoms) that are in a chemical compound. If even one atom is changed (either in type or amount) in a chemical formula, a POSITA would understand the chemical formula would refer to an entirely different chemical compound. Thus, when a POSITA reads a chemical formula, a POSITA would understand the chemical compound represented by that chemical formula to have only the components (e.g., atoms) recited in the chemical formula and in the amount recited in the chemical formula and not any other components (e.g., atoms) that are not recited in the chemical formula.

66. When determining whether a chemical compound meets a specific chemical formula, a POSITA would look at each component of the chemical compound for the determination. If a chemical compound is missing a component recited in a chemical formula, it cannot be described having that chemical formula. That chemical compound would have a different chemical formula. Similarity, if a chemical compound includes extra components not recited in a chemical formula, it cannot be described as having that chemical formula. Again, that chemical compound would have a different chemical formula. Therefore, a POSITA would understand that a chemical compound "having a general formula" must include each component recited in that general formula and may not include any additional components.

67. The specification of the ’077 Patent is also consistent with the understanding that for a compound to “have[] a general formula,” the compound must include each component recited in the general formula and no additional components. The ’077 Patent does not disclose any amides of creatine that include components not named in the recited general formula of Claims 1 and 3—“$NH{=}C(NH_2)—N(CH_3)—CH_2—CO—NH—R*X$” or otherwise indicate that amides of creatine that include components not named in the recited general formula would practice the claims of the ’077 Patent. All examples in the patent specification involve the synthesis of compounds that match the general formula recited in Claims 1 and 3 exactly—without any missing components or additional components not recited in the general formula. *See* Example 1 (“Creatinyl- γ-Aminobutyeric Acid Ethyl Ester Acetate”); Example 2 (“Creatinyl-L-Phenylalanine Amide Hydrate”); Example 3 (“Creatinyl-L-Phenylalanine Amide Acetate”); Example 4 (“Creatinyl-Glycine Benzyl Ester hydrochloride”); Example 5 (“Creatinyl-Tyrosine Amide Succinate”); Example 6 (“Creatinyl-Glycine Ethylamide Acetate”); Example 7 (“Creatinyl-Phenylalanyl-Arginyl-Glycine Ethyl Ester Acetate”); and Example 8 (“Creatinyl-Phenylalanine hydrochloride”).

68. Accordingly, a POSITA would have understood that in the context of Claims 1 and 3, “having” means “containing only what is expressly set forth in the recited general formula.” Thus, it is my opinion that Defendants’ proposed construction is consistent with the claims and specification of the ’077 Patent and the understanding of a POSITA, and that Defendants’ proposed construction clarifies and forestalls ambiguity for this claim term.

### C. "X is Low-Molecular-Weight Organic or Mineral Acid or Water"

69. I am informed that the parties propose the following constructions:

| Claim Term(s) | Defendants' Construction | Plaintiff's Construction |
|---|---|---|
| "X is low-molecular-weight organic or mineral acid or water"<br><br>(Claim 1, 3) | The term "X is low-molecular-weight organic or mineral acid or water" requires that X must be one molecule of "low-molecular weight organic or mineral acid or water." "X" therefore cannot be equal to zero molecules of low-molecular-weight organic or mineral acid or water. | Plain meaning |

70. The proper interpretation of this term is Defendants' proposed construction because it is consistent with the use of this term in the specification of the '077 Patent, because it comports with well-known and fundamental chemistry principles, and because it is how a POSITA would have understood this term at the time of the alleged invention. Defendants' proposed construction provides necessary clarity for what is claimed for this term and obviates ambiguity as to how a POSITA would have understood these limitations.

71. A POSITA at the time of the alleged invention would have understood that X is a single molecule based on standard nomenclature in the field of chemistry and the '077 Patent's specification. First, POSITAs utilize standard nomenclature for writing chemical formula so that others in the field can understand what the compound is; this is like using a universal language. According to the standard nomenclature at the time of the alleged invention, a numerical value or variable may immediately precede a molecule or compound in a chemical formula. This numerical value or variable is called a coefficient, and coefficients indicate the number of molecules or compounds present. If a POSITA used a variable (e.g., n) for the coefficient, the POSITA would

also include a definition of the variable that provided the appropriate numerical range for the variable (e.g., n is 2 to 5).

72. When a component of a chemical formula is not preceded by a coefficient, the coefficient is understood to be 1. This understanding is reflected in the various pieces of extrinsic evidence cited by Defendants *See, e.g.*, Exhibit 10, Brady, Russell, Holum, *Chemistry Matter and Its Changes 3E*, Wiley, 52-53 (2000) (PEPSI_0005991–98 at 997-98) (HEB0003744–51 at 750-51) ("When no number is written, the coefficient is assumed to be 1 (so the coefficient of $O_2$ equals 1)."); Exhibit 9, Connelly, et al., *Nomenclature of Inorganic Chemistry IUPAC Recommendations 2005*, International Union of Pure and Applied Chemistry, 31 (2005) (PEPSI_0005918–31 at 926) (HEB0003776–89 at 784) ("(c) To indicate the composition of (formal) addition compounds or non-stoichiometric compounds. The numeral is written on the line before the formula of each constituent except that unity is omitted."). When a component of a chemical formula is not proceeded by a coefficient, a POSITA would understand the coefficient to not include values other than 1 (i.e., the coefficient cannot have a value of zero or a value of 2 or higher).

73. The '077 Patent does not disclose a coefficient associated with X with the claimed general formula. Therefore, reading the specification and claims of the '077 Patent in light of standard nomenclature in the field of chemistry, a POSITA would have understood that X, in the claimed general formula, has an assigned coefficient of 1 and that the claimed formula requires one and only one molecule of "low-molecular-weight organic or mineral acid or water."

74. The examples in the patent specification are consistent with the understanding that X is one molecule and support Defendants' proposed construction. All of the examples in the patent specification involve the synthesis of compounds that have, as their "X" component, *one* molecule of low-molecular-weight organic acid or water. *See* Example 1 ("Creatinyl- γ-

Aminobutyeric Acid Ethyl Ester Acetate"); Example 2 ("Creatinyl-L-Phenylalanine Amide Hydrate"); Example 3 ("Creatinyl-L-Phenylalanine Amide Acetate"); Example 4 ("Creatinyl-Glycine Benzyl Ester hydrochloride"); Example 5 ("Creatinyl-Tyrosine Amide Succinate"); Example 6 ("Creatinyl-Glycine Ethylamide Acetate"); Example 7 ("Creatinyl-Phenylalanyl-Arginyl-Glycine Ethyl Ester Acetate"); and Example 8 ("Creatinyl-Phenylalanine hydrochloride").

75. Examples 1, 3, 6, and 7 involve the synthesis of "acetates," meaning that they have one acetic acid molecule that is bound to the amide of creatine. Acetic acid is a low molecular weight organic acid.

76. Example 2 involves the synthesis of a "hydrate," meaning that it has one water molecule that is bound to the amide of creatine.

77. Examples 4 and 8 involve the synthesis of "hydrochlorides," meaning that they have one hydrochloric acid molecule that is bound to the amide of creatine. Hydrochloric acid is a low molecular weight mineral acid.

78. Example 5 involves the synthesis of a "succinate," meaning that it has a succinic acid molecule that is bound to the amide of creatine. Succinic acid is a low molecular weight organic acid.

79. The prosecution history of the '077 Patent is also consistent with the understanding that X is one molecule and supports Defendants' proposed construction. Pursuant to standard nomenclature in the field of chemistry, a compound is called a hydrate where it has one or more water molecules bonded to it. Additionally, a compound is called a monohydrate where it has just one molecule of water bonded to it. Under the recited general formula in Claims 1 and 3 of the '077 Patent, X is the component of the compound that can be water, and as a result, water is bonded

to the compound and the compound is a hydrate only if X is water. Further, under the recited general formula, because the assigned coefficient of X is 1 based on standard nomenclature in the field of chemistry and X is the only component in the compound that can be water, if X is water, the compound must be a monohydrate. Therefore, a hydrate with more than one water molecule bonded to it does not meet the general formula recited in Claims 1 and 3 of the ’077 Patent.

80. Statements made by a previous owner of the ’077 Patent during the prosecution of the patent confirm that hydrates other than monohydrates cannot practice the claims of the ’077 Patent. Indeed, during prosecution, the previous patent owner distinguished a combination of two prior art references on the basis that the references allegedly do not render obvious a creatine monohydrate and therefore did not render obvious the claimed compound. *See* Reexamination No. 90/013,902 Declaration of Richard Chamberlain Under 37 C.F.R. § 1.132 dated 09/22/2017 at ¶¶ 14-20 (“I don’t see how Weiss or any other reference can support the mistaken contention that Purpura discloses the monohydrate form of anything, and most certainly not of N-creatinyl-L-glutamine amide or any other amide.”). The USPTO relied on this argument when issuing its Notice of Intent to Issue *Ex Parte* Reexamination Certificate withdrawing rejections of Claims 1 and 3, stating:

> The rejections allege obviousness with respect to forming the monohydrate, i.e., X being water. In particular, Weiss is cited for teaching creatine monohydrate and Pischel is cited for teaching creatine ascorbate salt in hydrate form. However, as noted in ¶ 27 of the Chamberlin Declaration, “the hydration state of a starting material, ‘conventional form’ or not, has virtually nothing to do with its expected reactions (the water of hydration is easily removed before any moisture sensitive reaction is attempted). And . . . a method for isolating the monohydrate of one molecule does not transfer to other structures (discussed above, especially ones as different as creatine and ascorbic acid. Thus, a person with ordinary skill in the art would not make such a far-fetched analogy [with creatine monohydrate or creatine ascorbate salt in hydrate form], much less depend on it for guidance about how to prepare an actual amide such as the creatinyl-L-glutamine amide described in the ’077 patent.

Reexamination No. 90/013,902 Notice of Intent to Issue *Ex Parte* Reexamination Certificate dated 10/05/2017 at Reasons for Patentability/Confirmation.

81. I further understand that a prior claim construction order regarding the '077 Patent is consistent with my understanding that X is one molecule, and that order supports Defendants' proposed construction. In their respective Local Patent Rule 4-2 Disclosures, both Plaintiff and Defendant cited a prior litigation claim construction order regarding this term. In the *Werteks Closed Joint Stock Co. et al. v. Vitamin Shoppe, Inc. et al.* claim construction order, the court held that "[t]he term 'X is low-molecular weight organic or mineral acid or water' in Claims 1 and 3, which is also incorporated into Claim 2, shall be construed as follows: The term 'X is low molecular-weight organic or mineral acid or water' requires that X **must be** one molecule of 'low-molecular weight organic or mineral acid or water.' 'X' therefore cannot be equal to zero molecules of low-molecular-weight organic or mineral acid or water." Exhibit 11, No. 0:16-cv-60693-UU, Dkt. 74, 23-24 (S.D. Fla. Jan. 12, 2017) (PEPSI_0006018–41 at 040-41) (HEB0003713–36 at 735-36) (bold and underline original). In that prior litigation, the plaintiffs proposed the following construction: "'Water' refers to degrees of hydration, and hydrate systems can be classified from anhydrous, where the coefficient that is implicit in 'X' would be zero, to higher degrees of hydrates, where the coefficient would be greater than zero." *Id.* at 3. (PEPSI_0006020) (HEB0003715). Those plaintiffs argued that X could be zero or some higher number; the court disagreed and held that X "**must be** one." I agree with that court's construction, which matches how a POSITA would have understood this term at the time of the alleged invention in view of the '077 Patent's specification.

82. Defendants' proposed construction is consistent with the specification and the understanding of a POSITA, and Defendants' proposed construction clarifies ambiguity for this claim term.

**D. "Compound Possessing Neuroprotective Activity" / "As a Remedy Possessing a Neuroprotective Activity"**

83. I am informed that the parties propose the following constructions:

| Claim Term(s) | Defendants' Construction | Plaintiff's Construction |
|---|---|---|
| "compound possessing neuroprotective activity" / "as a remedy possessing a neuroprotective activity"<br><br>(Claim 3) | Indefinite | Plain meaning |

84. It is my opinion that this term is indefinite. In view of the specification, claims, and file history, a POSITA would not have understood the scope of this term with reasonable certainty. As such, I understand that this term and claims that recite or depend from it are indefinite. For the reasons explained below, this term does not have a plain and ordinary meaning, and a POSITA would not have understood the meaning of this term with reasonable certainty.

85. The claim language itself creates significant uncertainty to a POSITA. Claim 3 recites:

> 3. A compound ***possessing neuroprotective activity***, said compound consisting of amides of Creatine having a general formula: $NH{=}C(NH_2)—N(CH_3)—CH_2—CO—NH—R{*}X$;
>
> wherein R is amino acid residue of aliphatic L-amino acid, or aromatic amino L-acid or heteroaromatic L-amino acid, or derivatives of aliphatic L-amino acid, or aromatic L-amino acid, or heteroaromatic L-amino acid representing at least one of the following: salts of amino acid, amino acid esters, amino acid amides, or amino acid peptides; and
>
> X is low-molecular-weight organic or mineral acid or water ***as a remedy possessing a neuroprotective activity***.

86. "Neuroprotective activity" is not a term of art, nor is it commonly used in the field. While it is possible that this term is a term of art in other fields, such as neuroscience, pharmacology, toxicology, or pharmaceutical science, it is not used in the field of art of the '077 Patent. *See supra* Section V. Indeed, within the field of art of the '077 Patent, the term "neuroprotective activity" has no established meaning and therefore does not define the type of activity that might be deemed "neuroprotective activity." For example, it would be unclear to a POSITA whether "neuroprotective activity" refers to any combination of: (1) healing of neurons, (2) slowing neuron damage, (3) causing increased neuron activity, or (4) any other activity. And even if a POSITA could determine the type of activity to which the term "neuroprotective activity" refers, a POSITA would not be aware of the appropriate way to measure "neuroprotective activity." Indeed, a POSITA would not be aware of methods for measuring activities that could be regarded as "neuroprotective activity," such as healing of neurons, slowing neuron damage, causing increased neuron activity, and other activities that could be classified as "neuroprotective activity." Therefore, without further context or background, a POSITA would not have understood the scope and meaning of the "neuroprotective activity" term.

87. A review of the use of the "neuroprotective activity" term in the context of the claims provides no additional clarity as to scope and meaning of the term to a POSITA and instead further obscures the scope and meaning of the term. First, Claim 3 of the '077 Patent, the only claim where the "neuroprotective activity" term appears, uses the "neuroprotective activity" term in the claim without any description of what activities may be classified as "neuroprotective activity" or any description of how a person of skill in the art may determine the existence of "neuroprotective activity." Additionally, Claim 3 makes the term even more confusing, pairing it

to the recited chemical compound. Specifically, Claim 3 recites "neuroprotective activity" in the context of "[a] compound possessing neuroprotective activity" and "as a remedy possessing neuroprotective activity." However, the "[a] compound possessing neuroprotective activity" and "as a remedy possessing neuroprotective activity" terms are not terms of art in the field of the '077 Patent. And Claim 3 does not explain how a compound could "possess[] a neuroprotective activity" or how something could be "a remedy possessing a neuroprotective activity." Also, even if a POSITA could have understood what the term "neuroprotective activity" represented, a POSITA would not have understood how the claimed compound could "possess[] neuroprotective activity" or be "a remedy possessing a neuroprotective activity."

88. Even if a POSITA could understand how the claimed compound would meet the "neuroprotective activity" terms—"[a] compound possessing neuroprotective activity" and "as a remedy possessing neuroprotective activity"—a POSITA would not have been able to understand how to measure whether the claimed compound "possess[es] neuroprotective activity" or is "a remedy possessing a neuroprotective activity." The claims provide no recitation for how a POSITA can determine that the claimed compound "possess[es] neuroprotective activity" or is a "remedy possessing a neuroprotective activity." And as a POSITA, it is unclear from the context of the claims how to measure whether the claimed compound "possess[es] neuroprotective activity" or is a "remedy possessing a neuroprotective activity"—i.e., what units of measurement a POSITA would use—and it is unclear what is the actual threshold for making the determination. For example, under the claims, it is possible that a POSITA should measure whether the claimed compound "possess[es] neuroprotective activity" or is a "remedy possessing a neuroprotective activity" by simply counting the total number of the claimed "amides of Creatine" administered. This interpretation is consistent with the language of Claim 3, which contemplates administration

of more than one of the claimed "amides of Creatine," stating: "A compound possessing neuroprotective activity, said compound consisting of: amides of Creatine." Additionally, under the claims it is possible that a POSITA should measure whether the claimed compound "possess[es] neuroprotective activity" or is a "remedy possessing a neuroprotective activity" by measuring how administration of the claimed compound impacts brain activity, such as by causing: (1) healing of neurons, (2) slowing neuron damage, (3) causing increased neuron activity, or (4) any other activity. Regardless of what method of measurement is appropriate, it is unclear, based on the patent claims, what units of measurement should be applied and what threshold would apply to determine whether the claimed compound "possess[es] neuroprotective activity" or is a "remedy possessing a neuroprotective activity."

89. Understanding the correct method for measuring, units of measurement, and applicable threshold for determining whether the claimed compound "possess[es] neuroprotective activity" or is a "remedy possessing a neuroprotective activity" is important. Any change in the method for measuring, units for measuring, or applicable threshold could have a significant impact in the determination of whether a compound "possess[es] neuroprotective activity" or is a "remedy possessing a neuroprotective activity." Under one method of measurement, unit of measurement, and applicable threshold, a compound could be deemed to meet the "possess[es] neuroprotective activity" and "remedy possessing a neuroprotective activity" limitations; however, if the method of measurement, unit of measurement, or applicable threshold is changed, that same compound may no longer meet these claim limitations. Therefore, without further context or background, a POSITA would not have understood the scope and meaning of the "compound possessing neuroprotective activity" and "remedy possessing a neuroprotective activity" terms.

90. The ’077 Patent specification and prosecution history do not provide any additional clarity as to the scope and meaning of the terms “compound possessing neuroprotective activity” and “remedy possessing a neuroprotective activity.” “Neuroprotective activity” is referenced in passing in the ’077 Patent in the Abstract and Object of and Brief Description of the Invention sections. ’077 Patent at Abstract, 3:60-61. However, these references do not describe what “neuroprotective activity” is and therefore do not clarify the scope and meaning of “neuroprotective activity” to a POSITA.

91. The background of invention section of the ’077 Patent discusses prior-art substances as having “moderate neuroprotective efficiency.” ’077 Patent at 3:30-33. However, this passing reference to “neuroprotective efficiency” provides no description of “neuroprotective efficiency” and in no way clarifies the scope and meaning of “neuroprotective activity.” *Id.* The background of invention section also discloses that it is “known that the clinical using of effective neuroprotectors would allow increasing the share of ‘small’ strokes among ischemic damages in the cerebral blood flow, reducing the infarction zone sizes considerably, extending the period of ‘therapeutic window and protecting from the reperfusion injuries.’ *Id.* at 3:33-44. First, this disclosure does not clarify whether the disclosed activity of “neuroprotectors” would be considered “neuroprotective activity.” But assuming that this disclosure provides one example of “neuroprotective activity,” it still fails to provide clarity as to the full scope of what can be considered “neuroprotective activity.” Indeed, it does not disclose whether “neuroprotective activity” is limited to the specifically disclosed example of “increasing the share of ‘small’ strokes among ischemic damages in the cerebral blood flow” or whether “neuroprotective activity” is broader and extends to other activities. To the extent that “neuroprotective activity” is not limited to the specific disclosed activity, this disclosure provides no description of the bounds of what a

POSITA would consider to be "neuroprotective activity." The references to "neuroprotective efficiency" and "neuroprotectors" in the background of the invention section of the '077 Patent do not clarify the scope and meaning of "neuroprotective activity" to a POSITA, including method of measuring "neuroprotective activity," the appropriate unit of measurement, or the applicable threshold for determining if "neuroprotective activity" is present.

92. The detailed description of the '077 Patent similarly fails to provide clarity as to the scope and meaning of the terms "[a] compound possessing neuroprotective activity" and "as a remedy possessing a neuroprotective activity." Example 10 in the '077 Patent's detailed description, titled "Nootropic Activity of Creatine Amides," discusses a "[s]tudy of Creatine amides['] influence upon their ability to demonstrate a neuroprotective action on the brain tissues." *See* '077 Patent at 12:40-16:32. That study was "carried out on the model of focal and global ischemia in rats." *Id.* at 12:44-50. And "[t]he examined samples were administered intravenous . . . in a dose of 20 mg/kg" in rats where ischemia had been induced. *See id.* at 12:57-67. And "on the *7th* day after ischemia, the rats were killed by decapitation, the brain was removed, . . . and the morphological examination was carried out." *Id.* at 13:1-7. "A conclusion regarding . . . the samples['] efficiency was drawn" on two bases: (1) "their effect on animals' behavior reactions in Morris watermaze," and (2) "morphological changes in brain tissue . . . by administration of Creatine amides" after the initiation of "global and focal cerebral ischemia." *Id.* at 13:9-14. The '077 Patent discloses the studies conducted and reaches the following conclusion:

> The above-presented data indicate substance compositions, containing Creatine amides, are capable of producing a neuro-protective effect in the conditions of ischemia of the brain tissue. The compositions based on Creatine amides positively affect the rehabilitation of cognitive functions after experimental stroke and latency of the 'warm-up,' characterizing a general condition of the energy tissue metabolism of the brain tissue in animals, the functional condition of the neurons and the associative areas of the cerebral cortex.

*Id.* at 16:24-32.

93. While Example 10 of the '077 Patent provides one example of "neuroprotective activity"—"positively affect[ing] the rehabilitation of cognitive functions after experimental stroke," specifically, induced ischema in rats—it still fails to provide clarity as to the scope of what can be considered "neuroprotective activity." Like the similar disclosures regarding "neuroprotective efficiency" and "neuroprotectors" in the '077 Patent's background of invention section, Example 10 does not explain whether "neuroprotective activity" is limited to its specifically disclosed example or whether "neuroprotective activity" is broader and extends to other activities. To the extent that "neuroprotective activity" is not limited to the specific disclosed example, this disclosure provides no explanation of the bounds of what a POSITA would consider to be "neuroprotective activity." Example 10 of the '077 Patent does not clarify the scope and meaning of "neuroprotective activity" to a POSITA, including the method of measuring "neuroprotective activity," the appropriate unit of measurement, or the applicable threshold for determining if "neuroprotective activity" is present.

94. The above-discussed references related to "neuroprotective activity" in the '077 Patent are the '077 Patent's only disclosures regarding "neuroprotective activity." As discussed above, none of those disclosures clarify the scope and meaning of "neuroprotective activity" to a POSITA; thus, the specification of the '077 Patent fails to clarify the scope and meaning of "neuroprotective activity" to a POSITA.

95. The prosecution history of the '077 Patent similarly fails to clarify the scope and meaning of "neuroprotective activity" to a POSITA. The prosecution and reexamination of the '077 Patent do not discuss what "neuroprotective activity" is and do not distinguish any prior-art references based on a lack of "neuroprotective activity."

96. I have reviewed Amide's Preliminary Proposed Constructions and Extrinsic Evidence Under Local Patent Rule 4-2, including the extrinsic evidence that Amide provided for the terms "compound possessing neuroprotective activity" and "as a remedy possessing neuroprotective activity," and the extrinsic evidence that Amide provides does not clarify the scope and meaning of "neuroprotective activity." Amide provides only one piece of evidence, a Merriam-Webster.com dictionary definition for "neuroprotective" accessed on June 11, 2025, which is identified as AMIDE_COMMON003350-3356 and attached as Exhibit 12. As an initial matter, this dictionary definition does not evidence how a POSITA would have understood the term "neuroprotective activity" at the time of the alleged invention because it is dated June 11, 2025, which is over *16 years after* the priority date for the '077 Patent. Further, Miriam-Webster.com is not a technical dictionary pertaining to the field of the '077 Patent and therefore is not a resource that a POSITA at the time of the alleged invention would have used. Regardless, the definitions of "neuroprotective" from Merriam-Webster.com does not clarify the scope and meaning of "neuroprotective activity." Merriam-Webster.com provides two definitions for "neuroprotective": (1) "serving to protect neurons form injury or degeneration," Exhibit 12 at AMIDE_COMMON003350, and (2) "serving to protect nerve cells from injury or degeneration," Exhibit 12 at AMIDE_COMMON003352. While these definitions do broadly define "neuroprotective" as protecting neurons, they fail to disclose any method of measuring "neuroprotective activity," an appropriate unit of measurement for "neuroprotective activity," or the applicable threshold for determining whether "neuroprotective activity" is present.

97. Accordingly, a POSITA reading this claim, in view of the specification and file history, would not know how to evaluate with reasonable certainty whether the claim is met.

**E. "Anhydrous"**

98. I am informed that the parties propose the following constructions:

| Claim Term(s) | Defendants' Construction | Plaintiff's Construction |
|---|---|---|
| "anhydrous"<br><br>(Claim 4) | "without water" | Plain meaning |

99. The proper interpretation is Defendants' proposed construction because it is consistent with the use of this term in Claim 4 of the '077 Patent, because it comports with well-known and fundamental chemistry principles, and because it is how a POSITA would have understood this term at the time of the alleged invention. Defendants' proposed construction provides necessary clarity for what is claimed for this claim term and obviates ambiguity as to how a POSITA would have understood these limitations.

