# EXHIBIT F

8571040

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE

United States Patent and Trademark Office

*February 10, 2025*

**THIS IS TO CERTIFY THAT ANNEXED IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF THE FILE WRAPPER AND CONTENTS OF:**

**APPLICATION NUMBER:** *90/013,902*
**FILING DATE:** *March 03, 2017*

Certified by

ACTING DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/013,902 | 03/03/2017 | 8350077 | 1255.117RE | 7190 |

54434 7590 05/02/2017
BOOTH UDALL FULLER, PLC
1255 W. Rio Salado Pkwy.
Suite 215
Tempe, AZ 85281

| EXAMINER | |
|---|---|
| DIAMOND, ALAN D | |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3991 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 05/02/2017 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

***Decision on Reexamination Request***

A substantial new question of patentability affecting claims 1-3 of United States Patent Number 8,350,077 to Burov et al (hereinafter “the ‘077 patent”) is raised by the request for *ex parte* reexamination filed by Patent Owner. Pre-AIA first to invent provisions apply with respect to examination.

***Substantial New Question of Patentability (SNQ)***

The presence or absence of a “substantial new question of patentability” determines whether or not reexamination is ordered.

For a “substantial new question of patentability” to be present, it is only necessary that:

A) the prior art patents and/or printed publications raise a substantial new question of patentability regarding at least one claim, i.e., the teaching of the (prior art) patents and printed publications is such that a reasonable examiner would consider the teaching to be important in deciding whether or not the claim is patentable; and

B) the same question of patentability as to the claim has not been decided by the Office in a previous examination of the patent or in a final holding of invalidity by the Federal Courts in a decision on the merits involving the claim.

A SNQ may be based solely on old art where the old art is being presented/viewed in a new light, or in a different way, as compared with its use in the earlier concluded examination(s), in view of a material new argument or interpretation in the request. (MPEP 2242).

### *Art Cited*

U.S. Patent 5,561,146 to Kim et al, hereafter "**Kim**".

Russian Patent 2,354,645 C1, hereafter "**RU '645**". The machine English translation of RU '645 accompanying the instant Order is hereafter referred to below.

U.S. Patent 6,114,379 to Wheelwright et al, hereafter "**Wheelwright**".

U.S. Patent 7,319,157 to Chaudhuri et al, hereafter "**Chaudhuri**".

WO 03/071884 to Purpura et al, hereafter "**Purpura**".

U.S. Patent Application Publication 2008/0003208 to **Nivaggioli**.

U.S. Patent 5,863,939 to Pischel et al, hereafter "**Pischel**".

Zapf et al, "A Novel Traceless Resin-Bound Guanidinylating Reagent for Secondary Amines to Prepare N,N-Disubstituted Guanidines," Organic Letters, Vol. 3, No. 8, (2001), pp. 1133-1136, hereafter "**Zapf**".

Robinson et al, "Solid Phase Synthesis of Guanidines," Tetrahedron, Vol. 53, No. 19 (1997), pp. 6697-6705, hereafter "**Robinson**".

Manimala et al, "Solid-Phase Synthesis of Guanidinium Derivatives from Thiourea and Isothiourea Functionalities," Eur. J. Org. Chem., (2002), pp. 3903-3922, hereafter "**Manimala**".

Katritzky et al, "Recent Developments in guanylating agents," ARKIVOC (iv), (2005), pp. 49-87, hereafter "**Katritzky 2005**".

Katritzky et al, "Benzotriazole-1-Carboxamidium Tosylate: An Alternative Method for the Conversion of Amines to Guanidines," Synthetic Communications, 25(8), (1995), pp. 1173-1186, hereafter "**Katritzky 1995**".

U.S. Patent 6,399,819 to Kessel et al, hereafter "**Kessel**".

**1. The request indicates the Requester considers that there may be a substantial new question of patentability regarding claims 1 and 3 of the '077 patent based on Kim.**

Consideration of Kim raises a substantial new question of patentability as to claims 1 and 3.

Kim teaches a compound having the following formula and pharmaceutically acceptable salts thereof:



wherein "p" can be 1, R can be $CH_3$, $R^1$ can be hydroxyl, and $R^{4'}$, $R^{5'}$ and $R^8$ can be as seen in the table bridging cols. 63-64 (see col. 1, lines 15-30; and the entire page encompassing cols. 63-64).

There is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not claims 1 and 3 were patentable. Accordingly, Kim raises a substantial new question of patentability as to claims 1 and 3, which question has not been decided in a previous examination of the '077 patent.

**2. The request indicates the Requester considers that there may be a substantial new question of patentability regarding claims 1 and 3 of the ‘077 patent based on Burov.**

Consideration of Burov does not raises a substantial new question of patentability as to claims 1 and 3.

As pointed out on pp. 6-7 of the Request, Burov issued May 10, 2009, which is antedated by the ‘077’s effective filing date of December 24, 2008. Accordingly, Burov does not qualify as prior art with respect to the ‘077 patent, and thus Burov does not raise a substantial new question of patentability as to claims 1 and 3.

**3. The request indicates the Requester considers that there may be a substantial new question of patentability regarding claims 1 and 3 of the ‘077 patent based on Wheelwright.**

Consideration of Wheelwright does not raise a substantial new question of patentability as to claims 1 and 3.

Wheelwright teaches a creatine chelate comprising a creatine ligand bonded to a metal atom, wherein the creatine ligand can be a “creatine amide” (see col. 5, lines 19-52 and claims 1 and 2 at col. 12). Wheelwright provides no examples of the creatine amide. During prosecution of the ‘077 patent, in the Office action mailed 05/17/12, the Examiner rejected claims 1-3 over U.S. Patent 6,518,458 (Moinet) for teaching an amide of creatine (see p. 2). In the subsequent Remarks filed 09/05/12, Patent Owner argued that “[t]he main substantial difference of the present invention from Moinet is that

the claimed compound comprises an amino acid residue R of one of the following amino acids: aliphatic L-amino acid, or aromatic amino L-acid or heteroaromatic L-amino acid or derivatives of aliphatic L-amino acid, or aromatic L-amino acid or heteroaromatic L-amino acid, whereas Moinet does not disclose any amino acid residue neither expressly, nor impliedly, nor inherently." (See pp. 5-6 of the Remarks). In the Reasons for Allowance mailed 09/27/12, the Examiner withdrew the rejection over Moinet and stated that Moinet fails to teach an amino acid residue. Similarly, Wheelwright does not teach an amino acid residue in its amide of creatine.

Accordingly, Wheelwright does not raise a substantial new question of patentability as to claims 1 and 3 of the '077 patent.

**4. The request indicates the Requester considers that there may be a substantial new question of patentability regarding claims 1 and 3 of the '077 patent based on Chaudhuri.**

Consideration of Chaudhuri does not raise a substantial new question of patentability as to claims 1 and 3.

Chaudhuri's teaches a creatine amide having the Formula 1:




Formula 1

where R is an alkyl group, preferably saturated, and containing from about 3 to a maximum of 21 carbons (see col. 4, lines 25-44). This amide differs from the instantly

claimed amides of creatine not only in the location of the amide bond, but also due to the fact that Chaudhuri's amide, like that of Wheelwright's amide discussed above, lacks the claimed amino acid residue.

Accordingly, Chaudhuri does not raise a substantial new question of patentability as to claims 1 and 3 of the ‘077 patent.

**5. The request indicates the Requester considers that there may be a substantial new question of patentability regarding claims 1 and 3 of the ‘077 patent based on Purpura.**

**6. The request indicates the Requester considers that there may be a substantial new question of patentability regarding claim 2 of the ‘077 patent based on Purpura and Zapf.**

**7. The request indicates the Requester considers that there may be a substantial new question of patentability regarding claim 2 of the ‘077 patent based on Purpura and Robinson.**

**8. The request indicates the Requester considers that there may be a substantial new question of patentability regarding claim 2 of the ‘077 patent based on Purpura and Manimala.**

**9. The request indicates the Requester considers that there may be a substantial new question of patentability regarding claim 2 of the ‘077 patent based on Purpura and Katritzky 2005.**

**10. The request indicates the Requester considers that there may be a substantial new question of patentability regarding claim 2 of the ‘077 patent based on Purpura and Katritzky 1995.**

**11. The request indicates the Requester considers that there may be a substantial new question of patentability regarding claim 2 of the ‘077 patent based on Purpura and Kessel.**

**12. The request indicates the Requester considers that there may be a substantial new question of patentability regarding claim 2 of the ‘077 patent based on Purpura in view of Zapf, Robinson, Manimala, Katritzky 2005, Katritzky 1995 and Kessel.**

**13. The request indicates the Requester considers that there may be a substantial new question of patentability regarding claim 2 of the ‘077 patent based on Purpura and Nivaggioli in view of Zapf.**

**14. The request indicates the Requester considers that there may be a substantial new question of patentability regarding claim 2 of the ‘077 patent based on Purpura and Nivaggioli in view of Robinson.**

**15. The request indicates the Requester considers that there may be a substantial new question of patentability regarding claim 2 of the ‘077 patent based on Purpura and Nivaggioli in view of Manimala.**

**16. The request indicates the Requester considers that there may be a substantial new question of patentability regarding claim 2 of the ‘077 patent based on Purpura and Nivaggioli in view of Katritzky 2005.**

**17. The request indicates the Requester considers that there may be a substantial new question of patentability regarding claim 2 of the '077 patent based on Purpura and Nivaggioli in view of Katritzky 1995.**

**18. The request indicates the Requester considers that there may be a substantial new question of patentability regarding claim 2 of the '077 patent based on Purpura and Nivaggioli in view of Kessel.**

**19. The request indicates the Requester considers that there may be a substantial new question of patentability regarding claim 2 of the '077 patent based on Purpura and Nivaggioli in view of Zapf, Robinson, Manimala, Katritzky 2005, Katritzky 1995 and Kessel.**

Consideration of the above cited prior art in SNQ Nos. 5 to 19 raises a substantial new question of patentability as to claims 1-3 of the '077 patent. Each of the SNQs relies at least in part on Purpura.

Please note that p. 4 of the Request refers to a machine-generated translation of Purpura as Exhibit H, but there is no such machine translation of record in the instant electronic file. Nevertheless, the Request cites, for example, the Abstract, claim 1 and Example 1 of Purpura and notes that Purpura teaches a compound containing creatine as well as an acid component and/or complexing agent that can be an L amino acid (see pp. 10-14 of the Request). Purpura's Example 1 is a complex of creatine and L-glutamine.

There is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not claims 1-3 were patentable.

Accordingly, the above cited prior art in SNQ Nos. 5 to 19 raises a substantial new question of patentability as to claims 1-3, which question has not been decided in a previous examination of the ‘077 patent.

**20. The request indicates the Requester considers that there may be a substantial new question of patentability regarding claims 1 and 3 of the ‘077 patent based on Nivaggioli.**

**21. The request indicates the Requester considers that there may be a substantial new question of patentability regarding claims 1 and 3 of the ‘077 patent based on Nivaggioli in view of Pischel.**

**22. The request indicates the Requester considers that there may be a substantial new question of patentability regarding claims 1 and 3 of the ‘077 patent based on Nivaggioli in view of Purpura.**

Consideration of the above cited prior art in SNQ Nos. 20 to 22 raises a substantial new question of patentability as to claims 1 and 3 of the '077 patent. Each of the SNQs relies at least in part on Nivaggioli.

Nivaggioli teaches creatine bound to a ligand, wherein the binding can be covalent and the ligand can be an amino acid, e.g., a standard or non-standard amino acid (see ¶¶ 0022 and 0033-0034).

There is a substantial likelihood that a reasonable examiner would consider these teachings important in deciding whether or not claims 1 and 3 were patentable. Accordingly, the above cited prior art in SNQs Nos. 20 to 22 raises a substantial new

question of patentability as to claims 1 and 3, which question has not been decided in a previous examination of the ‘077 patent.

***Duty to Disclose***

The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a) to apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving Patent No. 8,350,077 throughout the course of this reexamination proceeding.

***Correspondence***

Any inquiry concerning this communication or earlier communications from the examiner should be directed to Alan Diamond whose telephone number is (571) 272-1338. The Specialist can normally be reached on Monday through Thursday from 5:30 a.m. to 3:00 p.m. and on Fridays from 5:30 a.m. to 9:30 a.m.

