**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| AMIDE BEVERAGE COMPANY, LLC,<br>*Plaintiff,*<br>v.<br>AMAZON.COM, INC., ET AL.,<br>*Defendants.* | Civil Action No. 4:24-cv-1022-SDJ<br><br>JURY TRIAL DEMANDED |

**PLAINTIFF AMIDE BEVERAGE COMPANY, LLC'S**
**REPLY CLAIM CONSTRUCTION BRIEF**

## TABLE OF CONTENTS


**I.** DISPUTED TERMS OF U.S. PATENT NO. 8,350,077 .......... 2

**A.** "Amides of Creatine having a general formula: $NH{=}C(NH_2)—N(CH_3)—CH_2—CO—NH—R*X$" (cls. 1 and 3) .......... 2

**B.** "having" (cls. 1 and 3) .......... 4

**C.** "X is low-molecular-weight organic or mineral acid or water" (cls. 1 and 3) .......... 5

**D.** "compound possessing neuroprotective activity" / "as a remedy possessing a neuroprotective activity" (cl. 3) .......... 7

**E.** "consisting of" (cl. 3) .......... 9

**F.** "anhydrous" (cl. 4) .......... 10

**II.** CONCLUSION .......... 10

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**


*Aircraft Tech. Publrs. v. Avantext, Inc.*,
No. C 07-4154 SBA, 2009 LX 90923, at *10 (N.D. Cal. Nov. 10, 2009) ................................ 6

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010)........................................................................................ 9

*Exxon Chem. Patents, Inc. v. Lubrizol Corp.*,
64 F.3d 1553 (Fed. Cir. 1995).......................................................................................... 6

*Grace Instrument Indus., LLC v. Chandler Instruments Co., LLC*,
57 F.4th 1001 (Fed. Cir. 2023) ........................................................................................ 7

*Norian Corp. v. Stryker Corp.*,
363 F.3d 1321 (Fed. Cir. 2004)........................................................................................ 9

*Oakley, Inc. v. Sunglass Hut Int'l*,
316 F.3d 1331 (Fed. Cir. 2003)........................................................................................ 7

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
520 F.3d 1358 (Fed. Cir. 2008)................................................................................... 4, 5

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)........................................................................................ 4

*ThermoLife Int'l LLC v. Vital Pharms., Inc.*,
No. 16-cv-6063-UU,
2017 U.S. Dist. LEXIS 239929 (S.D. Fla. Jan. 12, 2017) ........................................................ 6

*Thorner v. Sony Computer Entm't Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012)................................................................................... 5, 10

Defendants' proposed constructions share a single objective: to freeze the claimed creatine amides into a rigid crystalline structure—an "adduct"—with one molecule of acid or water permanently fixed to each amide and incapable of ordinary solution behavior. But that objective runs against the face of the claims. The recited formula, $NH{=}C(NH_2)$—$N(CH_3)$—$CH_2$—CO—NH—R*X, is not one covalent molecule. Rather, the "*" is a *non-covalent* association, with the "$NH{=}C(NH_2)$—$N(CH_3)$—$CH_2$—CO—NH—R" on one side and the "X" on the other, held loosely rather than fused. Defendants' constructions demand that the "*" be rigid and permanent, locking X to the amide in an "addition compound." This is chemically nonsensical and would read the "*" out of the formula.

Defendants' own record refutes their construction. Their expert defines "addition compounds" to include van der Waals adducts and double salts—i.e., loose associations between species that exist separately. Further, the chemistry text they attach explains that the "center dot" that Defendants insist on—a keystroke interchangeable with "*"—marks a component "not bound too tightly" that "can be removed," and defines "aqueous" as "dissolved in water." Even the patent's own reported molecular weights for its Examples exclude the molecular weight of the "X" acid or water, and claim 5 recites the compound of claim 1 "in an aqueous solution[,]" even though dissolving the compound in a solution would ordinarily cause the "X" to dissociate. At each turn, Defendants' own sources and the patent itself establish Amide's plain-meaning readings.

One of the disputes is different. "Neuroprotective activity" carries a settled meaning—protecting neurons from injury or degeneration—and Example 10 supplies an objective, quantitative measure of it: brain-damage area reduced from 17.0% in the untreated group to between 8.4% and 11.9% in the treated groups. Indeed, Defendants' own expert concedes that

Example 10 "provides one example of 'neuroprotective activity[.]'" A term with a settled meaning and a measured boundary is not indefinite.