100. The term "anhydrous" is used in the '077 Patent only in Claim 4. Outside of Claim 4, no portion of the '077 Patent uses the term "anhydrous," let alone explains what that term means. The term does not appear in the '077 specification. The file history of the '077 Patent also does not disclose the meaning of the term "anhydrous."

101. Regardless, "anhydrous" was (and still is) a term of art in the field of the '077 Patent at the time of the alleged invention, and at that time, a POSITA would have understood "anhydrous" to mean "without water." *See, e.g.*, Exhibit 13, Whitten, *et al.*, *Chemistry 8th Edition*, Brooks Cole, 77 (2007) (PEPSI_0005979–82 at 982) (HEB0003794–97 at 797) (defining "Anhydrous" as "Without water"); Exhibit 10, Brady, Russell, Holum, *Chemistry Matter and Its Changes 3E*, Wiley, 51 (2000) (PEPSI_0005991–98 at 996) (HEB0003744–51 at 749) ("When all the water is removed, the solid is said to be anhydrous, meaning without water."); Exhibit 14, *McGraw-Hill Dictionary of Chemistry*, Parker, Sybil P., 25 (1997) (PEPSI_0005915–17 at 917)

(HEB0003766–68 at 768) (defining "Anhydrous" as "Being without water, especially water of hydration"); Exhibit 15, Florence and Atwood, *Physicochemical Principles of Pharmacy Fourth Edition*, Pharmaceutical Press, 19 (2006) (PEPSI_0005909–14 at 914) (HEB0003752–57 at 757) ("Crystals that contain solvent of crystallisation are called crystal solvates, or crystal hydrates when water is the solvent of crystallisation. Crystals that contain no water of crystallisation are termed anhydrates."). Even Amide's own extrinsic evidence supports that "anhydrous" is understood by POSITAs to mean "without water." Exhibit 16, *Oxford Dictionary of Chemistry*, Oxford University Press, 37 (2016) (AMIDE_COMMON002833–36 at 835) (defining "Anhydrous" as "Denoting a chemical compound lacking water: applied particularly to salts lacking their water of crystallization"); Exhibit 17, Glenn D. Considine, Van Nostrand's Encyclopedia of Chemistry 5th ed., 101 (2005) (AMIDE_COMMON003281–89 at 289) (defining "Anhydrous" as "Descriptive of an inorganic compound that does not contain water either absorbed on its surface or combined as water of crystallization").

102. Thus, Defendants' proposed construction is consistent with the claims, specification, and the understanding of a POSITA, and Defendants' proposed construction clarifies ambiguity for this claim term.

## VIII. OTHER COMMENTS

103. My opinions are subject to change based on any expert opinions that Defendants may later present and information I may receive in the future or additional work I may perform. With this in mind, based on the analysis I have conducted and for the reasons set forth above, I have reached the conclusions and opinions in this Declaration.

104. I understand that the Court does not generally hear expert testimony during the claim construction hearing. However, if I am called to testify, in connection with my anticipated

testimony in this action. I may use as exhibits various documents produced in this case that refer or relate to the matters discussed in this Declaration. I have not yet selected the particular exhibits that might be used. In addition, I may create or assist in the creation of certain demonstrative evidence to assist me in testifying, and I reserve the right to do so, to further support the positions in this Declaration.

105. I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct.

Dated: July 14, 2025

Marvin J. Rudolph

Dr. Marvin J. Rudolph

# EXHIBIT 1



**Marvin J. Rudolph, Ph.D.**
**Managing Principal, *Dr. M.J. Rudolph Consulting, LLC***

Dr. Marvin J. Rudolph is the Managing Principal of Dr. M.J. Rudolph Consulting LLC, an independent food-science based consulting company dedicated to:

-Providing the technical expertise to help entrepreneurial food and food ingredient companies grow through the introduction of successful new products; and

- Serving as an expert witness in food and beverage-based cases concerning patent infringement, misappropriation of confidential technical information, ingredient claims and others where an expert opinion is needed to support a legal conclusion.

Dr. Rudolph has over 50 years of experience in food product development, working on concept and prototype generation through product rollout. He has provided market and technology assessment for numerous private and public companies, as well as government agencies. Dr. Rudolph's experience spans several food categories, including dairy, confectionary, and diet and health.

Prior positions have included:

- Director of Food Science, MooBella, Inc. ,Taunton, MA
- Business Development Manager, DuPont Food Industries Solutions (Division of E.I. DuPont De Nemours & Co.), Wilmington, DE.
- Director of Food Product Development, Arthur D. Little, Inc. and TIAX, LLC., Cambridge, MA.
- Manager, Product Development, Ragu Foods Inc. (Division of Unilever), Shelton CT.
- Group Leader, General Foods Corporation, Tarrytown, NY.
- Research Food Scientist, Lehi the Farmer's Dairy, Allentown, PA.

Dr. Rudolph has been involved with the development of multiple innovative products, including:

◆**Slim*Fast® Foods**- formulated and commercialized vitamin, mineral and fiber fortified meal replacement beverages in dry mix and ready-to-drink (asep tic) forms.

◆**Procter & Gamble-** formulated and scaled-up three products containing Olestra fat substitute- ice cream, mayonnaise and butter-like spread. Received two patents (U.S. 5,084,295, U.S. 6,010,734). Supplied co-packed products for clinical trials leading to U.S. regulatory approval of this ingredient

◆**Colombo Frozen Products Co**.-Formulated a frozen yogurt that can be scooped with a plastic spoon directly from the consumer's freezer.

◆**Frain Co.**-Developed a unique baked snack comprised of a peanut encased in a crunchy rice flour shell (U.S. 5,571,546)

◆A proprietary, shelf-stable nutraceutical beverage with demonstrated appetite-suppressing (satiety) functionality for a major ingredient supplier.

◆An all-natural reduced-calorie (40% fat) table spread containing no hydrogenat ed fats or oils or trans fatty acids.

◆Savory vegetable leather (as opposed to the typical sugar-based fruit leather).

◆*Granogurt Bar*-A unique shelf-stable confection containing live and active yogurt cultures.

He currently holds the following ten US patents in the areas of confectionery, snack food and dairy technology:

| **Patent Number** | **Title** |
|---|---|
| 11,825,868 | Sweetener Composition |
| 6,010,734 | Low calorie fat-containing frozen dessert products having smooth, creamy non-gritty mouthfeel |
| 5,571,546 | Food product and method of making same |
| 5,084,295 | Process for making low calorie fat-containing frozen dessert products having smooth, creamy non-gritty mouthfeel |
| 4,356,198 | Method of preparing a binder for tableted gasified candy |
| 4,273,793 | Apparatus and process for the preparation of gasified confections by pressurized injection molding |
| 4,271,206 | Gasified candy having a predetermined shape |

| | |
|---|---|
| 4,263,328 | Tableted gasified candy |
| 4,254,149 | Carbonated chewing gum |
| 4,150,161 | Carbonated chewing gum |

Recently, two patent applications have been filed by his clients naming him as inventor:

1. *Polymer-Based Oral Cannabinoid and/or Terepene Formulations;* US Application No. 16/672,057, filed November 1, 2019; and

2. *Healthy Shelf -Stable Nutella ™ Product-* Provisional US Patent Application filed June 2020.

## Recent Expert Witness Experience

**Dalmatia Import Group, Inc. v. Foodmatch, Inc. et al**
**United States District Court for the Eastern District of a Pennsylvania**
Case No. 2:16-cv-02767-EGS
Assignment from McDermott, Will & Emery, LLP representing the plaintiff Dalmatia Import Group:
My assignment was to evaluate whether Divina fig spread misappropriated Dalmatia's trade secrets with a focus on whether FoodMatch's Divina fig spread is derived from the Dal matia recipe known to the common copacker Lancaster Fine Foods. In this case, I was deposed by the defendant's counsel.
Verdict (filed 2/24/2017):
Verdict in favor of Plaintiff on misappropriation of trade secrets as to Defendants Foodmatch, Lancaster, and Earth Pride; in fa vor of Plaintiff on Trademark Infringement as to Defendants Foodmatch, Lancaster, EartPride, and C.O. Nolt: in favor of Plaintiff on conversion as to Defendants Lancaster and Earth Pride; in favor of Defendant Lancaster as to civil trespass counterclaim against Plaintiff Maia Magee.

**Kraft Foods Group Brands, LLC, Plaintiff, v. TC Heartland, LLC d/b/a Heartland Food Products Group and Heartland Packaging Corporation**
Assignment from Dinsmore & Shohl LLP, representing Patent Owner, Kraft Foods Group Brands.LLC.
My assignment was to provide an opinion as to whether claims 1-29 of United States Patent No. 8,603,557 are obvious over the references relied upon by the Patent Trial and Appeals Board.

I was deposed by attorneys for Hughes Hubbard & Reed repre senting TC Heartland LLC during the Inter Partes Review (IPR) phase; and testified in Federal District Court in Delaware.
The case has been heard in April 2017 by the US Supreme Court regarding the issue of forum shopping; see https://www.law.cor nell.edu/supct/cert/16-341.
Case was settled in September 2017.

**Natural Brands, Inc. Plaintiff, v. Beaumont Juice, Inc. D/B/A Perricone Juice Company and John N. Dembeck**
Assignment from Adams & Reese, LLP, representing Natural Brands Inc.
This lawsuit involves the misappropriation and theft by Perricone Juice Co. and John Dembeck from Natural Brands, Inc of confidential and proprietary informa tion and trade secrets that NBI has spent 36 years building and safeguarding, in violation of PLC's and Dembeck's respective contractual obligations and Texas law.
My assignment was to review records and conduct research and analysis for the case.
I was deposed on July 2, 2020 by the attorneys for Sheppard, Mullin, Richter & Hampton, LLP representing Perricone Juice Co.
The case was heard by a panel of the American Arbitration Association. National Brands Inc. was awarded $12 million.

**Dram Apothecary, Plaintiff, v. Colorado's Best Drinks, LLC Assignment from Kris & Singer, P.C. representing the Plaintiff, Dram Apothecary.**
I was requested by Dram Apothecary to provide expert testimony in matters related to the misappropriation of trade secrets regarding the process for ex tracting flavoring and coloring from herbs to make beverages without the addi tion of natural flavors and colors.
I was deposed by the attorney for McFarland Litigation Partners, LLC on 11/17/2021 and testified on 12/14/2021 in a jury trial held in the Denver County (Colorado) District Court.
The case was settled in December 2021.

**Soluble Technologies Group, LLC Plaintiff, v. Dreampak, LLC**
Assignment from Christian & Barton, LLP and Reinhart Boerner Van Deuren s.c. representing the Defendant Dreampak LLC.
My assignment is to determine if specific claims made by US 10,448,659, Flavoring Composition Concentrates, have been infringed by Dreampak LLC.
The case is ongoing.

**Selected publications include:**

◆*Pop Rocks- The Inside Story of America's Revolutionary Candy.* Published by Specialty Publishers LLC. 2006 (book).

◆*Working with Healthy Ingredients: Developing Products Containing Fish Oil, Probiotics and Low Digestible Carbohydrates*
Presented at the National Association of Flavors and Food Ingredient Systems, Technical Meeting, April 2005, Edison, New Jersey

◆*Fortification of Reduced Fat Ice Cream with Omega-3 Long Chain Polyunsaturated Fatty Acids (LCPUFAs)*
Presented at the Institute of Food Technologists Annual Meeting, June 24, 2001

◆*A Scoopful of Nutrition: Enriching Ice Cream with Fish Oil*
Innovations in Food Technology, Issue 13, December 2001. pp 69-70.

◆*Optimization of Protein Content and Sensory Characteristics of Energy Bars* Presented at the Institute of Food Technologists Annual Meeting, June 22-26, 1996

◆*The Food Product Development Process*
British Food Journal, Vol. 97 No.3, 1995 pp.3-11 MCB University Press, Limited 0007-070X

◆ *Developing New Food Products for a Changing Marketplace*, (Chapter Heading- *Innovations in Food Technology)* Technomic Publishing, 1999.

Dr. Rudolph is an emeritus member of the American Chemical Society and the Institute of Food Technologists, where he was designated as a Certified Food Scientist.

Dr. Rudolph earned his Ph.D. in Physical Chemistry and a B.S. in Chemistry in from Drexel University, Philadelphia, Pennsylvania.

He resides in Sharon, Massachusetts.

* * *

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 0:16-cv-60693-UU**

THERMOLIFE INTERNATIONAL, LLC, *et al.*,

Plaintiffs,

v.

VITAL PHARMACEUTICALS, INC., d/b/a VPX, *et al.*,

Defendants.
_______________________________________/

**<u>Expert Report of Dr. Gregg B. Fields</u>**

## I. Scope of Assignment

I have been retained by counsel for Vital Pharmaceuticals as an expert to provide my expert opinion as to certain issues pertaining to United States Patent No. 8,350,077 ("the '077 patent"), specifically: whether any of the claims of the '077 patent are invalid due to prior art.

## II. Background Qualifications

My curriculum vitae is attached as Exhibit A. I received my doctorate degree in 1988 from Florida State University. I am currently a Full Professor at Florida Atlantic University where I am the Chair of the Department of Chemistry & Biochemistry of the Charles E. Schmidt College of Science. I am also an Adjunct Professor in the Department of Chemistry of The Scripps Research Institute/Scripps Florida. I served as Co-Chair of the 16th American Peptide Symposium in 1999 and was President of the American Peptide Society from 2009-2011. I have been elected as a Fellow of the National Academy of Inventors and as a Fellow of the American Association for the Advancement of Science (AAAS).

EXHIBIT
Plf's 11
6-13-19
PENGAD 800-631-6989

in the art." *Id.* Therefore, "any need or problem known in the field of the endeavor at the time of the invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *Id.*

While the ultimate conclusion of obviousness is a legal question, it is based upon underlying facts. *In re Icon Health and Fitness Inc.*, 496 F.3d 1374, 1378 (Fed. Cir. 2007). "Underlying facts include the scope and content of the prior art, the level of ordinary skill in the art at the time of the invention, objective evidence of nonobviousness, and differences between the prior art and the claimed subject matter." *Id.* (citing *Graham*, 383 U.S. at 17-18). "The presence or absence of a motivation to combine" is also a question of fact, *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000), as are the "secondary considerations" discussed in *Graham*, *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1359 (Fed. Cir. 2007).

**D. Person of Ordinary Skill in the Art**

The art of the '077 patent is amino acid and peptide chemistry, and a person of ordinary skill in that art at the time of the filing of the patent application (December 24, 2008) would have a degree in chemistry and at least two additional years of laboratory experience. Although my educational background and work experience in the field are greater than that required for a perspective in this case, I am familiar with the perspective of the person having ordinary skill in the art from my university teaching position and my research work.

In reaching my opinions below, I have kept in mind the instruction that my opinions should reflect not my own perspective as a professor, but rather, they should reflect my opinion on how a person having ordinary skill in the art at the time the patent application was filed would have understood the patent claims, patent specification, and the prosecution history.

I am aware of the ingredients and constitution of the CremTor product, and I have not seen any evidence that either the CremTor product or its ingredient Creatinyl-L-Leucine, were designed based on "copying" of the '077 patent. The Creatinyl-L-Leucine ingredient is materially different from the compound claimed in the '077 patent. The Creatinyl-L-Leucine ingredient does not have the "•X" component that is claimed in the '077 patent. CremTor contained a number of ingredients other than Creatinyl-L-Leucine and consuming these other active ingredients in conjunction with Creatinyl-L-Leucine is not indicated in the '077 patent.

**VIII. Listing of Publications and Other Expert Testimony**

Exhibit A includes a listing of my publications. During the previous 4 years, I testified as an expert at trial or by deposition in the following case: ThermoLife International, LLC v. Vital Pharmaceuticals, Inc., Case NO 14-61864-CIV-ZLOCH (deposition).

**IX. Supplemental Testimony**

This report is a summary of my stated opinions and the bases of the opinions. I reserve the right to modify and update my opinions as I further review the above-referenced materials and other information, and will consider other evidence with which I may be presented during this case.

Signed: ______________________

Dated: January 30, 2017

# EXHIBIT 3

(12) МЕЖДУНАРОДНАЯ ЗАЯВКА, ОПУБЛИКОВАННАЯ В СООТВЕТСТВИИ С ДОГОВОРОМ О ПАТЕНТНОЙ КООПЕРАЦИИ (PCT)

(19) Всемирная Организация Интеллектуальной Собственности
Международное бюро

(43) Дата международной публикации
01 июля 2010 (01.07.2010)

PCT

(10) Номер международной публикации
WO 2010/074591 A1

(51) Международная патентная классификация:
*C07C 279/10* (2006.01) *A61K 38/05* (2006.01)
*C07C 277/08* (2006.01) *A61K 38/07* (2006.01)
*C07K 5/068* (2006.01) *A61K 31/16* (2006.01)
*C07K 5/11* (2006.01) *A61P 25/28* (2006.01)

(21) Номер международной заявки: PCT/RU2008/000793

(22) Дата международной подачи: 24 декабря 2008 (24.12.2008)

(25) Язык подачи: Русский

(26) Язык публикации: Русский

(71) Заявитель: ЗАКРЫТОЕ АКЦИОНЕРНОЕ ОБЩЕСТВО "ВЕРТЕКС" (VERTEX CLOSED JOINT STOCK COMPANY) [RU/RU]; В.О., 24 линия, д. 27А, Санкт-Петербург, 199026, St.Petersburg (RU).

(71) Заявители *(только для US)*: ХРОМОВА Наталья Васильевна (KHROMOVA Natalia Vasilyevna) (наследница умершего изобретателя) [RU/RU]; Московский пр-т, 159-20, Санкт-Петербург, St.Petersburg (RU). ХРОМОВ Пётр Алексеевич (KHROMOV Petr Alekseevich) (наследник умершего изобретателя) [RU/RU]; Московский пр-т, 159-20, Санкт-Петербург, St.Petersburg (RU). ХРОМОВА Анна Александровна (KHROMOVA Anna Alexandrovna) (наследница умершего изобретателя) [RU/RU]; ул. Фрунзе, 23-300, Санкт-Петербург, St.Petersburg (RU).

(72) Изобретатель: ХРОМОВ, Алексей Николаевич (KHROMOV, Alexej Nikolaevich) *(Умерший)*.

(72) Изобретатель; и
(75) Изобретатель/Заявитель *(только для US)*: БУРОВ Сергей Владимирович (BUROV, Sergej Vladimirovich) [RU/RU]; ул. Мончегорская д. 10, кв. 23, Санкт-Петербург, 197198, St.Petersburg (RU).

(74) Агент: КУЗНЕЦОВ, Виктор Александрович (KUZNETSOV, Viktor Alexandrovich); ул. Подвойского, 14-1-741 Санкт Петербург, 193318, St.Petersburg (RU).

(81) Указанные государства *(если не указано иначе, для каждого вида национальной охраны)*: AE, AG, AL, AM, AO, AT, AU, AZ, BA, BB, BG, BH, BR, BW, BY, BZ, CA, CH, CN, CO, CR, CU, CZ, DE, DK, DM, DO, DZ, EC, EE, EG, ES, FI, GB, GD, GE, GH, GM, GT, HN, HR, HU, ID, IL, IN, IS, JP, KE, KG, KM, KN, KP, KR, KZ, LA, LC, LK, LR, LS, LT, LU, LY, MA, MD, ME, MG, MK, MN, MW, MX, MY, MZ, NA, NG, NI, NO, NZ, OM, PG, PH, PL, PT, RO, RS, RU, SC, SD, SE, SG, SK, SL, SM, ST, SV, SY, TJ, TM, TN, TR, TT, TZ, UA, UG, US, UZ, VC, VN, ZA, ZM, ZW.

(84) Указанные государства *(если не указано иначе, для каждого вида региональной охраны)*: ARIPO (BW, GH, GM, KE, LS, MW, MZ, NA, SD, SL, SZ, TZ, UG, ZM, ZW), евразийский (AM, AZ, BY, KG, KZ, MD, RU, TJ, TM), европейский патент (AT, BE, BG, CH, CY, CZ, DE, DK, EE, ES, FI, FR, GB, GR, HR, HU, IE, IS, IT, LT, LU, LV, MC, MT, NL, NO, PL, PT, RO, SE, SI, SK, TR), OAPI (BF, BJ, CF, CG, CI, CM, GA, GN, GQ, GW, ML, MR, NE, SN, TD, TG).

Декларации в соответствии с правилом 4.17:
— *касающаяся установления личности изобретателя (правило 4.17 (i))*
— *об авторстве изобретения (правило 4.17 (iv))*

Опубликована:
— *с отчётом о международном поиске (статья 21.3)*

(54) **Title**: CREATINE AMIDES, A METHOD FOR THE PRODUCTION THEREOF AND AN AGENT EXHIBITING A NEUROPROTECTIVE ACTION

(54) **Название изобретения** : АМИДЫ КРЕАТИНА, СПОСОБ ИХ ПОЛУЧЕНИЯ, СРЕДСТВО, ОБЛАДАЮЩЕЕ НЕЙРОПРОТЕКТОРНЫМ ДЕЙСТВИЕМ

(57) **Abstract**: The invention relates to pharmaceutical chemistry, in particular to new biologically active substances (BAS) and to the properties thereof, namely, to creatine derivatives of general formula : $NH{=}C(NH_2)\text{-}N(CH_3)\text{-}CH_2\text{-}CO\text{-}NH\text{-}R \cdot X$, wherein R is an amino-acid residue or a substituted amino-acid residue; X is a low-molecular organic or mineral acid or water. The new substances are produced by interacting guanidyl agents with sarcosine amides in polar organic solvents at a temperature equal to or less than 50°C. The new substances exhibit a neuroprotective action and can be used in the form of an agent promising for preventing and treating brain ischemia.

(57) **Реферат**: Изобретение относится к области фармацевтической химии, а именно к новым биологически активным веществам (БАВ) и их свойствам, а именно к производным креатина общей формулы: $NH{=}C(NH_2)\text{-}N(CH_3)\text{-}CH_2\text{-}CO\text{-}NH\text{-}R{*}X$, где R- аминокислотный остаток, или замещенный аминокислотный остаток; X - низкомолекулярная органическая или минеральная кислота или вода. Новые вещества получают взаимодействием гуанидилирующих агентов с амидами саркозина в полярных органических растворителях при температуре не более 50°C. Новые соединения проявляют нейропротекторное, действие и могут применяться в качестве средства, перспективного для профилактики и лечения ишемии мозга.

WO 2010/074591 A1

# АМИДЫ КРЕАТИНА, СПОСОБ ИХ ПОЛУЧЕНИЯ, СРЕДСТВО, ОБЛАДАЮЩЕЕ НЕЙРОПРОТЕКТОРНЫМ ДЕЙСТВИЕМ

## Область техники

Изобретение относится к области фармацевтической химии, а именно к новым биологически активным веществам (БАВ) и их свойствам. В частности, изобретение относится к производным креатина - веществам общей формулы: **$NH{=}C(NH_2)\text{-}N(CH_3)\text{-}CH_2\text{-}CO\text{-}NH\text{-}R{*}X$,** где R- аминокислотный остаток, или замещенный аминокислотный остаток; X – низкомолекулярная органическая или минеральная кислота или вода.

## Предшествующий уровень техники

Креатин (Кр) является эндогенным питательным веществом, присутствующим в различных тканях млекопитающих, например, в печени, почках, мышечной ткани, ткани головного мозга, крови и находится как в свободном состоянии, так и в форме креатинфосфата. Креатин рассматривается в качестве средства, улучшающего энергетический тканевый метаболизм - повышающего энергетический резерв АТФ, прежде всего, в мышечных и нервных клетках.

В митохондриях клетки под действием фермента креатинкиназы, креатин обратимо взаимодействует с аденозинтрифосфатом (АТФ) с образованием креатинфорфата и аденозиндифосфата (АДФ). Это взаимодействие выполняет функцию подержания концентрации АТФ на постоянном уровне в моменты его интенсивного потребления. Другие пути - гликолиз или окислительное фосфорилирование пополняют запасы АТФ зна-

# ФОРМУЛА ИЗОБРЕТЕНИЯ

1.Амиды креатина общей формулы:

**$NH{=}C(NH_2){-}N(CH_3){-}CH_2{-}CO{-}NH{-}R{*}X$,** где R- аминокислотный остаток алифатической, ароматической или гетероароматической аминокислоты или ее производное, представляющее собой фармацевтически приемлемые соли аминокислот, сложные эфиры аминокислот, амиды аминокислот или пептиды; X – низкомолекулярная органическая или минеральная кислота, или вода.

2.Способ получения амидов креатина по п.1, заключающийся в том, что реакцию гуанидилирующих агентов с амидами саркозина проводят в полярных органических растворителях при температуре не более 50 °С.