If attempts to reach the Specialist by telephone are unsuccessful, the examiner’s supervisor, Stephen Stein can be reached on (571) 272-1544.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free).

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/013,902 | 03/03/2017 | 8350077 | 1255.117RE | 7190 |

54434 7590 07/26/2017
BOOTH UDALL FULLER, PLC
1255 W. Rio Salado Pkwy.
Suite 215
Tempe, AZ 85281

| EXAMINER | |
|---|---|
| DIAMOND, ALAN D | |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3991 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 07/26/2017 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

| *Office Action in Ex Parte Reexamination* | **Control No.**<br>90/013,902 | **Patent Under Reexamination**<br>8350077 | |
|---|---|---|---|
| | **Examiner**<br>ALAN DIAMOND | **Art Unit**<br>3991 | **AIA (First Inventor to File) Status**<br>No |

***-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --***

a. ☐ Responsive to the communication(s) filed on ______ .

☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on ______.

b. ☐ This action is made FINAL.

c. ☒ A statement under 37 CFR 1.530 has not been received from the patent owner.

A shortened statutory period for response to this action is set to expire _2_ month(s) from the mailing date of this letter.
Failure to respond within the period for response will result in termination of the proceeding and issuance of an *ex parte* reexamination certificate in accordance with this action. 37 CFR 1.550(d). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**
If the period for response specified above is less than thirty (30) days, a response within the statutory minimum of thirty (30) days will be considered timely.

Part I THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1. ☒ Notice of References Cited by Examiner, PTO-892.
2. ☐ Information Disclosure Statement, PTO/SB/08.
3. ☐ Interview Summary, PTO-474.
4. ☐ ______.

Part II SUMMARY OF ACTION

1a. ☒ Claims _1-3_ are subject to reexamination.

1b. ☐ Claims ______ are not subject to reexamination.

2. ☐ Claims ______ have been canceled in the present reexamination proceeding.

3. ☐ Claims ______ are patentable and/or confirmed.

4. ☒ Claims _1-3_ are rejected.

5. ☐ Claims ______ are objected to.

6. ☐ The drawings, filed on ______ are acceptable.

7. ☐ The proposed drawing correction, filed on ______ has been (7a) ☐ approved (7b) ☐ disapproved.

8. ☐ Acknowledgment is made of the priority claim under 35 U.S.C. § 119(a)-(d) or (f).

a) ☐ All b) ☐ Some* c) ☐ None of the certified copies have

1 ☐ been received.

2 ☐ not been received.

3 ☐ been filed in Application No. ______ .

4 ☐ been filed in reexamination Control No. ______.

5 ☐ been received by the International Bureau in PCT application No. ______.

* See the attached detailed Office action for a list of the certified copies not received.

9. ☐ Since the proceeding appears to be in condition for issuance of an *ex parte* reexamination certificate except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte* Quayle, 1935 C.D. 11, 453 O.G. 213.

10. ☐ Other: ______

cc: Requester (if third party requester)

## DETAILED ACTION

The present application is being reexamined under the pre-AIA first to invent provisions.

### *Summary of Proceedings*

A Request pursuant to 37 CFR 1.510 for *ex parte* reexamination of claims 1-3 of U.S. Patent 8,350,077 (the ‘077 patent) was filed March 3, 2017 by Patent Owner. An Order granting *ex parte* reexamination of claims 1-3 of the ‘077 patent was mailed May 2, 2017.

### *Scope of Claims*

In reexamination, patent claims are construed broadly. *In re Yamamoto*, 740 F.2d 1569, 1571, 222 USPQ 934, 936 (Fed. Cir. 1984) (claims given “their broadest reasonable interpretation consistent with the specification”). The instant reexamination proceeding contains claims 1-3 directed to amides of creatine, a method for preparation of said amides of creatine, and a compound possessing neuroprotective activity.

Claims 1-3 are reproduced below:

1. Amides of Creatine having a general formula: NH=C(NH2)-N(CH3)-CH2-CO-NH-R*X, wherein R is amino acid residue of aliphatic L-amino acid, or aromatic amino L-acid or heteroaromatic L-amino acid or derivatives of aliphatic L-amino acid, or aromatic L-amino acid or heteroaromatic L-amino acid representing at least one of the following: salts of amino acid, amino acid esters, amino acid amides, or amino acid peptides; and X is low-molecular-weight organic or mineral acid or water.

2. A method for preparation of said amides of Creatine according to claim 1, said method comprising: interaction of amides of sarcosine and amino acids or their derivatives with guanidinylating agents in an organic solvents at a temperature not exceeding 50° C.

3. A compound possessing neuroprotective activity, said compound consisting of: amides of Creatine having a general formula: $NH{=}C(NH_2)\text{-}N(CH_3)\text{-}CH_2\text{-}CO\text{-}NH\text{-}R{*}X$; wherein R is amino acid residue of aliphatic L-amino acid, or aromatic amino L-acid or heteroaromatic L-amino acid, or derivatives of aliphatic L-amino acid, or aromatic L-amino acid, or heteroaromatic L-amino acid representing at least one of the following: salts of amino acid, amino acid esters, amino acid amides, or amino acid peptides; and X is low-molecular-weight organic or mineral acid or water as a remedy possessing a neuroprotective activity.

In claim 2, the recitation "in an organic solvents" is taken as meaning that one or more organic solvents is used in the method.

## ***Art Cited in the Rejections***

WO 03/071884 A1 to Purpura et al, hereafter "**Purpura**". The English translation of Purpura accompanying the instant Office Action is hereinafter referred to below.[1]

U.S. Patent 5,719,319 to Weiss et al, hereafter "**Weiss**".

Zapf et al, "A Novel Traceless Resin-Bound Guanidinylating Reagent for Secondary Amines to Prepare N,N-Disubstituted Guanidines," Organic Letters, Vol. 3, No. 8, (2001), pp. 1133-1136, hereafter "**Zapf**".

---

[1] The Order (p. 9) stated that while the Request referred to an English translation, no such translation was present in the electronic file. Upon further review, there is a translation of record filed 02/02/17. However, this translation is not relied upon in the rejections in the instant Office Action. Rather, the relied upon translation is the translation accompanying the instant Office Action and made of record on the accompanying PTO-892, Notice of References Cited form.

Robinson et al, “Solid Phase Synthesis of Guanidines,” Tetrahedron, Vol. 53, No. 19 (1997), pp. 6697-6705, hereafter “**Robinson**”.

Manimala et al, “Solid-Phase Synthesis of Guanidinium Derivatives from Thiourea and Isothiourea Functionalities,” Eur. J. Org. Chem., (2002), pp. 3909-3922, hereafter “**Manimala**”.

Katritzky et al, “Recent Developments in guanylating agents,” ARKIVOC (iv), (2005), pp. 49-87, hereafter “**Katritzky 2005**”.

Katritzky et al, “Benzotriazole-1-Carboxamidium Tosylate: An Alternative Method for the Conversion of Amines to Guanidines," Synthetic Communications, 25(8), (1995), pp. 1173-1186, hereafter "**Katritzky 1995**”.

U.S. Patent 6,399,819 to Kessel et al, hereafter “**Kessel**”.

U.S. Patent Application Publication 2008/0003208 to **Nivaggioli**.

U.S. Patent 5,863,939 to Pischel et al, hereafter “**Pischel**”.

### *Claim Rejections - 35 USC §§ 102 and 103*

The following is a quotation of the appropriate paragraphs of pre-AIA 35 U.S.C. 102 that form the basis for the rejections under this section made in this Office action:

A person shall be entitled to a patent unless –

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States.

The following is a quotation of pre-AIA 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

(a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

**1. Claims 1 and 3 are rejected under pre-AIA 35 U.S.C. 102(a) as anticipated by, or in the alternative, under pre-AIA 35 U.S.C. 103(a) as obvious over Purpura.**

Purpura teaches compounds containing creatine, as well as an acid component and/or complexing (sequestering) agent (see p. 10, lines 6-12 and claim 1). The acid component and/or complexing (sequestering) agent can be an L-amino acid (see pp. 16-17 and claim 5). In fact, in Example 1 on pp. 26-27, Purpura reacts 0.005 mol of creatine with 0.05 mol of L-glutamine to form a creatine/L-glutamine compound having a melting point of 193-194℃ and the IR properties noted at the top of p. 27. It is the Specialist's position that this reaction product in Example 1 contains the amide compound creatinyl-L-glutamine having the formula:




In particular, Purpura teaches that its compounds possess salt-like character and complexing-like or sequestering-like character, and "IR-investigations ... have demonstrated that the compounds in accordance with the invention do not only exist as pure salts, or as simple physical mixtures of creatine and the respective acid components or/and complexing (sequestering) agents." (See p. 12, lines 4-11). Further, while glutamine decomposes at around 185℃ and creatine has a melting point of 255°C, Purpura's creatine/L-glutamine compound in Example 1 has said melting point of 193-194℃.

With respect to the X portion of the instant compound, Purpura teaches water is removed such that the water content of the compound is 0.1 to 20% by weight, preferably <5% by weight, in particular <1% by weight, and more preferred < 0.1% by weight (see p. 23, lines 1-2 and 11-13). For creatinyl-L-glutamine, the molecular weight (MW) = 260, while a single water molecule has a MW = 18. For creatinyl-L-glutamine monohydrate, the water content would be 6.5% of the mass. Thus, for creatinyl-L-glutamine having the preferred <5% by weight water content, the water would be present on average as a monohydrate as here claimed, i.e., instant X is water, or not present at all.

With respect to claim 3, Purpura teaches that its compounds possess neuroprotective activity (see p. 25, line 8).

While Purpura does not disclose that its reaction product of creatine and L-glutamine in Example 1 contains an amide of creatine here claimed, Purpura, as cited above, teaches a hydrated reaction product which reasonably appears to be either the same as or an obvious variation of the instant compound. Accordingly, claims 1 and 3, if not anticipated under 35 USC 102(b), would be obvious under 35 USC 103(a).

Alternatively, it would have been obvious to one of ordinary skill in the art at the time the invention was made to have prepared Purpura's reaction product of creatine and L-glutamine, i.e., the creatine amide compound creatinly-L-glutamine having the formula:




such that the compound is, or on average is, a monohydrate because Purpura teaches the water content is 0.1 to 20% by weight, preferably < 5% by weight, and, for creatinyl-L-glutamine monohydrate, the water content is 6.5%.

**2. Claims 1-3 are rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over Purpura in view of Weiss.**

Purpura is relied upon for the reasons stated above in Rejection No. 1. As noted above, the reaction product in Purpura's Example 1 contains the creatine amide compound creatinly-L-glutamine having the formula:




With respect to claims 1 and 3, and as an alternative to the formation of the monohydrate stated in Rejection No. 1, formation of the monohydrate would have been obvious further in view of the teachings of Weiss.

Weiss is directed to a process for the preparation of creatine or creatine monohydrate (see Abstract). Weiss teaches the reaction can be carried out in water or in the further presence of an aliphatic alcohol such as methanol, and that for the preparation of creatine monohydrate, the drying procedure is discontinued at a water content of about 12.1% by weight or the drying parameters are so chosen such that the water content does not fall below about 12.1% by weight (see col. 2, line 51 through col. 3, line 20). Creatine monohydrate has a theoretical water content of 12.08% by weight (see col. 3, lines 10-15).

Purpura similarly teaches the formation of its compound can be in aqueous solution or alcoholic solution, and, as noted above, Purpura teaches removal of water such that the water content of its compound is 0.1 to 20% by weight, preferably <5% by weight, in particular <1% by weight, and more preferred < 0.1% by weight (see p. 23, lines 1-2 and 11-13). As also noted above, for creatinyl-L-glutamine, the MW = 260, while a single water molecule has a MW = 18. For creatinyl-L-glutamine monohydrate, the water content would be 6.5%.

It would have been obvious to one of ordinary skill in the art at the time the invention was made to have prepared Purpura's creatinyl-glutamine compound such that it is a monohydrate, i.e., contains 6.5% water, because Purpura teaches removal of water from the compound such that the water content of the compound is 0.1 to 20% by weight, preferably <5% by weight; and Weiss teaches that in the preparation of creatine monohydrate, the drying procedure is discontinued at a water content of about 12.1% by weight or the drying parameters are so chosen such that the water content does not

fall below about 12.1% by weight because creatine monohydrate has a theoretical water content of 12.08%.