The constructions Defendants propose are untethered to the patent and refuted by their own expert, exhibits, and cited caselaw. They invite the Court to rewrite the recited formula—and to read the dependent claims out of the patent in the process. The Court should instead preserve the formula as written and give each disputed term its plain meaning.

## I. DISPUTED TERMS OF U.S. PATENT NO. 8,350,077

### A. "Amides of Creatine having a general formula: NH=C($NH_2$)—N($CH_3$)—$CH_2$—CO—NH—R*X" (cls. 1 and 3)

| | |
|---|---|
| **Amide:** Plain meaning | **Defendants:** "Amides of Creatine having a general formula: NH=C($NH_2$)—N($CH_3$)—$CH_2$—CO—NH—R*X, wherein * represents a center dot that separates components of an addition compound, in this case NH=C($NH_2$)—N($CH_3$)—$CH_2$—CO—NH—R and X" |

Amide does not dispute that the * in the recited formula stands in for a "center dot"—the particular keystroke used, * or ·, is immaterial. Rather, Amide disputes Defendants' next step—that a center dot compels an "addition compound" in which the "NH=C($NH_2$)—N($CH_3$)—$CH_2$—CO—NH—R" and X "cannot exist as two separate components[,]" (Dkt. #283 at 8), which would wrongly exclude the non-covalent association the claim recites.

A claim term's plain meaning controls absent a clear and unmistakable disavowal (*see* Dkt. #277 at 9), and there is no such disavowal of *non-covalent* association between NH=C($NH_2$)—N($CH_3$)—$CH_2$—CO—NH—R and X anywhere in the '077 patent. Quite the opposite: for each example that states a formula, the patent's reported molecular weight excludes X, which suggests that the X had dissociated from NH=C($NH_2$)—N($CH_3$)—$CH_2$—CO—NH—R by the time the compound was weighed, likely during mass spectrometry, meaning that the *X was a non-covalent bond. (*See* Dkt. #277-1 at 4:55-59.) As one example, Example 1 is written

“$C_{10}H_{20}N_4O_3$*$CH_3COOH$,” yet reports “Calculated: M 244.15.” That is the mass of $C_{10}H_{20}N_4O_3$ alone, whereas with the acetate ($CH_3COOH$) it would weigh 304. (Dkt. #277-1 at 5:47.) Examples 2 through 4 follow the same pattern. Taken together, these Examples demonstrate that “NH=C($NH_2$)—N($CH_3$)—$CH_2$—CO—NH—R” and “X” can—and do—exist as two separate components within the claimed formula. In other words, while Defendants and Dr. Rudolph argue that Example 1 “is an adduct in which all atoms from both [$C_{10}H_{20}N_4O_3$] and [$CH_3COOH$] remain present” (*see* Dkt. #283 at 7-8 (citing Dkt. #283-2 ¶ 52)), they did not check the math on what the patent actually discloses.

Moreover, Defendants’ construction contradicts itself. Defendants assert that their preferred meaning “does not ‘improperly exclude the non-covalent bonds’” between the “NH=C($NH_2$)—N($CH_3$)—$CH_2$—CO—NH—R” and “X” (Dkt. #283 at 8), yet ***still*** requires an “addition compound” in which the two “cannot exist as two separate components[,]” (*id.* at 8). But a non-covalent bond is by definition an attraction between species that regularly exist separately, unlike a covalent bond which fuses atoms into one molecule. Further, Defendants’ own expert defines an “adduct” as an addition compound that may form “through . . . van der Waals forces” (a non-covalent bond), and lists non-covalently-bonded “double salts” among “addition compounds.” (Dkt. #283-2 ¶¶ 49-50.) Even the chemistry text Defendants attach states that “[t]he raised dot is used to indicate that the water molecules are not bound too tightly in the crystal and can be removed.” (Dkt. #283-8 at PEPSI_0005996.)

Defendants respond that the claimed compounds are “expressly obtained only after the solvent is evaporated or separated.” (Dkt. #283 at 9 n.5.) But evaporation is recovery; it says nothing about the states the compound may later occupy.

Claim 5 puts the point beyond argument. It recites the "compound of claim 1 . . . in an aqueous solution." Defendants ask the Court to disregard the entire claim as "litigation-driven" (Dkt. #283 at 9), but that would invert settled law. Each claim, including one added on reexamination, is presumed valid, 35 U.S.C. § 282 (Pre-AIA), and a dependent claim adds a "further limitation" to the claim from which it depends, 35 U.S.C. § 112 ¶ 4 (Pre-AIA). Because independent claim 1 necessarily subsumes claim 5, claim 1 also covers this "aqueous solution" form. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005). Even worse, construing claim 1 to exclude the solution form would render claim 5 a nullity—a result claim construction disfavors. *See Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1362-63 (Fed. Cir. 2008).