3.Амиды креатина общей формулы:

**$NH{=}C(NH_2){-}N(CH_3){-}CH_2{-}CO{-}NH{-}R{*}X$,** где R- аминокислотный остаток алифатической, ароматической или гетероароматической аминокислоты или ее производное, представляющее собой фармацевтически приемлемые соли аминокислот, сложные эфиры аминокислот, амиды аминокислот или пептиды; X – низкомолекулярная органическая или минеральная кислота или вода, в качестве средства, обладающего нейропротекторным действием.

# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 0:16-cv-60693-UU**

WERTEKS CLOSED JOINT STOCK COMPANY d/b/a WERTEKS PHARMACEUTICAL COMPANY and THERMOLIFE INTERNATIONAL, LLC

Plaintiffs,

v.

VITAMIN SHOPPE, INC., VITACOST.COM, INC., and VITAL PHARMACEUTICALS, INC. d/b/a VPX

Defendants.
_______________________________________/

**EXPERT DECLARATION OF DR. RICHARD CHAMBERLIN IN SUPPORT OF PLAINTIFFS' CLAIM CONSTRUCTION BRIEF**

I, Richard Chamberlin, hereby submit the following declaration in support of Plaintiffs' Claim Construction Brief:

1. I am a Professor of Chemistry, Pharmaceutical Sciences, and Pharmacology at the University of California, Irvine. I served as Chair of the Department of Chemistry from 1996-2001 and am the founding Chair of the Department of Pharmaceutical Sciences (2007-present). I have had an active research program in the field of synthetic organic chemistry and chemical biology at UCI for more than 30 years. During that time I have published more than 100 peer reviewed journal articles and was elected as a Fellow of the American Academy of Sciences in 2009.

2. I hold a Bachelor's degree in Chemistry from Stanford University and a PhD from the University of California, San Diego. I joined the UC Irvine faculty in 1980 after additional training at Harvard University as an NIH Postdoctoral Fellow with Chemistry Nobel Laureate E. J. Corey. My curriculum vitae is attached as Exhibit A.

3. I have been engaged by Plaintiffs to review U.S. Patent No. 8,350,077 (the "'077 Patent") and the prosecution history for the '077 Patent, and provide an opinion as to the meaning of "X is…..water" within claim 1 of the '077 Patent, which reads in full as follows:

> "Amides of Creatine having a general formula: NH=C(NH2)–N(CH3)–CH2–CO–NH–R*X, wherein R is amino acid residue of aliphatic L-amino acid, or aromatic amino L-acid or heteroaromatic L-amino acid or derivatives of aliphatic L-amino acid, or aromatic L-amino acid or heteroaromatic L-amino acid representing at least one of the following: salts of amino acid, amino acid esters, amino acid amides, or amino acid peptides; and **X is** low-molecular-weight organic or mineral acid or **water**." [emphasis added]

4. My interpretation of the term "X is….water" within claim 1 of the '077 Patent is the same as the same term's meaning in claim 3.

5. I hold the opinions expressed in this Declaration with a reasonable degree of scientific certainty and in light of the knowledge of a person skilled in the art of chemistry as of the time the '077 Patent's application (that is, in or around December, 2008).

6. It is generally known that an asterisk such as in claim 1 is the equivalent of a center dot in a chemical equation, and that when a chemical structure is followed by a center dot, this usually indicates an additional element or molecule that is bonded to the structure. Thus, in this context "X" may be interpreted as a means of designating degree of hydration that is more generalizable than the more common "$nH_2O$" (where the coefficient n is any non-negative number, generally but not always an integer, including zero). There is no reason to assume that "X" in the general formula cannot similarly encompass the possibility of anhydrous material.

7. Here, the proper context that supports the notion that "X" could refer to anhydrous material is drawn from the '077 Patent's prosecution history, more particularly the section of the prosecution history where the applicant made it clear that the '077 Patent would cover anhydrous forms, as set forth in its statement: "The general formula of the claimed Amides of Creatine can be structurally represented as follows:

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration was executed on October 26, 2016.

Dr. Richard Chamberlin

# EXHIBIT 5

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO.: 16-CV-60693-UNGARO**

WERTEKS CLOSED JOINT STOCK COMPANY d/b/a WERTEKS PHARMACEUTICAL COMPANY, and THERMOLIFE INTERNATIONAL, LLC,

Plaintiffs,

v.

VITAMIN SHOPPE, INC., VITACOST.COM, INC. and VITAL PHARMACEUTICALS, INC. d/b/a VPX,

Defendants.
______________________________________/

**DECLARATION OF GREGG B. FIELDS, Ph.D.**
**IN SUPPORT OF DEFENDANT'S OPENING CLAIM CONSTRUCTION BRIEF**

1. My name is Gregg B. Fields.

2. I received my doctorate degree in 1988 from Florida State University.

3. I am currently a Professor at Florida Atlantic University where I am the Department Chair of Charles E. Schmidt College of Science, Department of Chemistry and Biochemistry.

4. My curriculum vitae is attached as Exhibit A.

5. I am a named inventor of six (6) patents issued by the United States Patent and Trademark Office that are related to synthesis of chemical structures and peptide chemistry, which is the same chemistry involved in United States Patent No. 8,350,077 ("the '077 patent"). *See* Exhibit A.

6. In addition to having an understanding of the chemical principles involved in the '077 Patent, I have an understanding of claim construction with respect to patents.

7. The art of the patent is organic chemistry, and a person of ordinary skill in that art at the time of the filing of the patent application would have at least a bachelors' degree in chemistry and at least two additional years of laboratory experience. Based on my areas of expertise, I am an individual of at least ordinary skill in the art with respect to the '077 Patent.

8. Vital Pharmaceuticals, Inc. ("VPX") requested that I provide expert analysis in the above-captioned patent infringement action brought against VPX by ThermoLife International, LLC ("ThermoLife") and Vertex Joint Closed Stock Company ("Vertex").

9. In particular, I was asked to provide my opinion on certain matters pertaining to United States Patent No. 8,350,077 ("the '077 patent"), including the meaning to a person of ordinary skill in the art of the formula NH=C(NH2)–N(CH3)–CH2–CO–NH–R*X and the term "X is low-molecular-weight organic or mineral acid or water," which are used in the claims of the '077 patent.

10. I hold the opinions expressed herein with a reasonable degree of scientific certainty.

11. In my opinion, the term "X is low-molecular-weight organic or mineral acid or water" would be understood by a person of ordinary skill in the art to require that that X <u>must be</u> one molecule of low-molecular-weight organic or mineral acid or water. "X" therefore cannot be equal to zero molecules of low-molecular-weight organic or mineral acid or water.

12. I understand that Plaintiffs have set proposed the following construction of "X is low-molecular-weight organic or mineral acid or water": *"'Water' refers to degrees of hydration, and hydrate systems can be classified from anhydrous, where the coefficient that is*

18. The asterisk ("*") in the chemical formula in claims 1 and 3 is the equivalent of a center dot ("•"). An asterisk is sometimes used in lieu of a center dot in chemical formulas in patents.

19. When a chemical structure is followed by a center dot ("•"), followed by another chemical molecule, this indicates that the additional molecule is bonded non-covalently to the structure. A non-covalent bond is a bond that does not involve the sharing of electrons. Covalent bonds, on the other hand, involve the sharing of electrons. Non-covalent bonds are weaker than covalent bonds.

20. When $H_2O$ (water) is the molecule that is written after the center dot, this specifically indicates that the full chemical structure of the compound is a "hydrate."

21. Based on these fundamental principles of chemistry nomenclature, the formula in claims 1 and 3 of the '077 patent requires that one of the specified alternative compounds (low-molecular-weight organic acid, low-molecular-weight mineral acid, or water) must be non-covalently bonded within the claimed compound. "X" therefore must be one molecule of one of the specified alternative compounds (low-molecular-weight organic acid, low-molecular-weight mineral acid, or water) and cannot be equal to zero molecules of low-molecular-weight organic or mineral acid or water.

22. Based on these fundamental principles of chemistry nomenclature, the formula in claims 1 and 3 of the '077 patent requires the formation of a hydrate when "X" is $H_2O$ (water).

23. Plaintiffs' proposed construction is inconsistent with the fundamental principles of chemistry nomenclature. Specifically, as related to claims 1 and 3:

a. **First, Plaintiffs' proposal states that there is a coefficient (e.g., "*x*") implicit in "X" in the formula.** I disagree with Plaintiffs' position that there

35. Example 1 ("Creatinyl-γ-Aminobutyeric Acid Ethyl Ester ***Acetate***"), Example 3 ("Creatinyl-L-Phenylalanine Amide ***Acetate***"), Example 6 ("Creatinyl-Glycine Ethylamide ***Acetate***"), and Example 7 ("Creatinyl-Phenylalanyl-Arginyl-Glycine Ethyl Ester ***Acetate***") involve the synthesis of "acetates," meaning that they have an acetic acid molecule that is non-covalently bound. Acetic acid is a low molecular weight organic acid.

36. Example 2 ("Creatinyl-L-Phenylalanine Amide ***Hydrate***") involves the synthesis of a "hydrate," meaning that it has a water molecule that is non-covalently bound.

37. Example 4 ("Creatinyl-Glycine Benzyl Ester ***hydrochloride***") and Example 8 ("Creatinyl-Phenylalanine ***hydrochloride***") involve the synthesis of "hydrochlorides," meaning that they have a hydrochloric acid molecule that is non-covalently bound. Hydrochloric acid is a low molecular weight mineral acid.

38. Example 5 ("Creatinyl-Tyrosine Amide ***Succinate***") involves the synthesis of a "succinate," meaning that it has a succinic acid molecule that is non-covalently bound. Succinic acid is a low molecular weight organic acid.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 11, 2016.

Gregg B. Fields, Ph.D.

# EXHIBIT 6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 0:14-cv-61864 -WJZ**

THERMOLIFE INTERNATIONAL, LLC, and VERTEX CLOSED JOINT STOCK COMPANY, d/b/a VERTEX PHARMACEUTICAL COMPANY,

Oral Argument Requested

Plaintiffs/Counter-Defendants,

v.

VITAL PHARMACEUTICALS, INC.,

Defendant/Counter-Plaintiff.
_______________________________________/

**VITAL PHARMACEUTICALS, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT OF NON-INFRINGEMENT**

THE LAW OFFICES OF NEIL D. KODSI
Neil D. Kodsi, Esq.
2 South University Drive, Suite 315
Plantation, Florida 33324
Telephone: (786) 464-0841
Facsimile: (954) 790-6722

*and*

VITAL PHARMACEUTICALS, INC.
Marc J. Kesten, Esq.
1600 North Park Drive
Weston, Florida 33326
Telephone: (954) 641-0570
Facsimile: (954) 389-6245

*Attorneys for Defendant/Counter-Plaintiff, Vital Pharmaceuticals, Inc.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................1

MEMORANDUM OF LAW ....................3

I. SUMMARY JUDGMENT STANDARD. ....................3

II. THE STANDARD FOR PROVING INFRINGEMENT ....................5

III. PLAINTIFFS' PURPORTED EVIDENCE OF INFRINGEMENT IS BASED SOLELY ON A FLAWED INTERPRETATION OF THE CLAIMS IN THE '077 PATENT. ....................7

A. Dr. Bugay's Flawed Interpretation of the Claims in the '077 Patent. ....................8

B. Dr. Bugay's Flawed Interpretation Makes this Case Ripe for Summary Judgment. ....................10

CONCLUSION ....................10

SIGNATURE BLOCK ....................10

CERTIFICATE OF SERVICE ....................11

## TABLE OF AUTHORITIES

### CASE LAW

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................................3

*Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573 (Fed. Cir. 1996)....................4

*Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831 (Fed. Cir. 1984)........................................................................................................3

*Calmac Mfg. Corp. v. Dunham-Bush, Inc.*, 929 F.Supp. 951 (E.D. Va. 1996)

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................3, 4

*Chore-Time Equip., Inc. v. Cumberland Corp.*, 713 F.2d 774 (Fed. Cir. 1983)....................3

*Conroy v. Reebok Int'l Ltd.*, 14 F.3d 1570 (Fed. Cir. 1994).................................................4

*Hazani v. U.S.I.T.C.*, 126 F.3d 1473, 1480 (Fed. Cir. 1997) .................................................6

*Jonsson v. Stanley Works*, 903 F.2d 812 (Fed. Cir. 1990)....................................................4

*Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533 (Fed. Cir. 1991) ........................................5

*London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1537 (Fed. Cir. 1991) .......................4

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995).................................5, 6

*Massey v. Del Labs., Inc.*, 118 F.3d 1568, 1573 (Fed. Cir. 1997) ........................................3

*National Recovery Techs., Inc. v. Magnetic Separation Sys., Inc.*, 166 F.3d 1190 (Fed. Cir. 1999) ........................................................................................................6

*Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990)................................................................4

*Sextan Avionique, S.A., v. Analog Devices, Inc.*, 172 F.3d 817 (Fed. Cir. 1999) ..................5

*Union Carbide Corp. v. America Can Co.*, 724 F.2d 1567, 1571 (Fed. Cir. 1984)...............3

### RULE AND STATUTES

Fed. R. Civ. P 56(c). ........................................................................................................3

## PRELIMINARY STATEMENT

This is a patent infringement action that Plaintiff, ThermoLife International, LLC ("ThermoLife") filed against Vital Pharmaceuticals, Inc. ("VPX") on April 1, 2014 [D.E. 1]. Plaintiffs' Amended Complaint, which is the operative pleading in this action, alleges that VPX is infringing U.S. Patent No. 8,350,077 (the "'077 patent"), which consists of three claims; two independent claims and one dependent claim. [D.E. 16].

ThermoLife is a notoriously well-known patent trolling entity that has filed a slurry of patent infringement lawsuits against numerous nutritional and dietary supplement companies just within the past few years. In fact, ThermoLife filed over 100 new cases in 2013, alone, targeting defendants such as Defendant VPX. [D.E. 14, "Notice of Request and Request for Judicial Notice, Etc.," Exhibits A through D]; and [D.E. 13-2, Declaration of John H. Owoc].

The other Plaintiff in this action, Vertex Closed Joint Stock Company, d/b/a Vertex Pharmaceuticals ("Vertex") is a Russian-based pharmaceutical company[1] that licensed the patent-in-suit to ThermoLife. Vertex voluntarily joined this action on May 29, 2014, after VPX filed a motion to dismiss due to ThermoLife's failure to join Vertex as a necessary indispensable party. [D.E. 12, Motion to Dismiss Case] and [DE 16].

Defendant VPX, on the other hand, is a privately-held corporation located exclusively in Weston, Florida. VPX is a well-established sports nutrition company that has been developing, manufacturing, distributing, and selling dietary and nutritional supplements for the past 21 years. [D.E. 13, Declaration of John H. Owoc].

---

[1] Vertex is not affiliated or associated in any way with Vertex Pharmaceuticals, Inc., the publicly-traded company U.S. biotech company located in Boston, Massachusetts.

Prior to disclosing their expert, David E. Bugay ("Bugay"), Plaintiffs were unable to articulate any evidence supporting their allegations of infringement. Plaintiff Vertex conceded that it relied solely on Plaintiff ThermoLife for its infringement analysis, and ThermoLife conceded that it had not consulted with an expert in any field of chemistry prior to suing VPX. Thus, it became clear during discovery that VPX would need to wait for Plaintiffs to disclose their scientific expert before VPX could learn Plaintiffs' purported scientific theory supporting infringement.

On September 11, 2015, the parties disclosed their respective expert witnesses on infringement. Upon reviewing Bugay's report, it became readily apparent that the salient issue in this case is one of claims interpretation, an issue that is solely within the province of the Court and, thus, now ripe for summary judgment.

As will be explained more fully below, Bugay's interpretation of the claims in the '077 patent not only defies fundamental principles of chemistry and the ordinary meaning of very basic chemical nomenclature, but his interpretaion of the claims is not taught anywhere in the '077 patent. Indeed, there is no language in the '077 patent that directs one of ordinary skill in the art to make the invention that Bugay claims was invented.

With or without Bugay's report, Plaintiffs' have no evidence to support any claim construction they may propose, and have no evidence to show that any VPX product infringes any claim of the '077 patent. VPX, conversely, has identified voluminous evidence and expert opinion showing why, when the claims of the '077 patent are properly construed, VPX does not infringe them. For these reasons, which are set forth in more detail below, the Court should adopt VPX's proposed interpretation of the Claims in the '077 patent and grant summary judgment of non-infringement in VPX's favor.

## III. PLAINTIFFS' PURPORTED EVIDENCE OF INFRINGEMENT IS BASED SOLELY ON A FLAWED INTERPRETATION OF THE CLAIMS IN THE '077 PATENT.

In their Amended Complaint, Plaintiffs allege that VPX has, in the past, and still is literally infringing or directly infringing under the doctrine of equivalents one or more claims of United States Patent No. 8,350,077 by importing infringing ingredients into the U.S. [D.E. 16, at ¶ 23]. Plaintiffs further allege that accused products are formulated, made, manufactured, shipped, distributed, advertised, offered for sale, and sold by Defendant to include certain ingredients that, by virtue of their inclusion in the products, infringe one or more claims of U.S. Patent No. 8,355,077. [D.E. 16, at ¶ 25].

The alleged invention claimed in claim 1 of the '077 patent is: "Amides of Creatine having a general formula: NH=C(NH2)–N(CH3)–CH2–CO–NH–R*X, wherein R is amino acid residue of aliphatic L-amino acid, or aromatic amino L-acid or heteroaromatic L-amino acid or derivatives of aliphatic L-amino acid, or aromatic L-amino acid or heteroaromatic L-amino acid representing at least one of the following: salts of amino acid, amino acid esters, amino acid amides, or amino acid peptides; and <u>X is low-molecular-weight organic or mineral acid or water</u>." (S.O.F., at ¶ 2).[3] Claim 3 of the '077 patent contains the same chemical formula as that found in claim 1. *Id.*

With respect to the difference between Plaintiffs' claim interpretation and Defendant's claim interpretation, the salient issue relates to interpretation of the "X" in claimed formula. As fully explained in the Declaration of Gregg B. Fields, Ph.D., both Plaintiffs and Defendant fully agree on the following with respect to the X:

---

[3] Citations designated with "S.O.F." refer to Vital Pharmaceuticals, Inc.'s Statement of Undisputed Material Facts In Support of Its Motion For Partial Summary Judgment As To Non-Infringement ("SOF") by either referencing specific paragraphs in the SOF or Exhibits to the SOF.

1) The asterisk in front of the X is the equivalent of a center dot in the equation.

2) When a chemical structure is followed by a center dot ("•"), this indicates an additional element or molecule that is bonded to the structure.

3) When $H_2O$ (water) is written after the center dot, this specifically indicates a hydrate. (S.O.F., ¶ 21).

In addition to agreeing that, "when $H_2O$ (water) is written after the center dot, this specifically indicates a hydrate," Bugay and Fields also agree that the accused products at issue in this case, VPX's Bang®, mTORC1®, and CREmTOR® products contain zero degree of hydration and are thus **not hydrates**, otherwise, referred to as anhydrous.

If Bugay followed fundamental principles of chemistry and the rules of claim construction adopted by the Courts, the analysis would end there and Bugay would concede that Defendant's products do not infringe the '077 patent. But, the analysis does not end there because Bugay does exactly the opposite and chooses to ignore fundamental principles of chemistry and claim construction in an apparent effort to concoct a scenario where he can "find" infringement.

**A. Dr. Bugay's Flawed Interpretation of the Claims in the '077 Patent.**

As explained above, claims are construed from the vantage point of the ordinarily skilled artisan at the time of the invention. *Markman,* 52 F.3d at 986. Moreover, claim terms are to be given their ordinary meaning. *Id.* Bugay, however, ignores each of these doctrines.

The Declaration of Dr. Gregg Fields, Ph.D. (S.O.F. Exhibit B), fully sets forth a detailed explanation of why Bugay's analysis defies the fundamental principles of chemistry and is thus fundamentally flawed. Specifically, Bugay adds chemical nomenclature to the "X" in the claims

**B. Dr. Bugay's Flawed Interpretation Makes this Case Ripe for Summary Judgment.**

As stated above, with respect to patent infringement actions, summary judgment is particularly appropriate where, as here, the parties' primary dispute is related to claim interpretation. *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1578 (Fed. Cir. 1996).

Here, the Plaintiffs have set forth an interpretation of the claims that is fundamentally flawed. Defendant, on the other hand has set forth the only plausible claim interpretation for the "X" in the claims. Plaintiffs' purported interpretation requires inserting nomenclature into the claim that is nowhere present anywhere in the '077 patent, and it also requires an interpretation that would eliminate a necessary element of the formula in the claim.

Therefore, under the circumstances in this case, as set forth above, Plaintiff's purported claim interpretation is blatantly faulty and incorrect. Plaintiffs have no evidence of infringement; and, thus, summary judgment of non-infringement in favor of Defendant VPX should be granted.

## CONCLUSION

For all of the foregoing reasons, VPX respectfully requests this Court to adopt VPX's claim construction and grant partial summary judgment of non-infringement in favor of VPX.

Dated this 21st day of September, 2015.

Respectfully submitted,

*/s/ Neil D. Kodsi*

NEIL D. KODSI, ESQUIRE
Florida Bar No. 0011255
Email: nkodsi@ndkodsilaw.com
THE LAW OFFICES OF NEIL D. KODSI
2 South University Drive, Suite 315
Plantation, Florida 33324
Telephone: (786) 464-0841
Facsimile: (954) 790-6722

*and*

Marc J. Kesten, Esq.
VITAL PHARMACEUTICALS, INC.
Marc.Kesten@vpxsports.com
Florida Bar No. 691801
Vital Pharmaceuticals, Inc.
1600 North Park Drive
Weston, Florida 33326
Telephone: (954) 641-0570
Facsimile: (954) 389-6245

*Attorneys for Defendant/Counter-Plaintiff.*
*Vital Pharmaceuticals, Inc.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 21st day of September, 2015, I served a copy of the foregoing document with the Clerk of Court via the CM/ECF, which will, in turn, send notification of such filing by e-mail to all counsel of record identified below:

**Via E-Mail and U.S. Mail**

Tyler J. Woods, Esq.
twoods@trialnewport.com
Admitted *pro hac vice*
NEWPORT TRIAL GROUP
4100 Newport Place, Suite 800
Newport Beach, California 92660
(949) 706-6464 (Telephone)
(949) 706-6469 (Facsimile)
*Counsel for Plaintiffs*

Joseph Lucci, Esq.
jlucci@bakerlaw.com
Admitted *pro hac vice*
BAKER & HOSTETLER LLP
2929 Arch Street
Philadelphia, Pennsylvania 19104-2891
(215) 568-3100 (Telephone)
(215) 568-3439
*Counsel for Plaintiffs*

Alan M. Weisberg, Esq.
aweisberg@cwiplaw.com
Florida Bar No. 479349
Elissa A. Tisdahl, Esq.
etisdahl@cwiplaw.com
Florida Bar No. 85521
CHRISTOPHER & WEISBERG, P.A.
200 East Las Olas Boulevard, Suite 2040
Fort Lauderdale, Florida 33301
(954) 828-1488 (Telephone)
(954) 828-9122 (Facsimile)
*Counsel for Plaintiffs*

*/s/ Marc J. Kesten*
Marc J. Kesten
Florida Bar No. 691801
Email: Legal@vpxsports.com

# EXHIBIT 7

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**CASE NO.: 14-cv-61864-WJZ**

THERMOLIFE INTERNATIONAL, LLC
and VERTEX CLOSED JOINT STOCK
COMPANY, d/b/a VERTEX
PHARMACEUTICAL COMPANY,

Plaintiffs/Counter-Defendants,

vs.

VITAL PHARMACEUTICALS, INC.,

Defendant/Counter-Plaintiff.
____________________________________/

**DECLARATION OF GREGG B. FIELDS, Ph.D.**
**IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

## Introduction and Background

1. My name is Gregg B. Fields.

2. I received my doctorate degree in 1988 from Florida State University.

3. I am currently a Professor at Florida Atlantic University where I am the Department Chair of the Charles E. Schmidt College of Science, Department of Chemistry and Biochemistry.

4. Vital Pharmaceuticals, Inc. ("VPX") requested that I provide expert analyses in the above-captioned patent infringement actions brought against VPX by ThermoLife International, LLC ("ThermoLife") and Vertex Joint Closed Stock Company ("Vertex").

5. In particular, I was asked to analyze whether VPX's products, Bang®, mTORC1®, and CREmTOR®, infringe U.S. Patent No. 8,350,077 (the '077 patent).

21. Indeed, Bugay does not articulate any opinion with respect to infringement when the "X" in claims 1 or 3 is low-molecular-weight organic or mineral acid.

**The Role of the X in the '077 Patent**

22. "X" is a necessary molecule of the formula claimed in claims 1 and 3 because the "X" that is defined and taught in claims 1 and 3 to be either low-molecular-weight organic or mineral acid or water is preceded immediately by an asterisk.

23. Both Bugay and I agree that this asterisk is the equivalent of a center dot in the equation.

24. Bugay and I both agree that when a chemical structure is followed by a center dot ("•"), this indicates an additional element or molecule that is bonded to the structure.

25. Bugay and I also agree that when $H_2O$ (water) is written after the center dot, this specifically indicates a hydrate.