With respect to claim 2, Purpura alone anticipates or renders obvious the claimed amide of creatine, e.g., said creatinyl-L-glutamine, as set forth in Rejection No. 1, or alternatively Purpura in view of Weiss renders obvious said creatinyl-L-glutamine, as set forth above in the instant rejection. Purpura differs from claim 2 in that Purpura does not specifically teach the claimed method of preparing the amide of creatine comprising interaction of amides of sarcosine and amino acids or their derivatives with guanidinylating agents in an organic solvent at a temperature not exceeding 50°C.

Weiss further teaches a process for preparing creatine or creatine monohydrate comprising reaction of sodium or potassium sarcosinate with cyanamide, i.e., a guanidinylating agent, in a mixture of water and an organic solvent at a temperature from 20°C to 150°C (see col. 1, lines 29-34; the paragraph bridging cols. 1 and 2; col. 2, lines 51-58; and claims 1 and 20). The process provides for good purity in an economically useful yield (see col. 1, lines 29-34).

It would have been obvious to one of ordinary skill in the art at the time the invention was made to have prepared said creatinyl-L-glutamine of Purpura, or Purpura in view of Weiss, by reacting a sodium or potassium salt of sarcosine-L-glutamine amide compound with cyanamide guanidinylating agent in a mixture of water and an organic solvent at a temperature from 20°C to 150°C so as to guanidinylate the sarcosine portion of the compound and obtain said creatinyl-L-glutamine with good purity in an economically useful yield, as taught by Weiss. Weiss's temperature range

of 20°C to 150°C overlaps and renders obvious the claimed temperature range not exceeding 50°C. In fact, in Weiss's Example 4 at col. 4, the reaction temperature is 50°C to 52°C, i.e., very close to the upper limit of the temperature range here claimed.

**3. Claim 2 is rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over Purpura in view of Weiss as applied to claims 1-3 above, and further in view of Zapf, Robinson, Manimala, Katritzky 2005, Katritzky 1995 and Kessel.**

Purpura in view of Weiss is relied upon for the reasons stated above in Rejection No. 2. Zapf, Robinson, Manimala, Katritzky 2005, Katritzky 1995 and Kessel provide further teachings with respect to reacting guanidinylating agents with amines.

Zapf teaches that sarcosine methyl ester can be readily transformed into creatine methyl ester in high yield using a guanidinylating agent (see p. 1136).

Robinson makes a comparison of guanylating agents on a series of primary, secondary, and aromatic amines in solution and on solid phase resins, and discloses the results (see Abstract). In Table 1 (p. 6699), the second synthesis in solution shows a secondary amine being treated with a guanylating agent in an organic solvent at room temperature (presumed), producing a guanidinylated secondary amine. This is further described on page 6702 (top). In Table 2 (p. 6700), the second synthesis in solid phase shows a secondary amine being treated with a guanylating agent in an organic solvent at room temperature (presumed), producing a guanidinylated secondary amine. This is further described on page 6704 (top). The first example in Table 1 (p.

6699) shows the guanidinylating process being performed on an amino acid derivative, specifically alanine methyl ester.

Manimala conducts and discloses a survey and review of methods for the synthesis of guanidiniums from thiourea and isothiourea using different reagents (see pp. 3910 and 3917).

Katritzky 2005 states the following on p. 80:

> Benzotriazole-1-carboxamidinium tosylate ... prepared from benzotriazole ... with cyanamide ... in refluxing 1,4-dioxane in the presence of p-TsOH, is an efficient general reagent for the synthesis of mono and disubstituted guanidines ... Reactions are conveniently carried out using equimolar amine in (i) DMF-diisopropylethylamine at room temperature, (ii) acetonitrile or (iii) the absence of solvent. Product isolation is facile as the precipitated guanidine can be filtered from the ether soluble benzotriazole by-poduct [sic] when DMF is used. The product precipitates during the reaction, while in the absence of solvent product can be isolated chromatographically. Under mild conditions, benzotriazole-1-carboxamidinium tosylate gives guanidines in moderate to good yields and offers advantages over previous procedures (Scheme 44, Table 36).

The guanidinylating agent used in this method is the same used in examples 1, 5, 6, 7, and 8 of the ’077 patent. As seen in this citation from Katritzky 2005, the reaction is carried out in organic solvent at room temperature. This guanidinylating agent is similarly disclosed in Katritzky (1995). Table 1 (p. 1175) of Katritzky 1995 discloses the reaction of benzotriazole-1-carboxamidinium tosylate with primary and secondary amines. The reaction is facile and gives guanidines in moderate to good yield (see p. 1174 of Katritzky 1995).

Kessel teaches that “[c]rude creatine is generally prepared industrially by guanylation of sarcosine, that is to say transfer of the guanyl residue (carbamimidoyl residue) to sarcosine or salts thereof.” (See col. 3, lines 22-55).

Accordingly, it would have been obvious to one of ordinary skill in the art at the time the invention was made to have prepared said creatinyl-L-glutamine of Purpura, or Purpura in view of Weiss, with a reasonable expectation of success by reacting sarcosine-L-glutamine amide (or salt thereof) with guanidinylating agent in organic solvent at a temperature here claimed, because it is conventional in the art to react guanidinylating agent with amine to obtain a guanidine compound, e.g., to react guanidinylating agent with sarcosine to obtain creatine, under such conditions, as shown by Weiss, Zapf, Robinson, Manimala, Katritzky 2005, Katritzky 1995 and Kessel.

**4. Claims 1-3 are rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over Nivaggioli in view of Weiss and Pischel.**

Nivaggioli teaches creatine-ligand compounds wherein the ligand is covalently bound to creatine and the ligand is a standard amino acid, for example, leucine, proline, alanine, valine, glycine, serine, asparagine, glutamine, aspartic acid, glutamic acid, methionine, tryptophan, phenylalanine, isoleucine, threonine, cysteine, tyrosine, histidine, lysine or arginine (see ¶¶ 0022 and 0033-0034). The L isomer form is a conventional form of these standard amino acids. In view of Nivaggioli's teaching of covalent bonding, it is at once envisaged, or alternatively it would have been obvious to a skilled artisan, to have covalently bound creatine to any of these standard L amino acids by an amide bond as here claimed between the carboxylic acid group of creatine and an amino group of any of the standard L amino acids.

With respect to instant claim 3, Nivaggioli teaches treating creatine responsive states, such as a neurological disorder, i.e., Huntington's disease, Parkinson's disease, amyotrophic lateral sclerosis and creatine transporter defect (see Abstract and ¶¶ 0002, 0014, 0043-0045).

Nivaggioli does not specifically teach the "X" portion of the claimed compound, e.g., that the compound is in monohydrate form.

Weiss is directed to a process for the preparation of creatine or creatine monohydrate (see Abstract). Weiss teaches the reaction can be carried out in water or in the further presence of an aliphatic alcohol such as methanol, and that for the preparation of creatine monohydrate, the drying procedure is discontinued at a water content of about 12.1% by weight or the drying parameters are so chosen such that the water content does not fall below about 12.1% by weight (see col. 2, line 51 through col. 3, line 20). Creatine monohydrate has a theoretical water content of 12.08% by weight (see col. 3, lines 10-15).

Pischel similarly teaches that creatine can be in monohydrate form (col. 2, lines 47-49), and further teaches creatine ascorbate in hydrated form (Abstract; col. 2, lines 19-41; and claim 1). Creatine ascorbate is a creatine-ligand compound exemplified by Nivaggioli (see Example 2, in particular ¶¶ 0036 and 0142).

It would have been obvious to one of ordinary skill in the art at the time the invention was made to have prepared Nivaggioli's creatine-L-amino acid compound such that it is a monohydrate because the monohydrate form is a conventional form of

creatine and creatine ascorbate, i.e., a creatine-ligand compound exemplified by Nivaggioli, as shown by Weiss and Pischel.

With respect to claim 2, Nivaggioli does not specifically teach the claimed method of preparing the creatine-L-amino acid comprising interaction of amides of sarcosine and amino acids or their derivatives with guanidinylating agents in an organic solvent at a temperature not exceeding 50℃.

Weiss further teaches a process for preparing creatine or creatine monohydrate comprising reaction of sodium or potassium sarcosinate with cyanamide, i.e., a guanidinylating agent, in a mixture of water and an organic solvent at a temperature from 20℃ to 150℃ (see col. 1, lines 29-34; the paragraph bridging cols. 1 and 2; col. 2, lines 51-58; and claims 1 and 20). The process provides for good purity in an economically useful yield (see col. 1, lines 29-34).

It would have been obvious to one of ordinary skill in the art at the time the invention was made to have prepared the creatinyl-L-amino acid compound of Nivaggioli in view of Weiss and Pischel by reacting a sodium or potassium salt of sarcosine-L-amino acid amide with cyanamide guanidinylating agent in a mixture of water and an organic solvent at a temperature from 20℃ to 150℃ so as to guanidinylate the sarcosine and obtain said creatine-L-amino acid compound with good purity in an economically useful yield, as taught by Weiss. Weiss's temperature range of 20℃ to 150℃ overlaps and renders obvious the claimed temperature range not exceeding 50℃. In fact, in Weiss's Example 4 at col. 4, the reaction temperature is 50℃ to 52℃, i.e., very close to the upper limit of the temperature range here claimed.

**5. Claim 2 is rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over Nivaggioli in view of Weiss and Pischel as applied to claims 1-3 above, and further in view of Zapf, Robinson, Manimala, Katritzky 2005, Katritzky 1995 and Kessel.**

Nivaggioli in view of Weiss and Pischel is relied upon for the reasons stated above in Rejection No. 4. Zapf, Robinson, Manimala, Katritzky 2005, Katritzky 1995 and Kessel provide further teachings with respect to reacting guanidinylating agents with amines.

Zapf, Robinson, Manimala, Katritzky 2005, Katritzky 1995 and Kessel are relied upon for the reasons stated above in Rejection No. 3.

It would have been obvious to one of ordinary skill in the art at the time the invention was made to have prepared the creatine-L-amino acid compound of Nivaggioli in view of Weiss and Pischel with a reasonable expectation of success by reacting sarcosine-L-amino acid amide (or salt thereof) with guanidinylating agent in organic solvent at a temperature here claimed, because it is conventional in the art to react guanidinylating agent with amine to obtain a guanidine compound, e.g., to react guanidinylating agent with sarcosine to obtain creatine, under such conditions, as shown by Weiss, Zapf, Robinson, Manimala, Katritzky 2005, Katritzky 1995 and Kessel.

***Additional Prior Art***

U.S. Patent 5,561,146 to Kim et al (Kim) was found to raise an SNQ in the Order (see p. 4). However, Kim does not anticipate or render obvious the claimed amide of creatine in view of the fact that Kim's $R^1$ is not taught as being H (see col. 1, lines 27-29), and thus, Kim's compound is not an amide of creatine.

U.S. Patent 6,518,458 to Moinet et al (Moinet) was made of record on the PTO-892 Notice of References Cited form accompanying the Order. Moinet does not anticipate or render obvious the claimed amide of creatine since neither of Moinet's $R^2$ and $R^3$ is taught as containing a carboxyl, and thus, Moinet's compound does not have the claimed R residue.

***Conclusion***

In order to ensure full consideration of any amendments, affidavits or declarations, or other documents as evidence of patentability, such documents must be submitted in response to this Office action. Submissions after the next Office action, which is intended to be a final action, will be governed by the requirements of 37 CFR 1.116, after final rejection and 37 CFR 41.33 after appeal, which will be strictly enforced.

***Duty to Disclose***

The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a) to apprise the Office of any litigation activity, or other prior or concurrent

proceeding, involving Patent No. 8,350,077 throughout the course of this reexamination proceeding.

***Correspondence***

Any inquiry concerning this communication or earlier communications from the examiner should be directed to Alan Diamond whose telephone number is 571-272-1338. The examiner can normally be reached on Monday through Thursday from 5:30 am to 3:00 pm and Fridays from 5:30 am to 9:30 am. If the attempts to reach the examiner are unsuccessful, the examiner's supervisor, Stephen Stein can be reached by dialing 571-272-1544.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free).