Finally, Defendants' fallback position—that claim 5 is satisfied only by undissolved crystals in an aqueous solution (Dkt. #283 at 9-10)—is contrary to how a POSITA would understand the claim. As Defendants' own chemistry text defines it: "*Aqueous* means dissolved in water." (Dkt. #283-8 at PEPSI_0005998.) Defendant's imagined "undissolved crystals" are not dissolved in water, and so are not in the "aqueous solution" claim 5 requires.

**B. "having" (cls. 1 and 3)**

| | |
|---|---|
| **Amide:** Plain meaning | **Defendants:** "containing only what is expressly set forth in the recited general formula" |

Defendants would read "having" as closed—i.e., "containing ***only*** what is expressly set forth in the recited general formula" (emphasis added). But the claim does not say "only having," and so the presence of any additional species would not obviate infringement.

Defendants also seek to read out the transient non-covalent interactions that a compound of this kind constantly forms and un-forms when it is in solution. What the phrase "having" (as in "having a general formula") covers turns on how a POSITA reads that formula, and a POSITA

understands that a compound in solution engages in these transient interactions without ceasing to be the compound the formula recites. Whether a compound's general formula changes in the eyes of a POSITA when it is placed in solution is a factual question, not a claim-construction matter that licenses rewriting the claim language. Nor did the inventors choose the limiting words "only" or "expressly set forth"; nor did they anywhere clearly and unmistakably disclaim a compound that has the recited formula but also forms weak external bonds in solution. *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012).

Defendants' own brief confirms the point. They concede they "do not argue that 'having a general formula' limits the compounds *that can be used or combined with* the claimed creatine amides[.]" (Dkt. #283 at 11 n.6.) They agree that "how ***other components*** interact with the claimed compound is irrelevant when determining the claimed compound's chemical formula." (*Id.* at 13.) And they acknowledge that claims 6 and 7 do not "recite changing the chemical formula of Claim 1." (*Id.* at 14.) Each concession says the same thing: "having a general formula" fixes what the recited compound is, not what it may associate with or dissolve into.

The claim structure points the same way. The patent separately claims the compound in solution (claim 5) and in combination (claims 6 and 7)—the very forms in which these transient interactions arise. The closed "having" Defendants prefer would exclude those forms and wrongly render claims 5 through 7 nullities. *See Ortho-McNeil*, 520 F.3d at 1362-63.

### C. "X is low-molecular-weight organic or mineral acid or water" (cls. 1 and 3)

| | |
|---|---|
| **Amide:** Plain meaning | **Defendants:** The term "X is low-molecular-weight organic or mineral acid or water" requires that X must be one molecule of "low-molecular weight organic or mineral acid or water." "X" therefore cannot be equal to zero molecules of low-molecular-weight organic or mineral acid or water. |

Defendants would cap "X" at ***exactly one*** molecule of the recited acid or water. That is wrong—it is not what the claims say. They require X to be present, but not limited in number. How many molecules of *X a compound could carry ultimately depends on its structure and environment—not on a covalent-formula convention. So a POSITA would understand that one amino acid residue could carry a single *X at a particular moment, but a different amino acid residue with a second basic site (as in the patent's Example 7) could carry two *X's in the same moment. (*See* Dkt. #277-2 ¶ 33.) The convention that Defendants invoke—that "[w]hen no number is written, the coefficient is assumed to be 1" (*see* Dkt. #283 at 19)—addresses only formulas without multiple variables; i.e., it does not address a formula like the claimed formula here, in which the "*X" could attach to a range of possible "R" amino-acid residues, including lysine, which has its own side chain that could non-covalently bond to another "*X." It is simply not correct "that X must be one molecule . . . in all instances." (Dkt. #277-2 ¶ 33.)

The Florida court's *Markman* opinion does not teach otherwise—nor is it binding in any sense anyway (*see Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1555 (Fed. Cir. 1995); *Aircraft Tech. Publrs. v. Avantext, Inc.*, No. C 07-4154 SBA, 2009 LX 90923, at *10 (N.D. Cal. Nov. 10, 2009)). That court rejected an argument that X *was optional* (i.e., that it could be zero). *See ThermoLife Int'l LLC v. Vital Pharms., Inc.*, No. 16-cv-6063-UU, 2017 U.S. Dist. LEXIS 239929, at *26-27 (rejecting the argument that X is "mere surplusage"). As the court explained, the *X must be present to serve its purpose. *See id.* at *27. That point is not in dispute here—*X cannot be zero. Defendants ask more than that plain meaning, though. They seek to limit *X to exactly one molecule and no other despite the irrefutable scientific fact that certain claimed compounds would permit two *X's at the same time, as Dr. Sessler explains (*see* Dkt. #277-2 ¶ 33). Simply put, the claims require the presence of at least one *X but do not

somehow silently exclude otherwise-claimed compounds that carry more.