26. Therefore, based on these fundamental principles of chemisry, upon which Bugay and I both agree, it is clear that the formula in Claims 1 and 3 of the '077 patent require the formation of a hydrate when "X" is $H_2O$ (water).

27. Interestingly, Bugay and I also both agree that VPX's Bang®, mTORC1®, and CREmTOR® products contain zero degree of hydration and, thus, are **not hydrates**, otherwise, referred to as anhydrous.

**Bugay's Efforts to Alter the Role of the "X" in the Claims in Order to Find Infringement**

28. Bugay, however, in an apparent effort to find infringement, attempts to circumvent the fundamental principles of chemistry discussed above by completely altering the structure of claims 1 and 3 in the following manner:

coefficient in front of the "X" in the claims and then by arbitrarilly assigning a value of 0 (zero) to the "X" molecule.

47. In my expert opinion, which I hold with a reasonable degree of scientific certainty, Bugay's infringement analysis is based on an interpretation of the claims which:

a. defies fundamental principles of chemistry; and

b. is not taught anywhere in the '077 patent such that one of ordinary skill in the art could make the invention that Bugay claims was invented.

48. Therefore, in my expert opinion, which I hold with a reasonable degree of scientific certainty, Bugay's infringement analysis is based on a scientifically innacurrate interpretation of the claims of the '077 patent and thus his conclusion that VPX's products infringe the '077 patent, is fundamentally flawed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on this 20th day of September, 2015.

Gregg B. Fields, Ph.D.

# EXHIBIT 8

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| THERMOLIFE INTERNATIONAL, LLC.,<br><br>Plaintiff,<br><br>v.<br><br>VITAL PHARMACEUTICALS, INC.,<br><br>Defendant. | Civil Action No.: 14-6184-CIV-ZLOCH |

**EXPERT REPORT OF DAVID E. BUGAY, Ph.D.**

I, David E. Bugay, declare and state as follows:

1. The opinions set forth below are based on my over 25 years of experience as an expert in the characterization of pharmaceutical and nutraceutical drug substances, physical blends, intermediates, and final dosage forms.

## I. BACKGROUND

2. My *curriculum vitae* ("CV") highlights my education, experience, and qualifications as an expert in physical analytical characterization of pharmaceutical, dietary supplements, and nutraceutical entities such as the active pharmaceutical ingredient ("API"), powders, excipients, blends, intermediates, degradants, and various drug product formulations including tablets or pills, capsules, orally disintegrating tablets ("ODT"), drinks, syrups, injectables, and/or devices for inhalation, buccal, sublingual, nasal, or suppository administration. Some of the information from my CV that is more relevant to this case is summarized below. Attached as ***Exhibit A*** is a copy of my CV which contains a list of my publications.



**CONTAINS HIGHLY CONFIDENTIAL INFORMATION – OUTSIDE COUNSEL'S EYES ONLY**

Fort Lauderdale Division);

- *Spectrum Pharmaceuticals, Inc. and University of Strathclyde v. Sandoz, Inc.*, Case No. 2:12-cv-00111-GMN-NJK (US District Court, District of Nevada);
- *Eli Lilly Canada Inc. v. Mylan Pharmaceuticals*, Court File No. T-299-13 (Canada);
- *Cot'N Wash, Inc. and Big 3 Packaging, LLC v. The Sun Products Corporation*, Case No. 12-651 (SLR) (US District Court, District of Delaware);
- *Shire v. Mylan Pharmaceuticals*, Court File No. T-450-13 (Canada);
- *Eli Lilly v. Cobalt Pharmaceutical Co.*, Court File No. T-967-13 (Canada);
- *Spectrum Pharmaceuticals, Inc. and University of Strathclyde v. Innopharma, Inc. and Mylan Teoranta, Mylan Institutional LLC, and Mylan Institutional Inc.*, Case No. 12-260-RGA-CJB (US District Court, District of Delaware);
- *SigmaPharm Laboratories, LLC v. R. Grover, et al.*, Case No. 2014-06777-29 (Court of Common Pleas, Bucks County, Pennsylvania);
- *Supernus Pharmaceuticals, Inc. v. Actavis Inc., Watson Laboratories, Inc. – Florida, Actavis Pharma, Inc., Watson Laboratories, Inc., and ANDA, Inc.*, Case No. 13-4740 (RMB)(JS).

## II. ENGAGEMENT

18. Plaintiff Thermolife International, LLC ("Thermolife" or "Plaintiff") has asked me to provide my expert opinion as to whether Vital Pharmaceuticals, Inc. ("Vital" or "Defendant"), infringe U.S. Patent Nos. 8,350,077 ("the '077 patent") (***Ex. B***) (the "Thermolife Patent" or "patent-in-suit").

19. I understand that the following claim is asserted in this case:

- '077 patent: claim 1

20. In forming my opinions, I rely on my over 25 years of experience as an expert in physical analytical characterization of pharmaceutical and nutraceutical entities as well as the analytical testing described herein.



**CONTAINS HIGHLY CONFIDENTIAL INFORMATION – OUTSIDE COUNSEL'S EYES ONLY**

40. When water is incorporated into the crystalline structure of a solid, a formal nomenclature exists for naming these hydrates. The International Union of Pure and Applied Chemistry (IUPAC) present the official convention for hydrate nomenclature (IUPAC citation). When a chemical structure is followed by a center dot ("·") this indicates an addition compound. If $H_2O$ is written after the center dot, this specifically indicates a hydrate. For example, the following molecular formula indicates theophylline monohydrate: $C_7H_8N_4O_2 \cdot H_2O$.

41. The chemical community also understands that there are degrees of hydration for molecular compounds. Referring back to theophylline monohydrate, a single molecule of water is associated with a single molecule of theophylline, a stoichiometric 1:1 ratio, hence the term *mono* preceding hydrate. Hydrate systems are classified from anhydrous (no water of crystallization) to higher degrees of hydration (K.R. Morris, *Structural Aspects of Hydrates and Solvates*, in Polymorphism in Pharmaceutical Solids, Ed. H.G. Brittain, Marcel Dekker: New York, 1999, pp 125-181). The degree of hydration is indicated in the molecular formula by:

$\cdot$ n $H_2O$

or

$\cdot$ x H2O

where the dot indicates an addition compound, *n* or an *x* is interchangeably used and indicates the degree of addition (0, 1, 2, 3 . . .), and $H_2O$ specifies a hydrate. Thus, the compound azithromycin (USP monograph citation), which can exist in varying degrees of hydration (anhydrous, monohydrate, and dihydrate) is represented by the molecular formulas:

$C_{38}H_{72}N_2O_{12}$ (this represents an anhydrous compound containing no water of



CONTAINS HIGHLY CONFIDENTIAL INFORMATION –
OUTSIDE COUNSEL'S EYES ONLY

| | | |
|---|---|---|
| | $xH_2O$ | Karyakin, and S.E. Ermilov, Russian J. of Gen. Chem., 72, 1160 (2002). |
| Amoxicillin | $C_{16}H_{19}N_3O_5S \cdot 3\ H_2O$ (trihydrate) | United States Pharmacopeia/National Formulary (USP38/NF33), May 1, 2015, pp. 2219-2221. |
| Divalent Metal Perchlorates | $D(ClO_4)_2 - x\ H_2O$ where D = Zn, Cu, Ca, etc. and x is the number of water molecules, i.e., x = 0,1,2,.. | H.M. Abdelmoneim, Acta Physica Polonica A, 117, 936 (2010). |
| Sodium Sulfide | $Na_2S \cdot n\ H_2O$ | M. Roelands, R. Cuypers, K.D. Kruit, H. Oversloot, A. de Jong, W. Duvalois, L. van Vliet, C. Hoegaerts, Energy Procedia, 70, 257 (2015). |
| Ammonium and Potassium Oxalates | $M_2C_2O_4 \cdot x\ H_2O$ where $M^+ = Li^+$, $Cs^+$, $Na^+$, $K^+$ . . . and/or $NH_4^+$ and x is the number of water molecules, i.e., x = 0,1,2,.. | M.M. Mosaad, A. El-Shawarby, Z.H. El-Tanahy, and M.M. Abdel-Kader, J. Mater. Sci Mater. Electron., 6, 235 (1995). |
| Tert-Butylamine | $tBA \cdot n\ H_2O$ | L. Dobrzycki, P. Taraszewska, R. Boese, M.K. Cyrański, and S.A. Cirkel, Angew. Chem., 127, 1 (2015). |
| Ferrous Sulfate Hydrates | $FeSO_4\ xH_2O$ (x = 0, 1, 4, 7) | J. Ladriere, N. Beckris, and D. Apers, Hyperfine Interactions, 70, 1245 (1992) |
| Magnesium Chloride | $MgCl2 \cdot n\ H_2O$ | C.Smeets, E. Iype, S.V. Nedea, H.A. Zondag, and C.C.M. Rindt, J. Chem. Phys., 139, 124312 (2013). |
| Sulphate Compounds | $DSO_4 \cdot x\ H_2O$ and $T_2(SO_4)_3 \cdot x\ H_2O$ where D = Hg(II), Pb(II), . . . . and T is a trivalent ion i.e. Ce(III) | M.M. Abdel-Kader, M.M. Mosaad, S.A. Olofa, M.I. Abdel-Ati, and A. El-Shawarby, Acta Phys. Polonica A, 83, 187 (1993). |
| Calcium Oxalate | $CaC_2O_4 \cdot (H_2O)_n$ | V.M. Rosas-García, I.C. Sáenz-Tavera, V.J. Rodríguez-Herrera, B.R. Garza-Campos, J. Mol. Model, 19:1459, 1471 (2013). |

44. ThermoLife has licensed the '077 that refers to amides of creatine. Within the



**CONTAINS HIGHLY CONFIDENTIAL INFORMATION –
OUTSIDE COUNSEL'S EYES ONLY**

abstract of the patent, the following is stated:

> The invention relates to pharmaceutical chemistry notably to new biologically active substances (BAS) and their properties. In particular, the invention relates to Creatine derivatives having a general formula: $NH{=}C(NH_2)\text{-}N(CH_3)\text{-}CH_2\text{-}CO\text{-}NH\text{-}R{*}X$, wherein R-amino acid residue of aliphatic, aromatic or heteroaromatic L-amino acid or its derivative representing a salts of amino acid, amino acid esters, amino acid amides or peptides; X-lower organic or mineral acid or water. New substances are prepared by interaction of aforesaid amides of sarcosine having a general formula of $HN(CH_3)\text{-}CH_2\text{-}CO\text{-}NH\text{-}R{*}X$ wherein: R is amino acid residue or substituted amino acid residue; X is low-molecular-weight organic acid or mineral acid or water, with a guanidinylating agents with the in organic solvents at temperature not exceeking 50° C. New chemical compounds can be used as a remedy possessing a neuroprotective activity.

an addition compound is clearly referred to by the inclusion of an asterisk (equivalent to a center dot) in the molecular formula: $NH{=}C(NH_2)\text{-}N(CH_3)\text{-}CH_2\text{-}CO\text{-}NH\text{-}R\underline{*}X$ (*emphasis added*). In addition, the addition molecule, referred to as X, can be water: X-lower organic or mineral acid or **water** (*emphasis added*). Thus, based upon the aforementioned discussion of hydrate nomenclature, the creatine derivatives of the '077 patent include creatine derivatives with varying degrees of hydration from n = 0 to 1, 2, 3, 4 . . . which is identically equivalent to x = 0 to 1, 2, 3, 4, . . . as is specified in the '077 patent above.

45. I would like to note that the chemical literature interchangeably uses *"n"* and *"x"* to denote the degree of hydration. An example of the *"x"* notation is presented in **Exhibit D**.

## IV. INFRINGEMENT ANALYSIS

46. Counsel for Plaintiff Thermolife has asked me to analyze a number of products sold by the Defendant Vital. Table III lists the samples provided by Thermolife's Counsel. The subject of my analysis was to determine whether a creatine amide, in accordance with the '077 patent and the general formula $NH{=}C(NH_2)\text{-}N(CH_3)\text{-}CH_2\text{-}CO\text{-}NH\text{-}R{*}X$, was present in any of Vital's products.



**CONTAINS HIGHLY CONFIDENTIAL INFORMATION – OUTSIDE COUNSEL'S EYES ONLY**

73. If called to testify in this matter, I can and I will testify as stated herein.

74. I reserve the right to offer additional opinions and offer rebuttal testimony regarding any opinions which may be offered by experts and other witnesses on behalf of Vital either before or during the trial of this matter.

September 10, 2015

David E. Bugay, Ph.D.



CONTAINS HIGHLY CONFIDENTIAL INFORMATION –
OUTSIDE COUNSEL'S EYES ONLY

# EXHIBIT 9

NOMENCLATURE OF INORGANIC CHEMISTRY
IUPAC Recommendations 2005

IUPAC Periodic Table of the Elements

| 1 | | | | | | | | | | | | | | | | | 18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 **H** | 2 | | | | | | | | | | | 13 | 14 | 15 | 16 | 17 | 2 **He** |
| 3 **Li** | 4 **Be** | | | | | | | | | | | 5 **B** | 6 **C** | 7 **N** | 8 **O** | 9 **F** | 10 **Ne** |
| 11 **Na** | 12 **Mg** | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 **Al** | 14 **Si** | 15 **P** | 16 **S** | 17 **Cl** | 18 **Ar** |
| 19 **K** | 20 **Ca** | 21 **Sc** | 22 **Ti** | 23 **V** | 24 **Cr** | 25 **Mn** | 26 **Fe** | 27 **Co** | 28 **Ni** | 29 **Cu** | 30 **Zn** | 31 **Ga** | 32 **Ge** | 33 **As** | 34 **Se** | 35 **Br** | 36 **Kr** |
| 37 **Rb** | 38 **Sr** | 39 **Y** | 40 **Zr** | 41 **Nb** | 42 **Mo** | 43 **Tc** | 44 **Ru** | 45 **Rh** | 46 **Pd** | 47 **Ag** | 48 **Cd** | 49 **In** | 50 **Sn** | 51 **Sb** | 52 **Te** | 53 **I** | 54 **Xe** |
| 55 **Cs** | 56 **Ba** | *57–71 lanthanoids | 72 **Hf** | 73 **Ta** | 74 **W** | 75 **Re** | 76 **Os** | 77 **Ir** | 78 **Pt** | 79 **Au** | 80 **Hg** | 81 **Tl** | 82 **Pb** | 83 **Bi** | 84 **Po** | 85 **At** | 86 **Rn** |
| 87 **Fr** | 88 **Ra** | †89–103 actinoids | 104 **Rf** | 105 **Db** | 106 **Sg** | 107 **Bh** | 108 **Hs** | 109 **Mt** | 110 **Ds** | 111 **Rg** | 112 Uub | 113 Uut | 114 Uuq | 115 Uup | 116 Uuh | 117 Uus | 118 Uuo |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| * 57 **La** | 58 **Ce** | 59 **Pr** | 60 **Nd** | 61 **Pm** | 62 **Sm** | 63 **Eu** | 64 **Gd** | 65 **Tb** | 66 **Dy** | 67 **Ho** | 68 **Er** | 69 **Tm** | 70 **Yb** | 71 **Lu** |
| † 89 **Ac** | 90 **Th** | 91 **Pa** | 92 **U** | 93 **Np** | 94 **Pu** | 95 **Am** | 96 **Cm** | 97 **Bk** | 98 **Cf** | 99 **Es** | 100 **Fm** | 101 **Md** | 102 **No** | 103 **Lr** |

International Union of Pure and Applied Chemistry

# Nomenclature of Inorganic Chemistry

## IUPAC RECOMMENDATIONS 2005

Issued by the Division of Chemical Nomenclature and Structure Representation in collaboration with the Division of Inorganic Chemistry

Prepared for publication by

**Neil G. Connelly**
*University of Bristol, UK*

**Ture Damhus**
*Novozymes A/S, Denmark*

**Richard M. Hartshorn**
*University of Canterbury, New Zealand*

**Alan T. Hutton**
*University of Cape Town, South Africa*

RSC Publishing

IUPAC

Cover images ©Murray Robertson/visual elements 1998–99, taken from the 109 Visual Elements Periodic Table, available at www.chemsoc.org/viselements

ISBN 0-85404-438-8

A catalogue record for this book is available from the British Library

© International Union of Pure and Applied Chemistry, 2005

*All rights reserved*

*Apart from fair dealing for the purposes of research for non-commercial purposes or for private study, criticism or review, as permitted under the Copyright, Designs and Patents Act 1988 and the Copyright and Related Rights Regulations 2003, this publication may not be reproduced, stored or transmitted, in any form or by any means, without the prior permission in writing of The Royal Society of Chemistry, or in the case of reproduction in accordance with the terms of licences issued by the Copyright Licensing Agency in the UK, or in accordance with the terms of the licences issued by the appropriate Reproduction Rights Organization outside the UK. Enquiries concerning reproduction outside the terms stated here should be sent to The Royal Society of Chemistry at the address printed on this page.*

Published for the International Union of Pure and Applied Chemistry by The Royal Society of Chemistry, Thomas Graham House, Science Park, Milton Road, Cambridge CB4 0WF, UK

Registered Charity Number 207890

For further information see our web site at www.rsc.org and the IUPAC site at www.iupac.org

Typeset by Alden Bookset, Northampton, UK
Printed by Biddles Ltd, King's Lynn, Norfolk, UK

They can also indicate the sign of optical rotation in the formula or name of an optically active compound.

*Example:*

5. $(+)_{589}$-$[Co(en)_3]^{3+}$ $(+)_{589}$-tris(ethane-1,2-diamine)cobalt(3+)

### IR-2.3.3 'Em' dashes

'Em' dashes are used in *formulae* only when the formulae are structural. (The less precise term 'long dashes' was used in Ref. 4.)

In *names*, 'em' dashes are used in two ways.

(a) To indicate metal–metal bonds in polynuclear compounds. They separate the italicized symbols of the bond partners which are contained in parentheses at the end of the name.

*Example:*

1. $[Mn_2(CO)_{10}]$ bis(pentacarbonylmanganese)(*Mn*—*Mn*)

(b) To separate the individual constituents in names of (formal) addition compounds.

*Examples:*

2. $3CdSO_4{\cdot}8H_2O$ cadmium sulfate—water (3/8)
3. $2CHCl_3{\cdot}4H_2S{\cdot}9H_2O$ chloroform—hydrogen sulfide—water (2/4/9)

### IR-2.3.4 Special bond indicators for line formulae

The structural symbols ┌──┐ and └──┘ may be used in line formulae to indicate bonds between non-adjacent atom symbols.

*Examples:*

1.




$[Ni(S{=}PMe_2)(\eta^5\text{-}C_5H_5)]$

2.




$[(CO)_4MnMo(CO)_3(\eta^5\text{-}C_5H_4PPh_2)]$



PEPSI_0005923

3.




$[(Et_3P)ClPt(Me_2NCH_2CHCHCH_2NMe_2)PtCl(PEt_3)]$

4.




$[(OC)_3Fe(\mu\text{-}Ph_2PCHPPh_2)FeH(CO)_3]$

## IR-2.4 SOLIDUS

The solidus (/) is used in names of formal addition compounds to separate the arabic numerals which indicate the proportions of individual constituents in the compound.

*Examples:*

1. $BF_3{\cdot}2H_2O$ boron trifluoride—water (1/2)
2. $BiCl_3{\cdot}3PCl_5$ bismuth trichloride—phosphorus pentachloride (1/3)

## IR-2.5 DOTS, COLONS, COMMAS AND SEMICOLONS

### IR-2.5.1 Dots

Dots are used in *formulae* in various positions.

(a) As right superscripts they indicate unpaired electrons in radicals (see Section IR-4.6.2).

*Examples:*

1. $HO^{\bullet}$
2. $O_2^{2\bullet}$

(b) As right superscripts in the Kröger–Vink notation of solid-state chemistry, they indicate the unit of positive effective charge (see Section IR-11.4.4).

*Example:*

3. $Li^{x}_{Li,1-2x}Mg^{\bullet}_{Li,x}V'_{Li,x}Cl^{x}_{Cl}$



PEPSI_0005924

(c) Centre dots in *formulae* of (formal) addition compounds, including hydrates, adducts, clathrates, double salts and double oxides, separate the individual constituents. The dot is written in the centre of the line to distinguish it from a full stop (period).

*Examples:*

4. $BF_3{\cdot}NH_3$
5. $ZrCl_2O{\cdot}8H_2O$
6. $CuCl_2{\cdot}3Cu(OH)_2$
7. $Ta_2O_5{\cdot}4WO_3$

Dots are used in *names* of radicals to indicate the presence of unpaired electrons.

*Examples:*

8. $ClO^{\bullet}$ oxidochlorine(•)
9. $Cl_2^{\bullet-}$ dichloride(•1−)

IR-2.5.2 **Colons**

Colons are used in *names* in the following ways.

(a) In coordination and organometallic compounds, to separate the ligating atoms of a ligand which bridges central atoms.

*Example:*

1. $[\{Co(NH_3)_3\}_2(\mu\text{-}NO_2)(\mu\text{-}OH)_2]^{3+}$
di-μ-hydroxido-μ-nitrito-κ*N*:κ*O*-bis(triamminecobalt)(3+)

(See Sections IR-9.2.4.2 and IR-10.2.3.3 for the use of κ, and Sections IR-9.2.5.2 and IR-10.2.3.1 for the use of μ.)

(b) In polynuclear coordination and organometallic compounds, to separate the central atom locants when single ligating atoms or unsaturated groups bind to two or more central atoms. Thus, a chloride ligand bridging between central atoms 1 and 2 would be indicated by μ-chlorido-1:2$\kappa^2$*Cl*, and a carbonyl group terminally bonded to atom 1 and bridging atoms 2 and 3 *via* its π electrons would be indicated by $\mu_3$-2$\eta^2$:3$\eta^2$-carbonyl-1κ*C*.

(c) In boron compounds, to separate the sets of locants of boron atoms which are connected by bridging hydrogen atoms.

*Example:*

2.




1-silyl-2,3:2,5:3,4:4,5-tetra-μ*H*-pentaborane(9)

## IR-2.7 ELISIONS

In general, in compositional and additive nomenclature no elisions are made when using multiplicative prefixes.

*Example:*

1. tetraaqua (*not* tetraqua)
2. monoooxygen (*not* monoxygen)
3. tetraarsenic hexaoxide

However, monoxide, rather than monooxide, is an allowed exception through general use.

## IR-2.8 NUMERALS

### IR-2.8.1 Arabic numerals

Arabic numerals are crucially important in nomenclature; their placement in a formula or name is especially significant.

They are used in *formulae* in many ways.

(a) As right subscripts, to indicate the number of individual constituents (atoms or groups of atoms). Unity is not indicated.

*Examples:*

1. $CaCl_2$
2. $[Co(NH_3)_6]Cl_3$

(b) As a right superscript, to indicate the charge. Unity is not indicated.

*Examples:*

3. $Cl^-$
4. $NO^+$
5. $Cu^{2+}$
6. $[Al(H_2O)_6]^{3+}$

(c) To indicate the composition of (formal) addition compounds or non-stoichiometric compounds. The numeral is written on the line before the formula of each constituent except that unity is omitted.

*Examples:*

7. $Na_2CO_3 \cdot 10H_2O$
8. $8WO_3 \cdot 9Nb_2O_5$

*Example:*

15.




$[\{Pt(\mu_3\text{-}I)Me_3\}_4]$ tetra-$\mu_3$-iodido-tetrakis[trimethylplatinum(IV)]

(d) In the nomenclature of boron compounds (see Chapter IR-6.2.3), to indicate the number of hydrogen atoms in the parent borane molecule. The arabic numeral is enclosed in parentheses immediately following the name.

*Examples:*

16. $B_2H_6$ diborane(6)
17. $B_{10}H_{14}$ decaborane(14)

(e) As a right superscript to the symbol κ, to indicate the number of donor atoms of a particular type bound to a central atom or central atoms (see Sections IR-9.2.4.2 and IR-10.2.3.3).

(f) As a right superscript to the symbol η, to indicate the hapticity of a ligand. (See Sections IR-9.2.4.3 and IR-10.2.5.1.)

(g) In polynuclear structures, arabic numerals are part of the CEP descriptor[5] used to identify polyhedral shapes. (See also Section IR-9.2.5.6.)

(h) In the stoichiometric descriptor terminating the name of a (formal) addition compound (see Section IR-5.5).

*Example:*

18. $8H_2S{\cdot}46H_2O$ hydrogen sulfide—water (8/46)

(i) As a right superscript, to indicate the non-standard bonding number in the λ convention. (See Section IR-6.2.1.)

*Example:*

19. $IH_5$ $\lambda^5$-iodane

(j) To describe the coordination geometry and configuration of ligands around a central atom using polyhedral symbols and configuration indexes (see Sections IR-9.3.2 and IR-9.3.3).

6. $Ca_3(PO_4)_2$ [rule (iv)]
7. $[Co(NH_3)_6]_2(SO_4)_3$ [rules (iii), (iv), (vi)]
8. $[\{Rh(\mu\text{-}Cl)(CO)_2\}_2]$ [rules (iii), (vi), (vii)]
9. $K[Os(N)_3]$ [rules (ii), (iii)]
10. $-(S)-_n$ [rule (v)]
11. $(HBO_2)_n$, or $-(B(OH)O)-_n$ [rules (ii) and (v)]
12.