**All** correspondence relating to this ex parte reexamination proceeding should be directed:

By EFS: Registered users may submit via the electronic filing system EFS-Web at https://efs.uspto.gov/efile/myportal/efs-registered

By Mail to: Mail Stop *Ex Parte* Reexam
Central Reexamination Unit
Commissioner for Patents
United States Patent & Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

By FAX to: (571) 273-9900
Central Reexamination Unit

By hand: Customer Service Window
Randolph Building
401 Dulany Street
Alexandria, VA 22314

Signed:

/Alan Diamond/
Patent Reexamination Specialist
Central Reexamination Unit 3991

/Jerry D. Johnson/
Patent Reexamination Specialist
Central Reexamination Unit 3991

/Stephen Stein/
Supervisory Patent Reexamination Specialist
Central Reexamination Unit 3991

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| In re Patent of: | Burov *et al.* | Confirmation No.: | 7190 |
| Control No.: | 90/013,902 | Group Art Unit: | 3991 |
| Filed: | March 3, 2017 | Examiner: | Alan D. Diamond |
| For: | *Ex Parte* Reexamination of Claims 1-3 of U.S. Patent No. 8,350,077 | | |

Mail Stop *Ex Parte* Reexam
Attn: Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

## RESPONSE TO OFFICE ACTION DATED JULY 26, 2017

Sir:

The following is responsive to the Office Action mailed July 26, 2017. Patent Owner respectfully request reconsideration of the application in view of the following:

**Amendments to the Claims** are reflected in the listing of claims which begins on page 2 of this paper.

**Remarks/Arguments** begin on page 3 of this paper.

An **Appendix** containing the Declaration by Dr. Richard Chamberlin under 37 C.F.R. 1.132 begins after the last page of this paper.

## AMENDMENTS TO THE CLAIMS

1. Amides of Creatine having a general formula:

$$NH{=}C(NH_2){-}N(CH_3){-}CH_2{-}CO{-}NH{-}R{*}X,$$

wherein R is amino acid residue of aliphatic L-amino acid, or aromatic amino L-acid or heteroaromatic L-amino acid or derivatives of aliphatic L-amino acid, or aromatic L-amino acid or heteroaromatic L-amino acid representing at least one of the following: salts of amino acid, amino acid esters, amino acid amides, or amino acid peptides; and X is low-molecular-weight organic or mineral acid or water.

2. (Amended) A method for preparation of said amides of Creatine according to claim 1, said method comprising: interaction of amides of sarcosine and amino acids or their derivatives with guanidinylating agents in an organic solvent[s] at a temperature not exceeding 50°C.

3. A compound possessing neuroprotective activity, said compound consisting of: amides of Creatine having a general formula:

$$NH{=}C(NH_2){-}N(CH_3){-}CH_2{-}CO{-}NH{-}R{*}X;$$

wherein R is amino acid residue of aliphatic L-amino acid, or aromatic amino L-acid or heteroaromatic L-amino acid, or derivatives of aliphatic L-amino acid, or aromatic L-amino acid, or heteroaromatic L-amino acid representing at least one of the following: salts of amino acid, amino acid esters, amino acid amides, or amino acid peptides; and

X is low-molecular-weight organic or mineral acid or water as a remedy possessing a neuroprotective activity.

4. (New) The compound of claim 1, wherein X = 0.

5. (New) The compound of claim 1, wherein the compound is anhydrous.

6. (New) The compound of claim 1, wherein the compound is in an aqueous solution.

7. (New) The compound of claim 1, wherein the compound is a composition with an auxiliary component.

8. (New) The composition of claim 7, wherein the auxiliary component is water.

## REMARKS

Claims 1-3 are currently pending in the application. Patent Owner has amended claim 2 to correct a typo. New claims 4-8 have been added. Support for the new claims may be found in the specification, for example, in column 4 lines 5-10, column 5 lines 3-27, and Example 4. No new matter has been added by the amendment. Patent Owner request reconsideration of the application in light of the following remarks.

**Rejections under 35 U.S.C. 102**

*I. Claims 1 and 3 were rejected as being anticipated by Purpura (WO 03/071884A1).*

Page 5 of the Office Action alleged that the reaction product of Example 1 of the Purpura contains creatinyl-L-glutamine having the formula:




Patent Owner respectfully traverse this rejection for the following reasons.

As summarized on page 5 of the Office Action, the reaction of Example 1 comprises reacting 0.005 mol of creatine with 0.05 mol of L-glutamine to form a creatine/L-Glutamine compound having a melting point of 193-194°C. However, as noted in paragraph 6 of the Declaration under 37 C.F.R. 1.132 by Dr. Richard Chamberlin (hereinafter "Chamberlin Declaration"), the procedures of Purpura actually describe simple mixtures and/or salts rather than a compound according to the general definition of the term in the relevant technical field. More explicitly, Dr. Chamberlin noted in paragraph 7 of his declaration that "[a]n amide bond or peptide



PEPSI_0000904

bond cannot be formed by any of the procedures described in Purpura." Rather, he observed that the method of preparation presented in Example 1 of Purpura would not result in any reaction at least because (1) the stated molecular stoichiometry is incorrect (paragraph 7) and because (2) the inner salt of L-glutamine is too weak an acid to result in proton transfer to the weakly basic creatine carboxylate (paragraph 9). Thus, as summarized in paragraph 9 of the Chamberlin Declaration, the product in Example 1 is simply a mixture of two starting materials. The method described in Example 1 does not disclose the reaction requirements for the formation of an amide bond.

Page 5 of the Office Action also pointed to the melting point and IR properties reported for Example 1 to support the conclusion that creatinyl-L-glutamine was prepared. However, these two parameters cannot provide conclusive evidence that such a compound was prepared. Purpura described the IR spectra results of the reaction product as "v = 3408 (s), 3215 (m), 1628 (s), 1408 (m) $cm^{-1}$." That only these three bands were noted raises question on the accuracy and completeness of the IR data reported. Paragraph 12 of the Chamberlin Declaration specifically pointed out the absence of a stretch around 1680 $cm^{-1}$, which is indicative of the C=O from the primary amide group in the side chain of L-glutamine. As explained in the paragraph 12 of the Chamberlin Declaration, "[a]ny mixture, salt, or other product containing the L-glutamine side chain should have an amide band in the IR, and convention dictates that bands in the particularly important carbonyl diagnostic region of 1600-1850 cm-1 should be reported even if they are relatively weak." Accordingly, a person having ordinary skill in the art would not find the IR data for Example 1 to provide any information that could definitely identify the reaction product for the method of preparation described in Example 1.

Nonetheless, if the IR spectra were accepted as complete and accurate (which it is not), the lack of the highly diagnostic amide C=O stretch band in the range of 1640-1690 $cm^{-1}$ clearly

demonstrates that the reaction product of Example 1 is not an amide (paragraph 10 of the Chamberlin Declaration). In the context of the method of preparation described in Example 1, a person having ordinary skill in the art would find the IR data to show the reaction product of Example 1 is a carboxylate salt rather than amide (paragraph 11 of the Chamberlin Declaration).

In view of the method of preparation and the IR data both showing that the reaction product of Example 1 is not an amide of creatine, the melting point data is insufficient to show the reaction product is creatiny-L-glutaminate. As explained in detail in paragraph 13 of the Chamberlin Declaration, "melting points… have no predictive value regarding whether a reaction has occurred nor what course it might have taken."

Thus, the reaction of Example 1 does not show to a person having ordinary skill in the art that a peptide bond having formed with the creatine and the acid component and/or complexing agent. A claim is anticipated only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference. *Verdegaal Brothers v. Union Oil Co. of California*, 2 USPQ2d 1051, 1053 (Fed. Cir. 1987). The identical invention must be shown in as complete detail as is contained in the claim. *Richardson v. Suzuki Motor Co.*, 9 USPQ2d 1913, 1920 (Fed. Cir. 1989). In view of the description of the reaction product of Example 1 not showing a peptide bond and the method of preparation being only expected to produce a simple mixture of the starting material, Purpura does not teach implicitly or explicitly an amide of creatine. Accordingly, Purpura does not anticipate claims 1 and 3. Patent Owner respectfully request that this rejection be withdrawn.

**Rejections under 35 U.S.C. 103**

*I. Claim 1 and 3 were rejected as being unpatentable over Purpura*

Specifically, page 6 of the Office Action alleged that "it would have been obvious to one of ordinary skill in the art at the time of the invention was made to have prepared Purpura's reaction product of creatine and L-glutamine, i.e., the creatine amide compound creatinyl-L-glutamine having the formula:




such that the compound is, or on average is, a monohydrate because Purpura teaches the water content is 0.1-20% by weight, preferrably < 5% by weight, and for creatinyl L-glutamine monohyrate, the water content is 6.5%." Patent Owner respectfuly submits that Purpura does not establish a *prima facie* case of obviousness.

To establish a *prima facie* case of obviousness under 35 U.S.C. 103, three basic criteria must be met. First, there must be some suggestion or motivation, either in the references themselves or in the knowledge generally available to one of ordinary skill in the art, to modify the reference or to combine reference teachings. Second, there must be a reasonable expectation of success. Third, the cited prior art reference must teach or suggest all of the claim limitations. Furthermore, the suggestion to make the claimed combination and the reasonable expectation of success must both be found in the prior art, and not based upon the Patent Owner' disclosure. A

failure to meet any one of these criteria is a failure to establish a *prima facie* case of obviousness. MPEP 2143.

Here, Purpura does not teach or suggest all of the claim limitations and fails to establish a *prima facie* case of obviousness. As explained above in relation to the anticipation rejection based on Purpura, the reference does not disclose the compound of claim 1, which is an amide of creatine. Thus, Purpura also does not disclose the monohydrate of an amide of creatine. By drying the reaction product so that the water content is 6.5%, this only means reduction of the hydration of creatine (see parapgrah 9 of the Chamberlin Declaration). Accordingly, Purpura does not render obvious claims 1 and 3. Patent Owner respectfully request that this rejection be withdrawn.

*II. Claims 1-3 were rejected as being unpatentable over Purpura in light of Weiss (US Patent No. 5,719,319).*

Page 7 of the Office Action notes that Purpura is relied on for its alleged disclosure of creatinyl L-glutamine in Example 1, while Weiss is relied on as an alternative to the formation of the monohydrate. In particular, the Office Action noted that "formation of the monohydrate would have been obvious further in view of the teachings of Weiss." As noted on page 8 of the Office Action, Weiss allegedly discloses a process for the preparation of creatine or creatine monohydrate where the reaction carried out in water or in further in the presence of an aliphatic alcohol and that the creatine monohydrate may be prepared by stopping the drying procedure when the water content is at about 12.1%. On pages 8-9, the Office Action concluded based on Purpura and Weiss both allegedly teaching a water-removal step that "[i]t would have been obvious to one of ordinary skill in the art at the time the invention was made to have prepared Purpura's creatinyl-glutamine

compound such that it is a monohydrate." With respect to the method of preparation of claim 2, the Office Action concluded on page 9 that

> [i]t would have been obvious to one of ordinary skill in the art at the time the invention was made to have prepared said creatinyl-L-glutamine of Purpura, or Purpura in view of Weiss, by reacting a sodium or potassium salt of sarcosine-L-glutamine amide compound with cyanamide[, a] guanidinylating agent[,] in a mixture of water and an organic solvent at a temperature from 20°C to 150°C so as to guanidinylate the sarcosine portion of the compound and obtain said creatinyl-L-glutamine with good purity in an economically useful yield, as taught by Weiss.

Notwithstanding, for at least the reasons denoted below, Purpura in view of Weiss does not establish a *prima facie* case that the monohydrate form of the amide of creatine of claims 1 and 3 and the method of preparation of claim 2 are obvious.

*a. A person having ordinary skill in the art would not have a reasonable expectation from Purpura and Weiss that the monohydrate of the amide of creatine was produced*

As explained above, Purpura does not teach or suggest the amide of creatine as evidenced by the IR spectra of Example 1 lacking the peptide bond spectra. Thus, the combination of Weiss, which concerns the formation of creatine, with Purpura does not teach or suggest the amide of creatine, let alone the monohydrate or any other form of an amide of creatine.