### D. "compound possessing neuroprotective activity" / "as a remedy possessing a neuroprotective activity" (cl. 3)

| **Amide:** Plain meaning | **Defendants:** Indefinite |
|---|---|

"Neuroprotective" is an ordinary word with a settled meaning: "serving to protect neurons from injury or degeneration." (Dkt. #277-3 (Merriam-Webster).) The '077 patent's specification also supplies at least one objective quantitative measure. Example 10, for instance, subjected rats to focal cerebral ischemia ("FCI") and measured the resulting brain damage as a ratio of damaged area to total coronal section. The claimed compounds reduced that ratio from 17.0% in the saline control to 8.4%, 10.3%, and 11.9% in the treated groups. (Dkt. #277-1 at 16:5-22 (Table 6).) Indeed, Defendants' own expert concedes that "Example 10 of the '077 Patent provides one example of 'neuroprotective activity[.]'" (Dkt. #283-2 ¶ 93.) That is the "objective boundary" the law requires. *Grace Instrument Indus., LLC v. Chandler Instruments Co., LLC*, 57 F.4th 1001, 1010 (Fed. Cir. 2023).

Moreover, where a property can be assessed by more than one accepted method, the choice of method is a question for infringement, not indefiniteness. (*See* Dkt. #277 at 20.) Defendants' expert's complaint that "a POSITA would not be aware of the appropriate way to measure" the activity (Dkt. #283-2 ¶ 86) is therefore not a complaint about legal definiteness of claim language, but an incorrect demand for "mathematical precision" (*see Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1341 (Fed. Cir. 2003)) to replace a fact finder's ordinary factual weighing of a sufficient way to appropriately find neuroprotectiveness.

Defendants also argue that Example 10's Morris Water Maze ("MWM") results cannot show neuroprotection because "the MWM rats did not undergo FCI." (Dkt. #283 at 24.) But

Defendants are wrong. Example 10's study compared four groups: (1) rats given the claimed compound after FCI; (2) rats given only saline after FCI; (3) rats given hypothermia (a known neuroprotectant) after FCI; and (4) rats that underwent the same handling but no FCI. (Dkt. #277-1 at 14:31-44 & Table 4.) The study measured how quickly each group relearned the platform's location in the maze—i.e., what the patent describes as "training."

From that, Defendants' argument rests on misreading a single sentence—"FCI per se blocked the training completely." They read it to mean FCI prevented every FCI-induced rat from doing the MWM test altogether. (*See* Dkt. #283 at 24.) But *per se* means "by itself": "FCI per se" is FCI by itself—untreated—which describes the saline-only, FCI-induced group, and it was that group whose "training" (i.e., successfully relearning the maze) was "blocked[.]" Table 4 shows why the distinction matters: the saline-only, FCI-induced group's platform-finding time stayed essentially flat across training (*see* Dkt. #277-1 at 15:14-15 ("Focal ischemia without therapy")), while the compound-treated, FCI-induced group's time fell day by day (*id.* at 14:57-15:13), as did the FCI-induced positive-control group's (*id.* at 15:19-20 ("Focal ischemia + hypothermia")). The patent states it directly: the compound-treated, FCI-induced group "spent statistically significant less time to find the platform than the . . . negative control rats[.]" Had FCI blocked every FCI-induced rat from doing the MWM test, those falling curves could not exist, and the test would have measured nothing.

Defendants' final theory—that it is unclear whether the "compound" or "X" must possess neuroprotective activity—is a manufactured ambiguity. "X" alone need not be neuroprotective: that alternative reading is manufactured by Defendants' reformatting of the claim (*see* Dkt. #283 at 22) using paragraph breaks and indents to suggest that claim 3's final "neuroprotective" modifier applies only to X, whereas, as formatted in the patent, claim 3 is continuous prose, so

"as a remedy possessing a neuroprotective activity" is a terminal adjectival prepositional clause describing "amides of Creatine" having the recited general formula.[1]

### E. "consisting of" (cl. 3)

| | |
|---|---|
| **Amide:** Plain meaning | **Defendants:** "containing only what is expressly set forth in the claim" |