13.




14. NaCl
15. [NaCl]

The first formula in Example 11 may be considered to be a molecular formula (Section IR-4.2.2) with no implications about the structure of the polymer in question.

In Examples 14 and 15, the formula [NaCl] may be used to distinguish the molecular compound consisting of one sodium atom and one chlorine atom from the solid with the composition NaCl.

### IR-4.2.4 Formulae of (formal) addition compounds

In the formulae of addition compounds and compounds which can formally be regarded as such, including clathrates and multiple salts, a special format is used. The proportions of constituents are indicated by arabic numerals preceding the formulae of the constituents, and the formulae of the constituents are separated by a centre dot. The rules for ordering the constituent formulae are described in Section IR-4.4.3.5.

*Examples:*

1. $Na_2CO_3 \cdot 10H_2O$
2. $8H_2S \cdot 46H_2O$
3. $BMe_3 \cdot NH_3$

### IR-4.2.5 Solid state structural information

Structural information can also be given by indicating structural type as a qualification of a formula. For example, polymorphs may be indicated by adding in parentheses an abbreviated expression for the crystal system (see Sections IR-11.5.2 and IR-11.7.2, and Table IR-3.1). Structures may also be designated by adding the name of a type-compound in italics in parentheses, but such usage may not be unambiguous. There are at least ten varieties of ZnS(*h*).

3. FeO(OH)
4. $NaTl(NO_3)_2$
5. $Li[H_2PO_4]$
6. $NaNH_4[HPO_4]$
7. $Na[HPHO_3]$
8. $CuK_5Sb_2$ or $K_5CuSb_2$
9. $K_5[CuSb_2]$
10. $H[AuCl_4]$
11. $Na(UO_2)_3[Zn(H_2O)_6](O_2CMe)_9$

The first formula in Example 8 was arrived at by considering K and Cu to be electropositive constituents and Sb to be electronegative, the second by considering K to be electropositive and Cu and Sb to be electronegative. No structural information is conveyed by these formulae. The formula in Example 9, on the other hand, implies the presence of the coordination entity $[CuSb_2]^{5-}$.

Deviation from alphabetical order of constituents in the same class is allowed to emphasize similarities between compounds.

*Example:*

12. $CaTiO_3$ and $ZnTiO_3$ (rather than $TiZnO_3$)

Some generalized salts may also be treated as addition compounds, see Section IR-4.4.3.5.

### IR-4.4.3.5 *(Formal) addition compounds*

In the formulae of addition compounds or compounds which can formally be regarded as such, including clathrates and multiple salts, the formulae of the component molecules or entities are cited in order of increasing number; if they occur in equal numbers, they are cited in alphabetical order in the sense of Section IR-4.4.2.2. In addition compounds containing water, the water remains conventionally cited last. However, component boron compounds are no longer treated as exceptions.

*Examples:*

1. $3CdSO_4{\cdot}8H_2O$
2. $Na_2CO_3{\cdot}10H_2O$
3. $Al_2(SO_4)_3{\cdot}K_2SO_4{\cdot}24H_2O$
4. $AlCl_3{\cdot}4EtOH$
5. $8H_2S{\cdot}46H_2O$
6. $C_6H_6{\cdot}NH_3{\cdot}Ni(CN)_2$
7. $BF_3{\cdot}2H_2O$
8. $BF_3{\cdot}2MeOH$

*Examples:*

7. $K_2O$ dipotassium oxide
8. $K_2O_2$ dipotassium (dioxide), or potassium dioxide(2−)
9. $KO_2$ monopotassium (dioxide), or potassium dioxide(1−)
10. $KO_3$ potassium (trioxide), or potassium trioxide(1−)

Clearly, a simple stoichiometric name like 'potassium dioxide', although strictly speaking unambiguous (referring to the compound in Example 9), could easily be misinterpreted. In other cases, based on chemical knowledge, there is no chance of misinterpretation in practice, and the simple stoichiometric name will most often be used, as in Examples 11 and 12 below.

*Examples:*

11. $BaO_2$ barium dioxide (simple stoichiometric name), or barium (dioxide) or barium dioxide(2−) (specifying the diatomic anion), or barium peroxide (using the acceptable alternative name for the anion)
12. $MnO_2$ manganese dioxide (simple stoichiometric name), or manganese bis(oxide) (specifies two oxide ions rather than a diatomic anion), or manganese(IV) oxide

## IR-5.5 NAMES OF (FORMAL) ADDITION COMPOUNDS

The term *addition compounds* covers donor-acceptor complexes (adducts) and a variety of lattice compounds. The method described here, however, is relevant not just to such compounds, but also to multiple salts and to certain compounds of uncertain structure or compounds for which the full structure need not be communicated.

The names of the individual components of such a generalized addition compound are each constructed by using an appropriate nomenclature system, whether compositional, substitutive or additive. The overall name of the compound is then formed by connecting the names of the components by 'em' dashes; the proportions of the components are indicated after the name by a stoichiometric descriptor consisting of arabic numerals separated by a solidus or solidi. The descriptor, in parentheses, is separated from the compound name by a space. The order of names of the individual components is, firstly, according to the increasing number of the components and, secondly, alphabetical. As the only exception, the component name 'water' is always cited last. (Note that this represents a change from the rule in Ref. 2 according to which the component names must follow the order given by the formula.) The numerals in the descriptor appear in the same order as the corresponding component names.

For addition compounds containing water as a component, the class name 'hydrates' is acceptable because of well established use, even though the ending 'ate' might seem to indicate an anionic component. For hydrates with a simple stoichiometry, names of the classical 'hydrate' type are acceptable, but rules have not been formulated for non-integer stoichiometries such as that in Example 12 below. Also, because of their ambiguity, the



PEPSI_0005930

terms 'deuterate' and tritiate' are not acceptable for addition compounds of $^2H_2O$ and $^3H_2O$ or other isotope-modified water species. Example 3 shows a formula and a name for a compound of the present type with isotope modification. In this case the modified component formula and name are presented according to the rules of Section II-2.3.3 of Ref. 3.

*Examples:*

| | |
|---|---|
| 1. $BF_3 \cdot 2H_2O$ | boron trifluoride—water (1/2) |
| 2. $8Kr \cdot 46H_2O$ | krypton—water (8/46) |
| 3. $8Kr \cdot 46^3H_2O$ | krypton—($^3H_2$)water (8/46) |
| 4. $CaCl_2 \cdot 8NH_3$ | calcium chloride—ammonia (1/8) |
| 5. $AlCl_3 \cdot 4EtOH$ | aluminium chloride—ethanol (1/4) |
| 6. $BiCl_3 \cdot 3PCl_5$ | bismuth(III) chloride—phosphorus(V) chloride (1/3) |
| 7. $2Na_2CO_3 \cdot 3H_2O_2$ | sodium carbonate—hydrogen peroxide (2/3) |
| 8. $Co_2O_3 \cdot nH_2O$ | cobalt(III) oxide—water (1/$n$) |
| 9. $Na_2SO_4 \cdot 10H_2O$ | sodium sulfate—water (1/10), or sodium sulfate decahydrate |
| 10. $Al_2(SO_4)_3 \cdot K_2SO_4 \cdot 24H_2O$ | aluminium sulfate—potassium sulfate—water (1/1/24) |
| 11. $AlK(SO_4)_2 \cdot 12H_2O$ | aluminium potassium bis(sulfate) dodecahydrate |
| 12. $3CdSO_4 \cdot 8H_2O$ | cadmium sulfate—water (3/8) |

There is no difference between donor-acceptor complexes and coordination compounds from a nomenclature point of view. Thus, for such systems an additive name such as described in Sections IR-7.1 to IR-7.3 and in Chapter IR-9 may be given.

*Example:*

| | |
|---|---|
| 13. $BH_3 \cdot (C_2H_5)_2O$ or $[B\{(C_2H_5)_2O\}H_3]$ | borane—ethoxyethane (1/1), or (ethoxyethane)trihydridoboron |

In Section P-68.1 of Ref. 4, a slightly different nomenclature is presented for organic donor-acceptor complexes.

## IR-5.6 SUMMARY

Compositional names are either of the stoichiometric type (which, furthermore, are of the binary type except in the case of homoatomic species) or of the addition compound type. Compositional nomenclature is used if little or no structural information is to be conveyed

# EXHIBIT 10


3E
CHEMISTRY
Matter and Its Changes
BRADY · RUSSELL · HOLUM

3E

# CHEMISTRY
## Matter and Its Changes

**James E. Brady**
*St. John's University, New York*

**Joel W. Russell**
*Oakland University, Michigan*

**John R. Holum**
*Augsburg (Emeritus), Minnesota*

John Wiley & Sons, Inc.
New York / Chichester / Weinheim / Brisbane / Singapore / Toronto

| | |
|---|---|
| ACQUISITIONS EDITOR | Cliff Mills |
| DEVELOPMENT EDITOR | Beth Bortz |
| SENIOR PRODUCTION EDITOR | Elizabeth Swain |
| SENIOR MARKETING MANAGER | Charity Robey |
| DESIGNER | Dawn L. Stanley |
| ILLUSTRATION EDITORS | Sigmund Malinowski, Edward Starr |
| PHOTO EDITOR | Hilary Newman |
| PHOTO RESEARCHER | Ramon Rivera Moret |
| ELECTRONIC ILLUSTRATIONS | Precision Graphics |
| COVER ART | Norm Christensen |
| COVER PHOTOS | *Welder:* ©Lynn Johnson/AURORA<br>*Fireworks:* ©Tony Wiles/Tony Stone Images/New York, Inc.<br>*Hot-air balloon:* ©Donovan Reese/Tony Stone Images/New York, Inc.<br>*Lighthouse:* ©John Lund/Tony Stone Images/New York, Inc.<br>*Diamond:* ©Color Day Productions/The Image Bank |

This book was set in 10/12 Times Ten by Progressive and printed and bound by Von Hoffmann. The cover was printed by Lehigh.

This book is printed on acid-free paper. ♾

Copyright ©2000 John Wiley & Sons, Inc. All rights reserved.

No part of this publication may be reproduced, stored in a retrieval system or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, scanning or otherwise, except as permitted under Sections 107 or 108 of the 1976 United States Copyright Act, without either the prior written permission of the Publisher, or authorization through payment of the appropriate per-copy fee to the CopyrightClearance Center, 222 Rosewood Drive, Danvers, MA 01923, (978) 750-8400, fax (978) 750-4470. Requests to the Publisher for permission should be addressed to the Permissions Department, John Wiley & Sons, Inc., 605 Third Avenue, New York, NY 10158-0012, (212) 850-6011, fax (212) 850-6008, E-Mail: PERMREQ@WILEY.COM.

To order books or for customer service, call 1(800)-CALL-WILEY (225-5945).

***Library of Congress Cataloging-in-Publication Data***

Brady, James E., 1938–
Chemistry : the study of matter and its changes / James E. Brady, Joel W. Russell, John R. Holum.--3rd ed.
p. cm.
Includes bibliographical references and index.
ISBN 0-471-18476-4 (acid-free paper)
1. Chemistry. I. Title. II. Russell, Joel W. III. Holum, John R.

QD33.B82 2000
540 21--dc21 99-042979

Printed in the United States of America

10 9 8 7 6 5 4 3 2 1

# Table of Contents


**1 *Fundamentals of Chemical Change* 1**

1.1 Chemistry and Its Place among the Sciences 1
1.2 The Scientific Method: Building Models of Nature 2
1.3 Matter and Energy: Chemical Change 5
1.4 Tools of Chemistry: Measured Quantities and Their Units 9
1.5 Accuracy and Precision; Significant Figures 17
1.6 Computations and the Factor-Label Method 21
1.7 Properties of Substances; Density and Specific Gravity 25

*Tools You Have Learned* 32

**Thinking it Through** 33

*Chemicals in Our World 1:* **Ascorbic Acid—Limes, Scurvy, and the Scientific Method 40**

**2 *The Periodic Table and Some Properties of the Elements* 43**

2.1 Elements, Compounds, and Mixtures 43
2.2 Dalton's Atomic Theory 46
2.3 Symbols, Formulas, and Equations 49
2.4 Atomic Masses 53
2.5 The Structure of Matter: Atoms and Subatomic Particles 56
2.6 The Periodic Table 60
2.7 Metals, Nonmetals, and Metalloids 66
2.8 Reactions of the Elements: Formation of Molecular and Ionic Compounds 70
2.9 Ionic Compounds and Their Properties 72
2.10 Molecular Compounds and Their Properties 78
2.11 Inorganic Chemical Nomenclature 81

*Tools You Have Learned* 88

**Thinking it Through** 89

**3 *Stoichiometry: Quantitative Chemical Relationships* 97**

3.1 The Mole Concept 97
3.2 Measuring Moles of Elements and Compounds 100
3.3 Percentage Composition 107
3.4 Empirical and Molecular Formulas 110
3.5 Writing and Balancing Chemical Equations 116
3.6 Using Chemical Equations in Calculations 118
3.7 Limited Reactant Calculations 123
3.8 Theoretical Yield and Percentage Yield 125
3.9 Reactions in Solution 127
3.10 Molar Concentration 130
3.11 Stoichiometry of Reactions in Solution 136

*Tools You Have Learned* 139

**Thinking it Through** 139

*Chemicals in Our World 2:* **Silicon—An Element for the Twenty-first Century 148**

**4 *Reactions between Ions in Aqueous Solutions* 151**

4.1 Electrolytes and Nonelectrolytes 151
4.2 Equations for Ionic Reactions 154
4.3 Predicting Reactions That Produce Precipitates 158
4.4 Acids and Bases as Electrolytes 161
4.5 Strong and Weak Acids and Bases 166




**Figure 2.8** *Models that depict the diatomic molecules of hydrogen, oxygen, nitrogen, and chlorine.* Each contains two atoms per molecule; their different sizes reflect differences in the sizes of the atoms that make up the molecules. The atoms are shaded by color to indicate the element (hydrogen, white; oxygen, red; nitrogen, blue; and chlorine, green).

**Elements That Occur Naturally as Diatomic Molecules**

| | | | |
|---|---|---|---|
| Hydrogen | $H_2$ | Fluorine | $F_2$ |
| Nitrogen | $N_2$ | Chlorine | $Cl_2$ |
| Oxygen | $O_2$ | Bromine | $Br_2$ |
| | | Iodine | $I_2$ |



A "space-filling" model of $H_2O$.

**Tools**

**Subscripts in a formula**




*A ball-and-stick model of the chloroform molecule, $CHCl_3$.* A standard color scheme is used to represent the different elements: carbon, black; hydrogen, white; and chlorine, green.

Among them are the gases hydrogen, oxygen, nitrogen, and chlorine. We represent them with **chemical formulas** in which subscripts indicate the number of atoms in the molecule. Thus, the formula for molecular hydrogen is $H_2$, and those for oxygen, nitrogen, and chlorine are $O_2$, $N_2$, and $Cl_2$. (See Figure 2.8.) The elements that occur as diatomic molecules are listed in the table in the margin. Be sure to learn them; you will encounter them often throughout the course. Other elements have their atoms arranged in even more complex combinations, but we won't discuss them further at this point.

## Formulas of Compounds

Chemical formulas are also used to represent compounds. In one sense a chemical formula is a shorthand way of writing the name for a compound, just as chemical symbols are shorthand notations for the names of elements. The most important characteristic of a formula, however, is that it specifies the composition of a substance.

In the formula of a compound, each element present is identified by its chemical symbol. When more than one atom of an element is present, the number of atoms is given by a subscript. For example, the iron oxide in rust has the formula $Fe_2O_3$, which tells us that the compound is composed of iron and oxygen and that in this compound there are two atoms of iron for every three atoms of oxygen. When no subscript is written, we assume it to be 1. Thus, the formula $H_2O$ tells us that in water there are two H atoms for every one O atom. Similarly, the formula for chloroform, $CHCl_3$, indicates that one atom of carbon, one atom of hydrogen, and three atoms of chlorine have combined.

For more complicated compounds, we sometimes find formulas containing parentheses. An example is the formula for urea, $CO(NH_2)_2$, which tells us that the group of atoms within the parentheses, $NH_2$, occurs twice. (The formula for urea also could be written as $CON_2H_4$, but there are good reasons for writing certain formulas with parentheses, as you will see later.)

### *Hydrates*

Certain compounds form crystals that contain water molecules. An example is ordinary plaster—the material often used to coat the interior walls of buildings. Plaster consists of crystals of calcium sulfate, $CaSO_4$, that contain two molecules of water for each $CaSO_4$. These water molecules are not held very tightly and can be driven off by heating the crystals. The dried crystals absorb water again if exposed to moisture, and the amount of water absorbed always gives crystals in which the $H_2O$-to-$CaSO_4$ ratio is 2 to 1. Compounds whose crystals contain water molecules in fixed ratios are quite common and are called **hydrates.** The formula

for this hydrate of calcium sulfate is written $CaSO_4 \cdot 2H_2O$ to show that there are two molecules of water per $CaSO_4$. The raised dot is used to indicate that the water molecules are not bound too tightly in the crystal and can be removed.

Sometimes the *dehydration* (removal of water) of hydrate crystals produces changes in color. An example is copper sulfate, which is sometimes used as an agricultural fungicide. Copper sulfate forms blue crystals with the formula $CuSO_4 \cdot 5H_2O$ in which there are five water molecules for each $CuSO_4$. When these blue crystals are heated, most of the water is driven off and the solid that remains, now nearly pure $CuSO_4$, is almost white (Figure 2.9). If left exposed to the air, the $CuSO_4$ will absorb moisture and form blue $CuSO_4 \cdot 5H_2O$ again.

When all the water is removed, the solid is said to be **anhydrous**, meaning *without water*.

**▶Chemistry in Practice◀** The tendency of certain compounds to form hydrates has practical applications. For example, calcium chloride, $CaCl_2$, forms a number of hydrates including $CaCl_2 \cdot 6H_2O$, and the anhydrous compound will absorb water from the air to form hydrates. Products such as the one pictured in the margin are available in hardware stores and contain porous bags of $CaCl_2$. When placed in a damp basement or closet, the $CaCl_2$ absorbs moisture and reduces the humidity, slowing the growth of mildew. ◆




## *Counting Atoms in Formulas*

Counting the number of atoms of the elements in a chemical formula is an operation you will have to perform many times, so let's look at an example.

**EXAMPLE 2.1**
**Counting Atoms in Formulas**

How many atoms of each element are in the formulas (a) $Al_2(SO_4)_3$ and (b) $CoCl_3 \cdot 6H_2O$?

**Solution:** (a) Here we must recognize that all the atoms within the parentheses occur three times. Therefore, the formula $Al_2(SO_4)_3$ shows

2 Al  3 S  12 O

(b) This is a formula for a hydrate, as indicated by the raised dot. It contains six water molecules, each with two H and one O, for every $CoCl_3$. Therefore, the formula $CoCl_3 \cdot 6H_2O$ represents

1 Co  3 Cl  12 H  6 O

**Practice Exercise 1**

How many atoms of each element are expressed by the formulas: (a) $NiCl_2$, (b) $FeSO_4$, (c) $Ca_3(PO_4)_2$, (d) $Co(NO_3)_2 \cdot 6H_2O$? ◆



**Figure 2.9** *Water can be driven from hydrates by heating.* Shown here are blue crystals of copper sulfate hydrate ($CuSO_4 \cdot 5H_2O$), which readily lose water when they are heated. The white solid that forms is pure $CuSO_4$.

Case 4:24-cv-01022-SDJ Document 283-2 Filed 09/15/26 Page 110 of 168 PageID #: 4980



## Chemical Equations

*A* **chemical equation** *describes what happens when a chemical reaction occurs.* It uses chemical formulas to provide a before-and-after picture of the chemical substances involved. Consider, for example, the reaction that occurs when a mixture of powdered zinc (Zn) and sulfur (S) is ignited. This reaction, shown in Figure 2.6 on page 49, produces the compound zinc sulfide, which has the formula ZnS. The reaction can be represented by the chemical equation

$$Zn + S \longrightarrow ZnS$$

The two substances that appear to the left of the arrow, Zn and S, are called the **reactants.** These are the substances that exist before the reaction occurs. To the right of the arrow is the formula for zinc sulfide, ZnS, which is the **product** of the reaction. In this example, only one substance is formed in the reaction, so there is only one product. As we will see, however, in most chemical reactions there is more than one product. The products are the substances that are formed and that exist after the reaction is over. The arrow means "reacts to yield." Thus, this equation tells us that *zinc and sulfur react to yield zinc sulfide.*

## Coefficients

Most chemical equations are more complex than the one we've just examined. For instance, consider the reaction between the gases $H_2$ and $O_2$ to form $H_2O$ illustrated in Figure 2.10. We see that to use up both oxygen atoms of the $O_2$ molecule, we need two hydrogen molecules and we obtain two molecules of $H_2O$. The equation for the reaction is written to reflect this:

$$2H_2 + O_2 \longrightarrow 2H_2O$$




(*a*) (*b*)

**Figure 2.10** *The reaction between molecules of hydrogen and oxygen.* (*a*) The reaction between two molecules of hydrogen and one molecule of oxygen gives two molecules of water. (*b*) The space shuttle uses this reaction to provide thrust with its main rocket engines.

PEPSI_0005997

Case 4:24-cv-01022-SDJ Document 283-2 Filed 09/15/25 Page 111 of 168 PageID #: 4981



The numbers in front of the formulas are called **coefficients,** and they indicate the number of molecules of each kind among the reactants and products. Thus, $2H_2$ means two molecules of $H_2$, and $2H_2O$ means two molecules of $H_2O$. When no number is written, the coefficient is assumed to be 1 (so the coefficient of $O_2$ equals 1).

Coefficients are required to make an equation conform to the law of conservation of mass, with an equal number of atoms of each element on both sides of the arrow. When this condition is met, we say the equation is **balanced.** The following is another example of a balanced equation—the equation for the combustion of butane, $C_4H_{10}$, the fluid in disposable cigarette lighters (Figure 2.11). The chemical equation for this reaction is



**Figure 2.11** *The combustion of butane, $C_4H_{10}$.* The products are carbon dioxide and water vapor.

$$2C_4H_{10} + 13O_2 \longrightarrow 8CO_2 + 10H_2O$$

The 2 before the $C_4H_{10}$ tells us that two molecules of butane react. This involves a total of 8 carbon atoms and 20 hydrogen atoms. (Notice we have multiplied the numbers of atoms of C and H in one molecule of $C_4H_{10}$ by the coefficient 2.) On the right we find 8 molecules of $CO_2$, which contain a total of 8 carbon atoms. Similarly, 10 water molecules contain 20 hydrogen atoms. Finally, we can count 26 oxygen atoms on both sides of the equation. You will learn to balance equations such as this in Chapter 3.

In a chemical equation we sometimes specify the physical states of the reactants and products, that is, whether they are solids, liquids, or gases. This is done by writing *s*, *l*, or *g* in parentheses after the chemical formulas. For example, the equation for the combustion of the carbon in a charcoal briquette can be written as

*s* = solid
*l* = liquid
*g* = gas

$$C(s) + O_2(g) \longrightarrow CO_2(g)$$

At times we will also find it useful to indicate that a particular substance is dissolved in water. We do this by writing *aq*, meaning *aqueous* solution, in parentheses after the formula. For instance, the reaction between stomach acid (HCl) and the active ingredient in Tums, $CaCO_3$, is

*Aqueous* means dissolved in water.

$$2HCl(aq) + CaCO_3(s) \longrightarrow CaCl_2(aq) + H_2O(l) + CO_2(g)$$

### Practice Exercise 2

How many atoms of each element appear on each side of the arrow in the following equation?

$$Mg(OH)_2 + 2HCl \longrightarrow MgCl_2 + 2H_2O$$ ◆

### Practice Exercise 3

Rewrite the equation in Practice Exercise 2 to show that $Mg(OH)_2$ is a solid, HCl and $MgCl_2$ are dissolved in water, and $H_2O$ is a liquid. ◆

## 2.4 Atomic Masses

One of the most useful concepts to come from Dalton's atomic theory is that atoms of an element have a constant, characteristic **atomic mass** (or **atomic weight**). This concept opened the door to the determination of chemical formulas and ultimately to one of the most useful devices chemists have for organizing chemical information, the periodic table of the elements. But how can the masses of atoms be measured?

PEPSI_0005998

# EXHIBIT 11

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 0:16-cv-60693-UU

THERMOLIFE INTERNATIONAL, LLC
*et al.*,

Plaintiffs,

v.