*b. Purpura and Weiss do not teach the claimed method*

The method of claim 2 comprises a chemical reaction of two reactants: (1) the amide of sarcosine formed with an amino acid or its derivative and (2) the guanidinylating agent. As

explained in lines 24-35 in column 4 of the issued patent, the amide of sarcosine has a general formula of $NH(CH_3)-CH_2-CO-NH-R*X$, where R is an amino acid residue or a substituted amino acid residue. The claim also specifies that the reaction take place in an organic solvent at a temperature not exceeding 50°C. Neither Purpura nor Weiss disclose this specific chemical reaction.

Example 1 of Purpura describes a preparation method involving mixing creatine monohydrate and L-glutamine, where the reaction takes place in a methanol solution. Page 7 of the machine translation of Purpura generalizes the method of preparation as reacting creatine with an acid component and/or the complex-former in an aqueous or alcoholic solution. Thus, Purpura makes no mention of the methods containing as reactants an amide of sarcosine or a guanidinylating agent.

Weiss only describes preparation of creatine or creatine monohydrate by reacting cyanamide with the sodium or potassium salt of sarcosine. In column 1 lines 40-41, Weiss notes the reaction takes place in water or a mixture of water and an organic solvent. In Weiss's examples, the reactions between the sarcosinate and cyanamide take place in hydrochloric acid, acetic acid, or formic acid. Accordingly, the methods of Weiss only involve a sarcosine salt and cyanamide, which can be a guanidinylating agent. While the methods in Weiss involve either sodium sarcosinate or potassium sarcosinate, they are not an amide of sarcosine. Accordingly, Weiss makes no mention of the methods containing as reactants an amide of sarcosine.

In view of the above, the methods of both Purpura and Weiss do not involve an amide of sarcosine as a reactant. Accordingly, Purpura in view of Weiss does not teach each claim limitation of the method of claim 2.

*c. Purpura and Weiss does not suggest the claimed method with a reasonable expectation of success*

The Office Action's conclusion on page 9 that "reacting a sodium or potassium salt of sarcosine-L-glutamine amide compound with cyanamide[, a] guanidinylating agent[,] in a mixture of water and an organic solvent at a temperature from 20°C to 150°C so as to guanidinylate the sarcosine portion of the compound and obtain said creatinyl-L-glutamine" is obvious from Purpura in view of Weiss involves improper hindsight.

First, as noted above, neither Weiss nor Purpura disclose a reaction with the amide of sarcosine. Accordingly, there is neither any teaching nor any suggestion in the references for a reaction with an amide of sarcosine, such as a sodium or potassium salt of sarcosine-L-glutamine, to make an amide of creatine. Without the inventor's disclosures, a person having ordinary skill in the art would not have thought to make the amide of creatine using an amide of sarcosine as a reactant. In fact, based on the teachings of Weiss and Purpura (only overlap in the teachings of the references is creatine, the product of Weiss and a reactant of Purpura) and the Office Action's incorrect positions that Purpura's Example 1 produces an amide of creatine, the logical inferred method of preparing an amide of creatine from this combination of references would involve two steps. The first would be the producing and then isolating creatine according to the methods of Weiss. The second would be reacting the produced creatine with glutamate according to the methods of Purpura. However, it is well-known that it is chemically impossible to produce an amide of creatine with the second step, because a dipeptide with creatine cannot be created using the conventional methods of peptide synthesis.

Second, a person having ordinary skill in the art cannot have a reasonable expectation from Purpura in view of Weiss that reacting a sodium or potassium salt of sarcosine-L-glutamine amide compound with cyanamide would result in the formation of creatinyl-L-glutamine. The difference between the teaching of the prior art and the Office Action's proposed method of synthesis is the use of sarcosine-related reactant and the fact that the formation of creatine and alleged formation of a creatine amide are two separate reactions. As stated in paragraph 22 of the Chamberlin Declaration:

> [t]here is no chance that this "one-pot" procedure would work well because there are a number of well-known side reactions that would be competitive with the intended pathway. The most problematic of these competing processes would be the α-amino group of the L-glutamine reacting with the guanidylating agent which alone would short circuit the intended pathway and reduce the yield to unacceptable levels and greatly complicating purification.

Additionally, Dr. Chamberlin also noted in paragraph 22 of his declaration that the conditions described for the reaction of Weiss would "never result in the formation of an amide bond between creatine and L-glutamine to begin with."

In view of the above, a person having ordinary skill in the art would not find that Purpura in view of Weiss even suggests the method of claim 2.

*III. Claims 1-3 were rejected as being unpatentable over Nivaggioli (US Patent Application Publication 2008/0003208) light of Weiss and Pischel (US Patent No. 5,863,939).*

Page 11 of the Office Action alleged that Nivaggioli teaches creatine-ligand compounds, where the ligand compound covalently bound to creatine and the ligand is a standard amino acid.

However, a person having ordinary skill in the art would not find the reference to disclose an amide of creatine. As explained in paragraph 24 of the Chamberlin Declaration, it is clear to a person having ordinary skill in the art that Nivaggioli misused the term "ligand." Other than the bare statement that the "ligand" that supposedly binds to creatine can be an amino acid, Nivaggioli provides no evidence that an amide of creatine was actually made. The method of preparation that a person having ordinary skill in the art could infer from Nivagiolli's description might produce a salt, such as the creatine ascorbate used in the examples of the reference, but the inferred method of preparation actually suggests that instead resulting products are simple mixtures with no chance for any sort of complexation between components (see paragraph 24 of the Chamberlin Declaration). As such, Nivaggioli does not provide a teaching or suggestion for an amide of creatine or its monohydrate.

Pischel and Weiss do not remedy the deficiency of Nivagiolli. As noted in paragraph 28 of the Chamberlin Declaration, neither Pischel nor Weiss provide any guidance to a person having ordinary skill in the art wishing to prepare an amide of creatine. As explained above, Weiss is limited to the formation of creatine using a reaction with a salt of sarcosine and cyanamide. Pischel, as evident from its title, only describes methods for the preparation of creatine ascorbate.

Furthermore, a person having ordinary skill in the art simply cannot conclude from the disclosures of Nivagiolli, Pischel, and Weiss that an amide of creatine was prepared or could be prepared without undue experimentation. As explained in paragraph 27 of the Chamberlin Declaration, there is no relationship of consequence among these three references and the amide of creatine (or its monohydrate) of the claims being reexamined. In fact, a person having ordinary skill in the art would conclude that no amide of any sort would be produced under the conditions described by Weiss and Pischel (see paragraph 28 of the Chamberlin Declaration). More

specifically, activation of a carboxyl group is always required in the formation of amide bonds, which is missing from the teaching of the cited references (see paragraphs 29-30 of the Chamberlin Declaration). Accordingly, Nivaggioli in view of Weiss and Pischel does not teach or suggest an amide of creatine, its monohydrate, or methods of preparing thereof. Thus, the combination of references does not establish a prima facie case that claims 1-3 are obvious.

IV. *Claim 2 was rejected as being unpatentable over Purpura in light of Weiss as applied to claims 1-3, and further in view of Zapf (Zapf et al., "A Novel Traceless Resin- Bound Guanidinylating Reagent for Secondary Amines To Prepare N,N-Disubstituted Guanidines,"* Organic Letters, *2001, 3(8):1133-1136), Robinson (S. Robinson and E.J. Roskamp, "Solid Phase Synthesis of Guanidines,"* Tetrahedron, *1997, 53(19):6697-6705), Manimala (J.C. Manimala and sE.V. Anslyn, "Solid-Phase Synthesis of Guanidinium Derivatives from Thiourea and Isothiourea Functionalities,"* Eur. J. Org. Chem., *2002, (23) 3909-3922), Katritzky 2005 (A.R. Katritzky and B.V. Rogovoy, "Recent Developments in Guanylating Agents,"* ARKIVOC, *2005, (iv) 49-87), Katritzky 1995 (Katritzky et al., "Benzotriazole-1-Carboxamidinium Tosylate: An Alternative Method for the Conversion of Amines to Guanidines,"* Synthetic Communications, *1995, 25(8):1173-1186), and Kessel (US. Patent No. 6,399,819). Claim 2 also was rejected as being unpatentable over Nivaggioli in light of Weiss and Pischel and further in view of Zapf, Robinson, Manimala, Katritzky 2005, Katritzky 1995, and Kessel.*

Pages 10 and 15 of the Office Action noted that Zapf, Robinson, Manimala, Katritzky 2005, Katritzky 1995 and Kessel were cited to provide further teaching with respect to reacting guanidinylating agents with amines.

However, these references do not remedy the deficiency of Purpura in view of Weiss and Nivaggioli in view of Weiss and Pischel as explained above. Briefly, the reaction product in Example 1 of Purpura is not a creatinyl-L-glutamine amide of claim 1, and Nivaggioli also does not teach or suggest an amide of creatine. As noted in paragraph 32 of the Chamberlin Declaration, "it is fair to say that both Nivaggioli and Purpura actually teach away from amides of creatine since one somewhat less skilled in the art could mistakenly interpret some of the claims as bona fide methods of forming amides, which is most certainly not the case." Weiss describes a preparation scheme of creatine and Pischel describes the preparation of creatine ascorbate; thus, these references do not remedy the deficiencies of Purpura and Nivaggioli.

Of note, Zapf, Robinson, Manimala, Katritzky 2005, Katritzky 1995, and Kessel also do not discuss a ternary mixture for converting sarcosine into a creatine amide as in the method of claim 2. A person having ordinary skill in the art would have no reason based on the combination of references with Purpura or the combination of references with Nivaggioli that a creatine amide may be prepared in a single reaction mixture rather than through the more expected two-step process. Accordingly, the cited references clearly do not demonstrate that creatine amide would be prepared via a reaction mixture comprising an amide of sarcosine, an amino acid or its derivative, and a guanidinylating agent.

The Office Action's generalization that Zapf, Robinson, Manimala, Katritzky 2005, Katritzky 1995 and Kessel render obvious the method of claim 2 is a naïve inference from the cited prior art. As shown in the arguments above, chemistry is not a predictable art, as there are numerous factors to consider in designing a chemical reaction and variations for reaching a particular product, for example, the ratio of reactants, the temperature of the reaction, the solvent for the reaction, the specific reactant (e.g. cyanamide) from a class of reactants (e.g.

guanidinylating agents), or whether a reactant is anchored to a solid phase or the reactant or allowed to mix freely.

With regard to the guanidinylation reactions, Zapf, Robinson, Manimala, Katritzky 2005, Katritzky 1995, and Kessel only highlight particular kinds of reactions for transforming an amine into a guanidine. As noted in paragraph 34 of the Chamberlin Declaration, guanidylation of amines can be categorized into eight fundamentally different methods, and the use of cyanamide merely represents one of these methods. Given the many variations of a guanidinylation reactions and even further improvements reporting new or improved guanidylation reagents and/or conditions, a person having ordinary skill in the art cannot conclude that a guanidylation method and/or set of reaction conditions can be generalized for all guanidinylation reactions (see paragraphs 34 and 36-39). Additionally, as explained in paragraph 33 of the Chamberlin Declaration, the skilled artisan knows that "even very well-known reactions (e.g., guanidylation of amines) often do not work well when attempted in a previously untested system." Thus, even in view of Zapf, Robinson, Manimala, Katritzky 2005, Katritzky 1995, and Kessel, a person having ordinary skill in the art would not have a reasonable expectation that creatine amide could be prepared via a reaction mixture comprising an amide of sarcosine, an amino acid or its derivative, and a guanidinylating agent based on Purpura in view of Weiss or Nivaggioli in view of Weiss.

Thus, Purpura in view of Weiss or Nivaggioli in view of Weiss and Pischel further in combination with Zapf, Robinson, Manimala, Katritzky 2005, Katritzky 1995, and Kessel does not establish a prima facie case that claim 2 is obvious. Accordingly, the rejection should be withdrawn.

**CONCLUSION**

Patent Owner respectfully request that a timely Notice of Allowance be issued in this case. If any fees, including extension of time fees or additional claims fees, are due as a result of this response, please charge Deposit Account No. 50-3545. This authorization is intended to act as a constructive petition for an extension of time, should an extension of time be needed as a result of this response. The reexamination specialist is invited to telephone the undersigned if this would in any way advance the prosecution of this case. To that end, once the reexamination specialist has been able to consider this Response, Patent Owner hereby requests an Interview with the reexamination specialist prior to the issuing of the next action in the case.