"Consisting of" forecloses adding unrecited components to the claimed compound's formula, but it cannot rewrite what the formula itself means to a POSITA. Yet that is what Defendants ask "consisting of" to do: they use it—like most of their other proposed constructions—to exclude the transient non-covalent interactions in solution, improperly narrowing the claim to a solid, crystalline form. But there is no such clear disclaimer anywhere in the record. And how a POSITA would apply the recited formula is a fact question—not one a transitional phrase like "consisting of" can settle. Federal Circuit precedent draws precisely this line. A closed transition phrase (like "consisting of") "does not limit aspects unrelated to the invention." *Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1331-32 (Fed. Cir. 2004). What claim 3's "consisting of" closes is the compound to its recited components—it is not exclusively definitional for each individual recited component itself, so as to exclude from the scope of *X weak transient non-covalent interactions in solution.

Finally, Defendants insist that claim 3's compound "exists in crystalline form in *every* example in the '077 specification[.]" (Dkt. #283 at 27.) Defendants are wrong (as easily shown by at least Example 9, *see* Dkt. #277-1 at 11:24-12:39), but even if they were correct, it would

[1] In other words, claim 3 simply reads: "A compound possessing neuroprotective activity, said compound consisting of: amides of Creatine having a general formula . . . as a remedy possessing a neuroprotective activity." Also, Defendants' footnote asserting that claim 3 "lacks written description" (Dkt. #283 at 23 n.12) is wrong, but has no place here regardless—written description is a separate § 112 question of fact, not claim construction. *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1352 (Fed. Cir. 2010) (*en banc*).

not silently limit the claim. Embodiments do not limit claim scope absent a clear and unmistakable disavowal, *see Thorner*, 669 F.3d at 1366, and Defendants identify none.

**F. “anhydrous” (cl. 4)**

| | |
|---|---|
| **Amide:** Plain meaning | **Defendants:** “without water” |

“Anhydrous” denotes the absence of water of crystallization. Defendants read it to require that a compound’s “molecular formula does not include water” at all. (Dkt. #283 at 29.) But a POSITA gives “anhydrous” its plain meaning in proper technical context, which is broader than Defendants’ simple “without water” suggestion: even where X is water, that water is ionized and non-covalently bound, so the compound may contain no detectable free water—water not tightly bound to the molecule—and so remain anhydrous. (Dkt. #277-2 ¶¶ 46-47.) As a result, Defendants’ construction would wrongly exclude such a compound from claim 4. The dictionaries Defendants attach are consistent with that meaning—they define “anhydrous” in terms of “water of crystallization” without further specifying that “anhydrous” also means without ionized water. (*See* Dkt. #283-10, #283-11, #283-12.) Dr. Rudolph quotes these definitions, then treats them as supporting the imprecise definition “without water”—but neither Dr. Rudolph nor Defendants contradict Dr. Sessler’s more precise account of how a POSITA would understand the term in full context.[2] (Dkt. #283-2 ¶ 101.)

## II. CONCLUSION

The Court should reject Defendants’ proposed constructions and give each disputed term its plain and ordinary meaning.

---

[2] Defendants’ footnote asserting that “the term lacks written description” (Dkt. #283 at 28 n.14) has no place here; written description is a separate § 112 question of fact. *Ariad*, 598 F.3d at 1352. Claim 4’s limitation issued from reexamination, and issued claims are presumed valid. 35 U.S.C. § 282 (Pre-AIA).

DATED: September 24, 2026

DEVLIN LAW FIRM LLC

/s/ Joseph J. Gribbin
Timothy Devlin
tdevlin@devlinlawfirm.com
James M. Lennon
jlennon@devlinlawfirm.com
Joseph J. Gribbin (*pro hac vice*)
jgribbin@devlinlawfirm.com
Gina Hong (*pro hac vice*)
ghong@devlinlawfirm.com
1526 Gilpin Avenue
Wilmington, DE 19806
Tel: (302) 449-9010
Fax: (302) 353-4251

Andrew J. Wright
State Bar No. 24063927
Shawn A. Latchford
State Bar No. 24066603
LARSON BRUSTER PLLC
Heritage II
5001 North LBJ Freeway, Suite 850
Dallas, Texas 75244
877.744.4084 (telephone)
andrew.wright@larsonbruster.com
shawn.latchford@larsonbruster.com

*Attorneys for Plaintiff*
*Amide Beverage Company, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 24, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

/s/ Joseph J. Gribbin
Joseph J. Gribbin