VITAL PHARMACEUTICALS, INC.
d/b/a VPX,

Defendant.
_______________________________________/

**ORDER ON *MARKMAN* HEARING**

THIS CAUSE is before the Court upon the *Markman* Hearing, held in this Court on Wednesday, January 4, 2017, at 10:30 a.m. On November 4, 2016, the parties filed a Joint Claim Construction and Prehearing Statement, D.E. 43. The parties filed Initial Claim Construction Briefs on November 14, 2016, D.E. 46 and D.E. 47, and filed Responses on December 2, 2016, D.E. 59 and D.E. 60. On January 3, 2017, Defendant filed a notice attaching excerpts from the December 28, 2016 deposition of Plaintiffs' expert, Dr. Richard Chamberlin. D.E. 72. On January 6, 2017, after the *Markman* Hearing and with leave of Court, Plaintiffs filed a supplemental memorandum attaching excerpts from the deposition of Dr. Chamberlin and the complete *Moinet* patent, U.S. Patent No. 6,518,458, which both parties contend to be relevant to claim construction. D.E. 73.

THE COURT has considered the parties' filings and arguments, pertinent portions of the record, and is otherwise fully advised in the premises.

## I. <u>Background</u>

This action stems from Defendant's alleged infringement of United States Patent No. 8,350,077, entitled "Amides of Creatine, Method of Their Preparation, and Remedy Possessing a Neuroprotective Activity" (the "Patent"). D.E. 28. The Patent was duly and lawfully issued by the United States Patent and Trademark Office ("USPTO") on January 8, 2013. D.E. 46-1.

Plaintiff, Werteks Closed Joint Stock Company, d/b/a Werteks Pharmaceutical Company ("Werteks"), is the owner of the Patent. D.E. 28 ¶ 16. Plaintiff, ThermoLife International, LLC ("ThermoLife"), exclusively licenses the Patent from Werteks, and has been given the right by Wertex to institute the instant action (Werteks and ThermoLife shall, collectively, be referred to as "Plaintiffs"). *See id.* ¶¶ 17-18. Plaintiffs allege that Defendant, Vital Pharmaceuticals, Inc. ("Defendant" or "VPX"), manufactures and markets dietary supplemental products under the "CREmTOR" brand name, which Plaintiffs contend infringes on the Patent. *Id.* ¶¶ 21-26.

Plaintiffs assert a claim for patent infringement under each of the three claims of the Patent. Claim 1 provides that "[t]he invention claimed is:"

> **Amides of Creatine having a general formula: NH═C(NH2)-N(CH3)-CH2-CO—NH—R*X**, wherein R is amino acid residue of aliphatic L-amino acid, or aromatic amino L-acid or heteroaromatic L-amino acid or derivatives of aliphatic L-amino acid, or aromatic L-amino acid or heteroaromatic L-amino acid representing at least one of the following: salts of amino acid, amino acid esters, amino acid amides, or amino acid peptides; and **X is low-molecular weight organic or mineral acid or water.**

D.E. 46-1 at col. 16 lines 35-44 (emphasis added). Claim 2 provides that "[t]he invention claimed is:"

> A method for preparation of said amides of Creatine according to claim **1**, said method comprising: interaction of amides of sarcosine and amino acids

> or their derivatives with guanidinylating agents in an organic solvents at a temperature not exceeding 50° C.

*Id.* at col. 16 lines 45-50 (emphasis in original). Claim 3 provides that "[t]he invention claimed is:"

> A compound possessing neuroprotective activity, said compound consisting of: **amides of Creatine having a general formula: NH═C(NH2)-N(CH3)-CH2-CO—NH—R*X**; wherein R is amino acid residue of aliphatic L-amino acid, or aromatic amino L-acid or heteroaromatic L-amino acid, or derivatives of aliphatic L-amino acid, or aromatic L-amino acid, or heteroaromatic L-amino acid representing at least one of the following: salts of amino acid, amino acid esters, amino acid amides, or amino acid peptides; **and X is low-molecular-weight organic or mineral acid or water** <u>as a remedy possessing a neuroprotective activity.</u>

*Id.* at col. 16 lines 51-60 (emphasis added).

The parties dispute only one term in this action: "**X is a low-molecular weight organic or mineral acid or water**." D.E. 43 p. 1 (emphasis added). The parties' proposed constructions of the term are as follows:

| **Plaintiffs' Proposed Claim Construction of "X is low-molecular-weight organic or mineral acid or water"** | **Defendant's Proposed Claim Construction of "X is low-molecular-weight organic or mineral acid or water"** |
|---|---|
| "Water" refers to degrees of hydration, and hydrate systems can be classified from anhydrous, where the coefficient that is implicit in "X" would be zero, to higher degrees of hydrates, where the coefficient would be greater than zero. | The term "X is low-molecular-weight organic or mineral acid or water" requires that that X <u>**must be**</u> one molecule of "low-molecular weight organic or mineral acid or water." "X" therefore cannot be equal to zero molecules of low-molecular-weight organic or mineral acid or water. |

D.E. 43 p. 2.

## II. <u>Legal Standard</u>

In a case involving patents, claim construction is a matter of law exclusively within the province of the Court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). "The duty of the trial judge is to determine the meaning of the claims at issue and to instruct the jury accordingly." *Exxon Chem. Patents, Inc. v. Lubrizoil Corp.*, 64 F.3d 1553, 1555 (Fed. Cir. 1995) (internal citations omitted). "Claims of the patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (internal citations omitted). "Because the patentee is required to 'define precisely what his invention is,' it is 'unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms.'" *Id.* (internal citations omitted).

Words of a claim are generally given their ordinary and customary meaning. *Id.* The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention" and a court must, therefore, determine "how a person of ordinary skill in the art understands a claim term." *Id.* A "person of ordinary skill in the art is deemed to read the claim term not only in context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

When a claim term has a particular meaning in the field of art, the court must examine those sources available to the public to show what a person skilled in the art would have understood disputed claim language to mean. *Id.* at 1314. Those sources "include 'words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic

evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" *Id.* (internal citations omitted).

"[T]he ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* However, "[b]ecause the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." *Id.*

Claim language should not be interpreted in a vacuum. Rather, claim language is construed as "part of a fully integrated written instrument, consisting principally of a specification that concludes with the claims." *Id.* at 1315 (citing *Markman*, 52 F.3d at 978). For that reason, claims "must be read in view of the specification, of which they are a part . . . and the specification is always highly relevant to the claim construction analysis." *Id.* (internal citation and quotations omitted). The specification is usually "dispositive" and is the "single best guide to the meaning of a disputed term." *Id.* (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

The patent prosecution history is, in some cases, "of primary significant in understanding the claims." *Markman*, 52 F.3d at 980. But while "the prosecution history can and should be used to understand the language used in the claims, it too cannot 'enlarge, diminish, or vary' the limitations in the claims." *Id.* (internal citations omitted).

Lastly, a court may consider extrinsic evidence, such as dictionaries, inventor testimony, and learned treatises, but their use should be limited. *Phillips*, 415 F.3d at 1317, 1319. While extrinsic evidence in the form of expert testimony "can be useful to a court for a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field," conclusory, unsupported assertions by experts as to the definition of a claim term are not useful. *Phillips*, 415 F.3d at 1318 (collecting cases). Importantly, a court must also discount any expert testimony "that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent." *Key Pharm. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998). While at times useful, "extrinsic evidence is considered less significant than the intrinsic evidence" and should not be relied on where ambiguities can be resolved based on intrinsic evidence alone. *White Water Investments, Inc. v. Ethicon Endo-Surgery, Inc.*, No. 04-81178-CIV, 2005 WL 6258668, at *3 (S.D. Fla. Sept. 1, 2005) (citing *Phillips*, 415 F.3d at 1317); *Vitronics Corp.*, 90 F.3d at 1583.

## III. Discussion

The parties dispute the following claim language: "X is a low-molecular weight organic or mineral acid or water."[1] D.E. 43 p. 1. Plaintiffs propose the following construction of the disputed claim term: "'Water" refers to degrees of hydration, and hydrate systems can be

[1] As discussed above, "X" is a variable in the following incorporated into each of the Patent's three claims: "Amides of Creatine having a general formula: NH==C(NH2)-N(CH3)-CH2-CO—NH—R*X." D.E. 46-1 at col. 16 lines 35-44, 51-60.

classified from anhydrous, where the coefficient that is implicit in 'X' would be zero, to higher degrees of hydrates, where the coefficient would be greater than zero." D.E. 43 p. 2. In contrast, Defendant proposes the following construction of the disputed claim term: "The term 'X is low-molecular-weight organic or mineral acid or water' requires that that X **must be** one molecule of 'low-molecular weight organic or mineral acid or water.' 'X' therefore cannot be equal to zero molecules of low-molecular-weight organic or mineral acid or water." *Id.* (emphasis in original).

In other words, Defendant argues that "X" necessarily requires exactly one molecule of low-molecular-weight organic or mineral acid or water; in contrast, Plaintiffs contend that "X" means the *possible* presence of low-molecular-weight organic or mineral acid, or water, where X could be zero (i.e., no organic or mineral acid or water) or any number greater than zero.

The parties briefed the issue and submitted extrinsic evidence in advance of the *Markman* hearing which included, in relevant part: (1) the Declaration of Dr. Richard Chamberlin in Support of Plaintiffs' Claim Construction Brief (the "First Chamberlin Declaration"), D.E. 46-2; (2) the Declaration of Dr. Richard Chamberlin in Support of Plaintiffs' Response to Defendant's Claim Construction Brief (the "Second Chamberlin Declaration"), D.E. 59-1; (3) the Declaration of Dr. Gregg B. Fields in Support of VPX's Claim Construction Brief (the "Fields Declaration"), D.E. 47-2; (4) dictionary definitions of "is" and "be" from Webster's II New College Dictionary (Third Ed., 2005), D.E. 47-1 pp. 57-61; (5) U.S. Patent No. 6,777,397, U.S. Patent No. 7,329,307, U.S. Patent No. 7,393,466.and U.S. Patent No. 7,157,071; and (6) excerpts from the December 28, 2016 deposition of Dr. Chamberlin, including an article by Dr. Chamberlin used by Defendant's counsel at the deposition, D.E. 72, 72-1, 72-2, 73-2.

At the January 4, 2017 *Markman* hearing, the Court heard additional argument from the parties and, following the hearing, permitted Plaintiffs to file a supplemental memorandum attaching: (1) additional excerpts from the December 28, 2016 deposition of Dr. Chamberlin; and (2) the complete *Moinet* patent, U.S. Patent No. 6,518,458, which is relevant to the patent prosecution history and which both parties urge the Court to consider in ruling on claim construction. D.E. 73. The Court has considered all of the intrinsic and extrinsic evidence submitted in this case.

The Court will begin by summarizing the parties' arguments and, then, rule on claim construction.

A. <u>The Parties' Arguments</u>

i. *Defendant's arguments*

Defendant argues that the plain language of the claim, the specification, the prosecution history and extrinsic evidence all support its proposed claim construction.

With respect to the plain language of the claim, Defendant presents three arguments. First, Defendant relies on the phrase "X is . . ." and the definition of "is" from the Merriam-Webster II New College Dictionary to contend that the use of the phrase "is" requires low-molecular-weight organic or mineral acid or water to "exist in actuality" in the compound represented by the general formula: NH==C(NH2)-N(CH3)-CH2-CO—NH—R*X. D.E. 47 pp. 11-12. Second, Defendant argues that well-established patent claim construction case law holds that claim language in the form of "X is A, B, or C" is a *Markush* group signifying that X *must be* A, B, or C and cannot—as Plaintiffs argue—indicate either the presence or absence of A, B, or C. *Id.* pp. 12-14. Because the disputed claim language is in "A, B or C" format, Defendant

argues that "X" *must* include low-molecular-weight organic or mineral acid or water. *Id.* Lastly, Defendant relies on language in Claim 3 providing: "X is low-molecular-weight organic or mineral acid or water as a remedy possessing a neuroprotective activity." *Id.* p. 14 (emphasis added). Defendant argues that if X could be zero, then X would not be a "remedy possessing neuroprotective activity" and, therefore, argues that the Court should reject Plaintiffs' attempt to "read[] a necessary element (i.e., "X is . . .") out of the claim." *Id.* p. 14.

Defendant also argues that the patent specification supports its proposed claim construction. As an initial matter, Defendant argues the "Abstract" and "Detail Description of the Invention" sections include the same *Markush* group language as the claims themselves. D.E. D.E. 47 pp. 14-15. Moreover, Defendant argues that each of the examples in the patent specification involve the synthesis of compounds that have as their "X" component either low-molecular-weight organic or mineral acid or water and, therefore, do not have "nothing" as the "X." D.E. 47 pp. 14-15. And at the *Markman* hearing, after questioning from the Court, Defendant relied on the "Detail Description of the Invention," D.E. 46-1 col. 4 lines 19-23, to contend that the specification plainly states that "X" is a necessary element of Claims 1, 2 and 3 because the "X" serves the purpose of facilitating deployment of amides of Creatine with enhanced solubility and stability in aqueous solutions. Tr. at 51:12-52:18.

In addition, Defendant contends that the patent prosecution history supports its proposed claim construction. In May 2012, the Patent Examiner rejected the claims in the patent application at issue in this action due to anticipation by a prior patent, *Moinet*, U.S. Patent No. 6,518,458. D.E. 47-1 pp. 65-66. The inventors of the patent thereafter filed a "Response to Office Action & Amendment" (the "ROAA"), arguing that *Moinet* could not anticipate the claims at

issue due to the import of the "R" coefficient in the prosecuted patent's claims, which is defined, in relevant part, as: "R*X; wherein R is amino acid residue of aliphatic L-amino acid, or aromatic amino L-acid or heteroaromatic L-amino acid, or derivatives of aliphatic L-amino acid, or aromatic L-amino acid, or heteroaromatic L-amino acid representing at least one of the following: salts of amino acid, amino acid esters, amino acid amides, or amino acid peptides." *Id.* p. 67.

The ROAA stated: "[t]he main substantial difference of the present invention from Moinet is that the claimed compound comprises an amino acid residue R of one of the following amino acids . . . whereas Moinet does not disclose any amino acid residue neither expressly, nor impliedly, nor inherently." *Id.* In other words, the ROAA emphasized that "[i]n order to anticipate the present invention, radicals R2 and R3 of Moinet's compound have to include one of the" compounds in the "R is A, B, or C clause." *See id.*; D.E. 47 pp. 16-17. Defendant contends that because the ROAA construed "R" as a *Markush* group, whereby the proposed patent *required* the presence of "A, B or C" when prosecuting the patent, Plaintiffs should be precluded from taking the opposite position in this case with respect to the "X" variable. D.E. 47 p. 17.

Lastly, based on extrinsic evidence, Defendant argues that the use of "*X" by a person of ordinary skill in the art of organic and peptide chemistry would not allow the "X" to be zero, but would instead require that "X" be **one** molecule of low-molecular-weight organic or mineral acid or water. In particular, Defendant rejects Plaintiff's argument that there is an implied coefficient "n" in front of the "X" under ordinary principles of chemistry and, instead, argues that "X" indicates **one** molecule of "X" (i.e., low-molecular-weight organic or mineral acid or water). *Id.*

p. 17. In support thereof, Defendant relies on the declaration of Dr. Gregg Fields, an assortment of other U.S. Patents that include chemicals bonded with H2O and, at the *Markman* hearing, relied on excerpts from the December 28, 2016 deposition of Plaintiffs' expert, Dr. Richard Chamberlin. D.E. 47, 60.

ii. *Plaintiffs' arguments*

Plaintiffs argue that the claim language, specification, prosecution history and extrinsic evidence support their proposed claim construction. In support thereof, Plaintiffs rely primarily on: (1) case law allegedly rebutting Defendant's claim that "X" should be construed as a *Markush* group; (2) the patent specification; (3) the prosecution history; and (4) testimony from Dr. Chamberlin, including two declarations filed on his behalf as well as excerpts from Dr. Chamberlin's December 28, 2016 deposition. D.E. 46-2, 59-1, 73-2.

In their briefing and at the *Markman* hearing, Plaintiffs argued that "X" should not be construed as a *Markush* group because a *Markush* group requires "the requisite signaling language: 'selected from the group consisting of,'" which is not included in the Patent. D.E. 59 p. 9, n. 6; Tr. 63:24-66:21.

With respect to the patent specification, Plaintiffs rely on the "Detail Description of the Invention" section of the patent specification, which provides, in relevant part:

> Creatine amides can be administered into the organism independently and within compositions, containing a mixture of an active ingredient with auxiliary components. The auxiliary components are substances permitted by the Pharmacopoeia; they enhance the conditions of preparation, storage, or administering the remedy, for instance . . . the auxiliary substances may include: solvents, such as water . . . .

D.E. 46-1 col. 5, lines 1-12. Plaintiffs argue that this language shows that the compound described in the claims as "Amides of Creatine having a general formula: NH==C(NH2)-

N(CH3)-CH2-CO—NH—R*X" is generic enough to include an anhydrous compound, or a compound without any water indicated by the "X" variable, which is then mixed with water. D.E. 59 p. 6. Because there is no chemical difference between a "hydrated form of a compound and an anhydrous form of that same compound once they are dissolved in water," Plaintiffs argue that "X" can denote "either an anhydrous form of a compound of a hydrated form of that same compound." *Id.* pp. 6-8.

Moreover, Plaintiffs argue that the prosecution history is dispositive in resolving claim construction in their favor, for two reasons. First, Plaintiffs rely on the following diagram in the ROAA, which was provided to the Patent Examiner by the inventors of the patent at issue in this action, Sergej Vladimirovich Burov, Natalia Vasilyevna Khromova, Anna Alexandrovna Khromova and Petr Alekseevich Khromov[2]:

> The general formula of the claimed Amides of Creatine can be structurally represented as follows:




D.E. 47-1 p. 67 (the "Prosecution Diagram"). Plaintiffs argue that this "general formula of the claimed Amides of Creatine," as illustrated by the Inventors, does not include a low-molecular-

---

[2] The inventors of the patent at issue in this action, Sergej Vladimirovich Burov, Natalia Vasilyevna Khromova, Anna Alexandrovna Khromova and Petr Alekseevich Khromov, were the patent applicants who submitted the aforementioned ROAA. D.E. 47-1 p. 63; D.E. 1-5. Werteks thereafter acquired the Patent and licensed it to ThermoLife. *See* D.E. 28 ¶¶ 17-18. To avoid confusion, the Court will refer to the patent applicants as the "Inventors."

weight organic or mineral acid or water, thereby conclusively showing that "X" can indicate either the presence or absence of an organic or mineral acid or water. D.E. 59 pp. 2-4.

Second, Plaintiffs argue that the ROAA's focus on the "R" coefficient, rather than the "X" coefficient, indicates that the general formula of Amides of Creatine, as defined by the Patent, is broad enough to include an anhydrous compound. D.E. 59 pp. 4-6. In particular, Plaintiffs argue that the Inventors "could have argued that 'X' must be an acid or water and that *Moinet's* disclosure is distinguishable because the reference does not disclose a salt (in which 'X' is an acid) or a hydrate (in which 'X' is water)," but elected not to do so. *Id.* p. 4. Plaintiffs construe the Inventors' decision to prosecute the patent based on the "R" coefficient, rather than the "X" coefficient, as a strategic decision to make an argument generic enough to embrace an interpretation of "X" as indicating *either* the presence *or* absence of low-molecular-weight organic or mineral acid or water. *Id.* pp. 4-5; Tr. at 19:2-25.

Lastly, Plaintiffs argue that extrinsic evidence shows that a person skilled in the art of chemistry would understand, consistent with the Inventors' Prosecution Diagram, that there is a coefficient "n" implicit in the "X" in the general formula, which could be zero or any coefficient greater than zero. D.E. 46 pp. 4-5; 59 pp. 2-3, 8-9. In support thereof, Plaintiffs rely on the First Chamberlin Declaration, the Second Chamberlin Declaration, and excerpts of Dr. Chamberlin's testimony from his December 28, 2016 deposition. *Id.*; D.E. 73.

B. Analysis

The Court adopts Defendant's proposed claim construction based on the plain claim language, patent specification, and, to a lesser degree, patent prosecution history and expert testimony of Dr. Fields and Dr. Chamberlin, used to "assist in determining the meaning or scope

of technical terms in the claims." *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1216 (Fed. Cir. 1995); *see also Phillips*, 415 F.3d at 1312 ("The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation . . . [i]mportantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification.").

i. *Claim language*

As an initial matter, the plain language of the phrase "X is a low-molecular-weight organic or mineral acid or water" indicates that low-molecular weight organic or mineral acid or water must actually be present in the chemical compound having a general formula: NH═C(NH2)-N(CH3)-CH2-CO—NH—R*X, for three principal reasons. First, the plain meaning and dictionary definition of the word "is" indicates, absent patent language or specifications to the contrary, that "X" must actually be present. *Merriam Webster II New College Dictionary* (Third Ed., 2005) (defining "is" as the present tense of "be" and "be" as to "exist in actuality"); *see also Mission Pharmacal Co. v. Virtus Pharm., LLC*, No. SA-13-CA-176-OG, 2014 WL 12480013, at *17 (W.D. Tex. Feb. 26, 2014), *report and recommendation adopted*, No. 5:13-CA-176-OLG, 2014 WL 12480014 (W.D. Tex. Mar. 28, 2014) (construing claim term "to be" to mean "will occur in a future state"); *Phillips*, 415 F.3d at 1322 ("[J]udges are free to consult dictionaries and technical treatises . . . when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents."); *see also Vitronics Corp.*, 90 F.3d at 1585 (noting that dictionaries may be relied on as "more objective and reliable" forms of extrinsic evidence).

Second, language in Claim 3 concerning "neuroprotective activity" supports the conclusion that low-molecular-weight organic or mineral acid or water must, in fact, be present to satisfy the general formula for amides of Creatine. Claim 3 provides that the invention claimed is:

> A compound possessing neuroprotective activity, said compound consisting of: **amides of Creatine having a general formula: NH=C(NH2)—N(CH3)—CH2—CO—NH—R*X**; wherein R is amino acid residue of aliphatic L-amino acid, or aromatic amino L-acid or heteroaromatic L-amino acid, or derivatives of aliphatic L-amino acid, or aromatic L-amino acid, or heteroaromatic L-amino acid representing at least one of the following: salts of amino acid, amino acid esters, amino acid amides, or amino acid peptides; **and X is low-molecular-weight organic or mineral acid or water** <u>as a remedy possessing a neuroprotective activity.</u>

D.E. 46-1 at col. 16, lines 51-60 (emphasis added). If "water" could indicate *either* absence *or* presence of water, then the phrase "as a remedy possessing a neuroprotective activity" in Claim 3 would be rendered meaningless. Because Plaintiffs' proposed construction would, in effect, eliminate the language in Claim 3 concerning a "remedy possessing a neuroprotective activity," it must be rejected. *See, e.g.*, *Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."); *see also K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1363 (Fed. Cir. 1999) (rejecting claim construction "that would effectively expunge the term 'permanently' from the claim language").

Lastly, "X" is properly construed as a *Markush* group format under well-established patent law, which supports Defendant's proposed construction. "A Markush group is a listing of specified alternatives of a group in a patent claim, typically expressed in the form: a member selected from the group consisting of A, B, and C." *Abbott Labs. v. Baxter Pharm. Prod., Inc.*,

334 F.3d 1274, 1280 (Fed. Cir. 2003). While a "Markush claim is commonly formatted as: 'selected from the group consisting of A, B, and C' . . . the phrase 'Markush claim' means any claim that recites a list of alternatively useable species regardless of format." U.S. Dept. of Commerce, Patent and Trademark Offices, *Manual of Patent Examining Procedure* § 2173.05(h). Accordingly, "[w]hen materials recited in a claim are so related as to constitute a proper Markush group, they may be recited in the conventional manner, or alternatively." *In re Harnisch*, 631 F.2d 716, 723 (C.C.P.A. 1980); *Abbot Labs*, 334 F.3d at 1280. "For example, if 'wherein R is a material selected from the group consisting of A, B, C and D' is a proper limitation then 'wherein R is A, B, C or D' shall also be considered proper." *Id.*

Here, the disputed language provides that "X is low-molecular-weight organic or mineral acid or water," thereby creating a *Markush* group requiring that either low-molecular-weight organic or mineral acid or water be present. *See Abbot Labs*, 334 F.3d at 1283 ("To prove literal infringement of these claims on remand, Abbott must show a species selected from the members of the recited Markush group is present in Baxter's sevoflurane composition in an amount effective to function as a Lewis acid inhibitor."); *see also Application of Driscoll*, 562 F.2d 1245, 1249 (C.C.P.A. 1977) (noting that *Markush* groups are used in the "practice of describing a class of chemical compounds in terms of a structural formula").

ii. *Patent specification*

The patent specification also supports Defendant's proposed claim construction. *See also Medrad, Inc. v. MRI Devices Corp.,* 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."); *Unitherm Food Sys., Inc.*

*v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1351 (Fed. Cir. 2004) (proper definition is the "definition that one of ordinary skill in the art could ascertain from the intrinsic evidence in the record").