Respectfully submitted,

Date: September 26, 2017

By: /Pacer K. Udalll/

Pacer K. Udall
Reg. No. 50,976

**BOOTH UDALL FULLER, PLC**
1255 W. Rio Salado Parkway, Ste. 215
Tempe, AZ 85281
480.830.2700
480.830.2717 fax
pudall@BoothUdall.com

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

| | | |
|---|---|---|
| Reexam. Control No. | : | 90/013,902 |
| Patent Owner | : | ThermoLife International, LLC |
| Filed | : | 03/03/2017 |
| Examiner | : | Diamond, Alan D. |
| Art Unit | : | 3991 |
| Confirmation No. | : | 7190 |
| Docket No. | : | 1255.117 RE |

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

**DECLARATION OF RICHARD CHAMBERLIN UNDER 37 C.F.R. § 1.132**

I, Richard Chamberlin, declare as follows:

1. I am a Professor of Chemistry, Pharmaceutical Sciences, and Pharmacology at the University of California, Irvine. I served as Chair of the Department of Chemistry from 1996-2001 and am the founding Chair of the Department of Pharmaceutical Sciences (2007-present). I have had an active research program in the field of synthetic organic chemistry and chemical biology at UCI for more than 30 years. During that time I have published more than 100 peer reviewed journal articles and was elected as a Fellow of the American Academy of Sciences in 2009.

2. I hold a Bachelor's degree in Chemistry from Stanford University and a PhD from the University of California, San Diego. I joined the UC Irvine faculty in 1980 after additional training at Harvard University as an NIH Postdoctoral Fellow with Chemistry Nobel Laureate E. J. Corey. My curriculum vitae is attached as Appendix A.

3. I have been engaged by ThermoLife International, LLC ("ThermoLife") to review issued the Office Action mailed on July 26, 2017 (hereinafter "Office Action") issued for the

reexamination of U.S. Patent No. 8,350,077 (hereinafter "the '077 patent") and the cited references. As a person having skill in the relevant field of art, I was asked to provide my opinion regarding the Office Action's interpretation of the following publications to the claimed invention in the '077 patent:

- WO 03/071884A1 to Purpura et al., hereinafter "Purpura"
- U.S. Patent 5,719,319 to Weiss et al., hereinafter "Weiss"
- Zapf et al., "A Novel Traceless Resin-Bound Guanidinylating Reagent for Secondary Amines to Prepare N,N-Disubstituted Guanidines," *Organic Letters*, 2001, 3(8):1133-1136, hereinafter "Zapf"
- Robinson et al., "Solid Phase Synthesis of Guanidines," *Tetrahedron*, 1997, 53(19): 6697-6705, hereinafter "Robinson"
- Manimala et al., "Solid-Phase Synthesis of Guanidinium Derivatives from Thiourea and lsothiourea Functionalities," *Eur. J. Org. Chem.*, 2002, 3909-3922, hereinafter "Manimala"
- Katritzky et al., "Recent Developments in guanylating agents," *ARKIVOC (iv)*, 2005, 49-87, hereinafter "Katritzky 2005"
- Katritzky et al., "Benzotriazole-1-Carboxamidium Tosylate: An Alternative Method for the Conversion of Amines to Guanidines," *Synthetic Communications*, 1995, 25(8):1173-1186, hereinafter "Katritzky 1995"
- U.S. Patent 6,399,819 to Kessel et al., hereinafter "Kessel"
- U.S. Patent Application Publication 2008/0003208 to Nivaggioli
- U.S. Patent 5,863,939 to Pischel et al., hereinafter "Pischel"

4. I am being compensated at my customary rate for my time spent on developing, forming, and expressing the facts and opinions in this declaration. I have no personal interest in the ultimate outcome of the reexamination proceedings involving the '077 patent.

**<u>Purpura does not disclose an amide of creatine or its monohydrate form</u>**

5. Page 5 of the Office Action alleged that Example 1 of Purpura, where 0.005 mol of creatine is reacted with 0.05 mol of L-glutamine, is a creatiny-L-glutamine. The Office Action

also pointed to the melting point and IR properties provided in the example to support its position. However, a person having ordinary skill in the art would not find that Purpura's disclosure contemplates an amide of creatine or provides methods of preparation thereof.

6. While on its surface Purpura may appear to support the examiner's position, in fact the procedures and data in Purpura actually contradict the claims, although with some ambiguity, and certainly do not support the formation of any amide molecules. While Purpura uses terms such as "creatine/L-glutamine compounds," the procedures therein actually describe simple mixtures and/or salts, not compounds in the usual sense of the word. The methodology described in Purpura could not possibly produce amide bonds, and the IR and melting point data do not support such a claim. Purpura therefore does not anticipate the amide compounds of the '077 patent.

7. An amide bond or peptide bond cannot be formed by *any* of the procedures described in Purpura. For instance, in Example 1, a suspension of 7.46 g (0.005 mol) creatine hydrate in methanol is "reacted with 7.31 g (0.05 mole) of L-glutamine," to produce "13.80 g (> 99%) of the creatine/L-glutamine compound." In reality there is *no reaction* under these condition, the "product" is not properly referred to as a "compound," and the stated molar stoichiometry is incorrect.

8. The stated number of moles of creatine hydrate is incorrect: too low by a factor of 10. If that error is a simple typo, as it appears to be based on the mass balance, the weights are consistent with the isolated material being simply an anhydrous mixture of creatine and L-glutamine.

9. As stated above, there would be no reaction of any kind, not even salt formation, between the two alleged "reactants" in Example 1 of Purpura. L-glutamine is a zwitterionic amino acid, comprised of a carboxylate ion and a protonated α-amino nitrogen, pKa = 9.1. This "inner salt" is far too weak an acid to result in proton transfer to the weakly basic creatine carboxylate (pKa conj acid = 2.17). Thus, what would be produced is not a reaction product but simply a mixture

of the two starting materials, minus the water of hydration of creatine that is removed during the isolation step.

10. Page 5 of the Office Action quoted Purpura as stating that "IR-investigations... have demonstrated that the compounds in accordance with the invention do not only exist as pure salts, or as simple physical mixtures of creatine and the respective acid components or/and complexing (sequestering) agents." On its face, the IR data also demonstrate that the reaction product of Example 1 is *not an amide*, as the described peaks lack the highly diagnostic amide C=O stretch band in the range of 1640-1690 $cm^{-1}$.

11. The IR data, however, should be viewed with great skepticism given that only three bands are reported for each "product." Although not assigned, there are two N-H stretching bands around 3000 $cm^{-1}$ and one very strong band near 1600 $cm^{-1}$, which is consistent with carboxylate salts but not amides. The omission of other bands–there certainly are many others–creates tremendous ambiguity. Taken at face value, though, the IR spectra in Purpura are not consistent amide functionality in any of the reported products, regardless of their actual compositions and identities.

12. In this regard, it is particularly concerning that the IR data for Example 1 lack a C=O stretch around 1680 $cm^{-1}$ due to the primary amide group in the side chain of L-glutamine. Any mixture, salt, or other product containing the L-glutamine side chain should have an amide band in the IR, and convention dictates that bands in the particularly important carbonyl diagnostic region of 1600-1850 $cm^{-1}$ should be reported even if they are relatively weak. Purpura's IR data therefore are of little value, and they most assuredly do not allow one to draw any conclusions about identities and/or purities as suggested in the Office Action.

13. The Office Action seems to allege on page 3 that a melting point of 193-194ºC of the glutamine/creatine "product" in Example 1 indicates that the peptide (amide bond) in question was formed, based on the melting points of glutamine at 185ºC of creatine at 255ºC. There is no reason that I know of to draw this conclusion. The melting point provides no useful information

about the identity of the material isolated (except for the special case of a "mixed melting point," which is not applicable here). That the melting point of the reported "product" is different is to be expected even if it is a simple mixture of the two "reactants." If a reaction had occurred, the product melting point would likely differ from those of the reactants, but that would also be the case for salt formation. Even mixtures (solid solutions as this one appears to be, rather than mechanical mixtures of fine crystals) do not have a predictable melting point; it can be lower, intermediate, or higher than the pure components. In addition, the melting point range of such mixtures may be broad or narrow depending on the identities and ratios of the two components of the mixture. The reported melting points thus have no predictive value regarding whether a reaction has occurred nor what course it might have taken.

**The combination of Purpura and Weiss does not render obvious the monohydrate of the claimed compound.**

14. Page 7 of the Office Action alleged that the formation of the monohydrate would have been obvious in view of Weiss, as Weiss discloses creatine monohydrate. Specifically, page 8 of the Office Action explained both Weiss and Purpura describe water content in percentages by weight that support a conclusion that a monohydrate of creatine or of creatine-L-glutamate was described.

15. However, while it would be reasonable to interpret a disclosure on water content (by percentage) as evidence that a compound is monohydrate, water content alone is far from conclusive. Water percentage in a monohydrate must be consistent with the monohydrate, but this is only a necessary but not sufficient criterion to claim a monohydrate. The term monohydrate is generally understood to mean exactly one molar equivalent of water *that is an integral part of the crystal lattice of the material in question*. Without confirmation by an X-ray crystal structure, one normally infers a monohydrate by demonstrating that the combustion analysis (% C, H, and N) of an otherwise a pure sample, after drying to a constant weight, is consistent with the calculated molecular formula for the hydrate, but not the anhydrous material. Further confirmation is often obtained by attempted drying under more vigorous conditions

sufficient to drive off the water of hydration, follow by another combustion analysis to verify that the resultant crystalline material has a formula consistent with the anhydrous form.

16. A monohydrate is sometimes also inferred when the isolated material weighs more that the anhydrous material would; this in general is not a good practice, however, unless there is substantial evidence of purity (e.g., NMR and quantitative chromatography) to verify that there are no other contaminants that might account for the increased mass. Claiming a monohydrate based on an anomalously high mass, without other evidence of purity or a direct analysis of water content, would not be reliable. The IR and melting point data provided in Purpura are not sufficient in that regard; however, based the mass balance in the first three Examples, in which there is no chance of losing any mass except volatiles, the reported weights of "products" are consistent only with the anhydrous forms, not the monohydrate forms.

17. There appears to some fundamental confusion here because Purpura does not report the preparation of monohydrates. Instead mixtures of creatine monohydrate are converted into anhydrous mixtures. Example 1 cited above starts with creatine monohydrate and L-glutamine and results in a simple anhydrous mixture of the two. I don't see how Weiss or any other reference can support the mistaken contention that Purpura discloses the monohydrate form of anything, and most certainly not of N-creatinyl-L-glutamine amide or any other amide.

18. Weiss simply describes a slightly modified procedure for creatine based on the venerable reaction of sarcosine with cyanamide that discovered in the mid-1800s. The significance of this procedure has nothing directed to the fact that it produces the monohydrate of creatine.

19. The only significant difference between Weiss and hundreds of other reports since the discovery of sarcosine and cyanamide reacting to give creatine is that Weiss discovered specific reaction conditions that allow the use of cheap technical grade sarcosinate (the simple alkali metal salt of sarcosine itself) to provide pure product. It is very important to recognize that these conditions for isolating the monohydrate are *not generalizable*, as discussed below, and Weiss should not be considered as an enabling disclosure.

20. Generally, any procedure for synthesizing creatine in which the product is isolated/crystallized from an aqueous medium will "automatically" give the monohydrate, simply because of the kinetics and thermodynamics (rates and stabilities) specific to creatine crystallization in the presence of water. In other words, the crystal lattice of creatine and one equivalent of water forms faster and/or is more stable that the anhydrous form under these conditions. Special measures must the employed to obtain anhydrous material; such as, heating the monohydrate crystals under vacuum or crystallization from a non-aqueous medium. The critical point is that this propensity of creatine to form a monohydrate is specific to the physicochemical parameters of creatine crystallization and cannot be generalized to any other structures.