As an initial matter, Defendant's expert, Dr. Fields, states in his declaration—and Plaintiffs concede—that each of the eight examples of chemical compounds in the patent specification include either low-molecular-weight organic or mineral acid or water. D.E. 47-2 ¶¶ 35-38; Tr. 4:23-5:9. While the examples in the patent specifications are, by the Patent's own terms, only "illustrat[ive]," the fact that each of the eight examples of chemical compounds in the patent specification include the presence of one of the alternative compounds represented by "X" is consistent with the plain claim language requiring the presence of low-molecular-weight organic or mineral acid or water. D.E. 46-1 col. 5, line 28; D.E. 47-2 ¶¶ 35-38; Tr. 4:23-5:9; *IP Innovation LLC v. Mitsubishi Elec. Corp.*, No. 08 C 393, 2009 WL 3617505, at *5 (N.D. Ill. Oct. 29, 2009) (adopting plaintiffs' proposed construction where the "[p]atent specification provides a range of examples consistent with this construction"); *DE Techs., Inc. v. Dell, Inc.*, No. CIV.A. 704CV00628, 2006 WL 335608, at *3 (W.D. Va. Feb. 14, 2006), *amended in part*, No. CIV.A. 704CV00628, 2006 WL 733967 (W.D. Va. Mar. 21, 2006) (refusing to broaden claim term where plain claim language and "illustrative examples" both "consistently referr[ed] to the invention" in a narrower way).

There is also substantial language in the "Background of the Invention," "Object and Brief Description of the Invention" and "Detail Description of the Invention" sections of the patent specification to indicate that claims at issue here encompass a "general formula of Amides of Creatine" with "enhanced solubility and stability in aqueous solutions," *perhaps* as a result of the "X" coefficient. D.E. 46-1 col. 2, lines 41-45 ("Therefore preparation of Creatine derivatives

possessing a greater stability or higher biological activity represents a big interest that allows, on the one hand, reducing the dose of administered substance and, on the other hand, finding new fields of application therefor."), col. 3, lines 49-55 ("Therefore, a primary object of the present invention is the obtaining of novel Creatine derivatives produced through chemical synthesis, which derivatives should possess a higher stability and a wider spectrum of biological actions, in particular, the neuro-protective activity."), col. 4, lines 19-23 ("As it was determined during biological experiments, synthesized amides of Creatine have an enhanced solubility and stability in aqueous solutions in comparison will well-known analogues that allows deploying them more widely as a source of Creatine in the organism."); Tr. 51:12-52:22.

While neither party has submitted evidence to explicitly support the proposition that the "X" coefficient exists to facilitate enhanced solubility and stability in aqueous solutions, Defendant's counsel represented this to be the case at the *Markman* hearing and, more importantly, such a conclusion is supported by Dr. Fields' declaration, which states that "X" is a "necessary molecule of the formula claimed in claims 1 and 3 because it is set forth in the formula preceded immediately by an asterisk" and, therefore, "must be one molecule of one of the specified alternative compounds (low-molecular-weight organic or mineral acid or water) which is "non-covalently bonded within the claimed compound." D.E. 47-2 ¶¶ 17-22. Consistent with the patent specification, Defendant's counsel's representation and Dr. Fields' declaration, the Court therefore interprets the Patent to encompass an amide of Creatine whose general formula requires the presence of one of the alternative compounds indicated by the "X" variable, at least in part because the "X" variable serves *some* purpose in the claimed chemical compound. *See, e.g.*, *Phillips*, 415 F.3d at 1318 (permitting courts to consider extrinsic evidence "for a

variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field"). Accordingly, the Court rejects Plaintiffs' argument that the "X" variable is mere surplusage because this conclusion contravenes the "words of the claims themselves [and] the remainder of the specification" and, therefore, finds that the presence of one of the alternative compounds represented by "X" is a necessary and claimed component of "Amides of Creatine having a general formula: NH═C(NH2)-N(CH3)-CH2-CO—NH—R*X."[3] *Id.* at 1312.

iii. *Prosecution history*

Despite the parties' competing arguments to the contrary, the Court concludes that the patent prosecution history and *Moinet* patent have little impact on claim construction. The patent application at issue, patent application, No. 17/734,183, was filed on April 15, 2010. D.E. 47-1 p. 63. In May 2012, the Patent Examiner rejected each of the claims in the proposed patent, under 35 U.S.C. § 102(b), on grounds that such claims were anticipated by the prior *Moinet* patent,

[3] The Court also rejects Plaintiffs' argument that language in the "Detail Description of the Invention" concerning "auxiliary components" indicates that "X" is optional because: (1) one of the "auxiliary components" is water; and (2) there is no chemical difference between a "hydrated form of a compound and an anhydrous form of that same compound once they are dissolved in water." *See* D.E. 59 p. 6; D.E. 46-1 col. 5, lines 1-12. The section relied on by Plaintiffs sets forth a number of different "auxiliary substances" that can be used to "administer[] [Creatine amides] into the organism." D.E. 46-1 col. 5 lines 1-2. However, these auxiliary substances are, by the Patent's own terms, only "exemplar[y]." *Id.* at col. 5, line 11. After reading the language concerning "auxiliary compounds" in conjunction with the remainder of the Patent, the Court finds that this section only sets forth examples of different ways to ingest the "Amides of Creatine having a general formula: NH═C(NH2)-N(CH3)-CH2-CO—NH—R*X" and does not, as Plaintiffs argue, serve to broaden the plain meaning of the "X" variable. *See, e.g.*, *Phillips*, 415 F.3d at 1312 (requiring that courts construe a claim term by interpreting the term "in the context of the entire patent").

U.S. Patent No. 6,518,458. *Id.* p. 66. On September 5, 2012, the Inventors filed their ROAA in response to the Patent Examiner, requesting that the Examiner reconsider and amend the application. In particular, the Inventors contended that the claims in the proposed patent were not anticipated by *Moinet* by arguing, in relevant part, that:

> The main substantial difference of the present invention from Moinet is that the claimed compound comprises an amino acid residue of R of one of the following amino acids: aliphatic L-amino acid, or aromatic amino L-acid or heteroaromatic L-amino acid or derivatives of aliphatic L-amino acid, or aromatic L-amino acid or heterаromatic L-amino acid, **whereas Moinet does not disclose any amino acid residue neither expressly, nor impliedly, nor inherently.**

D.E. 47-1 p. 67. The Inventors further emphasized that "[i]n order to anticipate the present invention, radicals R2 and R3 of Moinet's compound have to include one of the following structures (as radical R of the present invention does)," and thereafter included drawings of chemical structures related to the definition of the "R" variable under the proposed '077 patent. *Id.*

In other words, the Inventors contested that the prosecuted patent was anticipated by *Moinet* by drawing distinctions between the pharmaceutical composition patented in *Moinet* and the chemical compound represented by the equation NH==C(NH2)-N(CH3)-CH2-CO—NH—R*X based on the "R" variable, which is defined as "amino acid residue of aliphatic L-amino acid, or aromatic amino L-acid or heteroaromatic L-amino acid or derivatives of aliphatic L-amino acid, or aromatic L-amino acid or heteroaromatic L-amino acid representing at least one of the following: salts of amino acid, amino acid esters, amino acid amides, or amino acid peptides." D.E. 47-1 pp. 67-69; D.E. 46-1 col. 16 lines 51-62. And after considering the ROAA, the Patent Examiner issued its Notice of Allowability based entirely on the "R" variable, stating:

"Rejection of claims 1-3 under 35 USC 102/103 over Moinet et al are hereby withdrawn, because the reference fails to teach R* to be amino acid residue." D.E. 47-1 p. 74.

Because the prosecution history hinged entirely on the "R" variable and did not address the "X" variable, prosecution history is not particularly helpful in construing the meaning of "X" in Claims 1, 2 and 3 of the Patent.[4] *See, e.g.*, *Gen. Am. Transp. Corp. v. Cryo-Trans, Inc.*, 93 F.3d 766, 770 (Fed. Cir. 1996) (resolving claim construction based on claim language and patent specification where "[t]he prosecution history is brief and not helpful to resolving the meaning of the disputed claim language"); *see also* Tr. 18:3-19:25. At best, it is weak support for Defendant's contention that "X" is expressed as a *Markush* group.

iv. *Extrinsic evidence*

With respect to extrinsic evidence, as noted above, the Court exercises its discretion to consider portions of the declaration of Dr. Fields, D.E. 47-2 ¶¶ 17-22, as helpful in determining the "meaning or scope of technical terms in the claims" and, in particular, to understand: (1) whether the examples in the patent specification contain low-molecular-weight organic or mineral acid or water; and (2) the Patent's apparent intent to patent a compound with "enhanced solubility and stability in aqueous solutions," based on the general formula NH=C(NH2)-N(CH3)-CH2-CO—NH—R*X, which includes the presence of one of the alternative compounds represented by the variable "X." *Supra* pp. 17-19; *Phillips*, 415 F.3d at 1319 ("[B]ecause extrinsic evidence can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean,

[4] The Court, therefore, declines to reach the parties' arguments concerning: (1) whether Dr. Chamberlin, as an expert, properly opined on the prosecution history; and (2) whether the Prosecution Diagram in the ROAA, D.E. 46-3 p. 69 ¶ 5, accurately described "the general formula of the claimed Amides of Creatine." *See* D.E. 46-3 p. 69 ¶ 5.

it is permissible for the district court in its sound discretion to admit and use such evidence."). But the remaining portions of Dr. Fields' declaration, besides those cited above, are not helpful in interpreting the scope of the patent claims at issue here. *Phillips*, 415 F.3d at 1317 ("However, while extrinsic evidence can shed useful light on the relevant art, we have explained that it is less significant than the intrinsic record in determining 'the legally operative meaning of claim language." (internal citations and quotations omitted)).

The Court has also considered the remaining extrinsic evidence submitted by the parties, including the First Chamberlin Declaration, the Second Chamberlin Declaration, excerpts from Dr. Chamberlin's December 28, 2016 deposition, and the six unrelated patents filed by Defendant, D.E. 60-1 pp. 4-66. For the following reasons, the Court does not find the aforementioned extrinsic evidence to be helpful.

As an initial matter, the Court finds Dr. Chamberlin's testimony that "X" could "refer to any degree of hydration, including zero" to be unpersuasive for three reasons. D.E. 59-1 ¶ 9. First, Dr. Chamberlin's testimony concerning the Prosecution Diagram in the Response to Office Action & Amendment, submitted in response to the Patent Examiner's denial of the patent application at issue based on anticipation by the *Moinet* patent, even if it were to be considered proper expert testimony, has no bearing on claim language pertaining to the variable "X" because the patent prosecution hinged on the meaning of the "R" variable and not the "X" variable. *Supra* pp. 19-21; *see* D.E. 46-2 ¶ 7.

Second, Dr. Chamberlin's testimony concerning whether amides of Creatine can exist in "anhydrous form or hydrated form" without "substantially alter[ing] their function, the way they achieve that function, or the results they achieve" is unpersuasive because of the claim language

and extensive language in the patent specification to indicate that "Amides of Creatine having a general formula NH==C(NH2)-N(CH3)-CH2-CO—NH—R*X" requires the presence of one of the three alternative compounds represented by the variable "X." D.E. 46-1 col. 2, lines 19-23, 41-45, 49-55; Tr. 51:12-52:22; D.E. 47-2 ¶¶ 18-22.

Third, Dr. Chamberlin's testimony that the "X" is "entirely optional" based on an implied coefficient "n" is, similarly, unconvincing because it is "clearly at odds with the claim construction mandated by the claims themselves [and] the written description . . . in other words, with the written record of the patent." D.E. 59-1 ¶¶ 12-20; *Key Pharm.*, 161 F.3d at 716 ("What is disapproved of is an attempt to use extrinsic evidence to arrive at a claim construction that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent.").

In addition, the six unrelated patents filed by Defendant are irrelevant because these *other* patents were drafted in different contexts than the instant Patent and, possibly, for different purposes, and therefore neither impact the Court's interpretation of the plain claim language nor "have the specification's virtue of being created at the time of patent prosecution for the purpose of explaining the patent's scope and meaning." *Phillips*, 415 F.3d at 1318.

## IV. Conclusion

For these reasons, the Court adopts Defendant's proposed claim construction. The term "X is a low-molecular weight organic or mineral acid or water" in Claims 1 and 3, which is also incorporated into Claim 2, shall be construed as follows: The term "X is low-molecular-weight organic or mineral acid or water" requires that X **must be** one molecule of "low-molecular

weight organic or mineral acid or water." "X" therefore cannot be equal to zero molecules of low-molecular-weight organic or mineral acid or water. Accordingly, it is

ORDERED AND ADJUDGED that United States Patent No. 8,350,077 shall be construed as described above.

DONE AND ORDERED in Chambers at Miami, Florida, this _12TH__ day of January, 2017.

URSULA UNGARO
UNITED STATES DISTRICT JUDGE

copies provided to: counsel of record

# EXHIBIT 12

neuroprotective

Dictionary Thesaurus

# neuroprotective adjective

neu·ro·pro·tec·tive ˌnu̇r-ō-prə-ˈtek-tiv ˌnyu̇r-

**:** serving to protect neurons from injury or degeneration

*neuroprotective* drugs

## Recent Examples on the Web

**Examples are automatically compiled from online sources to show current usage.** Read More

Dickinson has long studied another intriguing aspect of xenon: the gas has shown ***neuroprotective*** effects after a brain injury such as a stroke or a traumatic blow to the head.

– Stephanie Pappas, *Scientific American*, 29 May 2025

May Provide Cognitive Benefits Research indicates that the combination of curcumin and piperine may have promising ***neuroprotective*** effects for Alzheimer's disease, the most common form of dementia.

– Anna Giorgi, *Verywell Health*, 8 May 2025

Startups can develop ***neuroprotective*** interventions, ranging from nootropic compounds and digital therapeutics to diagnostic tools for early detection of cognitive deterioration.

– Abdo Riani, *Forbes.com*, 23 Apr. 2025

Another theory is that vaccines in general may have a ***neuroprotective*** effect.

– Fran Kritz, *Verywell Health*, 10 Apr. 2025

neuroprotective

Dictionary Thesaurus

## First Known Use

1919, in the meaning defined above

## Time Traveler

**The first known use of *neuroprotective* was in 1919**

See more words from the same year

intersubjective
overprotective
schizoaffective
advective
affective
collective
connective
convective
corrective
defective
detective
directive

See All Rhymes for *neuroprotective*

neuropodous **neuroprotective** neuropsychiatry

neuroprotective

Dictionary Thesaurus

**Style** MLA

“Neuroprotective.” *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/neuroprotective. Accessed 11 Jun. 2025.

Copy Citation

# neuroprotective adjective

neu·ro·pro·tec·tive ˌn(y)u̇r-ō-prə-ˈtek-tiv

**:** serving to protect nerve cells from injury or degeneration

*Neuroprotective* strategies involve interfering with the ischemic cascade, thereby prolonging and substantially reducing stroke size.
— Lewis B. Morgenstern et al., *Scientific American Medical Bulletin*

neuroprotective

Dictionary Thesaurus

- tek-shən noun

*Neuroprotection* is another approach that has become important in glaucoma research. It is the use of drugs to protect optic nerve cells from taking in too much calcium, thus strengthening them against growing intraocular pressure.
– Aimee Phan, *USA Today*

Last Updated: 6 Jun 2025 - Updated example sentences

**Love words? Need even more definitions?**

Subscribe to America's largest dictionary and get thousands more definitions and advanced search—ad free!

MERRIAM-WEBSTER UNABRIDGED



Can you solve 4 words at once?

neuroprotective

Dictionary Thesaurus

WORD OF THE DAY

debilitating

See Definitions and Examples »

Get Word of the Day daily email!

Your email addre SUBSCRIBE

'Affect' vs. 'Effect'

8 Words for the Wordy and Talking Too Much

How 'Namaste' Entered The English Language

neuroprotective

Dictionary Thesaurus

**Quordle**
Can you solve 4 words at once?

**Blossom**
Pick the best words!

**Missing Letter**
A daily crossword with a twist

**Odd Word Out: Synonyms Vol. 2 Quiz**
Figure out which word isn't like the others.

**See All**

Learn a new word every day. Delivered to your inbox!

Your email address

Help | About Us | Advertising Info | Contact Us | Privacy Policy | Terms of Use

neuroprotective

Dictionary Thesaurus

# EXHIBIT 13

INSTRUCTOR'S EDITION

# Chemistry

EIGHTH EDITION



WHITTEN DAVIS PECK STANLEY

# Chemistry

EIGHTH EDITION

KENNETH W. WHITTEN
*University of Georgia, Athens*

RAYMOND E. DAVIS
*University of Texas at Austin*

M. LARRY PECK
*Texas A&M University*

GEORGE G. STANLEY
*Louisiana State University*

THOMSON
BROOKS/COLE

Australia • Brazil • Canada • Mexico • Singapore • Spain
United Kingdom • United States

THOMSON
BROOKS/COLE

***Chemistry*, Eighth Edition**
Kenneth W. Whitten, Raymond E. Davis, M. Larry Peck, George G. Stanley

Publisher: David Harris
Chemistry Acquisitions Editor: Lisa Lockwood
Development Editor: Jay Campbell
Assistant Editor: Sarah Lowe
Editorial Assistant: Lauren Oliviera
Technology Project Manager: Ericka Yeoman-Saler
Marketing Manager: Amee Mosley
Marketing Assistant: Michele Colella
Marketing Communications Manager: Bryan Vann
Project Manager, Editorial Production: Lisa Weber
Creative Director: Rob Hugel
Art Director: Lee Friedman
Print Buyer: Rebecca Cross

Permissions Editor: Joohee Lee
Production Service: G&S Book Services
Text Designer: Ellen Pettengell Design
Photo Researcher: Dena Digilio Betz
Copy Editor: Sara Black
Illustrators: 2064design, J/B Woolsey Associates, and Rolin Graphics
Cover Designer: Ha Nguyen Design
Cover Images: Stuart Westmorland/Getty (ocean) and 2064design (molecule)
Cover Printer: Phoenix Color Corp
Compositor: G&S Book Services
Printer: Quebecor World/Versailles

© 2007 Thomson Brooks/Cole, a part of The Thomson Corporation. Thomson, the Star logo, and Brooks/Cole are trademarks used herein under license.

ALL RIGHTS RESERVED. No part of this work covered by the copyright hereon may be reproduced or used in any form or by any means—graphic, electronic, or mechanical, including photocopying, recording, taping, web distribution, information storage and retrieval systems, or in any other manner—without the written permission of the publisher.

Printed in the United States of America
1 2 3 4 5 6 7 00 09 08 07 06

Library of Congress Control Number: 2005926728

ExamView® and ExamView Pro® are registered trademarks of FSCreations, Inc. Windows is a registered trademark of the Microsoft Corporation used herein under license. Macintosh and Power Macintosh are registered trademarks of Apple Computer, Inc. Used herein under license.

Student Edition: ISBN 0-495-01448-6

**Thomson Higher Education**
**10 Davis Drive**
**Belmont, CA 94002-3098**
**USA**

For more information about our products, contact us at:
**Thomson Learning Academic Resource Center**
**1-800-423-0563**

For permission to use material from this text or product, submit a request online at
**http://www.thomsonrights.com.**
Any additional questions about permissions can be submitted by e-mail to
**thomsonrights@thomson.com.**




**Figure 2-7** Some important relationships from Chapters 1 and 2. The relationships that provide unit factors are enclosed in green boxes. F units = formula units (molecules for molecular systems).

GENERAL ChemistryNow™ Assess your understanding of this chapter's topics with additional quizzing and tutorials at **http://now.brookscole.com/whitten8**.

## Key Terms

**Allotropic modifications (allotropes)** Different forms of the same element in the same physical state.

**Anhydrous** Without water.

**Anion** An ion with a negative charge.

**Atomic mass unit (amu)** One twelfth of the mass of an atom of the carbon-12 isotope; a unit used for stating atomic and formula weights.

**Atomic weight** Weighted average of the masses of the constituent isotopes of an element; the relative mass of atoms of different elements.

**Avogadro's number** $6.022 \times 10^{23}$ units of a specified item. See *Mole*.

**Cation** An ion with a positive charge.

**Chemical formula** Combination of element symbols that indicates the chemical composition of a substance.

**Composition stoichiometry** Describes the quantitative (mass) relationships among elements in compounds.

**Empirical formula** See *Simplest formula*.

**Formula** Combination of element symbols that indicates the chemical composition of a substance.

**Formula unit** The smallest repeating unit of a substance—for non-ionic substances, the molecule.

**Formula weight** The mass, in atomic mass units, of one formula unit of a substance. Numerically equal to the mass, in grams, of one mole of the substance (see *Molar mass*). This number is obtained by adding the atomic weights of the atoms specified in the formula.

**Hydrate** A crystalline sample that contains water, $H_2O$, and another compound in a fixed mole ratio. Examples include $CuSO_4 \cdot 5H_2O$ and $(COOH)_2 \cdot 2H_2O$.

**Ion** An atom or group of atoms that carries an electric charge. A positive ion is a *cation*; a negative ion is an *anion*.

**Ionic compound** A compound that is composed of cations and anions. An example is sodium chloride, NaCl.

**Law of Constant Composition** See *Law of Definite Proportions*.

**Law of Definite Proportions** Different samples of a pure compound always contain the same elements in the same proportions by mass; this corresponds to atoms of these elements in fixed numerical ratios. Also known as the Law of Constant Composition.

**Law of Multiple Proportions** When two elements, A and B, form more than one compound, the ratio of the masses of element B that combine with a given mass of element A in each of the compounds can be expressed by small whole numbers.

**Molar mass** The mass, in grams, of one mole of a substance; numerically equal to the formula weight of the substance. See *Formula weight*; see *Molecular weight*.

**Mole** $6.022 \times 10^{23}$ (Avogadro's number of) formula units (or molecules, for a molecular substance) of a substance. The mass, in grams, of one mole is numerically equal to the formula (molecular) weight of the substance.

**Molecular formula** A formula that indicates the actual number of atoms present in a molecule of a molecular substance. Compare with *Simplest (empirical) formula*.

# EXHIBIT 14

McGraw-Hill

# Dictionary of Chemistry

Sybil P. Parker
Editor in Chief

BAKER BOTTS LLP
APR 2 3 2010
Dallas Library

McGraw-Hill

New York San Francisco Washington, D.C. Auckland
Bogotá Caracas Lisbon London Madrid Mexico City
Milan Montreal New Delhi San Juan Singapore
Sydney Tokyo Toronto

**Library of Congress Cataloging in Publication Data**

McGraw-Hill dictionary of chemistry / Sybil P. Parker, editor in chief.
p. cm.
ISBN 0-07-052428-9 (acid-free paper)
1. Chemistry—Dictionaries. I. Parker, Sybil P. II. McGraw-Hill Book Company.
QD5.M357 1997
540'.3—dc20 96-46184

*McGraw-Hill*

*A Division of The McGraw-Hill Companies*

All text in this dictionary was published previously in the McGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS, Fifth Edition, copyright © 1994 by McGraw-Hill, Inc. All rights reserved.

McGRAW-HILL DICTIONARY OF CHEMISTRY, copyright © 1997 by The McGraw-Hill Companies, Inc. All rights reserved. Printed in the United States of America. Except as permitted under the United States Copyright Act of 1976, no part of this publication may be reproduced or distributed in any form or by any means, or stored in a database or retrieval system, without the prior written permission of the publisher.

4 5 6 7 8 9 0 DOC/DOC 9 0 1 0 9

ISBN 0-07-052428-9

**INTERNATIONAL EDITION**

Copyright © 1997. Exclusive rights by The McGraw-Hill Companies, Inc. for manufacture and export. This book cannot be re-exported from the country to which it is consigned by McGraw-Hill. The International Edition is not available in North America.

When ordering this title, use ISBN 0-07-114918-x.

*This book is printed on recycled, acid-free paper containing a minimum of 50% recycled, de-inked fiber.*

*This book was set in Helvetica Bold and Novarese Book by Progressive Information Technologies, Emigsville, Pennsylvania. It was printed and bound by R. R. Donnelley & Sons Company, The Lakeside Press.*

*McGraw-Hill books are available at special quantity discounts to use as premiums and sales promotions, or for use in corporate training programs. For more information, please write to the Director of Special Sales, McGraw-Hill, 11 West 19th Street, New York, NY 10011. Or contact your local bookstore.*

The McGraw-Hill
disciplines that
terms, it serves
essential to unc
many unique di
naries and gloss
general readers
single comprehe
Terms and
chemistry, chem
istry, and spectr
primarily used. V
chemistry, it is i
The terms s
chemistry. All de
*and Technical Term*
terms also incluc
Such synonyms,
sequence as cros
The McGraw
will facilitate the
needs of readers

$(C_5H_{11})_2O$. **2.** A mixture
ration of amyl alcohols
ly as a solvent. { 'am·əl

o light yellow liquid with
dorant for detecting gas

amyl alcohol added to

low liquid; soluble in al-
mable and the vapor is
isoamyl nitrite. { 'am·əl

colorless liquid with an
perfumes, lacquers, and

A clear liquid that occa-
ohol, insoluble in water;
licylate. { 'am·əl sə'lis·

ng the hydrogen attached
tor agent in the flotation

extracted from the plants
; soluble in alcohol and

to that of another com-
·əl,äg }
e composition of a sub-

mining the concentration
}
zed. **2.** The specific com-
·ə,līt }
'id·ə·kəl 'blaŋk }
dealing with techniques
ystems. { ,an·əl'id·ə·kəl

lution of a volatile liquid
heat or vacuum, and the
respective boiling points.

sfer of one or more com-
liquid) by contacting the
t is preferentially soluble.

electric field, the move-
olecules suspended in a

pation by a neighboring
encountered in reactions
ring-group participation.