**<u>The combination of Purpura and Weiss does not render obvious the claimed method of preparation.</u>**

21. Page 9 of the Office Action observed that Weiss teaches preparing creatine or creatine monohydrate through a reaction of sodium sarcosinate or potassium sarcosinate with cyanamide, which is a guanidinylating agent, in a mixture of water and an organic solvent. The Office Action alleged that this reaction can be used to substituted the creatine starting ingredient of the reaction in Purpura and concluded that:

> [i]t would have been obvious to one of ordinary skill in the art at the time the invention was made to have prepared said creatinyl-L-glutamine of Purpura, or Purpura in view of Weiss, by reacting a sodium or potassium salt of sarcosine-L-glutamine amide compound with cyanamide guanidinylating agent in a mixture of water and an organic solvent at a temperature from 20ºC to 150ºC so as to guanidinylate the sarcosine portion of the compound and obtain said creatinyl-L-glutamine with good purity in an economically useful yield, as taught by Weiss.

22. One skilled in the art would immediately recognize that this scheme is doomed. It would require preparing a ternary mixture of sarcosinate salt, cyanamide, and L-glutamine, and anticipating that (as in Weiss) cyanamide and sarcosinate will first form creatine, which in turn

will form Purpura's "creatinyl-L-glutamine,". There is no chance that this "one-pot" procedure would work well because there are a number of well-known side reactions that would be competitive with the intended pathway. The most problematic of these competing processes would be the α-amino group of the L-glutamine reacting with the guanidinylating agent which alone would short circuit the intended pathway and reduce the yield to unacceptable levels and greatly complicating purification. More importantly, the conditions reported by Weiss would never result in the formation of an amide bond between creatine and L-glutamine to begin with.

23. Again, Purpura does not in fact disclose any chemistry of creatine amides. Thus a person having ordinary skill in the art would not find any teaching or suggestion from the combination of Purpura and Weiss for the preparation of a creatine amide.

**Nivaggioli does not provide an enabling disclosure for the claimed amide of creatine.**

24. Page 11 of the Office Action alleged that Nivaggioli teaches creatine-ligand compounds where the ligand compound covalently bound to creatine and the ligand is a standard amino acid. This assertion in the Office Action is not true. Nivaggioli misuses the term "ligand," which in biochemistry is defined as a small molecule that binds to a biomacromolecule (e.g., a protein) via non-covalent intermolecular forces, such as ionic bonds, hydrogen bonds and Van der Waals forces. While some of the Nivaggioli preparations may be salts (notably, the creatine ascorbate studied in the examples of the patent application), the inferred method of preparing them suggests that instead they are simple mixtures of finely divides solids, with no chance for any sort of true complexation between components. Consequently, Nivaggioli does not teach creatine-ligand compounds.

**Nivaggioli in view of Weiss and Pischel does not render obvious the claimed amide of creatine and its method of preparation**

25. While acknowledging that Nivaggioli does not specifically teach the monohydrate of an amide of creatine, the Office Action referenced Weiss and Pischel to remedy the deficiency of

Nivaggioli. Based on Weiss describing a process for preparing creatine or its monohydrate with a sarcosinate and cyanamide and Pischel describing the monohydrate of creatine ascorbate and its method of production, the Office Action concluded that:

> it would have been obvious to one of ordinary skill in the art at the time the invention was made to have prepared Nivaggioli's creatine-L-amino acid compound such that it is a monohydrate because the monohydrate form is a conventional form of creatine and creatine ascorbate, i.e., a creatine-ligand compound exemplified by Nivaggioli, as shown by Weiss and Pischel.

26. Specifically, page 14 of the Office Action alleged that a person having ordinary skill in the art would find the preparation of a creatinyl-L-amino acid compound obvious from Nivaggioli in view of Weiss and Pischel "by reacting a sodium or potassium salt of sarcosine-L-amino acid amide with cyanamide guanidinylating agent in a mixture of water and an organic solvent at a temperature from 20°C to 150°C so as to guanidinylate the sarcosine and obtain said creatine-L-amino acid compound with good purity in an economically useful yield."

27. Nivaggioli in view of Weiss and Pischel is akin to comparing apples in view pears and oranges. There is no relationship of consequence. First, Nivaggioli does not mention creatine-L-amino acid compounds, much less its monohydrate. Second, the hydration state of a starting material, "conventional form" or not, has virtually nothing to do with its expected reactions (the water of hydration is easily removed before any moisture-sensitive reaction is attempted). And third, a method for isolating the monohydrate of one molecule does not transfer to other structures (discussed above), especially ones as different as creatine and ascorbic acid. Thus, a person with ordinary skill in the art would not make such a far-fetched analogy, much less depend on it for guidance about how to prepare an actual amide such as the creatinyl-L-glutamine amide described in the '077 patent.

28. Neither Weiss nor Pischel, separately or together, provide any guidance to a person having ordinary skill in the art wishing to prepare an amide of creatine. In fact, mixing a sarcosinate and cyanamide (as in Weiss), with the requisite amide N-donor (an amino acid, analogous to, the ascorbate of Pischel) would unquestionably give a mixture of products

resulting from guanidinylation of both sarcosine and the α-amino group of the amino acid. Significantly, one skilled in the art of peptide synthesis would confidently assert that no amide of any sort would be produced under these conditions.

29. One of the most fundamental principles of carbonyl chemistry is that "activation" of a carboxyl group is always required in the formation of amide bonds. Simply mixing a carboxylic acid or carboxylate (e.g., sarcosine/sarcosinate) with an amino acid such as L-glutamine (or any other amine nucleophile for that matter) *does not result in amide formation*. Carboxylic acids simply transfer a proton to the amino group to form an ammonium carboxylate salt, and the carboxylate group is far too weak an electrophile to react with any remaining free amine to form an amide (peptide) bond.

30. In peptide synthesis, amide bond formation always requires a separate step to "activate" the carboxyl group, usually in situ prior to mixing with the amine donor. This essential step, which generally forms a so-called active ester, simultaneously removes the Brönsted acid nature of the carbonyl group and renders it considerably more reactive as an electrophile. There are myriad methods for activation, but it is *always* necessary in the formation amide (peptide) bonds. Significantly, this crucial step is entirely missing from all of the references cited in the Office Action, and thus none provides any guidance on the preparation of amides (peptides).

**The combination of Zapf, Robinson, Manimala, Katrizky 2005, Katritzky 1995, and Kessel does not remedy the deficiencies of Purpura in view of Weiss or Nivaggioli in view of Weiss and Pischel in relation to the method of production.**

31. The Office Action referenced Zapf's disclosure that sarcosine methyl ester can be transformed into creatine methyl ester using a guanidinylating agent and Kessel's disclosure that creatine is generally prepared industrially by guanylation of sarcosine along with teachings from Robinson, Manimala, Katrizky 2005, Katrizky 1995 regarding guanidinylation of amine compounds to conclude that:

> it would have been obvious to one of ordinary skill in the art at the time the invention was made to have prepared said creatinyl-L-glutamine of Purpura, or Purpura in view of Weiss, with a

> reasonable expectation of success by reacting sarcosine-L-glutamine amide (or salt thereof) with guanidinylating agent in organic solvent at a temperature here claimed, because it is conventional in the art to react guanidinylating agent with amine to obtain a guanidine compound, e.g., to react guanidinylating agent with sarcosine to obtain creatine. (page 9 of the Office Action)

For the same reasons, page 15 of the Office Action concluded that the combination of Zapf, Robinson, Manimala, Katrizky 2005, Katrizky 1995, and Kessel with the combination of Nivaggioli in view of Weiss and Pischel render obvious the method of claim 2.

32. Again, the reaction product in Example 1 of Purpura is NOT the same creatinyl-L-glutamine AMIDE of the '077 patent. All of the other cited references do nothing to rehabilitate Purpura. Nivaggioli also does not teach or suggest an amide of creatine, and one skilled in the art would quickly conclude upon reading Nivaggioli that the methods reported therein could not possibly result in the formation an amide of creatine. In fact, it is fair to say that both Nivaggioli and Purpura actually teach away from amides of creatine since one somewhat less skilled in the art could mistakenly interpret some of the claims as bona fide methods of forming amides, which is most certainly not the case.

33. A person having ordinary skill in the art would find Office Action's generalization regarding guanidinylation reactions to be overly broad and unwarranted. Taken to its logical extreme, no patent would be issued for any preparation that employs any known reaction. Every functional group, guanidine included, can in theory be prepared in a number of ways. A report describing the use of a particular reagent (e.g., cyanamide) to transform functional group A into B (e.g., amine into guanidine) does not teach how to conduct that same functional group transformation in all other molecules. It is merely an example of such, but one to be weighed against among many others by one skilled in the art seeking to carry out that transformation in a different molecule. In that sense, Purpura should not reasonably be considered as making obvious how to conduct the guanidinylations claimed in the '077 patent. In fact, the use of much more modern and effective reagents was a likely key to success in the '077 patent (see Examples 1-3).

34. There are literally hundreds of guanidinylation procedures available, which complicates the "obviousness" issue. The Office Actions cites just of few examples of these reagents, but a recent review (Alonso-Moreno C, Antinolo A, Carrillo-Hermosilla F, and Antonio Oterob A. *Chem. Soc. Rev.*, 2014, 43, 3406. "Guanidines: from classical approaches to efficient catalytic syntheses.") references hundreds more, divided into eight fundamentally different methods of forming the guanidine core structure by guanidinylation of amines, each of which in turn has multiple variants. The following guanidinylation reagent classes are listed: (a) thioureas, (b) isothioureas, (c) amidine sulfonic acids, (d) cyanamides, (e) carbodiimides, (f) pyrazole carboximidamides, (g) triflyl guanidines, (h) benzotriazoles.

35. Those with ordinary skill in the art know very well that even very well-known reactions (e.g., guanidinylation of amines) often do not work well when attempted in a previously untested system. In fact, most "known" reactions attempted on new substrates fail, and much experimentation and verification is almost always required to optimize even the most venerable reactions.

36. The very fact that there are so many publications reporting new or improved guanidinylation reagents and/or conditions is prima facie evidence for this contention. If the classic guanidinylation of amines with cyanamide or any other specific reagent/conditions were truly general, i.e., applicable to all new substrates it was tested on, there would be no need to publish subsequent improvements. I can attest from personal experience that in practice the likelihood that a given procedure will work well on any new substrate is small.

37. This low probability is the reason for the proliferation of similar reagents that have been fine-tuned for specific applications. For example, the procedures reported by Zapf, Robinson, and Manimala were developed when attempts to form guanidines using solid-phase synthesis failed; generalizations of these solid-phase specific procedures would be risky even among solid phase reactions, and especially so for solution phase reactions.

38. Cyanamide itself, reported in Purpura as a guanidinylation agent (class (d)) is thus one of these many hundreds of choices, and for that reason alone is never the "obvious" choice for a given guanidinylation. That there are so many alternative reagents does not detract from the novelty of the '077 patent; in fact, the wealth of reagent choices suggests that considerable experimentation and expertise was required to find the one that worked.

39. Simply skimming through the review cited above that describes a multitude of reagents and many hundreds of specific reaction conditions for solution-phase guanidinylation is ample evidence that no guanidinylation method and/or set of reaction conditions is truly general. With so many reported options for the guanidinylation of specific precursor, how can any single choice be "obvious" for a new application? A person having ordinary skill in the art would not find the Office Action's generalization regarding guanidinylation reactions to be compelling.

**Conclusion**

40. The Office Action asserts that the examples in Purpura make obvious the choice of reagents and conditions for the guanidinylation of N-creatinyl-L-glutamine. This conclusion is entirely unjustified even with the suggested supporting patents. In fact, neither Purpura nor any of the other patents cited actually describe the preparation or reactions of any carboxamides, despite some confusing and misleading naming conventions suggesting otherwise. Beyond that, the Office Action appears to contend that the existence of a known procedure for the guanidinylation of the amino group in one substrate makes obvious how to convert *any* amine-containing molecule into the corresponding guanidine. A practitioner of organic synthesis with normal skill in the art—and who is therefore quite familiar with the all-too-common occurrence of a well-precedented procedure failing when applied to an untested substrate—would surely recognize that pronouncement as a fallacy. Thus, claims 1-3 of the '077 patent are both novel and inventive even in view of Purpura, Weiss, Nivaggioli, Pischel, Zapf, Robinson, Manimala, Katrizky 2005, Katritzky 1995, and Kessel.