'aŋ·kərd 'kad·ə,list }
that melt at 22.5°C; very
oil of anise; used in per-
processes in color photog-

**angle-resolved photoelectron spectroscopy** [SPECTROSCOPY] A type of photoelectron spectroscopy which measures the kinetic energies of photoelectrons emitted from a solid surface and the angles at which they are emitted relative to the surface. Abbreviated ARPES. { 'aŋ·gəl ri'zälvd ¦fōd·ō·ə'lek,trän ,spek'träs·kə·pē }

**anharmonic oscillator spectrum** [SPECTROSCOPY] A molecular spectrum which is significantly affected by anharmonicity of the forces between atoms in the molecule. { ,an·här¦män·ik ¦äs·ə,läd·ər ¦spek·trəm }

**anhydride** [CHEMISTRY] A compound formed from an acid by removal of water. { an'hī,drīd }

**anhydrous** [CHEMISTRY] Being without water, especially water of hydration. { an'hī·drəs }

**anhydrous alcohol** [ORGANIC CHEMISTRY] *See* absolute alcohol. { an'hī·drəs 'al·kə,hȯl }

**anhydrous ammonia** [INORGANIC CHEMISTRY] Liquid ammonia, a colorless liquid boiling at −33.3°C. { an'hī·drəs ə'mōn·yə }

**anhydrous ferric chloride** [INORGANIC CHEMISTRY] *See* ferric chloride. { an'hī·drəs ,fer·ik 'klȯr,īd }

**anhydrous hydrogen chloride** [INORGANIC CHEMISTRY] HCl Hazardous, toxic, colorless gas used in polymerization, isomerization, alkylation, nitration, and chlorination reactions; becomes hydrochloric acid in aqueous solutions. { an'hī·drəs ,hī·drə·jən 'klȯr,īd }

**anhydrous phosphoric acid** [INORGANIC CHEMISTRY] *See* phosphoric anhydride. { an'hī·dres fä'sfȯrik 'as·əd }

**anhydrous plumbic acid** [INORGANIC CHEMISTRY] *See* lead dioxide. { an'hī·dres 'pləmb·ik 'as·əd }

**anhydrous sodium carbonate** [INORGANIC CHEMISTRY] *See* soda ash. { an'hi·dres ,sōd·ē·əm 'kärb·ə,nāt }

**anhydrous sodium sulfate** [INORGANIC CHEMISTRY] $Na_2SO_4$ Water-soluble, white crystals with bitter, salty taste; melts at 888°C; used in the manufacture of glass, paper, pharmaceuticals, and textiles, and as an analytical reagent. { an'hī·drəs ,sōd·ē·əm 'səl,fāt }

**anilazine** [ORGANIC CHEMISTRY] $C_9H_5Cl_3N_4$ A tan solid with a melting point of 159–160°C; used for fungal diseases of lawns, turf, and vegetable crops. { ə'nil·ə,zēn }

**anilide** [ORGANIC CHEMISTRY] A compound that has the $C_6H_5NH_2$— group; an example is benzanilide, $C_6H_5NHCOC_6H_5$. { 'an·əl,īd }

**aniline** [ORGANIC CHEMISTRY] $C_6H_5NH_2$ An aromatic amine compound that is a pale brown liquid at room temperature; used in the dye, pharmaceutical, and rubber industries. { 'an·əl·ən }

**aniline black** [ORGANIC CHEMISTRY] A black dye produced on certain textiles, such as cotton, by oxidizing aniline or aniline hydrochloride. { 'an·əl·ən 'blak }

**aniline dye** [ORGANIC CHEMISTRY] A dye derived from aniline. { 'an·əl·ən 'dī }

**aniline-formaldehyde resin** [CHEMISTRY] A thermoplastic resin made by polymerizing aniline and formaldehyde. { 'an·əl·ən ,fȯr'mal·də,hīd ,rez·ən }

**aniline hydrochloride** [ORGANIC CHEMISTRY] $C_6H_5NH_2 \cdot HCl$ White crystals, although sometimes the commercial variety has a greenish tinge; melting point 198°C; soluble in water and ethanol; used in dye manufacture, dyeing, and printing. { 'an·əl·ən ,hī·drə'klȯr,īd }

**aniline *N,N*-dimethyl** [ORGANIC CHEMISTRY] *See* N,N-dimethylaniline. { 'an·əl·ən ¦en ¦en dī'meth·əl }

**animal black** [CHEMISTRY] Finely divided carbon made by calcination of animal bones or ivory; used for pigments, decolorizers, and purifying agents; varieties include bone black and ivory black. { 'an·ə·məl ,blak }

**animal charcoal** [CHEMISTRY] Charcoal obtained by the destructive distillation of animal matter at high temperatures; used to adsorb organic coloring matter. { 'an·ə·məl 'chär,kōl }

**anion** [CHEMISTRY] An ion that is negatively charged. { 'a,nī·ən }

**anion exchange** [CHEMISTRY] A type of ion exchange in which the immobilized functional groups on the solid resin are positive. { 'a,nī·ən iks'chānj }



PEPSI_0005917

# EXHIBIT 15

# Physicochemical Principles of Pharmacy

Fourth edition

Alexander T Florence and David Attwood

Pharmaceutical Press



# Physicochemical Principles of Pharmacy

# Physicochemical Principles of Pharmacy

FOURTH EDITION

**Alexander T Florence**
CBE, DSc, FRSC, FRSE, FRPharmS
School of Pharmacy, University of London, UK

**David Attwood**
PhD, DSc, CChem FRSC
School of Pharmacy and Pharmaceutical Sciences
University of Manchester, UK

London • Chicago
PhP Pharmaceutical Press

**Published by the Pharmaceutical Press**
Publications division of the Royal Pharmaceutical Society of Great Britain

1 Lambeth High Street, London SE1 7JN, UK
100 South Atkinson Road, Suite 206, Grayslake, IL 60030–7820, USA

© Pharmaceutical Press 2006

(PhP) is a trade mark of Pharmaceutical Press

First, second and third editions published by Palgrave
(formerly Macmillan Press Ltd) 1981, 1988, 1998
Third edition reprinted 2004, 2005
Fourth edition 2006

Typeset by MCS Publishing Services Ltd, Salisbury, Wiltshire
Printed in Great Britain by Butler & Tanner, Frome, Somerset

ISBN 0 85369 608 X

All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, without the prior written permission of the copyright holder.

The publisher makes no representation, express or implied, with regard to the accuracy of the information contained in this book and cannot accept any legal responsibility or liability for any errors or omissions that may be made.

*A catalogue record for this book is available from the British Library*

Cover image: Polarised light micrograph of liquid crystals. Magnification ×100 at 35 mm size. Reproduced with permission from James Bell/Science Photo Library.




**Figure 1.13** Comparison of serum levels ($\mu g\ cm^{-3}$) obtained with suspensions of chloramphenicol palmitate after oral administration of a dose equivalent to 1.5 g of chloramphenicol.
Redrawn from reference 8.

and biological grounds, the maximum response must be achieved with the minimum amount of drug substance.

## 1.4 Crystal hydrates

When some compounds crystallise they may entrap solvent in the crystal. Crystals that contain solvent of crystallisation are called crystal *solvates*, or crystal *hydrates* when water is the solvent of crystallisation. Crystals that contain no water of crystallisation are termed *anhydrates*.

Crystal solvates exhibit a wide range of behaviour depending on the interaction between the solvent and the crystal structure. With some solvates the solvent plays a key role in holding the crystal together; for example, it may be part of a hydrogen-bonded network within the crystal structure. These solvates are very stable and are difficult to desolvate. When these crystals lose their solvent they collapse and recrystallise in a new crystal form. We can think of these as *polymorphic solvates*. In other solvates, the solvent is not part of the crystal bonding and merely occupies voids in the crystal. These solvates lose their solvent more readily and desolvation does not destroy the crystal lattice. This type of solvate has been called a *pseudopolymorphic solvate*.

By way of illustration of this phenomenon, we return to the case of spironolactone which we considered earlier. As well as the two polymorphs, this compound also possesses four solvates, depending on whether it is crystallised from acetonitrile, ethanol, ethyl acetate or methanol. Each of these solvates is transformed to the polymorphic Form 2 on heating, indicating that the solvent is involved in the bonding of the crystal lattice.

The stoichiometry of some of the solvates is unusual. Fludrocortisone pentanol solvate, for example, contains 1.1 molecules of pentanol for each steroid molecule, and its ethyl acetate solvate contains 0.5 molecules of ethyl acetate per steroid molecule. A succinylsulfathiazole solvate appears to have 0.9 moles of pentanol per mole of drug. Beclometasone dipropionate forms solvates with chlorofluorocarbon propellants.

Infrared measurements show that cefaloridine exists in $\alpha$, $\beta$, $\delta$, $\varepsilon$, $\zeta$ and $\mu$ forms (that is, six forms after recrystallisation from different solvents).[9] Proton magnetic resonance

# EXHIBIT 16


VISIT ONLINE
OXFORD QUICK REFERENCE
THE BESTSELLING AND ACCESSIBLE
A–Z GUIDE ON CHEMISTRY
Oxford
DICTIONARY OF
Chemistry

OXFORD
UNIVERSITY PRESS

Great Clarendon Street, Oxford, OX2 6DP,
United Kingdom

Oxford University Press is a department of the University of Oxford.
It furthers the University's objective of excellence in research, scholarship,
and education by publishing worldwide. Oxford is a registered trade mark of
Oxford University Press in the UK and in certain other countries

© Market House Books Ltd. 1985, 1990, 1996, 2000, 2004. 2008, 2016

The moral rights of the author have been asserted

First published 1985 as *A Concise Dictionary of Chemistry*
Second edition 1990
Third edition 1996
Fourth edition 2000
Fifth edition 2004
Sixth edition 2008
Seventh edition 2016

Impression: 1

All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, without the prior permission in writing of Oxford University Press, or as expressly permitted by law, by licence or under terms agreed with the appropriate reprographics rights organization. Enquiries concerning reproduction outside the scope of the above should be sent to the Rights Department, Oxford University Press, at the address above

You must not circulate this work in any other form
and you must impose this same condition on any acquirer

Published in the United States of America by Oxford University Press
198 Madison Avenue, New York, NY 10016, United States of America

British Library Cataloguing in Publication Data

Data available

Library of Congress Control Number: 2015941922

ISBN 978-0-19-872282-3

Printed in Great Britain by
Clays Ltd, St Ives plc

Links to third party websites are provided by Oxford in good faith and for information only. Oxford disclaims any responsibility for the materials contained in any third party website referenced in this work.

velocity. The quantum theory of angular momentum is closely associated with the *rotation group and has important applications in the electronic structure of atoms and diatomic molecules and *rotational spectroscopy of molecules. Electron spin is a type of angular momentum.

**anharmonicity** The extent to which the oscillation of an oscillator differs from simple harmonic motion. In molecular vibrations the anharmonicity is very small near the equilibrium position, becomes large as the vibration moves away from the equilibrium position, and is very large as dissociation is approached. Anharmonicity is taken into account in molecular vibrations by adding an anharmonicity term to the potential energy function of the molecule. For a harmonic oscillator the potential energy function $U$ is given by $U=f(r-r_e)^2$ where $r$ is the interatomic distance, $r_e$ is the equilibrium interatomic distance, and $f$ is a constant. Anharmonicity is taken into account by adding a cubic term $g(r-r_e)^3$ to the quadratic term, where $g$ is much smaller than $f$. Higher terms in $(r-r_e)$ can be added to improve the description of anharmonicity.

**anharmonic oscillator** An oscillating system (in either classical mechanics or *quantum mechanics) that is not oscillating in simple harmonic motion. In general, the problem of an anharmonic oscillator is not exactly soluble, although many systems approximate to harmonic oscillators and for such systems the *anharmonicity can be calculated using *perturbation theory.

**anhydride** A compound that produces a given compound on reaction with water. For instance, sulphur trioxide is the (acid) anhydride of sulphuric acid $SO_3 + H_2O \rightarrow H_2SO_4$. *See also* ACID ANHYDRIDES.

**anhydrite** An important rock-forming anhydrous mineral form of calcium sulphate, $CaSO_4$. It is chemically similar to *gypsum but is harder and heavier and crystallizes in the rhombic form (gypsum is monoclinic). Under natural conditions anhydrite slowly hydrates to form gypsum. It occurs chiefly in white and greyish granular masses and is often found in the caprock of certain salt domes. It is used as a raw material in the chemical industry and in the manufacture of cement and fertilizers.

**anhydrous** Denoting a chemical compound lacking water: applied particularly to salts lacking their water of crystallization.

**aniline** *See* PHENYLAMINE.

**anilinium ion** The ion $C_6H_5NH_3^+$, derived from *phenylamine.

**animal charcoal** *See* CHARCOAL.

**animal starch** *See* GLYCOGEN.

**anion** A negatively charged *ion, i.e. an ion that is attracted to the *anode in *electrolysis. *Compare* CATION.

**anionic detergent** *See* DETERGENT.

**anionic resin** *See* ION EXCHANGE.

**anisotropic** Denoting a medium in which certain physical properties are different in different directions. Wood, for instance, is an anisotropic material: its strength along the grain differs from that perpendicular to the grain. Single crystals that are not cubic are anisotropic with respect to some physical properties, such as the transmission of electromagnetic radiation. *Compare* ISOTROPIC.

**annealing** A form of heat treatment applied to a metal to soften it, relieve internal stresses and instabilities, and make it easier to work or machine. It consists of heating the metal to a specified temperature for a specified time,

# EXHIBIT 17


5TH Edition
WILEY
Van Nostrand's
ENCYCLOPEDIA of CHEMISTRY
UNIVERSITY OF TEXAS AT AUSTIN - GEN LIBS
30163339852
0 5917 3016339852
LIBRARY USE ONLY
GLENN D. CONSIDINE
Editor-in-Chief

Copyright © 2005 by John Wiley & Sons Inc. All rights reserved.

Published by John Wiley & Sons, Inc., Hoboken, New Jersey.
Published simultaneously in Canada.

No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, scanning, or otherwise, except as permitted under Section 107 or 108 of the 1976 United States Copyright Act, without either the prior written permission of the Publisher, or authorization through payment of the appropriate per-copy fee to the Copyright Clearance Center, Inc., 222 Rosewood Drive, Danvers, MA 01923, 978-750-8400, fax 978-646-8600, or on the web at www.copyright.com. Requests to the Publisher for permission should be addressed to the Permissions Department, John Wiley & Sons, Inc., 111 River Street, Hoboken, NJ 07030, (201) 748-6011, fax (201) 748-6008.

Limit of Liability/Disclaimer of Warranty: While the publisher and author have used their best efforts in preparing this book, they make no representations or warranties with respect to the accuracy or completeness of the contents of this book and specifically disclaim any implied warranties of merchantability or fitness for a particular purpose. No warranty may be created or extended by sales representatives or written sales materials. The advice and strategies contained herein may not be suitable for your situation. You should consult with a professional where appropriate. Neither the publisher nor author shall be liable for any loss of profit or any other commercial damages, including but not limited to special, incidental, consequential, or other damages.

For general information on our other products and services please contact our Customer Care Department within the U.S. at 877-762-2974, outside the U.S. at 317-572-3993 or fax 317-572-4002.

Wiley also publishes its books in a variety of electronic formats. Some content that appears in print, however, may not be available in electronic format.

***Library of Congress Cataloging-in-Publication Data:***

Van Nostrand's encyclopedia of chemistry.–5th ed. / edited by Glenn D. Considine.
p. cm.
Rev. ed. of: Van Nostrand Reinhold encyclopedia of chemistry, 4th ed.c1984.
Includes bibliographical references and index.
ISBN 0-471-61525-0
1. Chemistry–Encyclopedias. I. Considine, Glenn D. II. Van Nostrand Reinhold encyclopedia of chemistry.

QD4.V36 2005
540'.3—dc22

2004057156

Printed in the United States of America.
10 9 8 7 6 5 4 3 2 1

AMIDE_COMMON003282

intravenous, extradural, spinal, and topical administration. The therapeutic indexes for systemic CNS and cardiovascular toxicity should be high and the agent should be compatible with the vasoconstrictor epinephrine.

GEORGE R. LENZ
BOC Group Technical Center

HOLLIS G. SCHOEPKE
THEODORE C. SPAULDING
Anaquest

### Additional Reading

Barash, P. G., R. K. Stoelting, and B. F. Cullen: *Clinical Anesthesia*, 4th Edition, Lippincott Williams & Wilkins, Philadelphia, PA, 2000.
Chung, D. C., A. M. Lam, and L. Day: *Essentials of Anesthesiology*, 3rd Edition, Elsevier Science, New York, NY, 1996.
Covino, B. G. and H. G. Vasallo: *Local Anesthetics: Mechanism of Action and Clinical Use*, Grune and Stratton, New York, NY, 1976.
Evers, A. S., and M. Maze: *Anesthetic Pharmacology: Physiologic Principles and Clinical Practice*, Elsevier Science, New York, NY, 2003.
Gilman, A. G., L. S. Goodman, T. W. Rall, and F. Murad, eds.: *The Pharmacological Basis of Therapeutics*, Macmillan Publishing Company, New York, NY 1985.
Lenz, G. R., S. M. Evans, D. E. Walters, and A. J. Hopfinger: *Opiates*, Academic Press, Orlando, FL, 1986.
Miller, K. W. and M. E. Wolff, eds.: *Burger's Medicinal Chemistry*, 4th Edition, Vol. 3, John Wiley & Sons, Inc., New York, NY, 1981, p. 623.
Roizen, M. F., and L. A. Fleischer: *Essence of Anesthesia Practice*, 2nd Edition, Elsevier Science, New York, NY, 2001.
Stoelting, R. K.: *Pharmacology and Physiology in Anesthetic Practice*, 3rd Edition, Lippincott Williams & Wilkins, Philadelphia, PA, 2003.
Tetzlaff, J. E.: *Clinical Pharmacology of Local Anesthetics*, Elsevier Science, New York, NY, 1999.

**ANFINSEN, CHRISTIAN B. (1916–1995).** An American biochemist who won the Nobel prize for chemistry in 1972 for his work on ribonuclease, especially concerning the connection between the amino acid sequence and the biologically active conformation. He shared the Nobel prize with Stanford Moore and William H. Stein. His doctorate was granted from Harvard.

**ANGLESITE.** Naturally occurring lead sulfate ($PbSO_4$), which crystallizes in the orthorhombic system and may be found mixed with galena, from which it is usually formed by oxidation. Hardness, 3; specific gravity, 6.12–6.39; luster, adamantine to vitreous or resinous; transparent to opaque; streak, white; colorless to white or green, but rarely may be yellow or blue. This mineral is used as a source of lead.

Anglesite, whose name derives from Anglesey, England, is found in many European localities; in the United States it has been found in large crystals in the Wheatley Mine, Phoenixville, Pennsylvania, and also in Missouri, Utah, Arizona, and Idaho.

**ÅNGSTROM (Å).** A unit of length almost one non-hundred millionth ($10^{-8}$) centimeter. The Ångstrom is defined in terms of the wavelength of the red line of cadmium (6438.4696 Å). Used in stating distances between atoms, dimensions of molecules, wavelengths of short-wave radiation, etc.

**ANHYDRIDE.** A chemical compound derived from and acid by elimination of a molecule of water. Thus sulfur trioxide, $SO_3$, is the anhydride of sulfuric acid; $CO_2$ is the anhydride of carbonic acid; phthalic acid, $C_6H_4(CO_2H)_2$ minus water gives phthalic anhydride. The term should not be confused with *anhydrous*.

**ANHYDRITE.** The mineral anhydrous calcium sulfate, $CaSO_4$, occurs in granular, scaly, or fibrous masses, is rarely crystallized in orthorhombic tabular or prismatic forms. Hardness, 3–3.5; sp gr, 2.9–2.98; translucent to opaque; streak white; color, white, gray, bluish, or reddish. Anhydrite has three cleavages at right angles to one another. It is similar to gypsum and occurs under the same conditions, often with the latter mineral. It is usually found in sedimentary rocks associated with limestones, salt, and gypsum, into which it changes slowly by the absorption of water. See also **Gypsum**.

Anhydrite is found in Poland, Saxony, Bavaria, Württemberg, Switzerland, and France; in the United States, in South Dakota, New Mexico, Texas, New Jersey, and Massachusetts; in Canada, in Nova Scotia, New Brunswick, and exceptional specimens from the Faraday Uranium Mine near Bancroft, Ontario.

**ANHYDROUS.** Descriptive of an inorganic compound that does not contain water either adsorbed on its surface or combined as water of crystallization. Do not confuse with *anhydride*.

**ANILINE.** Aniline, phenylamine, aminobenzene, $C_6H_5NH_2$, is a colorless, odorous liquid, an amine, with melting point−6°C, boiling point 184°C, is slightly soluble in water, miscible in all proportions with alcohol or ether, poisonous, turns yellow to brown in the air, is a weak base forming salts with acids, e.g., anilinehydrochloride ("aniline salt," $C_6H_5NH_2 \cdot HCl$) from which aniline is reformed by addition of sodium hydroxide solution. Aniline reacts (1) with hypochlorite solution, to form a transient violet coloration, (2) with nitrous acid (a) warm, to form nitrogen gas plus phenol, (b) cold, to form diazonium salt (benzene diazonium chloride, $C_6H_5N{-}Cl$), (3) with acetyl chloride, acetic anhydride, or acetic acid glacial, to form N-phenylacetamide

acetanillide, "antifebrin," $C_5H_6N$ (H / OCCH$_3$)

(4) with benzoyl chloride, to form N-phenylbenzamide

benzanilide, $C_5H_6N$ (H / OCC$_6$H$_5$)

(5) with benzenesulfonyl chloride, to form N-phenylbenzene sulfonamide, $C_6H_5SO_2NHC_6H_5$, soluble in sodium hydroxide, (6) with chloroform, $CHCl_3$, plus alcohol plus sodium hydroxide, to form phenyl isocyanide, $C_6H_5NC$, very poisonous, (7) with $H_2SO_4$ at 180° to 200°C, to form para -aminobenzene sulfonic acid (sulfanilic acid, $H_2N \cdot C_6H_4 \cdot SO_3H$ (1,4)), (8) with $HNO_3$, when the amine group is protected, e.g., using acetanilide, to form mainly paranitroacetanilide, $CH_3CONH \cdot C_6H_4 \cdot NO_2$ (1.4), from which paranitroaniline, $H_2N{\cdot}C_6H_4{\cdot}NO_2$(1,4) is obtained by boiling with concentrated hydrochloric acid, (9) with chlorine in an anhydrous solvent, such as chloroform or acetic acid glacial, to form 2,4,6-trichloroaniline (1) $H_2N \cdot C_6H_2Cl_3$(2,4,6), (10) with bromine water, to form white solid 2,4,6-tribromoaniline, (1)$H_2N \cdot C_6H_2Br_3$(2,4,6), (11) with potassium dichromate in sulfuric acid, to form aniline black dye, and, by further oxidation, benzoquinone, $O{:}C_6H_4{:}O$ (1,4), (12) with potassium permanganate in sodium hydroxide, to form azobenzene, $C_6H_5N{:}NC_6H_5$, along with some azoxybenzene $C_6H_5NO{:}NC_6H_5$, (13) with reducing agents, to form aminohexahydrobenzene (cyclohexylamine, $H_2N \cdot C_6H_{11}$), (14) with alkyl halides or alcohols heated, to form alkyl anilines, e.g., methylaniline, $C_6H_5NHCH_3$, dimethylaniline, $C_6H_5N(CH_3)_2$.

Aniline may be made (1) by the reduction, with iron or tin in HCl, of nitrobenzene, and (2) by the amination of chlorobenzene by heating with ammonia to a high temperature corresponding to a pressure of over 200 atmospheres in the presence of a catalyst (a mixture of cuprous chloride and oxide). Aniline is the end-point of reduction of most mono-nitrogen substituted benzene nuclei, as nitrosobenzene, beta-phenylhydroxylamine, azoxybenzene, azobenzene, hydrazobenzene. Aniline is detected by the violet coloration produced by a small amount of sodium hypochlorite.

Aniline is used (1) as a solvent, (2) in the preparation of compounds as illustrated above, (3) in the manufacture of dyes and their intermediates, (4) in the manufacture of medicinal chemicals. See also **Amines**.

**ANION.** A negatively-charged atom or radical. In electrolysis, an anion is the ion which deposits on the anode; that portion of an electrolyte which carries the negative charge and travels against the conventional direction of the electric current in a cell. Within the category of anions are included the nonmetallic ions and the acid radicals, as well as the hydroxyl ion, $OH^-$. In electrochemical reactions, they are designated by the minus sign placed above and after the symbol, such as $Cl^-$ and $SO_4^{2-}$, the number of the minus sign indicating the magnitude, in electrons, of the electrical charge carried by the anion. In a battery, it is the deposition of negative anions that makes the anode negative. See also **Ion**.