41. I further declare that all statements made herein of my own knowledge are true, and that all statements made on information and belief are believed to be true, and further, that these

statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code, and that such willful false statements may jeopardize the validity of U.S. Patent No. 8,350,077.

By: ________________

Richard Chamberlin, Ph.D.

Dated: 22 September 2017

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/013,902 | 03/03/2017 | 8350077 | 1255.117RE | 7190 |

54434 7590 12/05/2017
BOOTH UDALL FULLER, PLC
1255 W. Rio Salado Pkwy.
Suite 215
Tempe, AZ 85281

| EXAMINER | |
|---|---|
| DIAMOND, ALAN D | |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3991 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 12/05/2017 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

| **Notice of Intent to Issue Ex Parte Reexamination Certificate** | **Control No.** 90/013,902 | **Patent Under Reexamination** 8350077 | |
|---|---|---|---|
| | **Examiner** ALAN DIAMOND | **Art Unit** 3991 | **AIA (First Inventor to File) Status** No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

1. ☒ Prosecution on the merits is (or remains) closed in this *ex parte* reexamination proceeding. This proceeding is subject to reopening at the initiative of the Office or upon petition. *Cf.* 37 CFR 1.313(a). A Certificate will be issued in view of
   (a) ☒ Patent owner's communication(s) filed: *26 September 2017*.
   (b) ☐ Patent owner's failure to file an appropriate timely response to the Office action mailed: ______.
   (c) ☐ Patent owner's failure to timely file an Appeal Brief (37 CFR 41.31).
   (d) ☐ The decision on appeal by the ☐ Board of Patent Appeals and Interferences ☐ Court dated ______
   (e) ☐ Other: ______.
2. The Reexamination Certificate will indicate the following:
   (a) Change in the Specification: ☐ Yes ☒ No
   (b) Change in the Drawing(s): ☐ Yes ☒ No
   (c) Status of the Claim(s):
      (1) Patent claim(s) confirmed: *1 and 3*.
      (2) Patent claim(s) amended (including dependent on amended claim(s)): *2*
      (3) Patent claim(s) canceled: ______.
      (4) Newly presented claim(s) patentable: 5-8.
      (5) Newly presented canceled claims: 4.
      (6) Patent claim(s) ☐ previously ☐ currently disclaimed: ______
      (7) Patent claim(s) not subject to reexamination: ______.
3. ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on ______.
4. ☒ Note the attached statement of reasons for patentability and/or confirmation. Any comments considered necessary by patent owner regarding reasons for patentability and/or confirmation must be submitted promptly to avoid processing delays. Such submission(s) should be labeled: "Comments On Statement of Reasons for Patentability and/or Confirmation."
5. ☐ Note attached NOTICE OF REFERENCES CITED (PTO-892).
6. ☐ Note attached LIST OF REFERENCES CITED (PTO/SB/08 or PTO/SB/08 substitute).
7. ☐ The drawing correction request filed on ______ is: ☐ approved ☐ disapproved.
8. ☐ Acknowledgment is made of the priority claim under 35 U.S.C. § 119(a)-(d) or (f).
   a)☐ All b)☐ Some* c)☐ None of the certified copies have
   ☐ been received.
   ☐ not been received.
   ☐ been filed in Application No. ______.
   ☐ been filed in reexamination Control No. ______.
   ☐ been received by the International Bureau in PCT Application No. ______.

   * Certified copies not received: ______.
9. ☒ Note attached Examiner's Amendment.
10. ☐ Note attached Interview Summary (PTO-474).
11. ☐ Other: ______.

**All correspondence** relating to this reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this Office action.

| | | |
|---|---|---|
| /Jerry D. Johnson/<br>Patent Reexamination Specialist<br>Central Reexamination Unit 3991 | /Alan Diamond/<br>Patent Reexamination Specialist<br>Central Reexamination Unit 3991 | /Stephen Stein/<br>SPRS<br>CRU-3991 |

cc: Requester (if third party requester)

## EXAMINER'S AMENDMENT

An examiner's amendment to the record appears below. The changes made by this examiner's amendment will be reflected in the reexamination certificate to issue in due course. Authorization for this examiner's amendment was given in a telephonic interview with Mr. Pacer Udall on November 16, 2017. The requirement of a Patent Owner statement on the interview is hereby waived.

In The Claims:

Please cancel claim 4.

### *Correspondence*

Any inquiry concerning this communication or earlier communications from the specialist should be directed to Alan Diamond whose telephone number is (571) 272-1338. The specialist can normally be reached on Monday through Thursday from 5:30 a.m. to 3:00 p.m. and on Fridays from 5:30 a.m. to 9:30 a.m.

If attempts to reach the specialist by telephone are unsuccessful, the specialist's supervisor, Stephen Stein can be reached on (571) 272-1544.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free).

**All** correspondence relating to this ex parte reexamination proceeding should be directed:

By EFS: Registered users may submit via the electronic filing system EFS-Web

at https://efs.uspto.gov/efile/myportal/efs-registered

By Mail to: Mail Stop *Ex Parte* Reexam
Central Reexamination Unit
Commissioner for Patents
United States Patent & Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

By FAX to: (571) 273-9900
Central Reexamination Unit

By hand: Customer Service Window
Randolph Building
401 Dulany Street
Alexandria, VA 22314

Signed:

/Alan Diamond/
Patent Reexamination Specialist
Central Reexamination Unit 3991

/Jerry D. Johnson/
Patent Reexamination Specialist
Central Reexamination Unit 3991

/Stephen Stein/
Patent Reexamination Specialist
Central Reexamination Unit 3991

UNITED STATES DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE

# REEXAMINATION

## REASONS FOR PATENTABILITY / CONFIRMATION

Reexamination Control No. _90/013,902_ Attachment to Paper No. _20171117_.

Art Unit _3991_.

The rejections of claims 1-3 based on Purpura (WO 03/071884 A1) are expressly withdrawn in light of the Chamberlin Declaration fled 09/26/17. In particular, as noted in ¶¶ 6-13 of the Chamberlin Declaration, citing to Purpura's IR and melting point data, the procedures described in Purpura do not result in formation of any amide molecules, but rather, describe simple mixtures and or salts. As noted in ¶¶ 10-11 of the Chamberlin Declaration, pointing to Purpura's Example 1, i.e., the example which is cited in said rejections, "Example 1 is not an amide, as the described [IR] peaks lack the highly diagnostic amide C=O stretch band in the range of 1640-1690 cm-1" and "[a]lthough not assigned, there are two N-H stretching bands around 3000 cm-1 and one very strong band near 1600 cm-1, which is consistent with carboxylate salts but not amides."

The rejections relying on Nivaggioli (U.S. 2008/0003208) in view of Weiss (U.S. 5,719,319) and Pischel (U.S. 5,863,939) are also expressly withdrawn. While Nivaggioli teaches creatine covalently bound to a ligand such as an amino acid (see ¶¶ 0033-0034), Nivaggioli does not specifically teach the X portion of the claimed compound. This is the point of novelty of the claimed compound. The rejections allege obviousness with respect to forming the monohydrate, i.e., X being water. In particular, Weiss is cited for teaching creatine monohydrate and Pischel is cited for teaching creatine ascorbate salt in hydrate form. However, as noted in ¶ 27 of the Chamberlin Declaration, "the hydration state of a starting material, 'conventional form' or not, has virtually nothing to do with its expected reactions (the water of hydration is easily removed before any moisture sensitive reaction is attempted). And … a method for isolating the monohydrate of one molecule does not transfer to other structures (discussed above), especially ones as different as creatine and ascorbic acid. Thus, a person with ordinary skill in the art would not make such a far-fetched analogy [with creatine monohydrate or creatine ascorbate salt in hydrate form], much less depend on it for guidance about how to prepare an actual amide such as the creatinyl-L-glutamine amide described in the '077 patent." In fact, creatine monohydrate is specifically discussed in the Background of the Invention of the '077 patent (col. 1, line 60 through col. 2, line 13), and so are derivatives of creatine with different organic acids (see col. 2, lines 46-54). The '077 patent specification teaches that the instant creatine derivatives "should possess a higher stability and a wider spectrum of biological activity." (See col. 3, lines 49-53). Such stability and biological activity are illustrated in Examples 9 and 10 of the '077 patent.

| | | |
|---|---|---|
| /Jerry D. Johnson/<br>Patent Reexamination Specialist<br>Central Reexamination Unit 3991 | /Stephen Stein/<br>Supervisory Patent Reexam Specialist<br>CRU-3991 | /Alan Diamond/<br>Patent Reexamination Specialist<br>Central Reexamination Unit 3991 |

PTOL-476 (Rev. 03-98)

US008350077C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (11239th)

# United States Patent

**Burov et al.**

(10) **Number: US 8,350,077 C1**

(45) **Certificate Issued: Jan. 12, 2018**

(54) **AMIDES OF CREATINE, METHOD OF THEIR PREPARATION, AND REMEDY POSSESSING A NEUROPROTECTIVE ACTIVITY**

(75) Inventors: **Sergej Vladimirovich Burov**, Saint-Petersburg (RU); **Natalai Vasilyevna Khromova**, Saint-Petersburg (RU); **Anna Alexandrovna Khromova**, Saint-Petersburg (RU); **Petr Alekseevich Khromov**, Saint-Petersburg (RU)

(73) Assignee: **Vertex Closed Joint Stock Company**

**Reexamination Request:**

No. 90/013,902, Mar. 3, 2017

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **8,350,077** |
| Issued: | **Jan. 8, 2013** |
| Appl. No.: | **12/734,183** |
| PCT Filed: | **Dec. 24, 2008** |
| PCT No.: | **PCT/RU2008/000793** |
| § 371 (c)(1), (2), (4) Date: | **Apr. 15, 2010** |
| PCT Pub. No.: | **WO2010/074591** |
| PCT Pub. Date: | **Jul. 1, 2010** |

Certificate of Correction issued Aug. 25, 2015
Certificate of Correction issued Dec. 22, 2015
Certificate of Correction issued Feb. 23, 2016

(51) **Int. Cl.**

| | |
|---|---|
| ***C07C 229/26*** | (2006.01) |
| ***C07C 231/00*** | (2006.01) |
| ***C07C 237/20*** | (2006.01) |
| ***A61K 31/16*** | (2006.01) |
| ***C07C 279/14*** | (2006.01) |

(52) **U.S. Cl.**

CPC ........... ***A61K 31/16*** (2013.01); ***C07C 279/14*** (2013.01)

(58) **Field of Classification Search**

None

See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/013,902, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Alan Diamond

(57) **ABSTRACT**

The invention relates to pharmaceutical chemistry notably to new biologically active substances (BAS) and their properties. In particular, the invention relates to Creatine derivatives having a general formula: $NH{=}C(NH_2){-}N(CH_3){-}CH_2{-}CO{-}NH{-}R{*}X$, wherein R—amino acid residue of aliphatic, aromatic orheteroaromatic L-amino acid or its derivative representing a salts of amino acid, amino acid esters, amino acid amides or peptides; X—lower organic or mineral acid or water. New substances are prepared by interaction of aforesaid amides of sarcosine having a general formula of $HN(CH_3){-}CH_2{-}CO{-}NH{-}R{*}X$, wherein: R is amino acid residue or substituted amino acid residue; X is low-molecular-weight organic acid or mineral acid or water, with a guanidinylating agents with the in organic solvents at temperature not exceeding 50° C. New chemical compounds can be used as a remedy possessing a neuroprotective activity.

# EX PARTE REEXAMINATION CERTIFICATE

THE PATENT IS HEREBY AMENDED AS INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

The patentability of claims **1** and **3** is confirmed.

Claim **2** is determined to be patentable as amended.

New claims **4-7** are added and determined to be patentable.

**2**. A method for preparation of said amides of Creatine according to claim **1**, said method comprising: interaction of amides of sarcosine and amino acids or their derivatives with guanidinylating agents in an organic **[**solvents**]** *solvent* at a temperature not exceeding 50° C.

*4. The compound of claim 1, wherein the compound is anhydrous.*

*5. The compound of claim 1, wherein the compound is in an aqueous solution.*

*6. The compound of claim 1, wherein the compound is a composition with an auxiliary component.*

*7. The composition of claim 6, wherein the auxiliary component is water.*

* * * * *